# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ATSCO HOLDINGS CORP., *et al*. | ) | CASE NO. 1:15-CV-1586 |
| | ) | |
| *Plaintiffs*, | ) | JUDGE: CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| AIR TOOL SERVICE COMPANY, *et al*. | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## DEFENDANTS' JOINT MOTION FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FOR A JUDGMENT FINDING AGAINST PLAINTIFFS ON THEIR AMENDED COMPLAINT

---

By and through undersigned counsel, Defendants Air Tool Service Company, n/k/a X5432, Inc. ("Air Tool") and Rick J. Sabath ("Sabath") (collectively the "Defendants") respectfully move this Court to issue Findings of Fact and Conclusions of Law and for a Judgment finding against Plaintiffs on all remaining counts in their Amended Complaint, as they have failed to meet their burden of proof as Plaintiffs.

Defendants hereby move this Court for the following Findings of Fact and Conclusions of Law set out in the attached Memorandum in Support and ask that this Court grant Judgment in the Defendants' favor on all remaining counts in Plaintiffs' Complaint. Because Plaintiffs have been fully heard on all of their claims, this Court "may enter judgment against" Plaintiffs "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue" pursuant to Fed. R. Civ. P. 52(c). As will be explained further in the Memorandum in Support filed contemporaneously herewith, Plaintiffs have failed to meet their

burden of proof as to all remaining claims, and accordingly Defendants are entitled to Judgment on all remaining claims.

Respectfully Submitted,

*/s/ Tim L. Collins*
Tim L. Collins (0033116)
Elizabeth E. Collins (0091032)
Thrasher, Dinsmore & Dolan
1111 Superior Ave., Ste 412
Cleveland, Ohio 44114
Telephone: 216.255.5431
Facsimile: 216.255.5450
Email: tcollins@tddlaw.com
Email: ecollins@tddlaw.com

*Attorneys for Defendants Air Tool Service Company, n/k/a X5432, Inc. and Rick J. Sabath*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ATSCO HOLDINGS CORP., *et al.* | ) | CASE NO. 1:15-CV-1586 |
| | ) | |
| *Plaintiffs*, | ) | JUDGE: CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| AIR TOOL SERVICE COMPANY, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FOR A JUDGMENT FINDING AGAINST PLAINTIFFS ON THEIR AMENDED COMPLAINT**

---

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iv

I.  STATEMENT OF THE ISSUES TO BE DECIDED ...............................................1

II.  INTRODUCTION AND SUMMARY OF THE ARGUMENT PRESENTED  .....................1

III.  PROCEDURAL BACKGROUND.......................................................................2

IV.  FACTUAL BACKGROUND..............................................................................3

      A.  Background Facts...........................................................................3

             1.  Joe Molino. .........................................................................3

             2.  Jim Aloi...............................................................................4

             3.  Patrick Curry ......................................................................4

      B.  Plaintiffs' Claims............................................................................7

      C.  Plaintiffs' Contractual Claims .........................................................8

             1.  Working Capital Adjustment ...............................................8

                    a.  Inventory ..................................................................8

             2.  MacTurn Inefficiency and Work Performed Elsewhere; MacTurn Maintenance and MacTurn Replacement  ...................................................11

             3.  Waiver ...............................................................................17

V.  CONTROLLING LAW ...................................................................................18

      A.  Breach of Contract .......................................................................18

      B.  Unjust Enrichment........................................................................20

      C.  Judgment on Partial Findings ........................................................21

VI.  PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ...............................22

      Findings of Fact .................................................................................22

      Conclusions of Law ...........................................................................27

      A.  Plaintiffs Did Not Prove their Breach of Contract Claims.................27

      B.  Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law....................29

VII.  CONCLUSION ...........................................................................................................................30

CERTIFICATE OF SERVICE .........................................................................................................31

CERTIFICATE OF COMPLIANCE ................................................................................................31

## **TABLE OF AUTHORITIES**

### **CASES**

*Baghani v. Charter One Bank F.S.B*., No. 91373, 2009 WL 280399
    (Ohio Ct. App. Feb. 5, 2009) ......................................................................18

*Casserlie v. Shell Oil Co.*, 2009-Ohio-3, 121 Ohio St.3d 55, 902 N.E.2d 1 ...........21, 29

*Eggert v. Meritain Health, Inc*., 428 F.App'x 558 (6th Cir. 2011)................................27

*Emerman v. Financial Commodity Investments, L.L.C*., No. 1:13CV2546, 2016 WL 231309
    (N.D. Ohio 2016) ...........................................................................19, 28

*Gerboc v. ContextLogic, Inc*., No. 1:16 CV 928, 2016 WL 6563684 (N.D. Ohio 2016) .............27

*Guild Assoc., Inc. v. Bio-Energy (Washington), LLC*, 309 F.R.D. 436 (S.D.Ohio 2015) .............19

*Hacker v. Mail*, No. CA95-10-170, 1996 WL 346628 (Ohio Ct. App. 12th Dist. 1996).............19

*Kinetico, Inc. v. Indep. Ohio Nail Co*., 19 Ohio App.3d 26, 482 N.E.2d 1345
    (Ohio Ct. App. 8th Dist. 1984) ....................................................................19

*Langfan v. Carlton Gardens Co*., 2009-Ohio-3318, 183 Ohio App.3d 260, 916 N.E.2d 1079.....27

*Nachar v. PNC Bank, Nat. Ass'n*, 901 F.Supp.2d 1012 (N.D.Ohio 2012) ......................18, 27, 28

*Premier Colorscan Instruments Pvt. Ltd. v. Q–Lab Corp*., No. 1:15CV1900, 2016 WL 6124430
    (N.D. Ohio Oct. 19, 2016) ...............................................................20, 21, 29, 30

*Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383 (6th Cir. 1975) .............................29

*Reisenfeld & Co. v. Network Grp., Inc*., 277 F.3d 856 (6th Cir. 2002) ...................................20, 29

*White v. Wells Fargo Bank, NA*, 904 F. Supp. 2d 756 (N.D. Ohio 2012) ..............................21, 29

*Wood Elec., Inc. v. Ohio Facilities Constr. Comm'n*, 2017-Ohio-2743, 90 N.E.3d 371
    (Ohio Ct. App. 10th Dist. 2017) ...................................................................19, 28

*Younglove Const., LLC v. PSD Dev., LLC*, 782 F.Supp.2d 457 (N.D. Ohio 2011)................19, 28

*Zell v. Klingelhafer*, 751 F.App'x 641 (6th Cir. 2018) ...............................................................21

## **<u>RULES</u>**

Fed. R. Civ. P. 9 ...................................................................................................................17

Fed. R. Civ. P. 26 ..............................................................................................................6, 25

Fed. R. Civ. P. 52 ..........................................................................................................1, 21, 22

Fed. R. Evid. 702 ................................................................................................................18

## I.      STATEMENT OF THE ISSUES TO BE DECIDED

Have Plaintiffs met their burden of proof as to any of their remaining claims such that the claims survive a Motion for Judgment?  To survive Judgment, Plaintiffs must demonstrate that: (1) Defendants breached the Asset Purchase Agreement and that Plaintiffs performed all of their obligations under the Agreement; (2) Plaintiffs' decision to consent to a judgment in favor of Defendants *does not* preclude Plaintiffs from obtaining a judgment on that same contract on the same subject; and (3) Plaintiffs did not waive their claims against Defendants under the Agreement itself.

## II.      INTRODUCTION AND SUMMARY OF THE ARGUMENT PRESENTED

After five years of litigation, Plaintiffs are unable to prove that they are entitled to relief for any of their remaining claims.  Accordingly, Defendants ask this Court to issue a Judgment on all of Plaintiffs' remaining counts in favor of Defendants pursuant to Fed. R. Civ. P. 52(c). Plaintiffs attempt to fashion this case into one stemming from Defendants' alleged breach of representations and warranties related to inventory and a specific piece of manufacturing equipment as those affect working capital. The facts do not support this mischaracterization. In reality, Plaintiffs ask this Court to stand the parties' contract language on its head and superimpose Plaintiffs' business policies and expectations on Defendants, contravening the contract's language, all without relevant evidence to support their claims.

Plaintiffs were unable to meet their burden of proof on *any* of their remaining claims due to three fatal flaws: (1) the Asset Purchase Agreement unambiguously defined the parties' duties, which Defendants fulfilled, and Plaintiffs did not offer evidence required to bear their burden of proof of demonstrating otherwise; (2) Plaintiffs consented to a judgment in favor of Defendants in front of this Court on the Asset Purchase Agreement, which precludes Plaintiffs from obtaining a

judgment on that same contract on the same subject; and (3) Plaintiffs waived any claim against Defendants in the contract itself.  Plaintiffs have not proven their claims after five years of litigation.  Accordingly, final judgment should be entered in favor of Defendants.

## III.    PROCEDURAL BACKGROUND

The unusual procedure being utilized at this stage in this case was suggested by Plaintiffs and agreed to by Defendants. Plaintiffs chose to present their case using transcripts and exhibits, after which this Motion would be filed and determined. This procedure was first suggested by Plaintiffs at the pretrial conference on September 15, 2020 in preparation for the bench trial scheduled to commence on September 20, 2020. At that time, the parties agreed to establish a schedule for trial depositions of Plaintiffs' witnesses, to be recorded, and for Plaintiffs to file with this Honorable Court, followed by this Motion by Defendants, on the trial transcripts and associated exhibits. This Court adopted the procedural structure proposed by Plaintiffs in its Order of October 14, 2020.

After taking two extensions of time, Plaintiffs deposed their trial witnesses Patrick Curry, Jim Aloi and Joe Molino on November 4, 5 and 6, 2020. Video of those depositions, together with the transcripts, have been submitted to this Court. To the degree that this Motion is not well taken at this time, the parties have agreed that Defendants will present their evidence, with final arguments and/or briefing thereafter. Defendants respectfully reserve the right to supplement or modify their arguments herein based upon the facts adduced in Defendants' case, should the case proceed.

## IV.    FACTUAL BACKGROUND

### A. Background Facts

This is an action for breach of contract and unjust enrichment arising from the Defendants' 2014 sale of Air Tool to Plaintiffs, pursuant to the terms of an Asset Purchase Agreement (the "Agreement").[1] Defendants, in turn, asserted a Counterclaim for Plaintiffs' own breach of the Agreement, which resulted in a consent judgment on Defendants' claims on July 27, 2018, at the first bench trial.

Air Tool formerly operated a business in Mentor, Ohio, involved in the design, engineering, and manufacturing of pneumatic motors and tools. Defendant Sabath is the sole shareholder of Air Tool. In an effort to remove Air Tool as a competitor of Plaintiff Hy-Tech (a wholly-owned subsidiary of publicly traded P&F Industries, Inc. (NASDAQ: PFIN)), Plaintiffs negotiated the purchase of Air Tool from Defendants, which culminated in the Agreement. (Molino depo., pp. 53-54). Pursuant to the terms of the Agreement, Plaintiffs purchased Air Tool for a purchase price of $7,658,540.00, and the assumption of certain Assumed Payables pursuant to Section 2.3 of the Agreement. Pursuant to Section 2.3.4 of the Agreement, Defendants were paid $7,241,040.00 at closing by wire transfer, with a balance of $387,500.00 (the "Closing Escrow Payment") to be paid by Plaintiffs pursuant to the terms of a separate Escrow Agreement.

It should be noted the Plaintiffs propounded only three witnesses in support of their case:

1. **Joe Molino** – COO and CFO of P&F Industries, of Long Island, NY, a publicly traded holding company for the entity that purchased the assets of what was Air Tool. (Molino depo, pp.7-8). Mr. Molino is "the lead" as to all acquisitions his company makes, including the acquisition of Air Tool. (*Id.*, p. 9). Indeed, Mr. Molino is so experienced in acquisitions, he has

---

[1] Plaintiffs' Amended Complaint included a request for punitive damages; however, that request has already been dismissed by the Court. (ECF # 26).

developed his own road map for due diligence, which is compiled for the subject transaction in Plaintiffs' Ex. 17-19. (*Id.*, pp. 44-51). However, Mr. Molino is not an expert in machines, or an engineer, so he admits he can offer no testimony as to the nature and extent of problems with the Okuma MacTurn, the lion's share of the claims pending before this Court. (*Id.*, p. 99). As to the Working Capital Adjustment claim, Mr. Molino's testimony was nothing short of damning of the Plaintiffs' claims, as is shown below.

2.  **<u>Jim Aloi</u>** – Former division VP of finance at Hy-Tech, in Cranberry, PA, who took care of financial reporting at the company, <u>not</u> operations. (Aloi depo., pp. 8-10, 52). Accordingly, all information Mr. Aloi had about the operations at Hy-Tech, including the functioning of the Okuma MacTurn, was not based on either subject matter expertise or personal knowledge: it was all hearsay in every permutation of that term. (*Id.*, pp. 52-55). Accordingly, Mr. Aloi has no material evidence to offer this Court relative to the nature and extent of issues with the Okuma MacTurn. He did not attempt to offer any testimony regarding the Net Working Capital Adjustment Claim.

3.  **<u>Patrick Curry</u>** – Mr. Curry is the only engineer by training, and actual operations team member with Hy-Tech, who Plaintiffs had testify. (Curry depo., pp. 6-9). Mr. Curry acknowledged that the main piece of equipment at issue is a multifunction CNC machine, combining both a lathe and a grinder in one unit, operated by a computer program. (*Id.*, pp.17, 35, 64-65). However, Mr. Curry admitted he was not the right person to diagnose issues with the machine, or repair it, and that no one at Hy-Tech was equipped to do same. (*Id.*, pp. 98, 64-65). Mr. Curry pointed out that Hy-Tech used L&L, an outside contractor, to ascertain and repair problems with the Okuma MacTurn. (*Id.*, pp. 65-66, 97-98). Hence, Mr. Curry's testimony could not and did not provide a factual or legal basis to conclude that the Okuma MacTurn had a problem which Defendants are responsible for; indeed, Mr. Curry squarely disavowed the ability to even ascertain the source of

the MacTurn problem, let alone assign responsibility for same. Accordingly, his testimony is of no assistance to proving Plaintiffs' claims herein.

Prior to the August 14, 2014 closing, Plaintiffs admittedly were given free and unencumbered access to inspect all of Air Tool's machinery, assets, and inventory for a sufficient period of time to permit Plaintiffs to decide to proceed to closing. (Molino depo., pp. 60-62). In addition, Plaintiffs were provided full access to Air Tool's books, records, and properties. (*Id.*) Plaintiffs engaged numerous lawyers, accountants, and inside businesspersons to inspect, test, and perform due diligence regarding Air Tool, from April through August 2014. (*Id.*, pp. 57-60). This group of professionals totaled 12-13 persons, marshalled by Plaintiffs for their due diligence. (*Id.*, pp. 58-60). Following this period of full access, the sale of Air Tool was consummated, pursuant to the terms of the Agreement. (*Id.*, p. 43). Despite Defendants' fulfillment of all material terms placed upon them by the Agreement, Plaintiffs have refused to release the Closing Escrow Payment. Instead, Plaintiffs initiated the instant lawsuit, which Defendants believe is an attempt to cram down a deal even more favorable to Plaintiffs, after already having achieved their goal to eliminate an industry competitor, and gain access to Air Tool's customers which HyTech had long wished for, but never been able to achieve. (Molino depo., pp. 53-55; Aloi depo., pp. 13-14).

The Complaint asserts that Plaintiffs are entitled to a Working Capital Adjustment as a result of alleged deficiencies with inventory transferred under the Agreement. Specifically, Plaintiffs allege the following items were "non-saleable and without value" post-sale: (1) grinders and grinder parts inventory relating to a customer, ATA; (2) two tools manufactured specifically for a customer, Michigan Pneumatic; (3) parts manufactured prior the closing for a customer, TorcUp; and (4) various other parts and assemblies. (*See* Amended Complaint ("Complaint") (ECF # 4), at ¶¶ 13-17). The Complaint also alleges that the Defendants breached the Agreement, and thereby caused the Plaintiffs to sustain damages, as the alleged result of the condition of a device

known as an Okuma MacTurn LT200 transferred to Plaintiffs under the Agreement, including "operational losses" and damages associated with "lost productivity." (*Id.* at ¶¶ 18-24).

While this case was previously scheduled for a Bench Trial in June 2017, Defendants filed several motions in limine. (ECF # 47, 48, and 52). The first motion (ECF # 47) addressed Plaintiffs' failure to disclose experts as required under Civ. R. 26 and requested that the Court prohibit Plaintiffs from introducing (a) expert witnesses at trial, and (b) expert testimony through lay witnesses at trial. On December 20, 2017, the Court issued an Order granting Defendants' motion as to the introduction of any expert witnesses. (*See* ECF # 63, at p.1). As for the introduction of expert testimony through lay witnesses, the Court indicated that it would address that portion of the motion at trial, "based on the qualifications of the witnesses and the substance of the testimony presented." (*Id.*, at p. 4). A ruling on that aspect of the Motion in Limine is now ripe, given the testimony elicited from the witnesses and propounded in Plaintiffs' case.

Plaintiffs' second motion in limine (ECF # 48) sought to exclude the presentation of evidence concerning claims abandoned by Plaintiffs in discovery (*i.e.*, claims referenced in Paragraphs 25-27 of the Complaint that related to intellectual property, drawings, and credits allegedly owed to Michigan Pneumatic). As part of its December 20th Order, the Court granted this motion on the basis of abandonment. (ECF # 63, at 4). Incredibly, Plaintiffs are attempting to re-assert those claims ostensibly for other purposes. An abandoned claim is an abandoned claim, and that evidence should not be tolerated at this stage of the proceedings.

Defendants' Counterclaim asserted that, despite Defendants having fulfilled all material terms under the Asset Purchase Agreement, Plaintiffs refuse to release the Closing Escrow Payment to Plaintiffs, in violation of the Agreement and Escrow Agreement. (*See* Counterclaim (ECF # 11), at ¶¶ 1-18). That Counterclaim has been fully adjudicated by virtue of the stipulated judgment entered at the first bench trial on July 27, 2018. In other words, a fully stipulated

judgment in favor of Defendants against Plaintiffs was entered, on the basis that Defendants have fulfilled their contractual duties to Plaintiffs, and are now owed the balance of the contract purchase price.

### B. Plaintiffs' Claims

Plaintiffs' claims for breach of contract and unjust enrichment are premised upon alleged breaches of representations or warranties contained in the Agreement. (*See generally*, Complaint). Plaintiffs characterized these claims in their original Trial Brief (ECF # 54) as follows:

| Claim | Plaintiffs' Characterization of Claim | Litigation Status |
|---|---|---|
| Claim 1 | Poor Quality Parts | Voluntarily dismissed with prejudice |
| Claim 2 | Unsellable Inventory at Michigan Pneumatic | Voluntarily dismissed with prejudice |
| Claim 3 | Unsellable Inventory at TorcUp | Voluntarily dismissed with prejudice |
| Claim 4 | Poor Quality Parts Scrapped | Voluntarily dismissed with prejudice |
| Claim 5 | A/R Mispayment | Voluntarily dismissed with prejudice |
| Claim 6 | Working Capital Adjustment | Remanded on appeal |
| Claim 7 | MacTurn Inefficiency, and Work[2] Performed Elsewhere | Remanded on appeal |
| Claim 8 | MacTurn Maintenance | Remanded on appeal |
| Claim 9 | MacTurn Replacement | Remanded on appeal |
| Claim 10 | Inaccurate Drawing and Plans[3] | Abandoned in discovery |

Accordingly, only four claims remain for determination in this trial, referenced above as claims 6-9.

---

[2] Because the MacTurn claims all hinge on the same issue under the Agreement, they are argued together at this stage of these proceedings in this Brief.
[3] This claim is alleged in Paragraph 25 of the Complaint and was abandoned by Plaintiffs in discovery, as set forth in Defendants' separately-filed (and unopposed) Motion in Limine, or, in the alternative, Motion for Partial Summary Judgment (ECF # 48), which was granted by the Court on December 20, 2017. (*See* ECF # 63).

### C. Plaintiffs' Contractual Claims

#### 1. *Working Capital Adjustment*

The Working Capital Adjustment claim derives from §2.3 of the Agreement. The steps contractually necessary, and timing called for, to calculate the Working Capital Adjustment, are as follows:

| Contract § | Time Due | Action |
|---|---|---|
| 2.3.2.1 | 20 days post closing | Inventory Count by Seller |
| 2.3.2.1 | 20 days post closing | Roll-Back Inventory by Buyer |
| 2.3.2.1 | 20 days post closing | Inventory Acknowledgement by Buyer |
| 2.3.2.2 | 50 days post closing | Closing Statement by Buyer, setting forth Closing Net Working Capital Adjustment. |

Each of the above steps is time limited, and is purposefully built, one upon the other. Hence, without a Roll-Back Inventory, no Closing Statement could be calculated by Plaintiffs, so as to establish a Closing Net Working Capital Adjustment. The content of the Roll-Back Inventory is carefully defined in the Agreement. Similarly, each of the Inventory related calculations defined in the Agreement are co-dependent on previous steps, such that non-compliance with the defined terms vitiates the ability for an effective calculation of each of the building blocks to arrive at a Closing Net Working Capital calculation. Unfortunately, Plaintiffs have completely failed to prove their entitlement to a Closing Net Working Capital Adjustment by a failure of proof on every level.

#### (a.) Inventory

To begin with, Plaintiffs have not demonstrated that "Inventory", as contractually defined, was inaccurately represented by Defendants and thus subject to a Roll-Back. Inventory is defined in the Agreement at Art. I, Sec. 1.2, as follows:

> "Inventory" shall mean (i) all of the finished goods, raw materials, work in progress and inventoriable supplies owned by Seller (including all such items as set forth on the Balance Sheet, with additions thereto (net of dispositions in the ordinary course of business)) and (ii) all rights of Seller to the warranties received from its suppliers with respect to such inventory and related Claims, credits, and rights of recovery and set-off with respect thereto.

8

The Representation and Warranty section of the Agreement, setting out the contractual standard Seller must meet for Inventory, is found at Art. 3 Sec. 3.13, and reads as follows:

Attached hereto as Schedule 3.13 is a true and complete list of the Inventory as of June 30, 2014, including the location thereof. All items included in the Inventory consist of a quality and quantity usable and, with respect to finished goods, saleable, in the ordinary course of business of Seller, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Balance Sheet and/or will be written off or written down to net realizable value in the Closing Statement. All of the Inventory has been valued at the lower of cost or market value on a first in, first out basis. Inventory now on hand that was purchased after the Balance Sheet Date was purchased in the ordinary course of business of Seller at a cost not exceeding market prices prevailing at the time of purchase. The quantities of each item of Inventory (whether raw materials, work-in-progress or finished goods) are not excessive but are reasonable in the present circumstances of the Business. (emphasis added).

Finally, in the Purchase Price section of the Agreement, Art. 2 §2.3.2.1, Inventory, Inventory Count, the Roll-Back Inventory, and the Inventory Acknowledgement, as well as the timing for creating and exchanging these reports, are contractually defined as follows:

2.3.2.1 Inventory. Not later than twenty (20) days after the Closing Date, a physical count of the Inventory (the "Inventory Count") will be taken by Michael Sivula, Nicholas Russell and Michael Turick, or if for any reason any of such persons does not take such Inventory Count, such other persons as may be reasonably acceptable to Purchaser and Seller (such acceptance, if any, to be evidenced by written agreement between Purchaser and Seller), in accordance with past practices of Seller and other reasonable procedures of Purchaser, as of the date of such Inventory Count. Purchaser shall give Seller reasonable advance notice of the Inventory Count and allow Shareholder to be physically present during such count. Not later than twenty (20) days after the Closing Date, a roll-back (the "Roll-Back") of the Inventory Count (the "Roll-Back Inventory") to the Effective Time will be performed by employees of the Purchaser. The Roll-Back will be performed in a manner consistent with the method utilized in preparing the Audited Financial Statements. A statement setting forth the Roll-Back Inventory based upon such Roll-Back (the "Inventory Acknowledgement"), will be delivered by Purchaser to Seller not later than twenty (20) days after the Closing Date. The Roll-Back Inventory, as set forth in the Inventory Acknowledgement is hereby deemed final, conclusive and binding, absent manifest error. (emphasis supplied)

Rather than comply with the express terms of the Agreement, Plaintiffs in this case are either ignorant of the above terms, or seek to impose new and different, non-contractual terms of their own making. Plaintiffs provided no evidence of Seller's past practices or its ordinary business

9

practices as contractually required. Because of these failures, Plaintiffs have not proved the contract case they have pled.

In order for Plaintiffs to prevail in this matter on the Net Working Capital Adjustment claim, they were required to supply a Roll-Back Inventory Count twenty days after the closing of the underlying transaction, which was September 3, 2014. They did not. (*See* Plaintiffs' Ex. 22). Indeed, a letter dated October 16, 2014 was sent, which was six weeks late. Likewise, within the same twenty-day window post closing, Plaintiffs were required to provide Defendants an Inventory Acknowledgement. They did not. (*See* Plaintiffs' Ex. 16; Molino depo. pp. 72-73). By failing to timely perform <u>any</u> of the contractual steps to calculating the Working Capital Adjustment, Plaintiffs have breached the very contract they seek to enforce.

Further, the underlying Roll-Back Inventory was required to be performed "in a manner consistent with the method utilized in preparing the Audited Financial Statements." (*See* Plaintiffs' Ex. 16, Agreement § 2.3.2.1). The "Audited Financial Statements" are <u>not Plaintiff-Buyer's</u>, but rather <u>Defendant-Seller's statements</u>. (*See* Plaintiffs' Ex. 16 §3.6(a)(1)). Plaintiffs did not conduct Roll-Back Inventory with any knowledge of Defendants' methods, let alone in a manner consistent with same. (Molino depo., pp. 68-70, 73, 76, 78, 80, 85-86). Again, by seeking to conduct the Roll-Back Inventory without knowing, let alone using, a manner and method used by Seller, Plaintiffs failed to comply with the mandate of the Agreement they now seek to enforce. Hence, Plaintiffs' October 16, 2014 Letter styled "Roll-Back Inventory" cannot serve as a basis for determining Defendants' compliance with Agreement terms.

Finally, in arriving at a Closing Net Working Capital Amount, Plaintiffs are contractually required to make the calculation consistent "with the Seller's past practices, including giving effect to reasonable allowances for bad debt, Inventory shrinkage and obsolescence, and reasonable reserves for customer returns, allowances and Rebates." (Plaintiffs' Ex. 16, §2.3.2.2). Plaintiffs'

witnesses testified that they do not know what Defendant-Seller's past practices were, nor do they attempt to prove that they acted consistent with them. (Molino depo., pp. 73, 76, 78, 80, 85-86, 104; Aloi depo., pp. 62-63). Worse, as to inventory obsolescence, Plaintiffs have constantly and unabashedly sought to superimpose their own policy post closing, without knowing or conforming to Defendants' policy, as is required by the Agreement. (*See* Plaintiffs' Ex. 18, HY0603, 0605 ("There is no Inventory obsolescence policy. Ours will be established at closing.") ("At closing, we will establish an inventory reserve based on the standard Hy-Tech approach.")). Indeed, Plaintiffs made a $126,152.60 Inventory Adjustment despite not knowing or applying Defendants' Inventory policy. (*See* Plaintiffs' Ex. 22.; Molino depo., pp. 68-69, 76, 80, 85-86, 104; Aloi depo., pp. 62-64).

Plaintiffs apparently think they may unilaterally superimpose their own policies and practices on Defendants and use this case to collect on the resulting calculation, expressly contravening the Agreement. This is an effort to completely mutate the language of the Agreement, which should not be tolerated. Such a brazen effort to change the contractual rights and remedies in the Agreement, purportedly leading to a $100,000.00 Working Capital Adjustment in favor of Buyer, is not supported by the Agreement, trial exhibits, or testimony Plaintiffs propounded. Therefore, Plaintiffs' claim for a Net Working Capital Adjustment is ripe for rejection at this time.

## 2. *MacTurn Inefficiency and Work Performed Elsewhere; MacTurn Maintenance and MacTurn Replacement*

Plaintiffs also assert three varieties of damage claims, all focused on the Okuma MacTurn LT200, each of which fail as a matter of law and a matter of proof. (*See* Plaintiffs' Ex. 21, HY1791). Because they turn on the same fundamental language of the Agreement, those claims are aggregated for purposes of this Motion, and at this stage in these judicial proceedings.

The device in question is a CNC machine, a complicated multifunction device, which simultaneously acts as both a lathe and a mill, all controlled by a computer program. (Curry depo., pp. 64-65). The device is so complicated that, while Plaintiffs are acquainted with other Okuma equipment, Plaintiffs do not have anyone on staff who could diagnose issues with the MacTurn, or service it. (*Id*., pp.64, 66, 98). Rather, Plaintiffs relied on at least one outside professional repair service to undertake diagnosis of any issues with the MacTurn and then repair it. (*Id*., p. 65). Indeed, the only operations witness Plaintiffs proffered herein, Patrick Curry, admitted he is not capable of ascertaining what might, or might not, be wrong with the MacTurn. (*Id*., pp. 65, 97-98). In fact, Mr. Curry could not say whether even the transportation of the machine from Mentor, Ohio to Cranberry, PA. over the road could have caused any damage to the MacTurn. (*Id*., p. 97).

Without question, the obvious and acknowledged complexity of the MacTurn required Plaintiffs to produce expert testimony to support the propositions that (1) the device was out of compliance with the standards set forth in the Agreement, (2) that the non-compliance was a result of Defendants' violations of representations and warranties in the Agreement, (3) that all causes, including ordinary wear and tear, for the machine's alleged condition have been eliminated other than Defendants' actions and (4) that damages proximately caused by Defendants' alleged breach derived solely from Defendants' actions. The Plaintiffs' failure to provide expert testimony in this case is therefore a failure by Plaintiffs to carry their burden of proof, necessitating a defense verdict as to each of Plaintiffs' three Okuma MacTurn focused claims.

This Court must also note the contractual language which contains the representations and warranties Defendants made as to all of the Assets sold to Plaintiffs, including the Okuma MacTurn, which is found in the Agreement at Art. 3 §3.17, as follows:

**3.17 Ownership and Condition of Assets.**

(a) Seller owns outright, and has good and marketable title to, all of the Assets (including all assets reflected in the Balance Sheet), free and clear of all Liens. The Assets constitute <u>all assets necessary to permit Seller to conduct the Business as now conducted.</u> (emphasis added) None of the Assets are subject to any restriction with regard to transferability. There are no Contracts with any Person to acquire any of the Assets or any rights or interest therein. Other than the Leased Real Property, neither Shareholder, nor any Affiliate of Seller or Shareholder owns any Assets, properties or rights relating to the Business.

* * *

(c) The Fixed Assets (i) are in good operating condition and repair, <u>subject to normal wear and tear,</u> (ii) have been <u>reasonably maintained consistent with standards generally followed in the industry</u> (iii) are <u>suitable for their present uses,</u> and (iv) are sufficient in nature, quality and quantity to permit Purchaser to <u>conduct the Business from and after the Closing as currently conducted.</u> Seller has not received any notice that any of the Fixed Assets is in violation of any existing law, including any building, zoning, health, safety or other ordinance, code or regulation. (emphasis added).

It should be emphasized that the quantity of Assets which Defendants warranted was an amount "necessary to permit Seller to conduct the Business as now conducted." Plaintiffs' witnesses testified they *did not know* how Defendants conducted their business, and Plaintiffs did not deign to introduce any testimony that proved Defendants violated this representation and warranty. (Curry depo., pp.60-61, 81-82, 85). Without that evidence, they cannot prevail.

With regard to Fixed Assets, defined in the Agreement Art. 1, §1.2 to include "all machinery, equipment…", (*See* Plaintiffs' Ex. 16), Art.3 §3.17(c) prescribes four conditions which must be present in the Fixed Assets:

(i)   They are in good operating condition and repair, subject to normal wear and tear;
(ii)  Have been reasonably maintained consistent with standards generally followed in the industry;
(iii) Are suitable for their present uses; and
(iv)  Are sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after the Closing as currently conducted.

Plaintiffs' testimony and exhibits introduced do not supply any proof as to whether, on August 14, 2014 (the effective date of the AirTool sale to ATSCO), the equipment in question

13

complied with, or violated this provision. Rather, the testimony of both Mr. Molino and Mr. Curry is that the Okuma MacTurn, as delivered to the Cranberry, Pennsylvania offices of Plaintiffs on January 30, 2015, more than five months post closing, worked, but <u>thereafter</u> encountered irregular operational issues. (Molino depo., pp. 70-71; Curry depo., pp. 21-22). Taking this testimony for argument purposes only, Plaintiffs fail to prove Defendants are responsible for whatever condition the Okuma MacTurn was in <u>five months after Plaintiffs took control</u>.

Although he is an engineer, and has ample experience with manufacturing equipment by serving as an operating officer of manufacturing facilities, Mr. Curry was completely unequipped to diagnose whether the claimed problems with the Okuma MacTurn were Defendants' responsibility. (Curry depo., pp. 65-66, 97-98). Indeed, he flatly said someone else would have to make that assessment, not him. (*Id*., pp. 97-98). Plaintiffs propounded no other witness as to this most basic proposition. It must be emphasized that Plaintiffs had exclusive custody and control over the device from August 14, 2014 until it was picked up, placed on an over the road truck, and moved to Cranberry, PA. five months later on January 30, 2015. What could have happened while the MacTurn was in Plaintiffs' hands during the period of August 14, 2014 through January 30, 2015?  What could have happened to it bouncing over 120 road miles in the dead of winter?  No factual evidence was adduced relieving Plaintiffs themselves of, e.g., use and abuse.

Likewise, no expert was proffered to demonstrate that during the five intervening months of operation by Plaintiffs, no cause intervened rendering the device to be in less than "good operating condition and repair" on August 14, 2014.  Similarly, no evidence was adduced as to what exactly is "normal wear and tear" on this used piece of equipment. By failing to provide any of the above facts or expert proof, Plaintiffs have failed to prove the contractual elements they allege were violated, which destroys each of Plaintiffs' related claims to the Okuma MacTurn.

Further, contractually, Defendants represented and warranted that the device in question was "reasonably maintained consistent with standards generally followed in the industry." (Emphasis added). Plaintiffs adduced no evidence as to the maintenance Defendants applied to the device, let alone whether it was unreasonably deficient by industry standards. Plaintiffs admit not knowing if the MacTurn was being maintained by Defendants before the closing. (Curry depo., pp. 62-63). Indeed, Mr. Curry is only aware of the condition of the machine after it was transported over Northeast Ohio and Western Pennsylvania roads from Mentor to Pittsburgh, in January 2015. (Id., p. 63). Mr. Curry candidly admits the MacTurn could have been damaged in transit. (Id., p. 74). No contractually required industry standards testimony was introduced in the trial testimony, nor were any documents included in the exhibits showing that Defendants violated this obligation. No evidence of what constitutes "reasonably maintained", or what constitutes "standards generally followed in the industry", was introduced. This Court should not be asked to divine what these industry standards are. Rather, these purported violations may only be proved by expert testimony, especially with regard to industry standards.

Given that Plaintiffs' witnesses do not have the requisite knowledge to diagnose issues as to the Okuma MacTurn, attribute a cause to an observed issue, or provide a solution, Plaintiffs not only lack expert capacity to testify on the subject of industry standards, they also do not have a fact base upon which to found an argument in this regard. For this reason alone, all of Plaintiffs' claims regarding the Okuma MacTurn should be dismissed, because no violation of Defendants' representations and warranties has been shown.

Continuing with the analysis, Defendants contractually represented and warranted that the Okuma MacTurn was "suitable" for its "present uses". Since Plaintiffs do not know how Defendants put the subject device to its "present use", and submitted no evidence regarding same,

15

all of Plaintiffs' Okuma MacTurn claims fail as a matter of proof. (*See* Curry depo., pp. 60, 81, 85).

Finally, Defendants represented that the Fixed Assets, including the Okuma MacTurn, were "sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after closing <u>as currently conducted</u>." (Emphasis added). Not surprisingly, Plaintiffs have no knowledge of how Defendants conducted their business, and adduced no evidence in that regard; hence, Plaintiffs' case fails because they have not borne their burden of proof. (Curry depo., pp 60-61, 63-64, 81-82). By failing to prove violation of each and every one of the above contract standards, factually or with requisite expert testimony, all of Plaintiffs' Okuma MacTurn claims should be dismissed at this time.

It must be said that while Plaintiffs have alleged claims generally referencing contract provisions, when the precise language of the Agreement is reflected upon, Plaintiffs completely misconstrue whose perspective should be applied in each of those provisions. Throughout the applicable provisions, the Agreement uses phrases <u>from Seller's perspective</u>, like: "In accordance with past practices of the Seller", " in a manner consistent with the method utilized in preparing the [Seller's] Audited Financial Statements", "consistent with the Seller's past practices", "in the ordinary course of business of the Seller", " reasonable in the present circumstances [pre-closing] of the Business", "to conduct the Business as now [pre-closing] conducted", "suitable for their present [pre-closing] uses", and "conduct the Business from and after the Closing as currently [pre-closing] conducted". All of these expressions in the Agreement are from the perspective of the <u>Seller</u>, <u>not</u> the <u>Buyer</u>. In this litigation, Buyer has not come to grips with the significance of this difference. Plaintiffs admit as much through the deposition testimony of their COO, Mr. Joseph Molino. (*See* Molino depo., pp. 68-70, 73, 76, 78, 80, 85-86). Because the Agreement is clear, and because the proof put forward to support Plaintiffs' claims does not find support in the applicable

contract language, Plaintiffs' claims each fail. For these reasons, all of Plaintiffs' claims are now ripe to be rejected with a final verdict on the remaining claims in favor of Defendants.

### 3. *Waiver*

All of Plaintiffs' contract claims were expressly waived by authorized agents of Plaintiffs, in the Agreement, and were to proceed under the terms set out in § 11.5(c), as follows:

> (c) The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims (other than Claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article XI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, Claims and causes of Action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article XI.  Nothing in this Section 11.5 shall limit any Person's right to seek and obtain any equitable relief to which any person shall be entitled or to seek any remedy on account of any party's fraudulent, criminal or intention misconduct. The Indemnified Party shall not be entitled to recover any Losses under this Article XI to the extent that such Losses arose primarily from the gross negligence or willful misconduct of the Indemnified Party

Plaintiffs may be heard to argue that the Sixth Circuit has voided the contractual defense of failure to give notice of an indemnification claim. However, the waiver defense asserted by Defendants herein, which was asserted exactly as Rule 9 of the Federal Rules of Civil Procedure prescribes, still applies. That said, it is not a matter of dispute that Plaintiffs waived their claims against Defendants pursuant to § 11.5(c) of the Agreement. While it is unclear how Plaintiffs would have proceeded with their claims, having fought against the Indemnification claim notice provision, they have nonetheless unambiguously waived all of the claims pled in this case. Accordingly, Plaintiffs' claims are ripe for dismissal at this time, having been waived.

V.     **CONTROLLING LAW**

   **A. Breach of Contract**

   To prevail on their claims for breach of contract, Plaintiffs must prove: (1) the existence of a binding contract; (2) that the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach. *Nachar v. PNC Bank, Nat. Ass'n*, 901 F.Supp.2d 1012, 1018 (N.D.Ohio 2012) (Boyko, J.), citing *Baghani v. Charter One Bank F.S.B.*, No. 91373, 2009 WL 280399, ¶ 13 (Ohio Ct. App. Feb. 5, 2009).

   While the parties do not dispute that a written contract exists, Plaintiffs have been unable to satisfy the remaining three elements of a breach of contract claim. As to the second element, the evidence at trial shows that Plaintiffs failed to perform their contractual obligations. For example, Plaintiffs were required to perform a count of Air Tool's inventory and provide Defendants with an Inventory Acknowledgement within twenty days after the Closing Date. (*See* Agreement, at § 2.3.2.1). Plaintiffs violated the Agreement by failing to properly and diligently conduct an inventory review and failing to provide Defendants with an Inventory Acknowledgement until October 16, 2014 – sixty-two days after the Closing Date. Plaintiffs were also required to pay Defendants the Closing Escrow Payment of $387,500.00, and failed to do so. (*See* Agreement, at § 2.3.4). Moreover, although Plaintiffs' purported claims fall under the indemnification provision of the Agreement, and Plaintiffs specifically waived the right to assert causes of action of the kind they are now asserting, Plaintiffs failed to perform in accordance with the indemnification provision of the Agreement and initiated the instant lawsuit.

   As to the third element, the condition and functionality of highly technical machines and machine parts such as the ones at issue in this matter are beyond the experience or knowledge of an average fact finder, and thus fall under the category of expert testimony. *See* Fed. R. Evid. 702;

*see also*, *Guild Assoc., Inc. v. Bio-Energy (Washington), LLC*, 309 F.R.D. 436, 441 (S.D.Ohio 2015) (noting that, in order to resolve a breach of contract action arising from the alleged failure of a Nitrogen Removal Unit machine used to purify landfill gas into pipeline quality gas, "it is likely that the jury will need to sort through complex testimony from expert witnesses, highly technical evidence pertaining to machine functions at the BEW plant, and evidence and testimony regarding contract clauses and sub clauses"). Plaintiffs, having failed to properly and diligently conduct an inventory review within twenty days after the Closing Date, in violation of the Agreement, and having failed to introduce expert evidence they need to carry their burden as to this element, cannot prevail.

      As to the final element, a "party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty." *Younglove Const., LLC v. PSD Dev., LLC*, 782 F.Supp.2d 457, 461 (N.D. Ohio 2011). "Proving damages for breach of a contract requires greater certainty than in the proof of damages for a tort." *Id*. at 461, fn 1, citing *Kinetico, Inc. v. Indep. Ohio Nail Co*., 19 Ohio App.3d 26, 30, 482 N.E.2d 1345 (Ohio Ct. App. 8th Dist. 1984); also citing *Hacker v. Mail*, No. CA95-10-170, 1996 WL 346628, n. 5 (Ohio Ct. App. 12th Dist. 1996). To prove damages with reasonable certainty, expert testimony is often required. *See, e.g., Wood Elec., Inc. v. Ohio Facilities Constr. Comm'n*, 2017-Ohio-2743, ¶ 20, 90 N.E.3d 371 (Ohio Ct. App. 10th Dist. 2017) (expert presented on issue of claimed damages associated with "lost productivity"); *Emerman v. Financial Commodity Investments, L.L.C*., No. 1:13CV2546, 2016 WL 231309, **8-9 (N.D. Ohio 2016) (granting summary judgment where plaintiff's alleged damages, similar to Plaintiffs' alleged damages here, were supported only by "multi-page spreadsheets, each of which contains multiple columns of unexplained numbers and abbreviations" and finding plaintiff's failure to obtain an expert "perplexing when one considers the fact that they had every opportunity to obtain expert testimony regarding damages"). Plaintiffs,

having failed to introduce expert evidence needed to show Defendants caused damages alleged herein, cannot prevail on this element.

It must also be observed that each of Plaintiffs' claims are for purported breach of the Agreement, Plaintiffs' Ex. 16.  Defendants counterclaimed against Plaintiffs asserting violations of the very same Agreement, claiming to have fulfilled each and every contractual obligation they owed, and seeking a judgment for the balance of the purchase price. During the first bench trial set and conducted in this manner, Plaintiffs dismissed with prejudice claims 1-6 charted above, and consented to a judgment in favor of Defendants on their breach of contract counterclaim for the full demanded amount. It is not possible for Defendants to be entitled to a contract claim judgment in their favor, premised on Defendants' full compliance with all contractual duties, and for Defendants to be yet in breach of that contract so as to support a judgment in favor of Plaintiffs. This is not a tort case where comparative negligence can be attributed to both parties. There is but one contract; either Defendants complied with it or they did not. By stipulating to a judgment on the breach of contract counterclaim, Plaintiffs have as a matter of law also acknowledged their own breach of contract claims must fail. For this reason, each of Plaintiffs' breach of contract claims fails, and final judgment must be awarded in favor of Defendants at this time.

### B. Unjust Enrichment

Under Ohio law, there are three elements Plaintiffs must prove in order to make a claim for unjust enrichment. There must be: (1) a benefit conferred by the plaintiff upon the defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit under the circumstances where it would be unjust to do so without payment. *Premier Colorscan Instruments Pvt. Ltd. v. Q–Lab Corp*., No. 1:15CV1900, 2016 WL 6124430, *5 (N.D. Ohio Oct. 19, 2016) (Boyko, J.), citing *Reisenfeld & Co. v. Network Grp., Inc*., 277 F.3d 856, 860 (6th Cir. 2002). "The doctrine of unjust enrichment does not apply when a contract actually exists; rather, it is an

equitable remedy to be used only when the court finds there is no contract." *Premier Colorscan*, 2016 WL 6124430, *5 (internal citation omitted).

In Ohio, recovery under an unjust enrichment claim is not permitted where an express contract covers the same subject, with the exception that if the party the claim is against acted in bad faith, then the unjust enrichment claim may proceed. *See, e.g., White v. Wells Fargo Bank, NA*, 904 F. Supp. 2d 756, 767 (N.D. Ohio 2012) (explaining the rule and bad faith exception). The bad faith exception is limited to instances of bad faith where the party was induced into "entering into the contract, or . . . in terminating the contract." *White*, 904 F. Supp. 2d at 767 (internal quotation omitted). "Bad faith is that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Id.*, quoting *Casserlie v. Shell Oil Co.*, 2009-Ohio-3, 121 Ohio St.3d 55, 902 N.E.2d 1, ¶ 32 (internal quotation marks omitted).

There is no dispute in this case as to the existence of an express written contract between the parties. Moreover, Plaintiffs' Amended Complaint does not allege bad faith or fraud. As a result, Plaintiffs' claim for unjust enrichment must fail as a matter of law. *See, e.g., Premier Colorscan*, 2016 WL 6124430, *5 (Boyko, J.) ("Because Plaintiff has not alleged fraud or bad faith in its unjust enrichment claim, Plaintiff does not demonstrate an issue of material fact.").

### C. Judgment on Partial Findings

This case is ripe for a Rule 52(c) Judgment against Plaintiffs. "Under Federal Rule of Civil Procedure 52(c), once a party has been fully heard on an issue at a bench trial, 'the court may enter judgment against the party on a claim or defense that . . . can be maintained or defeated only with a favorable finding on that issue.'" *Zell v. Klingelhafer*, 751 F.App'x 641 (6th Cir. 2018) (affirming trial court's dismissal of a plaintiff's claims). Because Plaintiffs have presented their entire case and have been fully heard on all of their claims, and have failed to meet their burden of proof as to each of those claims, Plaintiffs' remaining claims are subject to dismissal at this time.

21

Accordingly, Defendants ask this Court to enter a Judgment against Plaintiffs on all of Plaintiffs' remaining claims pursuant to Fed. R. Civ. P. 52(c) based on the proposed Findings of Fact and Conclusions of Law set forth in this Memorandum.

## VI.    PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1. Plaintiff ATSCO Holdings Corp. ("ATSCO") is a Delaware corporation with its principal place of business in Pennsylvania. (Amended Complaint, at ¶ 1).

2. Plaintiff Hy-Tech machine, Inc. ("Hy-Tech") is a Delaware corporation with its principal place of business in Pennsylvania. Hy-Tech and ATSCO are, collectively, the "Plaintiffs." (Amended Complaint, at ¶ 2).

3. Defendant Air Tool Service Company, n/k/a X5432, Inc. ("Air Tool") is an Ohio Corporation which formerly operated a business involved in the designing, engineering, and manufacturing of pneumatic motors and tools in Mentor, Ohio. Air Tool was a competitor of Hy-Tech. (Answer and Counterclaim, Molino testimony).

4. Defendant Rick J. Sabath ("Sabath") is the sole shareholder of Air Tool. Sabath and Air Tool are, collectively, the "Defendants." (Answer and Counterclaim, at ¶ 2, testimony of Sabath).

5. Plaintiffs negotiated the sale of Air Tool from Defendants to Plaintiffs, and on August 13, 2014, Plaintiffs and Defendant entered into an Asset Purchase Agreement (the "Agreement"). (Plaintiffs' Ex. 16, testimony of Molino).

6. During the months of April, May, June, July, and August 2014, Plaintiffs were provided free and unencumbered access to inspect all of Air Tool's machinery, assets, and inventory. In addition, Plaintiffs were provided full access to Air Tool's books, records, and properties. Plaintiffs engaged numerous lawyers, accountants, and businesspersons to inspect, test, and perform due diligence regarding Air Tool from April through August 2014. Following this period of access, the

sale of Air Tool was consummated, pursuant to the terms of the Agreement. (Plaintiffs' Ex. 17-19, testimony of Molino and Aloi).

7. Plaintiffs purchased Air Tool for a purchase price of $7,658,540.00, which included the assumption of certain Assumed Payables pursuant to Section 2.3 of the Agreement. Pursuant to Section 2.3.4 of the Agreement, Defendants were to be paid $7,241,040.00 at closing by wire transfer, with a balance of $387,500.00 (the "Closing Escrow Payment") to be paid by Plaintiffs pursuant to the terms of an Escrow Agreement. (Plaintiffs' Ex. 16, §§ 2.3 and 2.3.4).

8. Pursuant to Section 2.3.2.1 of the Agreement, Plaintiffs were required to perform a count of Air Tool's inventory and provide Defendants with an Inventory Acknowledgement within twenty (20) days after the Closing Date (August 13, 2014):

> **2.3.2.1 Inventory**. Not later than twenty (20) days after the Closing Date, a physical count of the Inventory (the "Inventory Count") will be taken by Michael Sivula, Nicholas Russell and Michael Turick, or if for any reason any of such persons does not take such Inventory Count, such other persons as may be reasonably acceptable to Purchaser and Seller (such acceptance, if any, to be evidenced by written agreement between Purchaser and Seller), in accordance with past practices of Seller and other reasonable procedures of Purchaser, as of the date of such Inventory Count. Purchaser shall give Seller reasonable advance notice of the Inventory Count and allow Shareholder to be physically present during such count. Not later than twenty (20) days after the Closing Date, a roll-back (the "Roll-Back") of the Inventory Count (the "Roll-Back Inventory") to the Effective Time will be performed by employees of Purchaser. The Roll-Back will be performed in a manner consistent with the method utilized in preparing the Audited Financial Statements. A statement setting forth the Roll-Back Inventory based upon such Roll-Back (the "Inventory Acknowledgment"), will be delivered by Purchaser to Seller not later than twenty (20) days after the Closing Date. The Roll-Back Inventory, as set forth in the Inventory Acknowledgement is hereby deemed final, conclusive and binding, absent manifest error.

9. Plaintiffs provided Defendants with a letter styled "Inventory Acknowledgement" on October 16, 2014 – 62 days after the Closing Date – which document refers to Plaintiffs' inventory review as "ongoing." (Plaintiffs' Ex. 22).

10. Section 11.3 of the Agreement provides:

**11.3 Limitations**. Notwithstanding anything herein to the contrary, as to matters which are subject to indemnification pursuant to this Section 11.2.1 (b), (a) Seller and Shareholder shall not be liable unless and until the aggregate Losses to the Indemnified Purchaser Parties resulting from such otherwise indemnifiable matters under Section 11.2.l(b) (and (x) any Assumed Warranty Obligations described in Section 10.1 and (y) any Customer other Business Relationships described in Section 10.7) shall exceed a cumulative aggregate of $75,000 (the "Indemnification Threshold") (with Seller and Shareholder being responsible for all Losses that exceed the Indemnification Threshold), and (b) the aggregate amount of any payments that shall be payable by Seller and Shareholder as a result of any Claims for indemnification made under Section 11.2.1(b) with respect to a misrepresentation or breach of warranty shall be limited to $6 million (the "General Maximum Limitation"); provided, however, that neither the Indemnification Threshold nor the General Maximum Limitation shall apply to (i) Claims for Losses relating to a breach of the representations and warranties of Seller set forth in Sections 3.1 through 3.5, 3.10, 3.12, 3.17 (first sentence), 3.21, 3.24, 3.26, 3.27 and 3.37, (ii) Claims for Losses relating to the Retained Liabilities, (iii) Claims relating to any unpaid Taxes owed by Seller and/or Shareholder, including any sales Tax associated with the transactions contemplated hereby and/or required to be paid by, or on behalf of Seller in connection with the operations of its Business, or otherwise, or (iv) Claims for Losses relating to a breach of any representation or warranty that was actually known to be false when made or for fraud. For purposes of determining whether the Indemnification Threshold has been met and in the calculation of losses, all "materiality" qualifiers in this Agreement shall be disregarded.

11. Section 11.5(c) of the Agreement provides:

The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims (other than Claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article XI. In furtherance of the foregoing, **each party hereby waives, to the fullest extent permitted under Law, any and all rights, Claims and causes of Action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon Law, except pursuant to the indemnification provisions set forth in this Article XI.** * * * (Emphasis added).

12. Subsequent to the sale, Plaintiffs closed the facility operated by Air Tool in Mentor,

Ohio. (Testimony of Aloi and Curry).

13. Plaintiffs have refused to permit Defendants to be paid the Closing Escrow Payment out of the escrow account. (Answer and Counterclaim).

14. Plaintiffs commenced this action on August 10, 2015. An Amended Complaint was filed on October 22, 2015. The Amended Complaint asserts causes of action for breach of contract and unjust enrichment. (Amended Complaint).

15. The Amended Complaint also alleges that Defendants breached the Agreement, and thereby caused the Plaintiffs to sustain damages, as the result of the condition of an Okuma MacTurn transferred to Plaintiffs under the Agreement, including "operational losses" and damages associated with "lost productivity." (*Id.* at ¶¶ 18-24; testimony of Molino, Aloi and Curry).

16. The discovery deadline in this case was January 20, 2017. (*See* Order [non-document] dated November 10, 2016).

17. Plaintiffs were asked by Defendants in discovery to identify those experts whom they intended to call at trial in support of their claims, and Plaintiffs identified none. (Plaintiffs' Responses to Interrogatories and Requests for Production of Documents, in response to Interrogatory No. 5, testimony of Plaintiffs' representatives).

18. Plaintiffs did not provide expert disclosures for any witnesses as required under Fed. R. Civ. P. 26(a)(2)(B) or (C) within the deadline established by Fed. R. Civ. P. 26(a)(2)(D).

19. The Amended Complaint further alleges that Defendants breached the Agreement as a result of (1) certain product plans and drawings allegedly not being materially accurate and complete; and (2) an Air Tool customer allegedly claimed ownership over certain unidentified intellectual property that had been sold to Plaintiffs by Defendants. (Amended Complaint, at ¶¶ 25-26).

20. In their Discovery Responses, Plaintiffs indicated that Plaintiffs' plans and drawings claims were "withdrawn." (Plaintiffs' Responses to Interrogatories and Requests for Production of Documents, in response to Interrogatory No. 17 and Request for Production No. 14, testimony of Plaintiffs' representatives).

21. Finally, the Amended Complaint alleges that Defendants breached the Agreement because certain credits allegedly owed to a customer for warranty claims were not reserved on Air Tool's balance sheet. (Amended Complaint, at ¶ 27).

22. When asked in discovery to state the basis for this claim, Plaintiffs indicated these credits actually relate to parts a customer was attempting to return prior to closing, but which were, in fact, returned and credited by Plaintiffs, after closing. Plaintiffs also did not itemize any alleged damages to this claim as part of their Discovery Responses. (Plaintiffs' Responses to Interrogatories and Requests for Production of Documents, in response to Interrogatory Nos. 18 and 20, testimony of Plaintiffs' representatives).

23. Plaintiffs also claimed that they were not paid for certain receivables by Alcoa and never withdrew the claim. However, in his trial deposition, Mr. Molino admitted Plaintiffs had been paid in full. (Molino depo., p.115).

24. Plaintiffs stipulated to judgment in favor of Defendants on Defendants' contract counterclaim at the conclusion of the bench trial on July 27, 2018. (*See* ECF # 94).

25. Plaintiffs' agents expressly waived their contractual claims against Defendants regarding the MacTurn, pursuant to § 11.5(c) of the Agreement.

## CONCLUSIONS OF LAW

1. Plaintiffs bear the burden of proving their entitlement to relief under a preponderance of the evidence. *See Eggert v. Meritain Health, Inc.*, 428 F.App'x 558, 563 (6th Cir. 2011), citing *Langfan v. Carlton Gardens Co.*, 2009-Ohio-3318, 183 Ohio App.3d 260, 916 N.E.2d 1079, 1087 (as to breach of contract); *see also Gerboc v. ContextLogic, Inc.*, No. 1:16 CV 928, 2016 WL 6563684, *5 (N.D. Ohio 2016) (as to unjust enrichment) (internal citation omitted). Plaintiffs have not met their burden with respect to the facts or the law.

### A. Plaintiffs Did Not Prove their Breach of Contract Claims

2. To prevail on their claims for breach of contract, Plaintiffs must prove: (1) the existence of a binding contract; (2) that the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach. *Nachar*, 901 F.Supp.2d at 1018.

3. As to the first element, the parties do not dispute that a written contract between the parties exists. However, Plaintiffs have not established the remaining three elements of their breach of contract claim.

4. As to the second element, Plaintiffs have not established their own performance under the Agreement. Plaintiffs were required to perform a count of Air Tool's inventory and provide Defendants with an Inventory Acknowledgement within twenty days after the Closing Date. (*See* Agreement, at § 2.3.2.1). Plaintiffs failed to properly and diligently conduct an inventory review in violation of the Agreement, and did not provide Defendants with an Inventory Acknowledgement until October 16, 2014 – sixty-two days after the Closing Date.

5. Plaintiffs were also required to pay Defendants the Closing Escrow Payment of $387,500.00, and failed to do so. (*See* Agreement, at § 2.3.4). Because this a contract case, not a tort case, and because Plaintiffs stipulated to judgment in favor of Defendants on Defendants'

contract counterclaim, that stipulation precludes a finding in favor of Plaintiffs as to their claim for breach of the same contract.

6. Plaintiffs' purported claims fall under the indemnification provision of the Agreement, and Plaintiffs specifically waived the right to assert causes of action of the kind they are now asserting. Consequently, Plaintiffs have not met their burden as to this element.

7. As to the third element, the condition and functionality of highly technical machines and machine parts such as the ones at issue here are beyond the experience or knowledge of an average fact finder, and thus fall under the category of expert testimony. *See Nachar*, 901 F.Supp.2d at 1018 (internal citation omitted). Without providing an expert witness, Plaintiffs' proof related to the Okuma MacTurn claims fails. Additionally, Plaintiffs have not proven that Defendants violated the express terms of the contract such as: "In accordance with past practices of the Seller", " in a manner consistent with the method utilized in preparing the [Seller's] Audited Financial Statements", "consistent with the Seller's past practices", "in the ordinary course of business of Seller", " reasonable in the present circumstances [pre-closing] of the Business", "to conduct the Business as now [pre-closing] conducted", "suitable for their present [pre-closing] uses", and "conduct the Business from and after the Closing as currently [pre-closing] conducted". Each of these expressions in the Agreement are from the perspective of the <u>Seller</u>, <u>not</u> the <u>Buyer</u>.

8. As to the final element, a "party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty." *Younglove Const.*, 782 F.Supp.2d at 461. "Proving damages for breach of a contract requires greater certainty than in the proof of damages for a tort." *Id*. at 461, fn 1, (internal citation omitted). To prove damages with reasonable certainty, expert testimony is often required. *See, e.g., Wood Elec., Inc.*, 2017-Ohio-2743, ¶ 20 (expert presented on issue of claimed damages associated with "lost productivity"); *Emerman*, 2016 WL 231309, **8-9 (granting summary judgment where plaintiff's alleged

damages, similarly to Plaintiffs' alleged damages here, were supported only by "multi-page spreadsheets, each of which contains multiple columns of unexplained numbers and abbreviations" and finding plaintiff's failure to obtain an expert "perplexing when one considers the fact that they had every opportunity to obtain expert testimony regarding damages"). Plaintiffs have failed to present expert evidence and therefore have not met their burden as to the element of damages.

### B. Plaintiffs' Unjust Enrichment Claim Fails as a Matter of Law

9. Under Ohio law, Plaintiffs must prove three elements in order to successfully make a claim for unjust enrichment: (1) a benefit conferred by the plaintiff upon the defendant, (2) knowledge by the defendant of the benefit, and (3) retention of the benefit under the circumstances where it would be unjust to do so without payment. *Premier Colorscan Instruments Pvt. Ltd. v. Q–Lab Corp.*, N.D.Ohio No. 1:15CV1900, 2016 WL 6124430, *5 (N.D. Ohio Oct. 19, 2016) (Boyko, J.), citing *Reisenfeld & Co. v. Network Group, Inc.*, 277 F.3d 856, 860 (6th Cir. 2002).

10. The doctrine of unjust enrichment does not apply when a contract actually exists; rather, "it is an equitable remedy to be used only when the court finds there is no contract." *Premier Colorscan*, 2016 WL 6124430, *5 (internal citation omitted).

11. In Ohio, recovery under an unjust enrichment claim is not permitted where an express contract covers the same subject, with the exception that if the party the claim is against acted in bad faith, then the unjust enrichment claim may proceed. *See, e.g., White v. Wells Fargo Bank,* 904 F. Supp. 2d at 767 (explaining the rule and bad faith exception); *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975). The bad faith exception is limited to instances of bad faith where the party was induced into "entering into the contract, or . . . in terminating the contract." *White*, 904 F. Supp. 2d at 767 (internal quotation omitted). "Bad faith is that which imports a dishonest purpose and implies wrongdoing or some motive of self-interest." *Id.*, quoting *Casserlie*, 2009-Ohio-3, ¶ 32 (internal quotation marks omitted).

29

12. Here, in addition to the fact that Plaintiffs have waived the right to pursue a claim for unjust enrichment, there is no dispute as to the existence of an express written contract between the parties. Moreover, Plaintiffs' Amended Complaint does not allege bad faith or fraud on the part of either Defendant. As a result, Plaintiffs' claim for unjust enrichment fails as a matter of law. *See, e.g., Premier Colorscan*, 2016 WL 6124430, *5 (Boyko, J.) ("Because Plaintiff has not alleged fraud or bad faith in its unjust enrichment claim, Plaintiff does not demonstrate an issue of material fact.").

### VII.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court find against Plaintiffs as to each of the claims they allege and enter final judgment in favor of Defendants.

Respectfully Submitted,

*/s/ Tim L. Collins*
Tim L. Collins (0033116)
Elizabeth E. Collins (0091032)
FThrasher, Dinsmore & Dolan
1111 Superior Ave., Ste 412
Cleveland, Ohio 44114
Telephone: 216.255.5431
Facsimile: 216.255.5450
Email: tcollins@tddlaw.com
Email: ecollins@tddlaw.com

*Attorneys for Defendants Air Tool Service Company, n/k/a X5432, Inc. and Rick J. Sabath*

30

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2021, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties not receiving service through the Court's electronic filing system will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

Brian P. Muething
bmuething@kmklaw.com
Jacob D. Rhode
jrhode@kmklaw.com
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Telephone: 513-579-6400
Facsimile: 513-579-6457
*Counsel for Plaintiffs*
*ATSCO Holdings Corp. and*
*Hy-Tech Machine, Inc.*

Mark A. DiCello
madicello@dicellolevitt.com
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio 44060

 */s/ Tim L. Collins*
*Attorney for Defendants Air Tool Service*
*Company, n/k/a X5432, Inc. and Rick J.*
*Sabath*


## CERTIFICATE OF COMPLIANCE

I hereby certify that this Memorandum in Support does not exceed the thirty (30) page limitation set forth by the Court by special Order dated February 18, 2021 (ECF # 125).

 */s/ Tim L. Collins*
*Attorney for Defendants Air Tool Service*
*Company, n/k/a X5432, Inc. and Rick J.*
*Sabath*