1

2  UNITED STATES DISTRICT COURT

3  NORTHERN DISTRICT OF OHIO

4  EASTERN DIVISION

5  -----------------------------)

6  ATSCO HOLDINGS, CORP, et al.,

7          Plaintiffs,

8          v.                    No. 1:15-CV-1586

9  AIR TOOL SERVICE COMPANY, et al.,

10          Defendants.

11  -----------------------------)

12

13

14

15      REMOTE DEPOSITION OF JIM ALOI

16          New York, New York

17          November 5, 2020

18

19

20

21

22

23

24  Reported by:
    Linda Salzman
25  JOB NO. 186137

Page 2

```
1
2                  November 5, 2020
3                  10:05 a.m.
4
5        Remote deposition of JIM ALOI,
6   the witness herein, held remotely
7   from New York, New York, pursuant to
8   Notice, before Linda Salzman, a
9   Notary Public of the State of New
10  York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S :
3
4        KEATING MUETHING & KLEKAMP, PLL
5        Attorneys for Plaintiff
6            One East Fourth Street
7            Cincinnati, Ohio 45202
8        BY:   BRIAN MUETHING, ESQ.
9
10
11
12        THRASHER DINSMORE & DOLAN
13        Attorneys for Defendant
14            1111 Superior Avenue E
15            Cleveland, Ohio 44114
16        BY:   TIM COLLINS, ESQ.
17
18
19
20
21  Also Present:
22
23  CARLOS LOPEZ, Videographer
24  RICHARD GOODMAN, ATSCO Holdings Corp.
25  MICHAEL SIVULA, Air Tool Service Company
```

Page 4

```
1
2            STIPULATIONS
3        IT IS HEREBY STIPULATED AND
4   AGREED by and among counsel for the
5   respective parties hereto, that the
6   sealing and certification of the
7   within deposition shall be and the
8   same are hereby waived;
9        IT IS FURTHER STIPULATED AND
10  AGREED all objections, except as to
11  the form of the question, shall be
12  reserved to the time of the trial;
13        IT IS FURTHER STIPULATED AND
14  AGREED that the within deposition may
15  be signed before any Notary Public
16  with the same force and effect as if
17  signed and sworn to before the Court.
18
19
20
21
22
23
24
25
```

Page 5

```
1                  J. Aloi
2        THE VIDEOGRAPHER:  Good morning.
3   My name is Carlos Lopez. I am the
4   legal videographer in association with
5   TSG Reporting, Inc.
6        Due to the severity of COVID-19
7   and following the practice of social
8   distancing, I will not be in the same
9   room with the witness. Instead, I
10  will record this videotape deposition
11  remotely. The reporter, Linda
12  Salzman, also will not be in the same
13  room and will swear in the witness
14  remotely.
15        Do all parties stipulate to the
16  validity of this video recording and
17  remote swearing and that it will be
18  admissible in the courtroom as if it
19  had been taken following Rule 30 of
20  the Federal Rules of Civil Procedures
21  and the state's rule where this case
22  is pending?
23        MR. COLLINS: Yes.
24        MR. MUETHING:  Yes.
25        THE VIDEOGRAPHER:  Thank you.
```

Page 6

J. Aloi

1
2  This is the start of media labeled No.
3  1 of the video recorded deposition of
4  Jim Aloi in the matter ATSCO Holdings
5  Corp., et al., versus Air Tool Service
6  Company, et al.
7       This deposition is being held
8  remotely on November 5, 2020, at
9  approximately 10:05 a.m. My name is
10 Carlos Lopez. I am the legal video
11 specialist from TSG Reporting, Inc.
12 The court reporter is Linda Salzman in
13 association with TSG Reporting.
14      Will counsel please introduce
15 yourselves for the record.
16      MR. MUETHING: Good morning,
17 everyone. Brian Muething, Keating
18 Muething & Klekamp for the plaintiffs
19 ATSCO Holdings Corp. and Hy-Tech
20 Machine. With me is the corporate
21 representative Mr. Richard Goodman.
22      MR. COLLINS:  Good morning.  Tim
23 Collins from the Cleveland office of
24 the law firm of Thrasher, Dinsmore &
25 Dolan.  On the phone with me as a

Page 7

J. Aloi

1
2  representative of the defendants is
3  Mike Sivula. And I represent the
4  defendants, to be clear.
5       THE VIDEOGRAPHER:  Will the
6  court reporter please swear in the
7  witness.
8  J I M   A L O I,
9       called as a witness, having been duly
10      sworn by a Notary Public, was examined
11      and testified as follows:
12 DIRECT EXAMINATION
13 BY MR. MUETHING:
14      Q.    Mr. Aloi, my name, as you know,
15 is Brian Muething. I represent the
16 plaintiffs in this litigation matter.
17      If you have any tech issues or
18 you can't hear me today or there's
19 anything like that, just please speak up
20 and let us know.
21      Okay?
22      A.    Yes.
23      Q.    Could you state your full name
24 for the record, please.
25      A.    It is James Aloi.

Page 8

J. Aloi

1
2      Q.    And I understand you go by the
3  nickname Jim sometimes, correct?
4      A.    That's correct.
5      Q.    Is it okay if I call you Jim
6  today?
7      A.    Yes, that's fine.
8      Q.    Okay. Jim, tell the Court where
9  you worked from, say, in the 2014 through
10 2017 period, please.
11      A.    I worked for Hy-Tech Machine,
12 and my title was vice president of finance
13 for that period of time.
14      Q.    And what were some of your
15 functions as the vice president of
16 finance?
17      A.    I published monthly financial
18 statements, had meetings, assisted with
19 any acquisitions, oversaw the accounting
20 department, was the liaison with our
21 external and internal auditors.
22      Those were probably the main
23 duties, you know, run reports, monthly
24 reports, manufacturing reports, and so on,
25 on a monthly basis.

Page 9

J. Aloi

1
2      Q.    Okay.  Is there -- did this
3  provide you with knowledge of the
4  operations of Hy-Tech?
5      A.    Yes.
6      Q.    It did. And just for the
7  record, explain how you came to know about
8  the business operations of Hy-Tech, given
9  your function?
10      A.    I started with Hy-Tech. I was
11 with them for 13 years. Prior to that, I
12 had 20 years of manufacturing experience
13 with another company. So I fit right into
14 the manufacturing abilities of Hy-Tech in
15 the area of tooling and things.
16      Q.    In particular with respect to
17 your knowledge of what would have been
18 going on at Hy-Tech, I guess what I'm
19 asking is, how did you come to be aware of
20 the inner workings of the business of
21 Hy-Tech in the things that were going on
22 at the company?
23      A.    Oh, I was fairly well-integrated
24 into the operations aspects; again, the
25 manufacturing operations; again, the

Page 10

J. Aloi

1  reporting -- the daily and monthly
2  reporting, weekly reporting.
3      Very thorough knowledge of all
4  of our work centers that were out in the
5  manufacturing area and the interface with
6  the operations people, either through the
7  budgeting aspects for daily operations,
8  making sure that we were on plan, making
9  sure that we were as efficient as
10 possible.
11     Q.   Can you describe more the
12 interfacing or the inner workings between
13 you and the finance function and the
14 operations folks?
15     A.   The finance function, basically
16 we would -- you know, with most functions,
17 you create budgets, plans, what you think
18 you're going to do.  And then from that,
19 we interface with all the departments in
20 the operations area, from the
21 manufacturing operation all the way to the
22 warehouse, fiscal accounts.
23     Everything that all those
24 operations groups perform, we would report
25

Page 11

J. Aloi

1  back, obviously, through the ERP system,
2  and then we would print out the results,
3  look at those results. Again, it would be
4  a daily thing, who is efficient, who isn't
5  efficient. Typical ERP manufacturing
6  operations that occur.
7      Q.   Jim, there's a few times when
8  I'm not totally hearing what you're
9  saying, and I see Mr. Collins leaning up
10 as well.  So if you could just raise your
11 voice just slightly.
12     A.   Sure.
13     MR. COLLINS:  Can I just ask
14 you, you said ERP, three initials?
15     THE WITNESS:  Yes.
16     MR. COLLINS:  Thank you.
17     Q.   Jim, you mentioned daily and
18 monthly reports.
19     Can you describe a little bit in
20 more detail what reports you would have
21 been responsible for creating?
22     A.   On a daily basis, we would look
23 at sales, backlog, sales per segments
24 within Hy-Tech or five or six segments
25

Page 12

J. Aloi

1  that we would look at, and margin
2  analysis, as well as manufacturing
3  efficiencies as it related to machine use,
4  what was the amount of machine hours that
5  were used to absorb our manufacturing
6  overhead expenses, whether they be fixed
7  or variable.
8      So that would be daily. You
9  could look at that on a daily basis,
10 weekly basis, and then you would report
11 them, obviously, on a monthly basis.
12     Q.   Jim, are you familiar with a
13 transaction whereby Hy-Tech purchased the
14 assets of ATSCO, essentially?
15     A.   I am aware of, yes, some of
16 those transactions, definitely.
17     Q.   Were you involved in the due
18 diligence with respect to that
19 transaction?
20     A.   I was involved in the due
21 diligence as it related to some of the
22 financial aspects of that transaction,
23 including, you know, their customer lists;
24 estimated margins; any of the financial
25

Page 13

J. Aloi

1  data, their financial statements,
2  comparisons, so on and so forth.
3      Q.   Generally speaking, are you
4  familiar with the goals of Hy-Tech when it
5  purchased ATSCO assets?
6      A.   I'm sorry, Brian.  Did you
7  say --
8      Q.   Sure.  Are you familiar with the
9  company that is Hy-Tech's goals or hopes
10 as it related to the ATSCO transaction?
11     A.   Yes, I think I'm generally aware
12 of them.
13     Q.   And could you describe those,
14 please?
15     A.   Well, our goal was to ultimately
16 purchase this company and turn it into a
17 synergistic -- they had customers that,
18 obviously, we did not have, so it was
19 mainly on a customer basis. It was an
20 asset-based lending type of purchase.
21     So we felt that we could take
22 those customers and grow those customers,
23 taking -- you know, from a financial
24 standpoint, we could overlap some of that
25

Page 14

J. Aloi

1
2  overhead and enter it into our facility in
3  Pennsylvania.
4      Q.    Did you also understand that
5  Hy-Tech was purchasing assets in
6  connection with the transaction, in
7  addition to the customer list?
8      A.    Yes, asset-based purchasing,
9  sure.
10     Q.    Jim, given you're familiarity
11 with the company, Hy-Tech, at the time,
12 could you describe for the Court how the
13 ATSCO transaction sort of began to turn
14 out shortly after closing?
15     A.    Well, the -- I would say some of
16 the biggest issues immediately after
17 closing -- you know, I don't think some of
18 those areas of concern were noticed until
19 maybe a couple of months, about a month or
20 so.
21         But we were -- we did start to
22 get some inclinings about, you know, some
23 of the machines weren't running as they
24 were -- as they should; and ultimately,
25 when we did transfer some of those

Page 15

J. Aloi

1
2  machines to our building, they definitely
3  had some issues, especially with one of
4  the machines.
5          And just, you know, with every
6  purchase, you have some transition issues,
7  but those -- you can kind of work around
8  those, some of those issues; and probably
9  the biggest ones were the inadequacy of
10 the machines, being as they were
11 publicized, so to speak, to operate well.
12     Q.    You mentioned that machines had
13 issues.
14         What do you recall about that?
15     A.    I recall that very difficult to
16 get quality product off of one specific
17 machine, an Okuma Macturn, which is -- was
18 a machine that was -- as I recall, built
19 parts for one of their largest customers,
20 which was TorcUP. And that -- you know,
21 that was a very difficult situation for
22 us, to get quality parts off of that
23 particular machine.
24         It was out of tolerance and a
25 lot of the parts were produced.  As I

Page 16

J. Aloi

1
2  recall, the operations people attempting
3  to, you know, do as many things as they
4  could to get it fixed, as well as with the
5  Okuma experts, manufacturers reps that
6  came in to try and help us get that
7  machine running.
8          So those were probably the
9  biggest issues. That was a big issue for
10 us because it built products for one of
11 their largest customers.
12     Q.    And here you're referring to the
13 Macturn machine?
14     A.    Macturn machine.
15     Q.    You mentioned that the machine
16 was having issues with the quality of the
17 parts.
18         Can you speak to a little bit
19 more about that?
20     A.    Well, I didn't -- yeah, I wasn't
21 an operator in that.  Our operations
22 people didn't know the specifics of what
23 some of the issues were, but we definitely
24 were not getting parts that would fit
25 correctly in making the tool.

Page 17

J. Aloi

1
2          And some of that had to do with
3  the drawings too. The drawings were not
4  up to snuff. We would call them DCOs, I
5  think. They were not completely up to
6  snuff.
7          So the parts that were coming
8  off of that machine might have been to the
9  drawing, and at the same time, maybe the
10 drawing was wrong; or we could not get
11 quality parts that we could get to the
12 drawing specs off of that machine.  The
13 IDs and the ODs just -- it was not -- it
14 was just not producing quality parts.
15         So there would be -- so we would
16 have to either push it off to another
17 machine until we could get that machine
18 fixed again. There were many gaps in
19 time, I recall, between the time that the
20 machine just would get out of tolerance
21 and then we would have to go back and get
22 it back into tolerance, and then it was a
23 vicious cycle, a vicious cycle to get it
24 producing, you know, anything that would
25 work for us.

Page 18

J. Aloi

1
2   Q.  Okay.  Jim, on the right side of
3   your screen, there may be something called
4   a chat.
5       Do you see that?
6   A.  Yes.
7   Q.  And do you see that I've
8   uploaded a few -- or one PDF and one Excel
9   sheet.
10      Do you see that there?
11  A.  Yes.
12  Q.  Could you open the document, the
13  Excel sheet, that says PX 30?
14  A.  PX 30?  Okay.
15  Q.  Let me know when you have it
16  open, please.
17  A.  I have it open.
18  Q.  Just hold on for a second.
19      MR. MUETHING:  Tim, do you have
20      the document?
21      MR. COLLINS:  No.  Brian, I'm
22      trying to download it. I will let you
23      know when I got it.
24      MR. MUETHING: Thank you, sir.
25      MR. COLLINS:  I have to get help

Page 19

J. Aloi

1
2   from my expert.
3       MR. MUETHING:  Your teen?
4       MR. COLLINS:  My teen.
5       THE WITNESS:  There we go.  It
6   says open file now.  Okay.
7       MR. MUETHING:  Were just going
8   to wait for a second, Jim. I'll start
9   asking you questions in a minute.
10      It's been previously identified
11  as or previously referred to as PX 30.
12      MR. COLLINS:  All right, Brian.
13  Got it.  Thank you.
14      MR. MUETHING:  Thank you.
15  Q.  Jim, to confirm, you have the
16  document --
17  A.  Yes.  Yes, I do.
18  Q.  Have you seen this document
19  before? You don't need to describe it
20  yet.  I just need to lay some foundation
21  for it.
22      Have you seen this document
23  before?
24  A.  Yes.  Yes, I have.
25  Q.  Could you briefly describe what

Page 20

J. Aloi

1
2   this is a -- what this document describes
3   or shows?
4   A.  Yes, this document shows usage
5   on the Machine 143, which is a Macturn,
6   the Okuma Macturn.  And --
7   Q.  Okay.  Let me stop you there for
8   a second, Jim, just to do this in the
9   right order.
10      Is this a document that was
11  regularly maintained at the business of
12  Hy-Tech?
13  A.  Yes.
14      MR. MUETHING: Plaintiffs' move
15  to admit the document marked as PX 30.
16      (Plaintiffs' Exhibit No. 30,
17  Excel spreadsheet showing usage from
18  Machine 143, marked for
19  identification, as of this date.)
20      MR. MUETHING:  Just hold on for
21  a second, Jim.
22      Tim, anything?
23      MR. COLLINS:  I didn't hear you,
24  Brian.  There was a breakup there for
25  a second.  Were you asking questions?

Page 21

J. Aloi

1
2       MR. MUETHING:  I asked him if it
3   was essentially a record that was
4   maintained at Hy-Tech. I believe he
5   said yes. And I said plaintiffs move
6   to admit PX 30.
7       MR. COLLINS:  Okay.
8       MR. MUETHING:  And I assume you
9   would have said something.
10      MR. COLLINS:  Yeah, no.  I'm
11  going to reserve our -- we object, but
12  we'll reserve on that conversation for
13  later.  So you can go ahead.
14      MR. MUETHING:  Thank you.
15  Q.  Jim, you were beginning to
16  describe what this -- or you did begin to
17  describe.
18      But could you tell us in more
19  detail what this document shows?
20  A.  It shows usage on -- it is a
21  manufacturing operation document. This
22  one is sorted by that particular machine.
23  It gives the work order, a job number,
24  that we attempted to build parts for, so
25  you can see that job number.

J. Aloi

1
2        It gives you the employee
3    that -- whoever worked on that particular
4    job and the sequence they were on and the
5    date that that person was running that
6    particular machine and the amount of
7    machine time that the machine ran for and
8    the amount of labor and time that the
9    person was on that machine.
10       Q.   Okay.  So, Jim, looking at
11   Column A that has the date.
12            Do you see that there?
13       A.   Yes, I do.
14       Q.   Are you saying that that's the
15   date on which the machine was running?
16       A.   That's correct.
17       Q.   Okay.  Do you recall the dates
18   specifically on which the Macturn was
19   essentially broken and not able to run?
20       A.   You can -- if you look down this
21   report, you can see that we ran it on the
22   7th and 18th.  And then when we get to the
23   25th, you can see almost four-month gap.
24            That is when the machine, right
25   after we -- you know, it was brought in,

J. Aloi

1
2    set down.  It was out of tolerance at that
3    point, what it indicates to me; and then
4    they brought it back up on July 15 and ran
5    it for a few days, and then there was a
6    four-day gap, an eight-day gap.
7            These were all starts and stops.
8    This machine usually will run every day.
9    This type of machine will run every day.
10   So these were -- you can see that there
11   were many, many starts and stops in here;
12   and then finally, I think we finally
13   purchased another machine sometime in '16
14   or '17.
15            This was the last entry that was
16   made after many attempts to get this
17   machine to run.  You can see even scraps
18   that were on -- these are high scrap
19   amounts for the parts that were being
20   made.
21       Q.   I want to unpackage that
22   testimony a little bit, Jim.
23            Based on your experience from
24   having received the operations reports,
25   would it have been your expectation that

J. Aloi

1
2    this machine would have been running at
3    any time it was available to run?
4            MR. COLLINS:  Objection.
5       Q.   You can go ahead and answer,
6    Jim.
7       A.   Yes.  Our backlog with this
8    particular customer, TorcUP -- that's the
9    parts that this was made -- was a very
10   large backlog that we had.  So we were
11   forced in many ways -- when this machine
12   was down -- it performs multiple
13   operations.
14            Those operations -- let's say it
15   can do three operations or four -- or two
16   or three operations at a time.  Those
17   operations had to be sourced to other
18   machines in the plant that were single
19   operations, which obviously cost you more
20   money to do that, obviously, besides
21   repairing this machine.
22            So that was not an efficient --
23   that was, you know, not an efficient way
24   to build this product, and that's what we
25   were forced to do is kind of -- it was a

J. Aloi

1
2    very, I don't want to say difficult time.
3    But what you did, you took away -- we also
4    had other customers, our regular
5    customers, so we were taking away machine
6    time from other machines.
7            So it was mission critical to
8    get this machine operating the way it was
9    sold to us, obviously, in a way they're
10   supposed to perform.
11       Q.   Okay.  Jim, you can minimize
12   that document or set it aside for the
13   moment.
14            Can you open the PDF that was
15   also uploaded in the chat, the one that
16   says PX 14?
17       A.   The PDF file?
18       Q.   Yes, sir.
19       A.   Okay.  It's about to come up.
20   Let me get it turned.
21       Q.   Okay.
22            MR. MUETHING:  Tim, do you have
23   it?
24       A.   I have that.  Oh, I'm sorry.
25   You're talking to Tim.

Page 26

J. Aloi

1
2       MR. COLLINS:  Hang on a second.
3    I have it, Brian.
4       MR. MUETHING:  Thank you.
5    Q.    Jim, you have the document in
6  front of you that is -- that came through
7  labeled as PX 14?
8    A.    Yes, I do.
9    Q.    Have you seen this document
10  before?
11   A.    I have seen this document
12  before.
13   Q.    Can you tell the Court what is
14  reflected -- just briefly for a second,
15  can you tell the Court what is reflected
16  on this document?
17   A.    This document captures some --
18  in the beginning some of the expenses of
19  moving the machine. And then as you can
20  see where we have a lot of the Morris
21  Great Lakes or LO machine, that is the
22  continual attempts to get the machine
23  working in the manner that it should have
24  been working.
25   Q.    Is this a document that is --

Page 27

J. Aloi

1  was reflected or was stored at Hy-Tech as
2  part of its regularly conducted business
3  activities?
4
5    A.    Yes.
6       MR. MUETHING:  Plaintiffs move
7    to admit PX 14.
8       (Plaintiffs' Exhibit No. 14, PDF
9    of expenses incurred in moving the
10    Macturn machine, marked for
11    identification, as of this date.)
12       MR. MUETHING:  Tim, do you want
13    to say anything? Sorry, Tim, but
14    you're on mute.
15       MR. COLLINS:  Yeah, I knew that.
16    Sorry, Brian.
17       We object, but we are going to
18    preserve the conversation for later on
19    your motion to admit.
20       MR. MUETHING:  Thank you.
21       MR. COLLINS:  So go ahead and
22    proceed.
23       MR. MUETHING:  Thank you.
24   Q.    Jim, you began to tell us a
25  little bit about this document just by

Page 28

J. Aloi

1  description. I'll ask you to just start
2  again for the record so we can have this
3  examination here.
4
5       Can you tell us what is
6  reflected on PX 14?
7    A.    Is that the PDF I'm looking at?
8    Q.    Yes, it is.  Sorry.
9    A.    So basically as I said, this is
10  expenses related to the Macturn, whether
11  it was for moving the Macturn; having, you
12  know, companies setting it up, the set up
13  of the Macturn; and then ultimately having
14  initially Morris come in and fine-tune the
15  machine or get the machine working; and
16  then the continual repairs that occurred
17  afterwards to try to get this machine
18  working the way it's supposed to be
19  working.
20   Q.    Jim, sorry, as part of your
21  function in the VP of finance role, did
22  you have responsibility for receiving and
23  then ultimately paying invoices?
24   A.    That is correct.  We would have
25  to -- there would be a verification

Page 29

J. Aloi

1  process that those services were rendered,
2  and then our operations people -- in this
3  case our president would sign off and say,
4  yes, they did do the work, because he was
5  very heavily involved.
6
7       He was involved also, and our
8  operations person, in making sure that
9  this work was performed and the people
10  were there and they put that amount of
11  time in to get the machine repaired.
12   Q.    And was that process, to your
13  recollection, followed with respect to the
14  invoices that are reflected on PX 14?
15   A.    Yes, they would not have been
16  paid unless they were approved, reviewed,
17  approved, and I had that conversation and
18  discussion with those invoices. Our
19  payables people would not do that without
20  the proper approval.
21   Q.    Just to close the loop on that,
22  tell me what it takes to have an invoice
23  approved for payment.
24       What boxes have to be checked?
25   A.    The invoice would come in.

Page 30

J. Aloi

1    There is a purchase order in place, and
2    then a receipt. That receipt would have a
3    sign off by the appropriate person. Some
4    of these are above a threshold, so we
5    would -- so that would be -- you know, a
6    thousand dollar one would still have a
7    sign off. Would I have reviewed that, a
8    thousand or a hundred?  In most cases,
9    yes.  I reviewed every invoice.
10          When you got into the larger
11   ones, I would definitely go to the source
12   to make sure that, you know, that is what
13   took place, that is what is going on in
14   finding out. You know, that's how I kind
15   of was in the loop of that we're having
16   problems getting the machine fixed.
17       Q.    Leave aside this, the Macturn
18   machine that we've been discussing for a
19   moment, so I'm not talking about that one.
20          Have there been other occasions
21   in your time as the VP of finance where
22   Hy-Tech acquired a machine by virtue of an
23   acquisition and added it to the mix of
24   machines at Hy-Tech?

Page 31

J. Aloi

1         MR. COLLINS:  Objection.
2       A.    This would be outside of the
3    purchase of the assets from Air Tool
4    Service?
5       Q.    Yes.
6       A.    Never to this extent. Well, I
7    mean, I do not recall having a machine
8    that we either purchased used or purchased
9    in an acquisition that we moved to -- and
10   I've done this in my prior life in with a
11   prior company, that we moved that machine
12   in and we had the issues that occurred
13   with this particular machine.
14      Q.    So Jim, I want to -- my
15   question, perhaps, as Mr. Collins pointed
16   out, was not artful, so I want to clean
17   this up for a second.
18          In your time at Hy-Tech, were
19   there machines, other than this Macturn,
20   that were purchased just by virtue of just
21   being used in the marketplace?
22      A.    Yes.
23      Q.    Okay. And were there other
24   machines that were purchased by virtue

Page 32

J. Aloi

1    of through the process of a corporate
2    acquisition or corporate transaction?
3       A.    Yes.
4       Q.    And can you compare the
5    performance of this Macturn, as reflected
6    in the reporting that was done to you from
7    a finance perspective, compare the Macturn
8    to these other instances?
9         MR. COLLINS:  Objection.
10      A.    Excluding the rigging and the
11   moving, this far exceeds any -- any
12   situation to get those machines running
13   and running according to the manner that
14   they are supposed to produce a part.
15      Q.    Okay.
16      A.    We did not incur expenses this
17   large, that I recall, on any machines,
18   including the additional machines that we
19   brought in from ATSCO, from Air Tool
20   Service.
21          MR. COLLINS:  Objection. Move
22      to strike the uninvited response.
23          MR. MUETHING:  I'm sorry.  What
24      do you mean by that?

Page 33

J. Aloi

1         MR. COLLINS:  Your witness kept
2      talking even though he had already
3      answered your question.
4         MR. MUETHING:  I see.
5       Q.    Jim, I asked you questions to
6    compare this machine to other ones that
7    you had acquired at Hy-Tech in the
8    marketplace and by way of acquisition.
9          Can you compare that machine, to
10   your knowledge, as compared to other
11   machines that came in the ATSCO
12   transaction, please?
13          MR. COLLINS:  Objection.
14      Q.    You can answer.
15      A.    Yes, I do not recall any
16   significant expenses incurred from other
17   machines that were part of this particular
18   purchase.
19      Q.    Okay. Thank you. Jim, this
20   is -- we've been looking at repair and
21   maintenance repair documents.
22          Eventually, was there a decision
23   made with respect to this Macturn that
24   you're familiar with?

Page 34

J. Aloi

1
2    A.    I recall in 2016 -- 2015, '16,
3  as we continued to incur some of these
4  expenses, that there was a decision to
5  purchase a similar type of Okuma machine.
6    Q.    And what do you recall -- well,
7  let me ask you this.
8          What do you recall about that
9  decision?  What were the circumstances
10  that you recall surrounding that decision?
11    A.    The circumstances were, we were
12  behind in servicing our customer.  We just
13  couldn't make good parts, so we had to
14  make an investment, another investment, in
15  a new machine to make sure we could keep
16  up on our product deliveries, our timely
17  product deliveries, or improve our product
18  deliveries.
19    Q.    Okay. Jim, I uploaded another
20  PDF into the chat.  This one marked PX 15.
21          MR. MUETHING: Can you, and also
22    Mr. Collins, let me know when you have
23    it, please?
24          MR. COLLINS:  I've got it,
25    Brian.  Thank you.

Page 35

J. Aloi

1
2    A.    Yes, I've got it.
3    Q.    Thank you.
4          Jim, you have a document
5  marked -- or previously identified as PX
6  15 in front of you.
7          Have you seen this compilation
8  of documents?
9    A.    Yes, I have.
10    Q.    Could you identify them for the
11  Court, please?
12    A.    This is the total cost of the
13  new replacement machine, and it was
14  another Okuma.
15    Q.    Thank you. Jim, are these
16  documents that were regularly -- that were
17  maintained as part of Hy-Tech's regular
18  course of business?
19    A.    That is correct. Whenever we
20  purchased the machine, we would -- where
21  you're able to accumulate whatever it
22  costs to get that machine up and running
23  and capitalize it.
24          MR. MUETHING:  Plaintiffs move
25    to admit PX 15 into evidence.

Page 36

J. Aloi

1
2          (Plaintiffs' Exhibit No. 15,
3    Total cost of new machine, marked for
4    identification, as of this date.)
5          Tim, I won't make you say that
6    you reserve your objection.  I assume
7    that's the case.
8          MR. COLLINS:  I do.  Thank you.
9    Q.    Jim, I want to walk through
10  these documents for a moment.
11          And I'll ask you first to look
12  at -- in the bottom right corner, Jim,
13  there is some page markings.
14          Do you see that there?  They
15  start with HY.
16    A.    Yes.
17    Q.    Okay. I'll ask you to look at
18  the document marked HY 117.
19    A.    Do I have to minimize this --
20  oh, is it further down. I'm sorry. HY
21  117?
22    Q.    Yes, sir.
23    A.    Yes.
24    Q.    You have it there?
25    A.    I have it.

Page 37

J. Aloi

1
2    Q.    What is this document shown on
3  HY 117?
4    A.    That is the specifications of
5  the new machine.
6    Q.    Okay.  And --
7    A.    And you can see the list price.
8  It's a Moltus machine, which is, again, a
9  multi-functional machine.  It can do more
10  than one operation when loaded; and it's
11  the specs of that machine.
12    Q.    Okay.  And then going up above,
13  Jim, what is HY 116?
14    A. 116 is the invoice from Morris
15  Great Lakes for that, the Moltus that we
16  just looked at, the detail of the specs.
17    Q. Sure. And then back up another
18  page, what is HY 115?
19    A.    115 is the actual remaining
20  payment. My guess is we must have put a
21  45,000 deposit down on this machine.
22    Q.    So what do you show on Exhibit
23  115 as Hy-Tech paying for this machine?
24    A.    We paid for the machine itself,
25  the 375.  This is the $330,000 portion.

Page 38

J. Aloi

1  J. Aloi
2  And actually, they gave us another
3  reduction of $45,000. If you look at the
4  notation --
5      Q.    Yes.
6      A.    They gave us another deduction.
7  If I recall, I think that was because of
8  late delivery.
9      Q.    Okay.  Jim, going back up to
10  H -- to the first document, the first page
11  of the document --
12      A.    They gave us that discount
13  because of late delivery.
14      Q.    Did something in the document
15  refresh your recollection as to that?
16      A.    Yeah, the machine portion,
17  excluding the bar feeder, which was a
18  different invoice.
19          The machine was $330,000.  So it
20  wasn't 375 for the machine. If they did
21  not have the late delivery, it would have
22  cost us 375.
23      Q.    And then looking back at HY 114,
24  there's an entry for the machine --
25      A.    Correct.

Page 39

J. Aloi

1  J. Aloi
2      Q.    -- and a series of other entries
3  under description.
4          Do you generally know what those
5  entries refer to?
6      A.    Yeah, those are tooling and tool
7  holders for the new machine. They don't
8  lump sum them because they're purchased on
9  all different purchase orders. And
10  sometimes you don't know what, you know,
11  all the tool holders are that you might
12  need; and then the bar feeder was
13  separate.
14      Q.    Okay. I don't want to go
15  through all of them, Jim, but I just want
16  to make it clear for the Court how these
17  records work and the way that you dealt
18  with them.
19          Could you go down page HY 121?
20      A.    Okay.
21      Q.    Can you describe what that
22  document is, in your experience?
23      A.    Those are tool holders that can
24  be capitalized at the purchase of the
25  item.  You will see that on 699237, the

Page 40

J. Aloi

1  J. Aloi
2  invoice number.
3          If you go up to that master
4  sheet, you'll see invoice No. 699237, and
5  the vendor was Sandvik. Every one of
6  these backs up the entries on the master
7  sheet.  That's for audit reasons.
8          (Reporter clarification.)
9      Q.    Jim, can I stop you? I didn't
10  hear any of that either, so you need to
11  either not say that or start over from
12  where you were.
13      A.    Okay. This particular invoice
14  matches the front sheet, the 699237, which
15  is the fourth entry down.
16      Q.    Yes, sir.
17      A.    That matches the tool holder
18  invoice on this particular purchase order.
19      Q.    And was the matching related or
20  motivated by audit concerns or reasons?
21      A.    Yes. If you -- yes.  You're
22  allowed to capitalize your tool holders
23  initially upon purchase, delivery.
24      Q.    Okay. And so are the other
25  entries -- other than the machine here,

Page 41

J. Aloi

1  J. Aloi
2  are they related to the operation of the
3  replacement machine?
4      A.    Yes, they are.
5          MR. MUETHING:  Let's go off the
6      record for a few moments, please. I
7      want to use the restroom and check on
8      my notes, and we can reconvene in
9      maybe ten minutes or so, please.
10          THE VIDEOGRAPHER:  The time is
11      10:48 a.m. We're going off the
12      record.
13          (Thereupon, a recess was taken
14      and the proceedings continued as
15      follows:)
16          THE VIDEOGRAPHER:  The time is
17      11:02 a.m.  We're back on record.
18          MR. MUETHING: Jim, I do not
19      have any more questions for you at
20      this time; and now it's Mr. Collins'
21      turn to ask you some questions.
22          Okay?
23          THE WITNESS:  Okay.
24          MR. COLLINS:  Give me just one
25      minute here.  Actually, give me two

Page 42

J. Aloi

1   J. Aloi
2   minutes, please.
3          THE VIDEOGRAPHER:  We're on the
4   record.
5   CROSS EXAMINATION BY
6   MR. COLLINS:
7      Q.    Thank you. Sir, my name is Tim
8   Collins. I'm an attorney in Cleveland,
9   and I'm going to follow up on some of the
10  points that were with your lawyer this
11  morning.
12         So first things first, where are
13  you employed now?
14     A.    I am a self-employed consultant.
15     Q.    Okay.  Do you have a company
16  name?
17     A.    No.
18     Q.    So you're doing it as a sole
19  proprietorship?
20     A.    That's correct.
21     Q.    And I don't think we've had an
22  end point of your employment with Hy-Tech.
23         Could you tell us when you left
24  your employment there?
25     A.    I left Hy-Tech in May of 2019.

Page 43

J. Aloi

1   J. Aloi
2      Q.    Is that a retirement?
3      A.    I'm sorry, 2020.  Yes.
4      Q.    So that was retirement from
5   employment with Hy-Tech?
6      A.    Semiretired.
7      Q.    Do you still do work for
8   Hy-Tech?
9      A.    I do.
10     Q.    Can you describe what kind of
11  work you do for them?
12     A.    I assist with some of the
13  questions.  We had just installed a new
14  software system and from time to time,
15  they will call me with questions about
16  that system.
17     Q.    How often since May of 2020 has
18  Hy-Tech called you on software questions?
19     A.    Probably maybe 80 hours' worth.
20     Q.    I'm sorry.  Did you say 80, like
21  eight-zero?
22     A.    Eight-zero, yeah.
23     Q.    Would that have been spread
24  evenly from May until now?
25     A.    No, most of it probably about

Page 44

J. Aloi

1   J. Aloi
2   four to five weeks after I left, probably
3   90 percent of that time, to help them
4   transition with new employees.
5      Q.    Okay.  And what else would you
6   be doing as a consultant for Hy-Tech?
7      A.    That's -- that's it.
8      Q.    So this lawsuit has been pending
9   for, I believe, close to five years.
10         Did you know that?
11     A.    Yes, I did.
12     Q.    Okay. And have you been
13  consulting since May of 2020 on any of the
14  issues pertaining to the litigation?
15     A.    No.
16     Q.    Are you getting paid for
17  attending this deposition?
18     A.    Yes.
19     Q.    What's your hourly rate?
20     A.    $75.
21     Q.    Okay.  And have you spent any
22  time preparing for this deposition?
23     A.    Yes.
24     Q.    How much time?
25     A.    Two hours.  Two or three hours.

Page 45

J. Aloi

1   J. Aloi
2      Q.    When did you spend those two or
3   three hours?
4      A.    Yesterday.
5      Q.    Would that be yesterday --
6      A.    Tim, I'm sorry. If you go back
7   to when I was employed, I prepared some of
8   the documents that we looked at today. I
9   don't know the amount time or hours.
10     Q.    Okay.
11     A.    But since I have been -- since I
12  left Hy-Tech, that's the extent of the
13  amount of time.
14     Q.    Okay.  So yesterday, what time
15  did you do your preparation for this
16  deposition?
17     A.    8 o'clock in the morning until
18  about 10:00.
19     Q.    And have you reviewed any
20  deposition transcripts or drafts of
21  transcripts related to this case?
22     A.    No. I've looked at some
23  schedules. I don't know if that was part
24  of a deposition or not or if those were
25  just exhibits.

J. Aloi

1
2     Q.    Did you read any scripts of
3  answers that other people have given in
4  this case?
5     A.    No. I did read just the -- you
6  know, a couple of items of -- I can't even
7  remember what they pertain to -- the
8  Macturn machine. That was it. The
9  Macturn.
10     Q.   Okay. And let me ask a couple
11  of questions, then, to focus on what you
12  testified to earlier.
13          You used the phrase ABL
14  purchase.  That's what Hy-Tech apparently
15  undertook when it came to buying the
16  assets --
17          MR. MUETHING: I'm sorry to cut
18     you off, Tim. I did not hear anything
19     you said.  My apologies.
20          MR. COLLINS:  Okay.  I'm about
21     to start a new question. Are you able
22     to catch up here, Brian?
23          MR. MUETHING:  I am.  I just --
24     I didn't hear -- I heard the sound.  I
25     just couldn't make out the words.

J. Aloi

1
2  Thank you.
3          MR. COLLINS:  Do you need
4     something read back, Brian?
5          MR. MUETHING: No. I guess if
6     you want to read back the question
7     that you asked starting about 15
8     seconds ago, or you can reask it. I
9     didn't mean to interrupt you.  Sorry.
10          MR. COLLINS:  No, that's all
11     right.  I'll start all over again.
12     Q.   I want to talk about the phrase
13  or the initials that you used --
14     A.    You went mute.
15     Q.    -- ABL.  Can you tell the
16  Court --
17          MR. MUETHING:  Hey, Tim, sorry
18     to do this to you, but you were
19     breaking up and you froze on all of
20     us. So I'm not trying to disrupt your
21     examination, but I think you will need
22     to start over again.  Sorry.
23          MR. COLLINS: Yeah, I see I'm
24     getting an unstable internet message
25     on my screen.  So just tell me, sir,

J. Aloi

1
2     if there's problems.  I apologize.
3     Q.    ABL, what do those initials
4  stand for?
5     A.    Asset-based lending.
6     Q.    And what about this transaction
7  made it an ABL transaction, the purchase
8  by Hy-Tech of Air Tool?
9     A.    To go into the particulars, I
10  think each one is different. But most of
11  the times, it's a company that is
12  purchasing the inventory and value of
13  inventory and fixed assets and
14  receivables.  Anything that's an asset.
15     Q.    This ABL transaction, what
16  document would control the terms between
17  the parties?
18     A.    I don't get involved in that
19  particular aspect of the purchase.
20     Q.    Okay.
21     A.    I did, as I said, some of the
22  financial due diligence portion.
23     Q.    So you were not involved with
24  the terms of the Asset Purchase
25  Agreement --

J. Aloi

1
2     A.    No.
3     Q.    -- that was signed on August 13,
4  2014, were you?
5     A.    No.
6     Q.    You don't know what those terms
7  are, do you?
8     A.    I do not know what those terms
9  are.
10     Q.    So you don't know how those
11  terms might impact the testimony you've
12  given today, do you?
13     A.    Not necessarily, no.
14     Q.    Okay. You testified that this
15  purchase you thought or Hy-Tech thought
16  that it would take -- it would purchase
17  the customers, the inventory, and the
18  assets of Air Tool, and then you would
19  collapse the overhead and move the assets
20  you purchased into the Cranberry facility.
21          Is that an accurate assessment
22  of what you thought and Hy-Tech thought it
23  was doing in this transaction?
24     A.    Usually, those are the
25  incentives for making a particular

J. Aloi

1
2  purchase.
3      Q.    Yeah, I think you said it was
4  the goals of Hy-Tech in making this
5  purchase.
6      A.    It's -- I don't know if I --
7  those would have been my goals. I'm not
8  sure how we placed them as -- those would
9  have been my goals in making this type of
10 a purchase. Not necessarily P&F, P&F's
11 goals.
12     Q.    Or Hy-Tech's goals or Air Tools'
13 goals, correct?
14     A.    I would imagine -- you know,
15 we're talking about goals and that's up to
16 the determination of each group. That's
17 why I told you those would be my goals.
18     Q.    Right. I just want the record
19 to be clear that was your goals, and dare
20 I say, your expectations for this
21 transaction.
22          But that would be your personal
23 goals, right?
24     A.    Right.
25     Q.    Okay.  Great.  Thank you.

J. Aloi

1
2          Now, you said that -- you used a
3  phrase plural, machines, in this
4  transaction were not running as they
5  should, but then you went on to describe
6  one machine, the Okuma Macturn, as not
7  running as it should.
8          Is there more than one machine
9  that is in your mind in question here?
10     A.    I recollect that the Macturn, as
11 I stated, was a very important machine;
12 and there were other machines, but that
13 was -- that machine, because it fit into
14 the largest customer and so on and so
15 forth, was a very important machine.
16     Q.    And then you said it was not
17 working as publicized.
18          Do you remember that testimony?
19     A.    I said it was -- I don't know if
20 I said that in particular. But what I'm
21 trying to say is that it wasn't running
22 the way that particular type of machine
23 should be operating --
24     Q.    Okay.
25     A.    -- producing quality parts.

J. Aloi

1
2      Q.    And how would you come to the
3  conclusion that the piece of equipment was
4  not running as it should operate?
5          You're not an engineer, correct?
6      A.    Nope, correct.
7      Q.    And you're not an operations
8  person, correct?
9      A.    That's correct.  Operations as
10 far as being out on the floor, yes.
11     Q.    My next question was, you're not
12 out on the floor, so you don't know
13 whether something is running as was
14 publicized or expected, except if someone
15 else told you; is that correct?
16     A.    Yes. You get it from the
17 feedback of the people on the floor.
18     Q.    So you'd get reports from them,
19 but you yourself don't have personal
20 knowledge as to whether this piece of
21 equipment was operating as advertised or
22 expected, correct?
23     A.    Correct. We get it from -- yes.
24 From the finance side, I'm getting reports
25 that say we scrapped this many; and I'm

J. Aloi

1
2  getting reports from operators and people
3  out on in the shop, operations people.
4      Q.    Yesterday, we learned that
5  Hy-Tech used an outside service of
6  professionals to repair this particular
7  piece of equipment, and I think you looked
8  at the schedule of checks.
9          Is that your recollection that
10 outside service professionals came in to
11 service the Macturn?
12     A.    Outside service, Morris Great
13 Lakes, yes, as a certified Okuma repair
14 station.
15     Q.    Was there a company called L&L
16 also that did service on that particular
17 piece of equipment?
18     A.    L&L did some work, and I think
19 some of it was to get it prepared to move.
20 That's what I recollect what they did.
21          They have repair in their name.
22 They've done some machine repair for us.
23     Q.    Just to be clear, there's no one
24 on the staff at Hy-Tech who performed the
25 service on this particular Macturn after

Page 54

J. Aloi

1
2  it was in the ownership of Hy-Tech,
3  correct?
4      A.    That's correct. I want to
5  qualify, that I know of, yes.
6      Q.    Understood. I appreciate that.
7  Thank you.
8          You've described that some of
9  the drawings for parts that were to be
10 manufactured on this piece of equipment
11 were not up to snuff.
12          Do you recall that testimony?
13     A.    Yes.
14     Q.    And that would, similarly, be
15 information that you got from others.
16          You don't have personal
17 knowledge yourself whether or not those
18 drawings were up to snuff for
19 manufacturing parts on the Okuma, do you?
20     A.    Correct. It is from feedback.
21     Q.    And whether the machine was in
22 or out of tolerance is not -- the machine
23 being the Okuma, whether it was in or out
24 of tolerance is information you obtained.
25          You don't have personal

Page 55

J. Aloi

1
2  knowledge of that, do you?
3      A.    That's correct.
4      Q.    And then I think you used the
5  phrased there was a vicious cycle of
6  repairs, the Okuma going in and out of
7  tolerance, and then ultimately being no
8  longer repaired by your company.
9          You don't know of personal
10 knowledge the vicious cycle or why this
11 piece of equipment was in the vicious
12 cycle, do you?
13     A.    I witnessed the continual repair
14 of some of these bad quality parts by
15 other departments, like in our repair
16 department, in trying to fix the part to
17 get those back into tolerance.
18          And so I knew there was a --
19 there was a cycle of, you know, bad part
20 and it had to go over here, and we have to
21 try and fix it if we could salvage those
22 parts. But, again, that part I visually
23 saw.
24          And what was the other question
25 that you had, Tim?

Page 56

J. Aloi

1
2      Q.    Well, I was just talking about
3  the cycle and whether you had personal
4  knowledge of, you know, why the Okuma was,
5  as you described it, in a vicious cycle of
6  being in and out of tolerance.
7          Yours is not personal knowledge;
8  it's received knowledge from other
9  persons, correct?
10     A.    Yes. It's more the process that
11 was -- that we kept going through the same
12 thing, bad part and then we would have to
13 go --
14          MR. MUETHING: Jim, this is
15     Brian. I would just encourage you to
16     let Tim ask his whole question and
17     then that will give the court reporter
18     time to write that down; and then if
19     you answer, he'll give you the same
20     courtesy, and then Linda will have an
21     easier morning with us.
22          THE WITNESS: Okay.
23          MR. COLLINS: Thank you, Brian.
24     We're all struggling with this
25     technology and our --

Page 57

J. Aloi

1
2          MR. MUETHING: I know. Thank
3     you.
4          MR. COLLINS: I appreciate that.
5      Q.    You testified about this piece
6  of equipment. The phrase that you used
7  was that it was sold to us and it was
8  supposed to perform in a certain way.
9          Do you recall that testimony?
10     A.    Generally, yes.
11     Q.    Okay.
12     A.    In a general sense.
13     Q.    What information have you seen
14 describing how the Okuma Macturn was
15 supposed to perform as represented to
16 Hy-Tech by Air Tool?
17     A.    Well, from a finance standpoint,
18 it means producing quality parts, and it
19 was not producing quality parts.
20     Q.    And what representations were
21 made that you've seen by Air Tool
22 regarding this piece of equipment and its
23 ability to produce parts?
24     A.    I personally have not seen any
25 representations.

J. Aloi

1
2    Q.    Okay. Did you ever make any
3 trips to the Mentor, Ohio facility that
4 Air Tool had prior to the closing of the
5 transaction between Hy-Tech and Air Tool?
6    A.    No, not prior to the closing.
7    Q.    And did you have any
8 conversations with any persons at Air Tool
9 prior to the closing of the transaction?
10   A.    No.
11   Q.    Did you have any conversations
12 with persons -- and I'll name couple of
13 names to see if it jogs your memory, Rick
14 Sabbath, Mike Sivula, or any others from
15 Air Tool after the transaction closed?
16   A.    In a particular -- not with Rick
17 Sabbath.
18   Q.    Okay.
19   A.    Mike Sivula, I had discussions
20 with him after the purchase of the
21 company.
22   Q.    Okay. What did you talk to Mike
23 about?
24   A.    More of it was pertained to
25 inventory.

J. Aloi

1
2    Q.    All right. Did you have any
3 conversations regarding the Okuma Macturn?
4    A.    No. No.
5    Q.    Was there anybody else from Air
6 Tool that you had conversations with after
7 the closing of the transaction regarding
8 the Okuma Macturn?
9    A.    Not that I recall.
10   Q.    In Plaintiffs' Exhibit 14, there
11 was an item by Ramsey Rigging dated
12 September 24, 2014.
13        Do you have that information?
14   A.    Which schedule, Tim?
15   Q.    Plaintiff's Exhibit 14. And
16 that would be available to you, I think,
17 still on the chat box.
18   A.    I see PX 14. Is that what that
19 means?
20   Q.    Yes.
21   A.    Okay.
22   Q.    There's an entry for Ramsey
23 Rigging for September 24, 2014.
24        Do you see that entry?
25   A.    Yes.

J. Aloi

1
2    Q.    It reads, "Rigging rearranging
3 shop for Macturn."
4        Do you see that?
5    A.    Right.
6    Q.    And would that have been when
7 the service was provided by Ramsey Rigging
8 to take the Macturn out of the Mentor
9 facility and bring it to the Cranberry,
10 Pennsylvania facility?
11   A.    No.
12   Q.    All right. What was that for?
13   A.    That was to rearrange the
14 Cranberry facility to get it ready for
15 when they were going to move the Macturn.
16   Q.    Do you know when the Macturn was
17 actually relocated?
18   A.    I think it was January 7, 2015,
19 Tim, if you look down the fourth, the
20 fourth item.
21   Q.    Okay.
22   A.    "To move Okuma Macturn."
23 Actually, it looks like service date was
24 January 30. Sorry.
25   Q.    So January 30, 2014?

J. Aloi

1
2    A.    Yes.
3    Q.    Or '15?
4    A.    Correct.
5    Q.    '15.
6    A.    That would be the fourth --
7 fourth row, fourth, Ramsey.
8    Q.    Got it. Okay. And so who was
9 in charge of operating the Okuma Macturn
10 from August '14 until January 30, 2015?
11        Would that have been a Hy-Tech
12 set of personnel?
13   A.    I believe that that machine was
14 still at the Mentor facility.
15   Q.    Right. And so from the day of
16 the closing of the transaction until the
17 day it was positioned in Cranberry, that
18 piece of equipment was operated by Hy-Tech
19 personnel, correct?
20   A.    I think it was -- well, if you
21 want to call the new employees of Air Tool
22 Service as ATSCO Holding employees, then
23 yeah, it was the original people at the
24 Mentor facility that I believe -- I don't
25 recollect, but I believe they were the

Page 62

J. Aloi

1  J. Aloi
2  ones who would have operated it if it
3  stayed at Mentor.
4      Q.    Okay. Do you know how the
5  business of Air Tool prior to August 14,
6  2014, was operated?
7      A.    Do I know how it was operated?
8      Q.    Yes.
9          MR. MUETHING:  Objection.
10  Vague.
11      A.    Yeah, that -- from a broad
12  standpoint, I don't know how it was
13  operated.
14      Q.    Okay. And do you know whether
15  there was sufficient inventory, both in
16  terms of its quality and quantity, to be
17  used in the ordinary course of Air Tool's
18  business prior to August 14, 2014?
19      A.    Tim, could you repeat the whole
20  question, please?
21      Q.    Sure. Do you know if Air Tool
22  had sufficient inventory in terms of
23  quality and quantity so as to --
24  (inaudible) its business in the ordinary
25  course prior to the closing of the

Page 63

J. Aloi

1  transaction, that was August 14, 2014?
2          MR. MUETHING:  Objection.
3          MR. COLLINS:  Brian, what's the
4      basis for your objection?
5          MR. MUETHING: I think the
6      question is vague, and I didn't
7      understand some of it, and so I think
8      if the witness has the same effect,
9      then it's objectionable.
10          MR. COLLINS:  Let's hear and see
11      if he understood it.
12      Q.    Do you understand the question,
13  sir?
14      A.    I'm supposed to make an
15  assumption that prior to August 14, 2014,
16  that they had adequate inventory and
17  were --
18      Q.    I'm asking you if you had
19  knowledge if they had adequate inventory.
20          I'm betting your answer is no,
21  you don't know.
22      A.    I don't have knowledge that they
23  had adequate inventory.
24      Q.    Okay.  And you don't know what

Page 64

J. Aloi

1  the present circumstances of the operation
2  of the Air Tool business was prior to the
3  closing of the transaction between Hy-Tech
4  and Air Tool, do you?
5      A.    No, just financial statements.
6      Q. You don't know how the business
7  Air Tool was running prior to the closing
8  was conducted, do you?
9      A.    No.
10          MR. COLLINS:  Brian, can I have
11      two minutes, because I may be done.
12      If we can go off the record for two
13      minutes.
14          MR. MUETHING:  Tim, whatever you
15      need is fine.
16          MR. COLLINS:  Yeah, I think I'm
17      done, but just let me have a moment.
18          MR. MUETHING:  Absolutely.
19          THE VIDEOGRAPHER:  The time is
20      11:29 a.m. We're going off the
21      record.
22          (Thereupon, a recess was taken
23      and the proceedings continued as
24      follows:)

Page 65

J. Aloi

1  THE VIDEOGRAPHER: The time is
2  11:31 a.m.  We're back on the record.
3      MR. COLLINS: Mr. Aloi, thank
4  you very much for your time. I've
5  concluded my line of questions.
6      THE WITNESS: Okay.
7      MR. MUETHING: Plaintiffs have
8  no re-cross.
9      Jim, under the rules for a
10  deposition, you are entitled to review
11  the transcript that Linda puts
12  together, and you are entitled -- if
13  you would like to make any -- to fix
14  anything that did not get taken down
15  accurately.
16      I can't make that decision for
17  you. You have to make that decision.
18  Though, I always urge a witness to do
19  that. And so you need to say on the
20  record if you would like to read and
21  sign or you would like to waive that
22  right.
23      THE WITNESS: Yes, I would like
24  to read and sign.

Page 66

```
1            J. Aloi
2      MR. MUETHING:  Okay.  That will
3  be fine. We'll get you the transcript
4  whenever it becomes available.
5      MR. COLLINS:  Thanks everyone.
6      MR. MUETHING:  Thanks everybody.
7  Appreciate your time this morning.
8      THE VIDEOGRAPHER: The time is
9  11:32 a.m. We're going off the
10  record.
11      (Time Noted: 11:32 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 67

```
1
2  STATE OF_____)
3                          ) :ss
4  COUNTY OF_____)
5
6
7          I, JIM ALOI, the witness
8  herein, having read the foregoing
9  testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15
16
17      _____
18            JIM ALOI
19
20
21
22
23
24
25
```

Page 68

```
1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                      : ss.
5  COUNTY OF NEW YORK  )
6
7          I, Linda Salzman, a Notary
8  Public within and for the State of
9  New York, do hereby certify:
10      That JIM ALOI, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that
13  such deposition is a true record of
14  the testimony given by the witness.
15      I further certify that I am not
16  related to any of the parties to
17  this action by blood or marriage,
18  and that I am in no way interested
19  in the outcome of this matter.
20      IN WITNESS WHEREOF, I have
21  hereunto set my hand this 19th day
22  of November, 2020.
23          Linda Salzman
24          _____
25          Linda Salzman
```

Page 69

```
1
2  --------------- I N D E X ---------------
3  WITNESS        EXAMINATION BY     PAGE
4  TIM ALOI       MR. MUETHING         7
5                 MR. COLLINS         42
6  -------------- EXHIBITS ----------------
7  PLAINTIFFS'                     FOR ID.
8  Exhibit No. 30 Excel spreadsheet    20
9                 showing usage from
10                Machine 143
11  Exhibit No. 14 PDF of expenses      27
12                incurred in moving
13                the Macturn
14                machine
15  Exhibit No. 15 Total cost of new    36
16                machine
17
18
19
20
21
22
23
24
25
```

Page 70

```
1   NAME OF CASE:
2   DATE OF DEPOSITION:
3   NAME OF WITNESS:
4   Reason Codes:
5       1. To clarify the record.
6       2. To conform to the facts.
7       3. To correct transcription errors.
8   Page_____Line_____Reason _____
9   From_____to _____
10  Page_____Line_____Reason _____
11  From_____to _____
12  Page_____Line_____Reason _____
13  From_____to _____
14  Page_____Line_____Reason _____
15  From_____to _____
16  Page_____Line_____Reason _____
17  From_____to _____
18  Page_____Line_____Reason _____
19  From_____to _____
20  Page_____Line_____Reason _____
21  From_____to _____
22  Page_____Line_____Reason _____
23  From_____to_____
24
25          _____
```

## $

**$330,000** 37:25
38:19

**$45,000** 38:3

**$75** 44:20

## 1

**1** 6:3

**10:00** 45:18

**10:05** 6:9

**10:48** 41:11

**114** 38:23

**115** 37:18,19,23

**116** 37:13,14

**117** 36:18,21 37:3

**11:02** 41:17

**11:29** 64:21

**121** 39:19

**13** 9:11 49:3

**14** 25:16 26:7 27:7,8
28:6 29:14 59:10,15,
18 61:10 62:5,18
63:2,16

**143** 20:5,18

**15** 23:4 34:20 35:6,25
36:2 47:7 61:3,5

**16** 23:13 34:2

**17** 23:14

**18th** 22:22

## 2

**20** 9:12

**2014** 8:9 49:4 59:12,
23 60:25 62:6,18
63:2,16

**2015** 34:2 60:18
61:10

**2016** 34:2

**2017** 8:10

**2019** 42:25

**2020** 6:8 43:3,17
44:13

**24** 59:12,23

**25th** 22:23

## 3

**30** 5:19 18:13,14
19:11 20:15,16 21:6
60:24,25 61:10

**375** 37:25 38:20,22

## 4

**45,000** 37:21

## 5

**5** 6:8

## 6

**699237** 39:25 40:4,
14

## 7

**7** 60:18

**7th** 22:22

## 8

**8** 45:17

**80** 43:19,20

## 9

**90** 44:3

## A

**a.m.** 6:9 41:11,17
64:21

**abilities** 9:14

**ability** 57:23

**ABL** 46:13 47:15
48:3,7,15

**Absolutely** 64:19

**absorb** 12:6

**accounting** 8:19

**accounts** 10:23

**accumulate** 35:21

**accurate** 49:21

**acquired** 30:23 33:8

**acquisition** 30:24
31:10 32:3 33:9

**acquisitions** 8:19

**activities** 27:4

**actual** 37:19

**added** 30:24

**addition** 14:7

**additional** 32:19

**adequate** 63:17,20,
24

**admissible** 5:18

**admit** 20:15 21:6
27:7,19 35:25

**advertised** 52:21

**Agreement** 48:25

**ahead** 21:13 24:5
27:21

**Air** 6:5 31:4 32:20
48:8 49:18 50:12
57:16,21 58:4,5,8,15
59:5 61:21 62:5,17,
21 64:3,5,8

**allowed** 40:22

**Aloi** 5:1 6:1,4 7:1,14,
25 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1

40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1

**amount** 12:5 22:6,8
29:10 45:9,13

**amounts** 23:19

**analysis** 12:3

**answers** 46:3

**apologies** 46:19

**apologize** 48:2

**apparently** 46:14

**approval** 29:20

**approved** 29:16,17,
23

**approximately** 6:9

**area** 9:15 10:6,21

**areas** 14:18

**artful** 31:17

**aspect** 48:19

**aspects** 9:24 10:8
12:23

**assessment** 49:21

**asset** 48:14,24

**asset-based** 13:21
14:8 48:5

**assets** 12:15 13:6
14:5 31:4 46:16
48:13 49:18,19

**assist** 43:12

**assisted** 8:18

**association** 5:4 6:13

**assume** 21:8 36:6

**assumption** 63:16

**ATSCO** 6:4,19 12:15
13:6,11 14:13 32:20
33:12 61:22

**attempted** 21:24

**attempting** 16:2

**attempts** 23:16
26:22

**attending** 44:17

**attorney** 42:8

**audit** 40:7,20

**auditors** 8:21

**August** 49:3 61:10
62:5,18 63:2,16

**aware** 9:19 12:16
13:12

## B

**back** 11:2 17:21,22
23:4 37:17 38:9,23
41:17 45:6 47:4,6
55:17

**backlog** 11:24 24:7,
10

**backs** 40:6

**bad** 55:14,19 56:12

**bar** 38:17 39:12

**Based** 23:23

**basically** 10:16 28:9

**basis** 8:25 11:23
12:10,11,12 13:20
63:5

**began** 14:13 27:24

**begin** 21:16

**beginning** 21:15
26:18

**betting** 63:21

**big** 16:9

**biggest** 14:16 15:9
16:9

**bit** 11:20 16:18 23:22
27:25

**bottom** 36:12

**box** 59:17

**boxes** 29:24

**breaking** 47:19

Index: breakup..due

**breakup** 20:24

**Brian** 6:17 7:15 13:7 18:21 19:12 20:24 26:3 27:16 34:25 46:22 47:4 56:15,23 63:4 64:11

**briefly** 19:25 26:14

**bring** 60:9

**broad** 62:11

**broken** 22:19

**brought** 22:25 23:4 32:20

**budgeting** 10:8

**budgets** 10:18

**build** 21:24 24:24

**building** 15:2

**built** 15:18 16:10

**business** 9:8,20 20:11 27:3 35:18 62:5,18,24 64:3,7

**buying** 46:15

**C**

**call** 8:5 17:4 43:15 61:21

**called** 7:9 18:3 43:18 53:15

**capitalize** 35:23 40:22

**capitalized** 39:24

**captures** 26:17

**Carlos** 5:3 6:10

**case** 5:21 29:4 36:7 45:21 46:4

**cases** 30:9

**catch** 46:22

**centers** 10:5

**certified** 53:13

**charge** 61:9

**chat** 18:4 25:15 34:20 59:17

**check** 41:7

**checked** 29:24

**checks** 53:8

**circumstances** 34:9,11 64:2

**Civil** 5:20

**clarification** 40:8

**clean** 31:17

**clear** 7:4 39:16 50:19 53:23

**Cleveland** 6:23 42:8

**close** 29:21 44:9

**closed** 58:15

**closing** 14:14,17 58:4,6,9 59:7 61:16 62:25 64:4,8

**collapse** 49:19

**Collins** 5:23 6:22,23 11:10,14,17 18:21,25 19:4,12 20:23 21:7, 10 24:4 26:2 27:15, 21 31:2,16 32:10,22 33:2,14 34:22,24 36:8 41:24 42:6,8 46:20 47:3,10,23 56:23 57:4 63:4,11 64:11,17

**Collins'** 41:20

**Column** 22:11

**companies** 28:12

**company** 6:6 9:13, 22 13:10,17 14:11 31:12 42:15 48:11 53:15 55:8 58:21

**compare** 32:5,8 33:7,10

**compared** 33:11

**comparisons** 13:3

**compilation** 35:7

**completely** 17:5

**concern** 14:18

**concerns** 40:20

**conclusion** 52:3

**conducted** 27:3 64:9

**confirm** 19:15

**connection** 14:6

**consultant** 42:14 44:6

**consulting** 44:13

**continual** 26:22 28:16 55:13

**continued** 34:3 41:14 64:24

**control** 48:16

**conversation** 21:12 27:18 29:17

**conversations** 58:8, 11 59:3,6

**corner** 36:12

**Corp** 6:5,19

**corporate** 6:20 32:2, 3

**correct** 8:3,4 22:16 28:24 35:19 38:25 42:20 50:13 52:5,6,8, 9,15,22,23 54:3,4,20 55:3 56:9 61:4,19

**correctly** 16:25

**cost** 24:19 35:12 36:3 38:22

**costs** 35:22

**counsel** 6:14

**couple** 14:19 46:6,10 58:12

**court** 6:12 7:6 8:8 14:12 26:13,15 35:11 39:16 47:16 56:17

**courtesy** 56:20

**courtroom** 5:18

**COVID-19** 5:6

**Cranberry** 49:20 60:9,14 61:17

**create** 10:18

**creating** 11:22

**critical** 25:7

**CROSS** 42:5

**customer** 12:24 13:20 14:7 24:8 34:12 51:14

**customers** 13:18,23 15:19 16:11 25:4,5 49:17

**cut** 46:17

**cycle** 17:23 55:5,10, 12,19 56:3,5

**D**

**daily** 10:2,8 11:5,18, 23 12:9,10

**dare** 50:19

**data** 13:2

**date** 20:19 22:5,11,15 27:11 36:4 60:23

**dated** 59:11

**dates** 22:17

**day** 23:8,9 61:15,17

**days** 23:5

**DCOS** 17:4

**dealt** 39:17

**decision** 33:23 34:4, 9,10

**deduction** 38:6

**defendants** 7:2,4

**deliveries** 34:16,17, 18

**delivery** 38:8,13,21 40:23

**department** 8:20 55:16

**departments** 10:20 55:15

**deposit** 37:21

**deposition** 5:10 6:3, 7 44:17,22 45:16,20, 24

**describe** 10:12 11:20 13:14 14:12 19:19,25 21:16,17 39:21 43:10 51:5

**describes** 20:2

**describing** 57:14

**description** 28:2 39:3

**detail** 11:21 21:19 37:16

**determination** 50:16

**difficult** 15:15,21 25:2

**diligence** 12:19,22 48:22

**Dinsmore** 6:24

**DIRECT** 7:12

**discount** 38:12

**discussing** 30:19

**discussion** 29:18

**discussions** 58:19

**disrupt** 47:20

**distancing** 5:8

**document** 18:12,20 19:16,18,22 20:2,4, 10,15 21:19,21 25:12 26:5,9,11,16,17,25 27:25 35:4 36:18 37:2 38:10,11,14 39:22 48:16

**documents** 33:22 35:8,16 36:10 45:8

**Dolan** 6:25

**dollar** 30:7

**download** 18:22

**drafts** 45:20

**drawing** 17:9,10,12

**drawings** 17:3 54:9, 18

**due** 5:6 12:18,21 48:22

**duly** 7:9

**duties** 8:23

---

**E**

**earlier** 46:12

**easier** 56:21

**effect** 63:9

**efficiencies** 12:4

**efficient** 10:10 11:5, 6 24:22,23

**eight-day** 23:6

**eight-zero** 43:21,22

**employed** 42:13 45:7

**employee** 22:2

**employees** 44:4 61:21,22

**employment** 42:22, 24 43:5

**encourage** 56:15

**end** 42:22

**engineer** 52:5

**enter** 14:2

**entries** 39:2,5 40:6, 25

**entry** 23:15 38:24 40:15 59:22,24

**equipment** 52:3,21 53:7,17 54:10 55:11 57:6,22 61:18

**ERP** 11:2,6,15

**essentially** 12:15 21:3 22:19

**estimated** 12:25

**et al** 6:5,6

**evenly** 43:24

**Eventually** 33:23

**evidence** 35:25

**examination** 7:12 28:4 42:5 47:21

**examined** 7:10

**exceeds** 32:12

**Excel** 18:8,13 20:17

**excluding** 32:11 38:17

**Exhibit** 20:16 27:8 36:2 37:22 59:10,15

**exhibits** 45:25

**expectation** 23:25

**expectations** 50:20

**expected** 52:14,22

**expenses** 12:7 26:18 27:9 28:10 32:17 33:17 34:4

**experience** 9:12 23:23 39:22

**expert** 19:2

**experts** 16:5

**explain** 9:7

**extent** 31:7 45:12

**external** 8:21

---

**F**

**facility** 14:2 49:20 58:3 60:9,10,14 61:14,24

**fairly** 9:23

**familiar** 12:13 13:5,9 33:25

**familiarity** 14:10

**Federal** 5:20

**feedback** 52:17 54:20

**feeder** 38:17 39:12

**felt** 13:22

**file** 19:6 25:17

**finally** 23:12

**finance** 8:12,16 10:14,16 28:21 30:22 32:8 52:24 57:17

**financial** 8:17 12:23, 25 13:2,24 48:22 64:6

**finding** 30:15

**fine** 8:7 64:16

**fine-tune** 28:14

**firm** 6:24

**fiscal** 10:23

**fit** 9:13 16:24 51:13

**fix** 55:16,21

**fixed** 12:7 16:4 17:18 30:17 48:13

**floor** 52:10,12,17

**focus** 46:11

**folks** 10:15

**follow** 42:9

**forced** 24:11,25

**foundation** 19:20

**four-day** 23:6

**four-month** 22:23

**fourth** 40:15 60:19, 20 61:6,7

**front** 26:6 35:6 40:14

**froze** 47:19

**full** 7:23

**function** 9:9 10:14, 16 28:21

**functions** 8:15 10:17

---

**G**

**gap** 22:23 23:6

**gaps** 17:18

**gave** 38:2,6,12

**general** 57:12

**generally** 13:4,12 39:4 57:10

**give** 41:24,25 56:17, 19

**goal** 13:16

**goals** 13:5,10 50:4,7, 9,11,12,13,15,17,19, 23

**good** 5:2 6:16,22 34:13

**Goodman** 6:21

**Great** 26:21 37:15 50:25 53:12

**group** 50:16

**groups** 10:25

**grow** 13:23

**guess** 9:18 37:20 47:5

---

**H**

**Hang** 26:2

**he'll** 56:19

**hear** 7:18 20:23 40:10 46:18,24 63:11

**heard** 46:24

**hearing** 11:9

**heavily** 29:6

**held** 6:7

**Hey** 47:17

**high** 23:18

**hold** 18:18 20:20

**holder** 40:17

**holders** 39:7,11,23 40:22

**Holding** 61:22

**Holdings** 6:4,19

**hopes** 13:10

**hourly** 44:19

**hours** 12:5 44:25 45:3,9

**hours'** 43:19

**hundred** 30:9

**HY** 36:15,18,20 37:3, 13,18 38:23 39:19

**Hy-tech** 6:19 8:11

9:4,8,10,14,18,21 11:25 12:14 13:5 14:5,11 20:12 21:4 27:2 30:23,25 31:19 33:8 37:23 42:22,25 43:5,8,18 44:6 45:12 46:14 48:8 49:15,22 50:4 53:5,24 54:2 57:16 58:5 61:11,18 64:4

**Hy-tech's** 13:10 35:17 50:12

---

**I**

**identification** 20:19 27:11 36:4

**identified** 19:10 35:5

**identify** 35:10

**IDS** 17:13

**imagine** 50:14

**immediately** 14:16

**impact** 49:11

**important** 51:11,15

**improve** 34:17

**inadequacy** 15:9

**inaudible** 62:24

**incentives** 49:25

**inclinings** 14:22

**including** 12:24 32:19

**incur** 32:17 34:3

**incurred** 27:9 33:17

**information** 54:15, 24 57:13 59:13

**initially** 28:14 40:23

**initials** 11:15 47:13 48:3

**installed** 43:13

**instances** 32:9

**interface** 10:6,20

**interfacing** 10:13

---

**internal** 8:21

**internet** 47:24

**interrupt** 47:9

**introduce** 6:14

**inventory** 48:12,13 49:17 58:25 62:15,22 63:17,20,24

**investment** 34:14

**invoice** 29:22,25 30:10 37:14 38:18 40:2,4,13,18

**invoices** 28:23 29:14,18

**involved** 12:18,21 29:6,7 48:18,23

**issue** 16:9

**issues** 7:17 14:16 15:3,6,8,13 16:9,16, 23 31:13 44:14

**item** 39:25 59:11 60:20

**items** 46:6

**J**

**James** 7:25

**January** 60:18,24,25 61:10

**Jim** 6:4 8:3,5,8 11:8, 18 12:13 14:10 18:2 19:8,15 20:8,21 21:15 22:10 23:22 24:6 25:11 26:5 27:24 28:20 31:15 33:6,20 34:19 35:4, 15 36:9,12 37:13 38:9 39:15 40:9 41:18 56:14

**job** 21:23,25 22:4

**jogs** 58:13

**July** 23:4

**K**

**Keating** 6:17

**kind** 15:7 24:25 30:15 43:10

**Klekamp** 6:18

**knew** 27:15 55:18

**knowledge** 9:3,17 10:4 33:11 52:20 54:17 55:2,10 56:4,7, 8 63:20,23

**L**

**L&I** 53:15,18

**labeled** 6:2 26:7

**labor** 22:8

**Lakes** 26:21 37:15 53:13

**large** 24:10 32:18

**larger** 30:11

**largest** 15:19 16:11 51:14

**late** 38:8,13,21

**law** 6:24

**lawsuit** 44:8

**lawyer** 42:10

**lay** 19:20

**leaning** 11:10

**learned** 53:4

**Leave** 30:18

**left** 42:23,25 44:2 45:12

**legal** 5:4 6:10

**lending** 13:21 48:5

**liaison** 8:20

**life** 31:11

**Linda** 5:11 6:12 56:20

**list** 14:7 37:7

**lists** 12:24

**litigation** 7:16 44:14

**LO** 26:21

**loaded** 37:10

**longer** 55:8

**looked** 37:16 45:8,22 53:7

**loop** 29:21 30:16

**Lopez** 5:3 6:10

**lot** 15:25 26:20

**lump** 39:8

**M**

**machine** 6:20 8:11 12:4,5 15:17,18,23 16:7,13,14,15 17:8, 12,17,20 20:5,18 21:22 22:6,7,9,15,24 23:8,9,13,17 24:2,11, 21 25:5,8 26:19,21, 22 27:10 28:15,17 29:11 30:17,19,23 31:8,12,14 33:7,10 34:5,15 35:13,20,22 36:3 37:5,8,9,11,21, 23,24 38:16,19,20,24 39:7 40:25 41:3 46:8 51:6,8,11,13,15,22 53:22 54:21,22 61:13

**machines** 14:23 15:2,4,10,12 24:18 25:6 30:25 31:20,25 32:13,18,19 33:12,18 51:3,12

**Macturn** 15:17 16:13,14 20:5,6 22:18 27:10 28:10, 11,13 30:18 31:20 32:6,8 33:24 46:8,9 51:6,10 53:11,25 57:14 59:3,8 60:3,8, 15,16,22 61:9

**made** 23:16,20 24:9 33:24 48:7 57:21

**main** 8:22

**maintained** 20:11 21:4 35:17

**maintenance** 33:22

**make** 30:13 34:13,14, 15 36:5 39:16 46:25

58:2 63:15

**making** 10:9 16:25 29:8 49:25 50:4,9

**manner** 26:23 32:14

**manufactured** 54:10

**manufacturers** 16:5

**manufacturing** 8:24 9:12,14,25 10:6,22 11:6 12:3,6 21:21 54:19

**margin** 12:2

**margins** 12:25

**marked** 20:15,18 27:10 34:20 35:5 36:3,18

**marketplace** 31:22 33:9

**markings** 36:13

**master** 40:3,6

**matches** 40:14,17

**matching** 40:19

**matter** 6:4 7:16

**means** 57:18 59:19

**media** 6:2

**meetings** 8:18

**memory** 58:13

**mentioned** 11:18 15:12 16:15

**Mentor** 58:3 60:8 61:14,24 62:3

**message** 47:24

**Mike** 7:3 58:14,19,22

**mind** 51:9

**minimize** 25:11 36:19

**minute** 19:9 41:25

**minutes** 41:9 42:2 64:12,14

**mission** 25:7

**mix** 30:24

**Moltus** 37:8,15

**moment** 25:13 30:20 36:10 64:18

**moments** 41:6

**money** 24:20

**month** 14:19

**monthly** 8:17,23,25 10:2 11:19 12:12

**months** 14:19

**morning** 5:2 6:16,22 42:11 45:17 56:21

**Morris** 26:20 28:14 37:14 53:12

**motion** 27:19

**motivated** 40:20

**move** 20:14 21:5 27:6 32:22 35:24 49:19 53:19 60:15,22

**moved** 31:10,12

**moving** 26:19 27:9 28:11 32:12

**Muething** 5:24 6:16, 17,18 7:13,15 18:19, 24 19:3,7,14 20:14, 20 21:2,8,14 25:22 26:4 27:6,12,20,23 32:24 33:5 34:21 35:24 41:5,18 46:17, 23 47:5,17 56:14 57:2 62:9 63:3,6 64:15,19

**multi-functional** 37:9

**multiple** 24:12

**mute** 27:14 47:14

**N**

**names** 58:13

**necessarily** 49:13 50:10

**nickname** 8:3

**Notary** 7:10

**notation** 38:4

**notes** 41:8

**noticed** 14:18

**November** 6:8

**number** 21:23,25
40:2

---

**O**

**object** 21:11 27:17

**objection** 24:4 31:2
32:10,22 33:14 36:6
62:9 63:3,5

**objectionable** 63:10

**obtained** 54:24

**occasions** 30:21

**occur** 11:7

**occurred** 28:16
31:13

**ODS** 17:13

**office** 6:23

**Ohio** 58:3

**Okuma** 15:17 16:5
20:6 34:5 35:14 51:6
53:13 54:19,23 55:6
56:4 57:14 59:3,8
60:22 61:9

**open** 18:12,16,17
19:6 25:14

**operate** 15:11 52:4

**operated** 61:18 62:2,
6,7,13

**operating** 25:8 51:23
52:21 61:9

**operation** 10:22
21:21 37:10 41:2
64:2

**operations** 9:4,8,24,
25 10:7,8,15,21,25
11:7 16:2,21 23:24
24:13,14,15,16,17,19
29:3,8 52:7,9 53:3

**operator** 16:21

**operators** 53:2

---

**order** 20:9 21:23 30:2
40:18

**orders** 39:9

**ordinary** 62:17,24

**original** 61:23

**overhead** 12:7 14:2
49:19

**overlap** 13:25

**oversaw** 8:19

**ownership** 54:2

---

**P**

**P&f** 50:10

**P&f's** 50:10

**paid** 29:16 37:24
44:16

**part** 27:3 28:20 32:15
33:18 35:17 45:23
55:16,19,22 56:12

**particulars** 48:9

**parties** 5:15 48:17

**parts** 15:19,22,25
16:17,24 17:7,11,14
21:24 23:19 24:9
34:13 51:25 54:9,19
55:14,22 57:18,19,23

**payables** 29:19

**paying** 28:23 37:23

**payment** 29:23
37:20

**PDF** 18:8 25:14,17
27:8 28:7 34:20

**pending** 5:22 44:8

**Pennsylvania** 14:3
60:10

**people** 10:7 16:2,22
29:3,9,19 46:3 52:17
53:2,3 61:23

**percent** 44:3

**perform** 10:25 25:10
57:8,15

**performance** 32:6

---

**performed** 29:9
53:24

**performs** 24:12

**period** 8:10,13

**person** 22:5,9 29:8
30:4 52:8

**personal** 50:22
52:19 54:16,25 55:9
56:3,7

**personally** 57:24

**personnel** 61:12,19

**persons** 56:9 58:8,
12

**perspective** 32:8

**pertain** 46:7

**pertained** 58:24

**pertaining** 44:14

**phone** 6:25

**phrase** 46:13 47:12
51:3 57:6

**phrased** 55:5

**piece** 52:3,20 53:7,17
54:10 55:11 57:5,22
61:18

**place** 30:2,14

**Plaintiff's** 59:15

**plaintiffs** 6:18 7:16
21:5 27:6 35:24

**plaintiffs'** 20:14,16
27:8 36:2 59:10

**plan** 10:9

**plans** 10:18

**plant** 24:18

**plural** 51:3

**point** 23:3 42:22

**pointed** 31:16

**points** 42:10

**portion** 37:25 38:16
48:22

**positioned** 61:17

---

**practice** 5:7

**preparation** 45:15

**prepared** 45:7 53:19

**preparing** 44:22

**present** 64:2

**preserve** 27:18

**president** 8:12,15
29:4

**previously** 19:10,11
35:5

**price** 37:7

**print** 11:3

**prior** 9:11 31:11,12
58:4,6,9 62:5,18,25
63:16 64:3,8

**problems** 30:17 48:2

**Procedures** 5:20

**proceed** 27:22

**proceedings** 41:14
64:24

**process** 29:2,12
32:2 56:10

**produce** 32:15 57:23

**produced** 15:25

**producing** 17:14,24
51:25 57:18,19

**product** 15:16 24:24
34:16,17

**products** 16:10

**professionals** 53:6,
10

**proper** 29:20

**proprietorship**
42:19

**provide** 9:3

**provided** 60:7

**Public** 7:10

**publicized** 15:11
51:17 52:14

**published** 8:17

---

**purchase** 13:17,21
15:6 30:2 31:4 33:19
34:5 39:9,24 40:18,
23 46:14 48:7,19,24
49:15,16 50:2,5,10
58:20

**purchased** 12:14
13:6 23:13 31:9,21,
25 35:20 39:8 49:20

**purchasing** 14:5,8
48:12

**push** 17:16

**put** 29:10 37:20

**PX** 18:13,14 19:11
20:15 21:6 25:16
26:7 27:7 28:6 29:14
34:20 35:5,25 59:18

---

**Q**

**qualify** 54:5

**quality** 15:16,22
16:16 17:11,14 51:25
55:14 57:18,19
62:16,23

**quantity** 62:16,23

**question** 31:16 33:4
46:21 47:6 51:9
52:11 55:24 56:16
62:20 63:7,13

**questions** 19:9
20:25 33:6 41:19,21
43:13,15,18 46:11

---

**R**

**raise** 11:11

**Ramsey** 59:11,22
60:7 61:7

**ran** 22:7,21 23:4

**rate** 44:19

**read** 46:2,5 47:4,6

**reads** 60:2

**ready** 60:14

**rearrange** 60:13

Index: rearranging..sum

**rearranging** 60:2

**reask** 47:8

**reasons** 40:7,20

**recall** 15:14,15,18
16:2 17:19 22:17
31:8 32:18 33:16
34:2,6,8,10 38:7
54:12 57:9 59:9

**receipt** 30:3

**receivables** 48:14

**received** 23:24 56:8

**receiving** 28:22

**recess** 41:13 64:23

**recollect** 51:10
53:20 61:25

**recollection** 29:13
38:15 53:9

**reconvene** 41:8

**record** 5:10 6:15
7:24 9:7 21:3 28:3
41:6,12,17 42:4
50:18 64:13,22

**recorded** 6:3

**recording** 5:16

**records** 39:17

**reduction** 38:3

**refer** 39:5

**referred** 19:11

**referring** 16:12

**reflected** 26:14,15
27:2 28:6 29:14 32:6

**refresh** 38:15

**regular** 25:4 35:17

**regularly** 20:11 27:3
35:16

**related** 12:4,22 13:11
28:10 40:19 41:2
45:21

**relocated** 60:17

**remaining** 37:19

**remember** 46:7
51:18

**remote** 5:17

**remotely** 5:11,14 6:8

**rendered** 29:2

**repair** 33:21,22 53:6,
13,21,22 55:13,15

**repaired** 29:11 55:8

**repairing** 24:21

**repairs** 28:16 55:6

**repeat** 62:19

**replacement** 35:13
41:3

**report** 10:25 12:11
22:21

**reporter** 5:11 6:12
7:6 40:8 56:17

**reporting** 5:5 6:11,
13 10:2,3 32:7

**reports** 8:23,24
11:19,21 23:24
52:18,24 53:2

**represent** 7:3,15

**representations**
57:20,25

**representative** 6:21
7:2

**represented** 57:15

**reps** 16:5

**reserve** 21:11,12
36:6

**respect** 9:16 12:19
29:13 33:24

**response** 32:23

**responsibility** 28:22

**responsible** 11:22

**restroom** 41:7

**results** 11:3,4

**retirement** 43:2,4

**reviewed** 29:16 30:8,
10 45:19

**Richard** 6:21

**Rick** 58:13,16

**rigging** 32:11 59:11,
23 60:2,7

**role** 28:21

**room** 5:9,13

**row** 61:7

**rule** 5:19,21

**Rules** 5:20

**run** 8:23 22:19 23:8,
9,17 24:3

**running** 14:23 16:7
22:5,15 24:2 32:13,
14 35:22 51:4,7,21
52:4,13 64:8

**S**

**Sabbath** 58:14,17

**sales** 11:24

**salvage** 55:21

**Salzman** 5:12 6:12

**Sandvik** 40:5

**schedule** 53:8 59:14

**schedules** 45:23

**scrap** 23:18

**scrapped** 52:25

**scraps** 23:17

**screen** 18:3 47:25

**scripts** 46:2

**seconds** 47:8

**segments** 11:24,25

**self-employed**
42:14

**Semiretired** 43:6

**sense** 57:12

**separate** 39:13

**September** 59:12,23

**sequence** 22:4

**series** 39:2

**service** 6:5 31:5
32:21 53:5,10,11,12,
16,25 60:7,23 61:22

**services** 29:2

**servicing** 34:12

**set** 23:2 25:12 28:12
61:12

**setting** 28:12

**severity** 5:6

**sheet** 18:9,13 40:4,7,
14

**shop** 53:3 60:3

**shortly** 14:14

**show** 37:22

**showing** 20:17

**shown** 37:2

**shows** 20:3,4 21:19,
20

**side** 18:2 52:24

**sign** 29:4 30:4,8

**signed** 49:3

**significant** 33:17

**similar** 34:5

**similarly** 54:14

**single** 24:18

**sir** 18:24 25:18 36:22
40:16 42:7 47:25
63:14

**situation** 15:21
32:13

**Sivula** 7:3 58:14,19

**slightly** 11:12

**snuff** 17:4,6 54:11,18

**social** 5:7

**software** 43:14,18

**sold** 25:9 57:7

**sole** 42:18

**sort** 14:13

**sorted** 21:22

**sound** 46:24

**source** 30:12

**sourced** 24:17

**speak** 7:19 15:11
16:18

**speaking** 13:4

**specialist** 6:11

**specific** 15:16

**specifically** 22:18

**specifications** 37:4

**specifics** 16:22

**specs** 17:12 37:11,
16

**spend** 45:2

**spent** 44:21

**spread** 43:23

**spreadsheet** 20:17

**staff** 53:24

**stand** 48:4

**standpoint** 13:25
57:17 62:12

**start** 6:2 14:21 19:8
28:2 36:15 40:11
46:21 47:11,22

**started** 9:10

**starting** 47:7

**starts** 23:7,11

**state** 7:23

**state's** 5:21

**stated** 51:11

**statements** 8:18
13:2 64:6

**station** 53:14

**stayed** 62:3

**stipulate** 5:15

**stop** 20:7 40:9

**stops** 23:7,11

**stored** 27:2

**strike** 32:23

**struggling** 56:24

**sufficient** 62:15,22

**sum** 39:8

**supposed** 25:10 28:18 32:15 57:8,15 63:15

**surrounding** 34:10

**swear** 5:13 7:6

**swearing** 5:17

**sworn** 7:10

**synergistic** 13:18

**system** 11:2 43:14, 16

---

**T**

**takes** 29:22

**taking** 13:24 25:5

**talk** 47:12 58:22

**talking** 25:25 30:20 33:3 50:15 56:2

**tech** 7:17

**technology** 56:25

**teen** 19:3,4

**ten** 41:9

**terms** 48:16,24 49:6, 8,11 62:16,22

**testified** 7:11 46:12 49:14 57:5

**testimony** 23:22 49:11 51:18 54:12 57:9

**thing** 11:5 56:12

**things** 9:15,21 16:3 42:12

**thought** 49:15,22

**thousand** 30:7,9

**Thrasher** 6:24

**threshold** 30:5

**Tim** 6:22 18:19 20:22 25:22,25 27:12,13 36:5 42:7 45:6 46:18 47:17 55:25 56:16 59:14 60:19 62:19 64:15

**time** 8:13 14:11 17:9, 19 22:7,8 24:3,16 25:2,6 29:11 30:22 31:19 41:10,16,20 43:14 44:3,22,24 45:9,13,14 56:18 64:20

**timely** 34:16

**times** 11:8 48:11

**title** 8:12

**today** 7:18 8:6 45:8 49:12

**told** 50:17 52:15

**tolerance** 15:24 17:20,22 23:2 54:22, 24 55:7,17 56:6

**tool** 6:5 16:25 31:4 32:20 39:6,11,23 40:17,22 48:8 49:18 57:16,21 58:4,5,8,15 59:6 61:21 62:5,21 64:3,5,8

**Tool's** 62:17

**tooling** 9:15 39:6

**Tools'** 50:12

**Torcup** 15:20 24:8

**total** 35:12 36:3

**totally** 11:9

**transaction** 12:14, 20,23 13:11 14:6,13 32:3 33:13 48:6,7,15 49:23 50:21 51:4 58:5,9,15 59:7 61:16 63:2 64:4

**transactions** 12:17

**transcripts** 45:20,21

**transfer** 14:25

**transition** 15:6 44:4

**trips** 58:3

**TSG** 5:5 6:11,13

**turn** 13:17 14:13 41:21

**turned** 25:20

**type** 13:21 23:9 34:5 50:9 51:22

**Typical** 11:6

---

**U**

**ultimately** 13:16 14:24 28:13,23 55:7

**understand** 8:2 14:4 63:8,13

**understood** 54:6 63:12

**undertook** 46:15

**uninvited** 32:23

**unpackage** 23:21

**unstable** 47:24

**uploaded** 18:8 25:15 34:19

**usage** 20:4,17 21:20

---

**V**

**vague** 62:10 63:7

**validity** 5:16

**variable** 12:8

**vendor** 40:5

**verification** 28:25

**versus** 6:5

**vice** 8:12,15

**vicious** 17:23 55:5, 10,11 56:5

**video** 5:16 6:3,10

**videotape** 5:10

**virtue** 30:23 31:21,25

**visually** 55:22

**voice** 11:12

**VP** 28:21 30:22

---

**W**

**wait** 19:8

**walk** 36:9

**warehouse** 10:23

**ways** 24:11

**weekly** 10:3 12:11

**weeks** 44:2

**well-integrated** 9:23

**witnessed** 55:13

**words** 46:25

**work** 10:5 15:7 17:25 21:23 29:5,9 39:17 43:7,11 53:18

**worked** 8:9,11 22:3

**working** 26:23,24 28:15,18,19 51:17

**workings** 9:20 10:13

**worth** 43:19

**write** 56:18

**wrong** 17:10

---

**Y**

**years** 9:11,12 44:9

**yesterday** 45:4,5,14 53:4