1

2                 UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF OHIO

4                       EASTERN DIVISION

5                   Case No. 1:15-cv-1586

6    ---------------------------------------x

7    ATSCO HOLDINGS CORP., et al.,

8                            Plaintiffs,

9         v.

10   AIR TOOL SERVICE COMPANY, et al.,

11                           Defendants.

12   ---------------------------------------x

13

14     REMOTE VIDEOTAPED DEPOSITION OF JOSEPH MOLINO

15          Friday, November 6, 2020

16

17

18   Reported by:

19   Amy A. Rivera, CSR, RPR, CLR

20   JOB NO. 186138

21

22

23

24

25

Page 2

```
1
2                    November 6, 2020
3                     11:04 a.m.
4
5           REMOTE VIDEOTAPED deposition of
6  JOSEPH MOLINO held pursuant to Notice, before Amy A.
7  Rivera, Certified Shorthand Reporter, Registered
8  Professional Reporter, Certified LiveNote Reporter,
9  and a Notary Public of the States of New York, New
10 Jersey, and Delaware.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  R E M O T E   A P P E A R A N C E S:
3  KEATING MUETHING & KLEKAMP
4  Attorneys for Plaintiffs Atsco Holdings and
5  Hy-Tech Machine
6      One East Fourth Street
7      Cincinnati, Ohio 45202
8  BY: BRIAN MUETHING, ESQ.
9
10 THRASHER, DINSMORE & DOLAN
11 Attorneys for Defendants
12     1111 Superior Avenue
13     Cleveland, Ohio 44114
14 BY: TIM COLLINS, ESQ.
15
16
17 A L S O   P R E S E N T:
18     Richard Goodman, Esq. - P&F Industries
19     Rick Sabath
20     Michael Sevilla
21     Kevin Marth, Legal Video Specialist
22
23
24
25
```

Page 4

```
                    JOSEPH MOLINO
1
2      VIDEOGRAPHER:  Good morning,
3  counselors.
4      My name is Kevin Marth. I am a legal
5  videographer today in association with TSG
6  Reporting, Inc.
7      Due to the severity of the COVID-19
8  virus and following the practice of social
9  distancing, I will not be in the same room
10 with the witness. Instead, I will record
11 the deposition remotely.
12     Additionally, our court reporter
13 today, Ms. Amy Rivera, also will not be in
14 the same room and will swear the witness
15 remotely.
16     Do all parties stipulate to the
17 validity of this video recording and remote
18 swearing and that it will be admissible in
19 the courtroom as if it had been taken
20 following Rule 30 of the Federal Rules of
21 Civil Procedure and the state's rules where
22 the case is pending?
23     MR. MUETHING:  Yes.
24     MR. COLLINS:  Yes.
25     VIDEOGRAPHER:  This marks the start of
```

Page 5

```
                    JOSEPH MOLINO
1
2  media labeled No. 1 of the remote video
3  deposition of Joseph Molino, in the matter
4  of Atsco Holdings Corp., et al., versus Air
5  Tool Service Company, et al., in the United
6  States District Court for the Northern
7  District of Ohio, Eastern Division.
8      The deposition today is being held on
9  November 6, 2020, and the time on the video
10 monitor is 11:04 a.m.
11     My name is Kevin Marth.  I'm the legal
12 video specialist today in association with
13 TSG Reporting, Inc.
14     Our court reporter today is Ms. Amy
15 Rivera, also in association with TSG.
16     At this time, would counsel please
17 state your appearances for the record.
18     MR. MUETHING:  Good morning, everyone.
19 Brian Muething, Keating, Muething &
20 Klekamp, for plaintiffs Atsco Holdings and
21 Hy-Tech Machine.
22     MR. COLLINS:  Tim Collins, Thrasher,
23 Dinsmore & Dolan in the Cleveland office,
24 and I represent the defendants.
25     And also in attendance at the moment
```

Page 6

```
 1              JOSEPH MOLINO
 2      is Rick Sabath, and at some juncture, he'll
 3      be dropping off, and Michael Sevilla will be
 4      attending.
 5          MR. MUETHING: Mr. Collins reminds me
 6      that I should have mentioned that Richard
 7      Goodman, general counsel for P&F Industries,
 8      is with me as well as, of course,
 9      Mr. Molino, the witness.
10          VIDEOGRAPHER:  At this time, would the
11      court reporter please swear in the witness,
12      and we may proceed.
13  J O S E P H    M O L I N O, having been duly
14  sworn, testified as follows:
15  EXAMINATION
16    BY MR. MUETHING:
17      Q.    Good morning, Mr. Molino, and everyone
18  else.
19             Again, for the record, my name is
20  Brian Muething, and I represent the plaintiffs in
21  this matter.
22             I know from having spoken to you in
23  the past that you go by "Joe."
24             Is it okay if I call you that today?
25      A.    Yes.
```

Page 7

```
 1              JOSEPH MOLINO
 2      Q.    Joe, if you have any technical issues
 3  throughout the day, if you can't hear anyone --
 4  that that may happen based on some experience --
 5  feel free to let us know.
 6             If you need to take a break, of
 7  course, we'll try to accommodate that. So just
 8  feel free to let us know if there are any issues.
 9      A.    Yes.
10      Q.    I saw your mouth moving, Joe, but I
11  didn't hear you.
12             Can you just say something --
13      A.    Can you hear me now? Can you hear me?
14             Okay.  Sorry.
15      Q.    Okay.  Joe, can you tell the Court
16  your education background, please?
17      A.    Yes.
18             I have a BA in accounting from Loyola
19  University of Maryland.  I have a CPA certificate
20  as well, and I've an M.B.A. in finance from the
21  Wharton School at University of Pennsylvania.
22      Q.    Just can you give us a brief
23  description of your employment history?
24      A.    Yes.
25             I worked at an international
```

Page 8

```
 1              JOSEPH MOLINO
 2  accounting firm called Ernst & Young -- well, it
 3  was Ernst & Whinney then -- for about four years
 4  before getting my M.B.A.
 5             And since then, I have been chief
 6  financial officer and/or chief operating officer
 7  of a number of small and medium-size companies for
 8  the last 20 -- approximately 23 years here as CFO,
 9  and then ultimately, chief operating officer and
10  CFO, which is my current title.
11      Q.    Thank you.
12             And you said, "here."
13             Can you describe --
14      A.    I apologize.  P&F Industries.
15      Q.    And how does P&F Industries relate to
16  the company, for example, Hy-Tech Machine, that is
17  a plaintiff in this matter?
18      A.    Yes, Hy-Tech Machine is a wholly owned
19  subsidiary of Continental Tool, which is a wholly
20  owned subsidiary of P&F Industries.
21      Q.    Thank you.
22             You mentioned, Mr. Molino, that you
23  have been the CFO and/or the COO. And take those
24  functions one at a time, if you would, and let us
25  know what your job duties generally entail.
```

Page 9

```
 1              JOSEPH MOLINO
 2      A.    I'm -- for CFO, I'm in charge of
 3  relationships with our banks, and the accounting
 4  function reports to me as well.
 5             In addition to that, as we are a
 6  public company, I am considered the chief
 7  accounting officer. So I sign all of the
 8  documents that would need to be filed with the
 9  Securities and Exchange Commission.  Those staff
10  that produces those documents reports to me as
11  well. So that's really more or less my CFO
12  function.
13             As chief operating officer, I am in
14  charge of all the day-to-day operations of P&F.
15  The subsidiary executives report to me directly,
16  and I, in turn, report to the chairman and
17  president of the company as to the company
18  strategy and, you know, day-to-day execution of
19  that strategy, and as well as I have been
20  typically the lead on all the mergers and
21  acquisitions activities since I've been here.
22      Q.    You -- I want to pick up on that last
23  point.
24             Now, Joe, just can you give the Court
25  a flavor for the scope of the merger and
```

Page 10

JOSEPH MOLINO

1       JOSEPH MOLINO
2    acquisition activities then, say the last 15 years
3    of P&F, has this been a one-time thing or has it
4    been broader than that?
5       A.    No, we're a fairly inquisitive
6    company.  That's one of the ways we have grown.
7            I would say since I've been here, we
8    probably worked on, you know, several dozen
9    transactions, and I've been involved in meeting
10   with the buyer and the seller, representing the
11   company, responsible for due diligence, as well as
12   very involved in all the documentation.
13           Of course, we've got lawyers to help
14   out with that as well.  But, you know, a lot of --
15   a lot of -- a lot of transactions in our history
16   here.
17      Q.    Thank you.
18           You mentioned a concept of due
19   diligence.
20           Can you tell the Court what that is,
21   what you mean by that?
22      A.    Sure.
23           Once there's a meeting of the minds
24   between your buyer and a seller, and typically
25   some sort of document, we'll call it a letter of

Page 11

1       JOSEPH MOLINO
2    intent, to establish what the parties agreed to
3    work together towards to continue the agreement.
4            The due diligence period is an
5    opportunity for the buyer to assess various
6    aspects of the -- the target company by reviewing
7    documents in the various functions, whether it be
8    financial, marketing, customers, operations, and
9    as well as speaking with various employees of
10   the -- of the target company.  Typically, you're
11   allowed an opportunity to visit the facility.
12           So that's the due diligence process.
13   You review that, and you attempt to assess whether
14   the initial agreed-upon price is reasonable in
15   light of what -- what you see.
16           Due diligence is not a replacement for
17   an audit, or anything like that.  And typically,
18   it is limited in scope, just sort of the
19   practicalities of the matter. It's difficult
20   sometimes to get -- get into the facility for much
21   more than one or two times, and obviously, during
22   that period, the seller is usually trying to keep
23   the transaction quiet for many reasons.
24           So it is difficult to get as much of
25   the appeal for the operation as one might, but it

Page 12

1       JOSEPH MOLINO
2    is -- you know, it is done anyway.
3       Q.    So a couple of follow-up questions
4    about that, Joe.
5            You said that the due diligence can be
6    somewhat limited in scope.
7            What did you mean by that?
8       A.    Well, typically, the -- the seller
9    limits the amount of time that the buyer has.
10   There's usually an agreed-upon period -- it could
11   be 30 days, it could be 60 days, it could be 90
12   days -- when all the diligence has to be done, and
13   then, again, limited in scope in that you are
14   typically not allowed to speak to everybody in the
15   target, and it's often very difficult -- more
16   often than not, you're not really allowed to see
17   the operation running as it would be running in a
18   normal time.
19           Typically, you go in after hours or on
20   the weekend, so if you're buying a manufacturing
21   company, which is for the most part the sorts of
22   things we buy, you're not always able to see the
23   machines running, the employees running the
24   machines, and the business in full operation.
25      Q.    And just to be clear, why is that

Page 13

1       JOSEPH MOLINO
2    typically your experience?
3       A.    Well, generally, the seller wants to
4    keep the potential transaction secret, which is
5    understandable.  Employees get nervous if they are
6    aware that a company may be -- may be sold, for
7    obvious reasons.
8            MR. COLLINS: Brian, is your phone
9       near the microphone you're using? Because
10      we're getting feedback from you.  Sometimes
11      phones cause those problems, or there's
12      something else is bumping up against your
13      microphone.
14           MR. MUETHING:  Thanks for telling me,
15      Tim. I don't know because I'm not, in my
16      mind, doing anything different than I have
17      been, but I will try to --
18           MR. COLLINS:  It's better just now.  I
19      don't know what's happening, but we're
20      getting feedback.
21           MR. MUETHING:  Thank you for telling
22      me.  I'll keep an eye on it.  Thank you.
23   BY MR. MUETHING:
24      Q.    Mr. Molino, is a valuation of a target
25   company's machinery or equipment part of due

JOSEPH MOLINO

1
2  diligence?
3      A.    Yes, typically.
4      Q.    And how does that process work?
5      A.    Well, you know, sometimes you'll bring
6  in an expert.
7           I'm -- I'm not an expert in machinery.
8  I don't have a degree in engineering, or anything
9  like that. So we'll rely on our internal people
10 who are familiar with those machines, typically,
11 and how they run, and in some cases, we'll bring
12 in outside experts to help us place a value on it.
13          But, again, the assumption is that the
14 machines are in good working order and, you know,
15 that's how -- that's part of the valuation
16 process. If you make an assumption they're not in
17 good working order, you have a different value
18 that you place on it.
19     Q.    Not being able to see sometimes, you
20 know, an operation as it's actually making tools,
21 for example, how does that situation affect, you
22 know, the due diligence on equipment?
23     A.    Well, again, if you can't see the
24 parts being made, you don't exactly know, you
25 know, what the value of the equipment might be.

JOSEPH MOLINO

1
2           Again, you're making an assumption and
3  the apparent assumption is that -- that it's
4  making good parts, unless you're told otherwise,
5  that knowledge itself, clearly, at the end of the
6  day.
7      Q.    If there are certain limitations on
8  the due diligence process, then how does a buyer
9  assure itself of the quality of what it thinks
10 it's buying?
11          MR. COLLINS:  Objection.
12     Q.    Is there a mechanism -- well, let me
13 back up, Joe.
14          If -- if, in your experience, you have
15 found there are limitations on a due diligence
16 process, how have you taken steps to deal with
17 that situation?
18          MR. COLLINS:  Objection.
19     Q.    You can answer.
20     A.    Typically, the asset purchase
21 agreement or stock purchase agreement would have a
22 section. It's called "Representations and
23 Warranties."
24          Very typically in that section, and
25 certainly in all the documents we -- we are

JOSEPH MOLINO

1
2  involved in, there's specific representations that
3  the equipment is in good working order and of the
4  quantity and quality necessary to perform the
5  operations, you know, to run the company.
6      Q.    And let me unpack just a couple of
7  things that you said, Joe.
8           You mentioned a document or something
9  called an "asset purchase agreement."
10          Can you tell the Court what a document
11 like that is, in your experience?
12     A.    Sure.
13          It's, as I said maybe earlier -- I'm
14 not certain if I said earlier that there's a
15 letter of intent that's typically signed, and you
16 work towards the -- a definitive agreement, which
17 is the final understanding of the parties.
18          In this case, as I said, an asset
19 purchase agreement is where you're buying a
20 business but you're structuring the transaction as
21 the purchase of assets.  You can also structure it
22 as a purchase of stock, and there are probably a
23 number of other ways to do it.
24          But regardless of which structure, the
25 document lays out the purchase price, how much is

JOSEPH MOLINO

1
2  in cash, how much goes into escrow, and the
3  various assets that are being purchased,
4  liabilities that are being assumed, and
5  representations and warranties of the seller and
6  the buyer with respect to the business and the
7  transaction.
8      Q.    Okay. With respect to the
9  representations and warranties that you mentioned,
10 can you describe for the Court in more detail what
11 those are and how those function?
12     A.    Sure.
13          There are a number of them. With
14 respect to the assets that are being purchased,
15 you typically list the assets, and there's a
16 representation for each of them.
17          For example, one would -- one of them
18 would be that the inventory is -- is salable and
19 not obsolete. And, you know, are the parties
20 sufficient to provide sufficient working capital
21 for the business. The accounts receivable is
22 fully collectible, and as I said earlier, the
23 equipment is in good working order, properly
24 maintained, and of sufficient quantity to run the
25 operation in the manner that has been told to the

Page 18

JOSEPH MOLINO

1
2  potential buyer.
3          And there are other -- there are other
4  reps and warranties, but those are the -- those
5  are the most important ones. There are legal ones
6  as well.
7          MR. MUETHING:  Well, I do hear that.
8  I don't know why that happens.  Sorry.
9  BY MR. MUETHING:
10     Q.    Joe, when you think about the deals
11  that you have been involved in, are the
12  representations and warranties, are they always
13  the same in the documents?
14     A.    No, they're not always the same.
15          If -- if you're paying what we
16  consider full price for a business, you know, at
17  the high end of the valuation, you're expecting a
18  business that's fairly pristine, no issues with
19  any of the assets, very limited liability issues.
20          So you rely on -- as I said earlier,
21  the fact that the due diligence is somewhat
22  limited, you rely on the representations and
23  warranties to give you comfort that everything
24  is -- is what it is.
25          If, for example, that is not the case,

Page 19

JOSEPH MOLINO

1
2  what's typically done -- and we've done this
3  plenty of times -- if a piece of equipment is an
4  issue, it is -- you know, it's near the end of its
5  useful life or it has problems consistently
6  producing parts or, you know, it's about to
7  require a lot of repair, typically, the seller
8  will let the buyer know about that, and that is
9  stated in the document and scheduled, and then the
10  buyer has to determine if that requires some
11  adjustment to the purchase price.
12          So it's obviously -- once that
13  disclosure is made, decisions are made around
14  that, and you can choose to move forward. You can
15  lower -- you can change the purchase price, you
16  can address it via the meetings, but, typically,
17  there are ways to deal with that if that is, in
18  fact, the case.
19          And the same thing goes for other
20  assets that might be impaired. You know, maybe
21  there's some inventory that's not completely
22  saleable or maybe there's an issue with the intent
23  to collecting on some accounts.
24          Those are brought forward, scheduled,
25  discussed, and, you know, the buyer and the seller

Page 20

JOSEPH MOLINO

1
2  during the course of negotiations address those
3  issues.
4     Q.    Thanks, Joe.
5          You mentioned just one or two words
6  ago about negotiations.
7          Are representations and warranties
8  subject to negotiations?
9          MR. COLLINS:  Objection.
10     A.    Sure.  They're all there, absolutely.
11          Typically, an agreement is produced by
12  one side or the other, usually the buyer, and the
13  document itself is negotiated back and forth
14  several or many times -- many times to address the
15  very specific language regarding everything,
16  including the reps and warranties.
17     Q.    Joe, the chat function on the Zoom, do
18  you see that I've uploaded a particular document
19  there?
20     A.    Let's see, chat function...
21          Okay, yeah, I see the chat.  Yeah, I
22  do.
23     Q.    Could you see if you could open that
24  document and display it so that you can review it?
25     A.    Sure.

Page 21

JOSEPH MOLINO

1
2     Q.    And then let me know when you have it,
3  please.
4     A.    So it's asking me to save it, and then
5  I guess I'll be able to reach it later? Is that
6  how this is done?
7     Q.    Yes.
8     A.    Okay.  Now, where would I go find it?
9     Q.    I think if you just click on it again
10  in the chat function, Joe, you should be able to
11  open it.
12     A.    Okay.  Let me just do that.
13          Saying that you don't have permission
14  to save in this location. Would you like to save
15  in the linear folder instead?
16          So I guess --
17          MR. MUETHING:  Let's go off the record
18  for a moment, please.
19          VIDEOGRAPHER:  We are going off the
20  record at 11:24 a.m.
21          (Recess.)
22          VIDEOGRAPHER:  We are back on the
23  record at 11:30 a.m.
24          MR. MUETHING:  Thank you.
25

Page 22

JOSEPH MOLINO

1                  JOSEPH MOLINO
2  BY MR. MUETHING:
3      Q.    Joe, do you have a document that I've
4  attempted to upload through the Zoom feature that
5  was previously marked PX-16, and the first words
6  are "Asset purchase agreement"?
7           (Plaintiffs' Exhibit 16, Asset
8        purchase agreement, previously marked for
9        identification, shown at this time.)
10     A.    Yes.
11     Q.    Have you seen this document before?
12     A.    Yes.
13     Q.    Could you identify it for the Court,
14 please.
15     A.    It is the -- it appears to be the
16 final definitive agreement between the parties.
17     Q.    In connection with a particular
18 transaction?
19     A.    Yeah.  In connection with the purchase
20 of Atsco by Hy-Tech.
21         MR. MUETHING:  Plaintiffs seek to
22     admit PX-16.
23         MR. COLLINS:  Brian, do you know that
24     we'll deal with the admission of exhibits
25     later.  So I'll reserve my objections.

Page 23

1                  JOSEPH MOLINO
2  BY MR. MUETHING:
3      Q.    Mr. Molino, you began to describe what
4  this document was.
5          Could you say it again since beginning
6  our discussion of this document, please.
7      A.    Sure.
8          It's the final agreement between the
9  buyer and the seller, between Hy-Tech, Inc. and
10 Atsco. And it, you know, contains the various
11 agreements -- all the agreements between the
12 parties, the understandings between the parties.
13     Q.    We were discussing a little while ago,
14 before we went off the record, the concept of
15 representations and warranties.
16     A.    Yeah.
17     Q.    Are those representations and
18 warranties contained in this document?
19     A.    Yes.  I believe they're in Section 3.
20     Q.    Is that at the bottom of page 14?
21     A.    I'll confirm that as soon as I get
22 there.
23         Yes.  Article 3, correct.
24     Q.    And who here in the section you've
25 identified, Joe, is making the representations and

Page 24

1                  JOSEPH MOLINO
2  warranties?
3      A.    They're almost exclusively
4  representations and warranties of the seller.
5  There may be buyer representations and warranties,
6  but they're pretty -- they're pretty small.
7      Q.    And in connection with this
8  transaction, who is the -- the term there at the
9  top of page 15 as the seller and shareholder, who
10 is that in this agreement?
11     A.    Well, the shareholder would be Rick
12 Sabath, to my recollection, and the seller would
13 be -- I'm not sure of the legal structure, but I
14 believe the seller is also Rick Sabath.
15     Q.    And I want to look at some of that
16 language, Joe, that begins on the top of page 15.
17     A.    Okay.
18     Q.    Read it into the record and then ask
19 you some questions about it.  Okay?
20     A.    Okay.
21     Q.    Under the heading that says,
22 "Representations and warranties of seller and
23 shareholder," it states:
24         "Seller and shareholder jointly and
25 severally make the following representations and

Page 25

1                  JOSEPH MOLINO
2  warranties of purchaser, each of which shall be
3  deemed material and purchaser in executing,
4  delivering, and consummating this agreement has
5  relied upon the correctness and completeness of
6  each of such representations and warranties."
7          Did I read that correctly?
8      A.    Yes.
9      Q.    That is accurately what's contained in
10 PX-16?
11     A.    Yes.
12     Q.    "The concept of each of which shall be
13 schemed material," Joe, in your experience and in
14 connection with this transaction, what does that
15 mean?
16         MR. COLLINS:  Objection.
17     A.    It means the buyer is relying on these
18 representations and warranties as a critical
19 component regarding the decision to move forward
20 with the transaction.
21     Q.    The same question about the language
22 at "has relied upon the correctness and
23 completeness," what does that mean to you in your
24 capacity as the CFO and COO of the purchasing
25 company?

Page 26

JOSEPH MOLINO

1
2     MR. COLLINS:  Objection.
3     A.    It means that it -- you know,
4  regardless of the level of due diligence, we're
5  relying on these representations to give us
6  comfort that the various things that we're
7  purchasing, whether they be receivables or
8  inventory or equipment, are what they purport to
9  be on the balance sheet.
10     Q.    Joe, we talked about representations
11  and warranties kind of in a generic way a little
12  bit ago, and I asked you if they are typically
13  negotiated.
14          To your recollection, were the
15  representations and warranties in this document
16  subject to negotiation?
17     A.    Yes.  To my recollection, yes.
18     Q.    What do you recall about that?
19     MR. COLLINS:  Objection.
20     A.    Well, I recall -- I recall that the --
21  you know, the document went back and forth a few
22  times, and typically, there are comments made by
23  each side and the sides get together and, you
24  know, come up with the final language of the
25  agreement.

Page 27

JOSEPH MOLINO

1
2     Q.    Joe, through Article 3 here, there are
3  headings 3.1 down through 3.38.
4          Do you see that there?
5     A.    Yes.
6     Q.    What does that mean with respect to
7  the number of the representations that the seller
8  made here in connection with this transaction?
9     A.    Well, they made 38 different types of
10  representations to us, to the buyer.
11     Q.    One that I would like to ask you about
12  specifically is 3.17.
13          Could you turn to that, please?
14     A.    Sure.
15          Okay.  I'm there.
16     Q.    And specifically, I would like to ask
17  you questions about 3.17(c).
18          Can you review that representation and
19  let me know when you're ready?
20     A.    Sure.
21          Okay.  I'm finished.
22     Q.    Could you describe to the Court your
23  understanding of the representation at 3.17?
24     MR. COLLINS:  Objection.
25     A.    My understanding, based on my

Page 28

JOSEPH MOLINO

1
2  experience, is that the seller is representing
3  that the equipment that is in the business that's
4  being purchased -- it is purchased -- is of
5  sufficient quantity to conduct business as it's
6  been conducted historically, that it is in good,
7  working order, and that it's been properly
8  maintained and is sufficient -- is sufficiently --
9  of sufficient quality to continue to operate the
10  business as has been disclosed to the buyer.
11     Q.    Was this an important representation
12  to the transaction, Joe?
13     A.    Yes, and in a transaction where --
14     MR. COLLINS:  I didn't hear that.  I'm
15  sorry, there's echos.
16     MR. MUETHING:  I'm sorry.  I'm
17  fighting that feedback.  I can't figure out
18  why.
19     MR. COLLINS:  If you can repeat the
20  question or have the court reporter read it
21  back, I would appreciate that.  Thank you.
22     MR. MUETHING:  Of course.
23     Q.    The question was:  Was this an
24  important representation to you as a purchaser,
25  Joe?

Page 29

JOSEPH MOLINO

1
2     MR. COLLINS:  Objection.
3     A.    Yes. And in a situation where you're
4  acquiring a business that is reliant on equipment
5  to produce parts and, you know, that equipment
6  doesn't currently exist in the operation, that --
7  you know, the acquiring operation, it's absolutely
8  critical that it's in good working order so that
9  we can continue to produce those parts and sell
10  those parts and tools after the closing.
11     Q.    I want to ask you about the -- you
12  mentioned that you're -- the company has been
13  inquisitive, and you mentioned your role in
14  setting strategy.
15          What was your sort of strategy -- or
16  what appealed to you about this potential
17  transaction to make you try to report about this?
18     A.    We -- Hy-Tech Machine was and is in
19  the pneumatic tool business, which is producing
20  tools that are powered by compressed air. So we
21  have some knowledge of that industry and prior to
22  even the companies coming together, we knew of
23  Atsco. They had a certain niche in the market.
24  They were not in an area that we had a particular
25  presence.

Page 30

JOSEPH MOLINO

2    So between the concept of adding this
3 to our portfolio of tools, we -- we had some
4 comfort that we were somewhat familiar with their
5 operation, and that those two things usually are a
6 good recipe for doing an acquisition, an area that
7 you're familiar with but don't potentially have a
8 current product offering.
9    Q.   Does the representation at 3.17 relate
10 to that corporate strategy in any way?
11    A.   Could you -- I'm not sure I understand
12 the question. Could you maybe ask it in a
13 different way?
14    Q.   Well, you mentioned, I believe, that
15 the -- there is a representation at 3.17 that you
16 will be able to purchase equipment and that it
17 will be in good working condition, correct?
18    A.   Yes.
19    Q.   And thinking about the strategy that
20 you just outlined, how does having good working
21 equipment help you facilitate that strategy?
22    A.   Well, it would be difficult to be
23 successful after the closing without equipment
24 that was specifically purchased for the production
25 of the sorts of tools that were produced and sold

Page 31

JOSEPH MOLINO

2 by -- by Atsco.
3    So it's critical to success after the
4 closing that we get that equipment because it was
5 specifically purchased for the business that's
6 there. Without it, not impossible, but very
7 difficult to run the business in the way that it
8 was run, and the purchase price was based on how
9 the business was run prior to the closing.
10    So to get full value, you want it to
11 be run as closely as possible to how it was run
12 before the closing.
13    Q.   Joe, with document Exhibit PX-16 still
14 in front of you, could you turn to Section 11.7,
15 please.
16    A.   Sure.
17    Okay. I'm there.
18    Q.   And do you have a moment to review
19 the -- the Section 11.7?
20    A.   Just give me one moment.
21    Okay.
22    Q.   Can you provide the Court your
23 understanding of Section 11.7?
24    MR. COLLINS:  Objection.
25    A.   In general, it means that regardless

Page 32

JOSEPH MOLINO

2 of what was discovered by us during our due
3 diligence or shown to us during due diligence,
4 none of that has any bearing on the
5 representations and warranties that are made by
6 the seller in Section 3.
7    Q.   Joe, thinking about your experience in
8 doing, you know, multiple transactions, can you
9 describe for the Court what a "working capital
10 adjustment" is?
11    MR. COLLINS:  Objection.
12    A.   Sure.
13    Businesses, especially businesses that
14 have inventory, are required to maintain a certain
15 level of working capital function, and what I mean
16 by that is there's receivables, inventory, and
17 payables, which is what is owed to vendors for
18 various parts and other items required to run the
19 business. So that investment, if you will, is a
20 requirement for a functioning company.
21    So that figure -- I'll call it the
22 "networking capital," which would be the accounts
23 receivable inventory minus payables -- can
24 fluctuate over time. So the concept behind a
25 working capital adjustment is that when we get to

Page 33

JOSEPH MOLINO

2 a closing, which could be on, you know, any date,
3 there isn't any particular advantage or
4 disadvantage provided to the seller or the buyer
5 just by virtue of the fact what -- on the date
6 that the closing took place.
7    And, you know, by example -- for
8 example, if the day before the closing the seller
9 had a huge sale and sold, you know, half the
10 year's worth of -- of product, and the closing
11 took place the next day, while the seller would
12 have had all the expense of producing that product
13 and selling that product and shipping that
14 product, but given the typical transaction where
15 the buyer is acquiring the receivable, the seller
16 would take no part in the benefit of collecting
17 all of the cash that would come due as a result of
18 that sale.
19    So that is obviously inherently unfair
20 because if the sale had taken place, you know, a
21 few months earlier or not taken place, that would
22 have changed the level of working capital in the
23 business.
24    And in addition to that, if you do not
25 have a working capital adjustment, there is an

JOSEPH MOLINO

1
2 incentive to the seller to benefit themselves in
3 the short run by leaving less working capital in
4 the business at the closing, and, obviously, you
5 wouldn't want to incentivize that.
6           So the concept is the buyer and seller
7 negotiate a -- what's called a "working capital
8 target," and usually, based on the average working
9 capital over some period of time, let's call it a
10 year, and at the closing, the working capital --
11 the actual working capital is compared to what the
12 target was.
13           If the actual working capital provided
14 is greater than the target, then the purchaser
15 will pay that extra amount to the seller. If the
16 working capital at the closing is less, then the
17 buyer would write a check -- excuse me -- the
18 seller would write a check to the buyer for the
19 difference.
20           That's a working capital adjustment.
21      Q.    Thank you -- thank you for that.
22           Is there a working capital adjustment
23 built into the transaction with Atsco that we
24 looked at as PX-16?
25      A.    Yes.

JOSEPH MOLINO

1
2      Q.    And could you call attention to where
3 that's requested in the document?
4      A.    Yes.  I believe it's in Section 2.3.
5      Q.    Okay.
6      A.    Let me just get there.
7           So 2.3.2.2, and there's 2.3.3, I
8 guess -- 2.3.2.3.
9      Q.    Thank you.
10           And, generally, is the working capital
11 adjustment, as you described in your testimony a
12 moment ago, is that the way the working capital
13 adjustment in this agreement were to function?
14           MR. COLLINS:  Objection.
15      A.    Yes.
16      Q.    Mr. Molino, I've uploaded a document
17 in the chat function, a spreadsheet that begins
18 "Copy of Acquisition."
19           Do you see that there?
20      A.    Give me a minute.
21           Yes.
22           Would you like me to open that?
23      Q.    I would, please.
24      A.    Okay.
25           Okay.  I have it open.

JOSEPH MOLINO

1
2      Q.    Have you seen this document before?
3      A.    Yes.
4      Q.    Can you describe it briefly for the
5 Court?
6      A.    Yes.
7           It is the detailed calculation of the
8 working capital adjustment. On the left-hand
9 side, it begins with the balance sheet that was
10 provided at the closing.
11      Q.    Just hold on for one second.  Just --
12 let me ask you this, before you begin that
13 discussion:  Is this a document that is kept as a
14 regularly -- in the course of P&F or Hy-Tech's
15 regular course of business?
16      A.    No.  It's only typically done -- or
17 it's only ever done as part of an acquisition.
18      Q.    Sure.  Thank you.
19           Is this a record of business activity
20 conducted at either P&F or Hy-Tech?
21      A.    It is not a record of -- well, at P&F
22 or Hy-Tech?
23           No, it is not a record of activity at
24 P&F or Hy-Tech.  Sorry.
25      Q.    And I'm not trying to trick you.

JOSEPH MOLINO

1
2           What I'm asking is: Is this a record
3 that was generated in the course of P&F or Hy-Tech
4 engaging in various business activities?
5      A.    I'm not sure -- maybe you could ask
6 the question differently. I'm not sure I'm
7 understanding the question.
8      Q.    Have you seen this document before?
9      A.    Yes.
10      Q.    Leaving aside this litigation, is this
11 document stored or maintained somewhere?
12      A.    I'm sorry, say it again?
13      Q.    Is this document stored or
14 maintained -- or where was it stored or
15 maintained?  Where was it created or maintained?
16      A.    It would be part of the closing
17 documents to the then transaction, the purchase.
18           Done after the fact, but it's part of
19 all the documents related to the full transaction.
20      Q.    Okay.  And, Joe, in the upper
21 left-hand corner of this document, it says:  "P&F
22 Industries, Inc."
23           Do you see that there?
24      A.    Yes.
25      Q.    And just to belabor this point,

Page 38

JOSEPH MOLINO

2 because I need to for laying this evidentiary
3 record, why does it say, "P&F industries, Inc." in
4 the top left-hand corner?
5     A.    Well, it's just to make it clear that
6 it's part of the documentation of our corporation,
7 our records -- our corporate records.
8     Q.    That's what I was asking.  I'm sorry
9 for belaboring this to the point of inartful
10 questions.
11          Let's move to a document that's
12 previously been -- sorry.
13          Let's just call this PX-32 for the
14 moment, and we may come back and change that
15 number.  Sorry about that.
16          (Plaintiffs' Exhibit 32, spreadsheet,
17      previously marked for identification, shown
18      at this time.)
19          MR. COLLINS:  Just note my objection.
20          MR. MUETHING:  Yes, thank you.
21     Q.    Okay.  Sorry, for the detour, Joe.
22          Can you describe now what is reflected
23 on this document here?
24     A.    Sure.
25          As I was saying earlier, down the

Page 39

JOSEPH MOLINO

2 left-hand side is what we call the closing balance
3 sheet as -- as presented, you know, by the seller,
4 and then there are various adjustments made to get
5 to the final balance sheet on the right-hand side.
6          A number of the entries don't have
7 anything to do with the -- the seller.  They're
8 made as part of P&F's requirements and P&F being
9 public.  Those would be columns 10 and 11.
10          But the rest of the columns, 1
11 through -- 1 through 8 and 9, relate to the final
12 adjustments to get the balance sheet to be in
13 conformance with generally accepted accounting
14 principles and be complete and accurate as of the
15 closing date.
16     Q.    And does this document come to a
17 calculation with respect to a working capital
18 adjustment?
19     A.    Yes. All the way at the -- on the
20 bottom -- the bottom right is the final working
21 capital adjustment, then the very bottom number
22 would be the -- the amount of money that was
23 calculated in this case for the seller to pay the
24 buyer.
25     Q.    Joe, I've uploaded another document

Page 40

JOSEPH MOLINO

2 into your chat there.
3     A.    Okay.
4     Q.    Have you seen this document before?
5     A.    Yes, just give me a second to get it.
6          Yes, I have.
7     Q.    Can you briefly describe what this
8 document is for a moment, and then we'll talk
9 about the details?
10     A.    Sure.
11          At the closing date, it is often if
12 not impossible to know the exact inventory, which
13 is, again, as I mentioned earlier, part of the
14 working capital and part of the working capital
15 adjustment calculation.
16          So at some point, it could be before
17 the closing, could be weeks after the closing, an
18 actual physical inventory is taken, usually with
19 both sides, buyer and seller, present, and then
20 once that count is taken, what takes place is
21 what's called a "roll back."
22          So in this case, the inventory was
23 taken a few weeks after the closing, and then what
24 happens is you unwind or reverse any transaction
25 relating to inventory using the records for the

Page 41

JOSEPH MOLINO

2 company back to the actual closing date. That's
3 producing the final inventory at the closing date.
4          The opposite could also be the case,
5 you could take inventory before the closing, and
6 then you'd have to roll it forward to the closing
7 date, kind of doing the opposite.
8          But in any event, this reduces the
9 final inventory as counted for the purposes of
10 calculating the working capital adjustment, and --
11 I'm sorry, go ahead.
12          MR. MUETHING: For the record, this is
13      something we've previously identified as
14      PX-27.
15          (Plaintiffs' Exhibit 27, spreadsheet,
16      previously marked for identification, shown
17      at this time.)
18 BY MR. MUETHING:
19     Q.    Joe, is this a corporate record of P&F
20 Industries or Hy-Tech machine?
21     A.    Yes.
22          MR. MUETHING:  Plaintiffs seek
23      admission of PX-27.
24          I know Tim reserves his objections.
25     Q.    Does this document relate to the other

Page 42

JOSEPH MOLINO

1
2 spreadsheet we were looking at a moment ago in
3 that regard?
4        A.    Yes. In the -- you know, column X
5 cell, I believe it's 2247, it calculates the
6 difference between the balance sheet as presented
7 to us for -- excuse me -- the inventory on the
8 balance sheet presented to us and what they
9 actually calculated, and that difference, except
10 for a very small adjustment, the 19,637 is on
11 column -- is in column 6 of the acquisition
12 opening balance sheet workup schedule that we were
13 just looking at.
14        Q.    Thank you.
15             MR. MUETHING: Let's go off the
16        record, take maybe 10 minutes or so, and
17        then I'm going to review my notes, then
18        we'll see what else we need to accomplish.
19             Thank you.
20             MR. COLLINS: Thank you.
21             VIDEOGRAPHER:  This marks the end of
22        Media No. 1. We're going off the record at
23        11:59 a.m.
24             (Recess.)
25             VIDEOGRAPHER:  This marks the start of

Page 43

JOSEPH MOLINO

1
2 Media No. 2.  We are back on the record at
3 12:11 p.m.
4             MR. MUETHING:  Thank you.
5             Joe, I do not have anymore questions
6        for you at this time, and we will allow
7        Mr. Collins to take his turn now.
8             Thank you.
9             MR. COLLINS:  Thank you.
10 EXAMINATION
11   BY MR. COLLINS:
12        Q.    Mr. Molino, good morning -- it's
13 afternoon by now.
14             Allow me to follow up on some of the
15 things that we've been talking about so far today.
16             Plaintiff's Exhibit 16, I don't need
17 you to look at it, but let's just talk about it
18 for a second.
19             This is the document that defines the
20 transaction between Hy-Tech as buyer and Air Tool
21 as seller of Air Tool's assets.  Is that correct?
22        A.    The asset purchase agreement, yes.
23        Q.    There's no other document that defines
24 that transaction other than the asset purchase
25 agreement, correct?

Page 44

JOSEPH MOLINO

1
2        A.    I mean, there are other documents that
3 are part of the transaction, but that defines the
4 agreement and the terms.
5        Q.    Okay.  Prior to entering into the
6 asset purchase agreement, you described that
7 Hy-Tech did some due diligence.  Is that right?
8        A.    Yes.
9        Q.    And you actually have a system for
10 doing their due diligence, don't you?
11        A.    We have a typical set of documents we
12 require to be looked at and, you know, we perform
13 certain procedures around those, what we get.
14        Q.    Right. And you actually have a due
15 diligence series of questions and activities that
16 you undertake that you document, correct?
17        A.    Yes, we do that --
18        Q.    Did you create that system?
19        A.    Yeah -- yes, I created that system.
20        Q.    Okay.  And you followed that system
21 for purposes of the Air Tool transaction, correct?
22        A.    Yes.
23        Q.    We now have been provided in
24 discovery, and I have put in the chat function,
25 Exhibit 17 through 21.

Page 45

JOSEPH MOLINO

1
2             (Plaintiffs' Exhibit 17, due diligence
3        binder, was marked for identification at
4        this time.)
5             (Plaintiffs' Exhibit 18, due diligence
6        binder, was marked for identification at
7        this time.)
8             (Plaintiffs' Exhibit 19, due diligence
9        binder, was marked for identification at
10        this time.)
11             (Plaintiffs' Exhibit 20, due diligence
12        binder, was marked for identification at
13        this time.)
14             (Plaintiffs' Exhibit 21, due diligence
15        binder, previously marked for
16        identification, shown at this time.)
17   BY MR. COLLINS:
18        Q.    If you need a moment to download and
19 look at those, but I would -- I'm going to ask you
20 if those binders are the papers that reflect
21 Hy-Tech's due diligence system. That would be
22 Exhibits 17 through 21 -- Plaintiffs' Exhibit 17
23 through 21.
24        A.    It will take me a minute to get them
25 all saved.

JOSEPH MOLINO

2  Q.   Yeah, it will take you more than that.

3  A.   Okay.

4  Q.   Take your time.

5  A.   Sure.

6       So do you want me to address them one

7  at a time, or do you want me to get them all

8  uploaded first?

9  Q.   Well, upload them, and then look

10  through them, and then I'm going to ask you that

11  sort of global question: Do those exhibits, 17

12  through 21, reflect the system that Hy-Tech used

13  in doing its due diligence with this transaction?

14  A.   I'm having a little trouble opening

15  the first exhibit.

16  Q.   They're long, so take your time.

17  A.   All right.

18       No, that didn't work.

19       MR. MUETHING:  I think, since it will

20       only take a minute to get back on the

21       record, maybe we should go off the record

22       while he does this, and then we can get

23       started again?

24       They are very long.

25       THE WITNESS:  Yeah, my computer is not

JOSEPH MOLINO

2  recognizing this format.  I don't know what

3  it is.  They're not PDFs.

4       MR. COLLINS:  Well, they are PDFs,

5       actually.

6       MR. MUETHING:  Sorry.  Wait for a

7       second, please.

8       Let's go off the record.

9       Tim, is that okay?

10       MR. COLLINS:  Yeah, sure.

11       MR. MUETHING:  Okay.

12       VIDEOGRAPHER:  We are going off the

13       record at 12:15 p.m.

14       (Recess.)

15       VIDEOGRAPHER:  We're back on the

16       record at 12:26 p.m.

17  BY MR. COLLINS:

18  Q.   Mr. Molino, you have now downloaded

19  Plaintiffs' Exhibit 17, 18, 19, and 21.  Is that

20  correct?

21  A.   Yes.

22  Q.   All right.  And let me tell you, based

23  on the exhibit list from your lawyer that was

24  filed in court, that Exhibit 17 through 21 were

25  listed as due diligence binders.  And they -- and

JOSEPH MOLINO

2  I'm just saying for the record -- they encompass

3  page numbers that are Bates labeled HY0176 through

4  HY2034, and they're all consecutive pages that are

5  broken into binders, and, again, they're labeled

6  "due diligence binders."

7       So if you were to look at the -- the

8  documents in Exhibit 18, 19, and 21, do those

9  appear to be the due diligence binders that

10  Hy-Tech created for purposes of the Air

11  Tool/Hy-Tech transaction?

12  A.   Seventeen is not.

13       Let me look at 18.

14  Q.   What is 17?

15  A.   Seventeen looks like an attachment to

16  the asset purchase agreement.

17       Every asset purchase agreement at the

18  closing will have certain schedules that are

19  referenced in the document that are attached to

20  the document and become part of the formal asset

21  purchase agreement.

22       That is what looks like item 17 is.

23  Q.   Okay.  Hang on one second then,

24  please.

25  A.   Oh, wait, I apologize.  It looks like

JOSEPH MOLINO

2  it might be a couple of things combined here.

3       Just give me one second, if you

4  wouldn't mind?

5       MR. MUETHING:  Joe, what I would

6       suggest is take a moment and look through

7       the document and then --

8       THE WITNESS:  Yeah.

9       MR. MUETHING:  -- Mr. Collins can ask

10       you your question again, and then you can

11       answer.

12       THE WITNESS:  Yeah.  If you wouldn't

13       mind giving me a minute to just make sure I

14       understand what is here.  I thought it was

15       one thing, but it looks like something else.

16  BY MR. COLLINS:

17  Q.   Yes, please, take a moment and look at

18  them one at a time -- look at 17, and then we'll

19  come back and talk about it.

20  A.   Okay.  Item 17 is due diligence.  For

21  some reason I was looking at a different schedule

22  and I don't know why.  But 17 is due diligence.

23  Q.   And the face page of 17 says, "Tab

24  1A."  Now, this appears that there are a number of

25  tabs included in the due diligence binders that

Page 50

JOSEPH MOLINO

1  were created by Hy-Tech before it did the
2  transaction.  Is that right?
3      A.   Yes, yes.
4      Q.   And turning to the second page, which
5  has got a -- in the lower right-hand corner, a
6  "Bates number," as we call it, HY0176.
7           Do you see that?
8      A.   Yes.
9      Q.   There's handwriting on the top of the
10 page.
11          Is that yours?
12     A.   Yes, it looks like it.
13     Q.   And it's got a 7/1/14 date referenced.
14          Is that when you read it?
15     A.   I assume that's when I read it, yes.
16     Q. Okay. Would there be any other reason
17 here to date that page other than that was the day
18 you read it?
19     A.   I can't think of any other reason.
20     Q.   Okay.  And that's six weeks before
21 this transaction closed, correct?
22     A.   Yeah, it looks that way.
23     Q.   And so there's been six weeks of
24 reading and thinking about all of the compiled

Page 51

JOSEPH MOLINO

1  information that's in these binders that your
2  lawyer has labeled as "due diligence binders."  Is
3  that correct?
4      A.   Yes.
5           MR. MUETHING:  Objection.
6           You can answer.
7      Q.   The answer was "yes"?
8      A.   Yes.
9      Q.   Okay.  Thank you.
10          Who wrote this executive summary of
11 the potential acquisition of Atsco?
12     A.   I believe that I did.
13     Q.   And in this executive summary, you've
14 got a description that there will be -- in the
15 second paragraph -- the savings of $700,000
16 generated by the eventual movement of the entire
17 operation of our Hy-Tech manufacturing facility in
18 Pittsburgh.  We expect the transition period to be
19 about six to nine months.  Is that right?
20     A.   Yes, that's what it says.
21     Q.   Okay.  And that accurately expressed
22 your intention with regard to the Atsco
23 transaction.  Is that true?
24     A.   At the time, yes.

Page 52

JOSEPH MOLINO

1      Q.   Okay. And then in the third
2  paragraph, the first sentence, there were
3  considered factors you considered during your
4  negotiations that there was equipment valued at
5  over 1 million that will likely not all be
6  required to be moved to our facility and will be
7  sold.
8           That was the thought process of
9  Hy-Tech in this transaction.  Is that right?
10          MR. MUETHING:  Objection.
11          MR. COLLINS:  Grounds?
12          MR. MUETHING: Well, you asked the --
13          the eventual question was the thought
14          process of the corporation, and I'm not sure
15          this witness is here to testify to that
16          and --
17          MR. COLLINS:  Brian, thank you. Got
18          it.  Thank you.
19     Q.   Sir, your answer?
20     A.   I'm sorry.  Could you repeat the
21 question?
22          MR. COLLINS:  Could the court reporter
23          read back the question, please.
24          (Record read.)

Page 53

JOSEPH MOLINO

1      Q.   Is that your thinking process, sir, in
2  doing this transaction?
3      A.   Based on what's here, that was a
4  factor in the decision, yes.
5      Q. Okay. The next page I'd like you to
6  look at is Bates numbered HY0177. At the top of
7  the page, you wrote:
8           "In fact, Hy-Tech has tried for many
9  years to provide these tools to TorcUP, and TorcUP
10 has indicated their satisfaction with their
11 current supplier, Atsco."
12          Is that your understanding --
13     A.   I'm sorry. Could you say the page
14 number again?  I can't seem to find the section
15 you're referring to.
16     Q.   Yes. Right at the top of the page of
17 HY0177.
18     A.   Oh, okay.  Okay.  Got it.
19          I say it now, yes.
20     Q.   It's the first full sentence, I think.
21 Yeah, it's the first full sentence:
22          "In fact, Hy-Tech has tried for many
23 years to provide these tools to TorcUP, and TorcUP
24 has consistently indicated their satisfaction with

Page 54

JOSEPH MOLINO

1                    JOSEPH MOLINO
2  their current supplier, Atsco."
3            Do you see those words?
4      A.   I do.
5      Q.   And that was your understanding going
6  into this transaction for the purchase of Atsco
7  assets, correct?
8      A.   Yes.
9      Q.   Did you do any due diligence to
10  ascertain whether any of Atsco's customers,
11  including TorcUP, bought and produced these
12  materials?
13     A.   I don't remember.  I will say
14  generally it is difficult to speak to customers.
15  As you can imagine, a seller is reluctant for that
16  conversation to take place.
17     Q.   Did you know that Mr. Ober spoke with
18  the people at TorcUP?
19     A.   That is -- that is definitely
20  possible.
21     Q.   And did you know that Mr. Ober
22  recognized that he was not able to break in to
23  become a supplier to TorcUP?
24     A.   I do remember that.
25     Q.   And that Atsco consistently was the

Page 55

JOSEPH MOLINO

1                    JOSEPH MOLINO
2  supplier to Atsco, not Hy-Tech -- I'm sorry -- did
3  I say that right?
4            That Atsco was consistently the
5  supplier to TorcUP, and not Hy-Tech?
6            MR. MUETHING:  Objection.
7      Q.   Do you understand that, Joe?
8      A.   Yeah.
9            THE WITNESS:  I'm sorry.  Am I allowed
10            to answer, Brian?
11            MR. MUETHING:  Yes.  Joe, I should
12            have done a better job of saying that.
13            My objections are going to be for the
14            record, and unless I specifically instruct
15            you not to answer, which will be unlikely,
16            after the objection is interposed, and
17            pending any response from Mr. Collins, you
18            can feel free to answer the question, as you
19            are here.
20            THE WITNESS:  Okay.
21     A.   I'm sorry.  Could you repeat that
22  question again?
23            Sorry about that.
24     Q.   Well, I think you gave us the answer,
25  so I'm going to move on to the next question,

Page 56

JOSEPH MOLINO

1                    JOSEPH MOLINO
2  which will be related to it.
3            If you turn to the page we have -- or
4  your lawyers have labeled as HY0265.
5      A.   265?
6            Wait a minute.  Getting there.
7            Okay.
8      Q.   The fifth sentence in the middle of
9  the paragraph, let me read it to you.
10           "Hy-Tech has tried for a number of
11  years to provide these tools to TorcUP, and TorcUP
12  has consistently indicated their satisfaction with
13  their current supplier, Atsco. Despite not being
14  able to become a vendor to TorcUP, Bob Ober,
15  president of Hy-Tech, has a good relationship with
16  TorcUP."
17           Did I read that correctly?
18     A.   Yes.
19     Q.   And prior to the transaction of
20  Hy-Tech acquiring Air Tool, that was your
21  understanding.  Is that correct?
22     A.   Yes, to the best of my recollection.
23     Q.   Well, you looked at the due diligence
24  binders, so you would have been writing these
25  words back in 2014.  Is that right?

Page 57

JOSEPH MOLINO

1                    JOSEPH MOLINO
2      A.   Just because I was in charge of the
3  due diligence binders, that doesn't mean I wrote
4  everything in here.  We have a whole team that
5  does due diligence.
6      Q.   Okay.  Well, that's an interesting
7  question.
8            Who's on your -- who was on your due
9  diligence team, again, in 2014 for this
10  transaction?
11     A.   It would -- most likely would have
12  included Bob Ober, the CFO, controller, perhaps
13  somebody here, and myself, and along with any
14  experts we -- we would have required.
15     Q.   Would the CFO have been Mr. Aloi?
16     A.   At the time, no.  The CFO would have
17  been a woman named Betty Smail.
18     Q.   Okay.  So we've got Bob Ober.  We've
19  got Betty Smail. We heard testimony yesterday
20  that Mr. Aloi was involved with helping with the
21  due diligence.
22            Do you know if Mr. Horowitz was
23  involved with the -- any of the work prior to this
24  transaction taking place?
25     A.   No, he was not involved in due

Page 58

JOSEPH MOLINO

1                    JOSEPH MOLINO
2   diligence.
3        Q.   Was he involved with any of the work
4   prior to this transaction taking place?
5        A.   What do you mean by "the work"?
6        Q.   Whatever it took to cause Hy-Tech to
7   decide to make this purchase -- deciding to make
8   this purchase by Hy-Tech?
9        A.   Mr. Horowitz was not directly
10  involved.  He did meet with Mr. Sabath on several
11  occasions before the -- before the closing.  But
12  he was not involved in due diligence.
13       Q.   Was there any other business that Mr.
14  Horowitz had with Mr. Sabath, other than the
15  potential sale of the Air Tool assets to --
16       A.   Not to my knowledge.
17       Q.   All right.
18            Were there any other in-house
19  personnel at Hy-Tech that were involved with this
20  transaction in terms of due diligence?
21       A.   Patrick Curry would have been
22  involved.
23       Q.   Okay.  Anyone else?
24       A.   Most likely not, but I -- I would
25  say -- I would say no.

Page 59

1                    JOSEPH MOLINO
2        Q.   Well, by my math, there's Bob Ober,
3   Betty Smail, Patrick Curry, Mr. Aloi said he was
4   involved, and yourself.  So that would be five?
5        A.   Yes.
6        Q.   And then you had some outside
7   assistance as well, didn't you?
8        A.   We typically would have insurance
9   experts look at the insurance information.
10            I don't recall if there was any
11  environmental issues here.  I'd have to look at
12  the binders, but often we have an environmental
13  expert take a look at the facility and grounds.
14            In this transaction, I'd say that's
15  about it.  I don't think we had anybody else.
16       Q.   And was CohnReznick, the accounting
17  firm, involved?
18       A.   Yes.  That wasn't always the case, but
19  in this transaction, I asked CohnReznick to
20  perform some limited procedures on the financial
21  statement.
22       Q.   Okay.  And was the law firm of
23  Silverman Acampora involved?
24       A.   Yeah.  They were the -- the law firm
25  that helped us with all the documentation.

Page 60

1                    JOSEPH MOLINO
2        Q.   All right. How many insurance
3   professionals would have been helping you with due
4   diligence on this transaction?
5        A.   I would -- based on my recollection,
6   at most, one. We would have probably passed the
7   insurance information in front of our broker, and
8   they would have probably reviewed it for us.
9        Q.   And how many accountants from the
10  CohnReznick firm were involved with doing due
11  diligence?
12       A.   My recollection is it was a staff and
13  a manager with some involvement of a partner.
14  That's my recollection.
15       Q.   So that would be three.
16            And then how many lawyers from the
17  Silverman law firm were involved with this
18  transaction?
19       A.   I don't remember.
20       Q.   More than one?
21       A.   Most likely -- it wouldn't be more
22  than a couple.  Typically, it's a partner and a
23  staff.
24       Q.   Do you know of any lack of cooperation
25  by Air Tool with any of the due diligence that

Page 61

1                    JOSEPH MOLINO
2   Hy-Tech or any of the outside professionals were
3   doing on your behalf, do you know of any
4   uncooperativeness by Air Tool to any of those
5   information requests?
6        A.   My recollection is we were given a
7   very short time frame in which to perform the due
8   diligence. I do recall being given several hard
9   deadlines by Rick Sabath. I do remember having
10  very limited access to the facility.
11            If you want to call that being
12  uncooperative, I suppose you could.  I would say
13  that with respect to the amount of access and
14  timeline, this transaction was probably the
15  most -- I would say the sellers were the most --
16  probably one of the most uncooperative situations
17  we've ever encountered.
18       Q.   In pre -- presales and diligence?
19       A.   Yes.
20       Q.   And at that juncture, they weren't
21  cooperating, you could have just said, no, thank
22  you, and walked away, correct?
23       A.   Absolutely, yes.
24       Q.   And you didn't.  So you apparently got
25  what you needed to proceed the transaction

Page 62

JOSEPH MOLINO

1  closing, correct?
2
3       A.    Yes.
4       Q.    Do you have any information that was
5  given to you that Air Tool knew was false as of
6  August 13, 2014?
7             Let me just be clear: You have
8  certainly filed a lawsuit saying that there were
9  things you thought breached reps and warranties,
10  and you've described them.
11            What -- tell us what Air Tool knew was
12  false on August 13, 2014.
13       MR. MUETHING:  Objection.
14            Go ahead.  Form and compound.
15            You can answer, Joe.
16       A.    What did -- let me just rephrase --
17  make sure I understand the question.
18            Can you ask it one more time?
19       Q.    Yeah, sure.
20            You've certainly filed a lawsuit and
21  testified here today of what your company views to
22  be breaches of representations and warranties,
23  true?
24       A.    Yes.
25       Q.    Okay.  And so you're suggesting in

Page 63

JOSEPH MOLINO

1
2  that that you were given information that wasn't
3  true, correct?
4       A.    Correct.
5       MR. MUETHING:  Objection.
6       Q.    And what can you tell me about what
7  Air Tool knew on August 13, 2014 that it was
8  supplying to you was untrue?
9             Not your allegations, but what did --
10  tell me what you know about what Air Tool knew?
11       MR. MUETHING:  Objection.
12       A.    I'm not sure I could know what Air
13  Tool knew.
14       Q.    I'm not surprised at that answer, and
15  thank you.  That's really what I wanted to hear.
16            Your due diligence -- you made
17  repeated requests for materials from Air Tool.
18  Isn't that right?
19       A.    Yes.
20       Q.    And was anything withheld from you or
21  not supplied to you?
22       A.    Well, what was withheld from us was
23  information regarding the non-saleability of
24  certain inventory and the damage to certain
25  inventory.  That was withheld from us.

Page 64

JOSEPH MOLINO

1
2       Q.  If you asked for a description of a
3  particular -- how many -- how many items from a
4  particular part number, did you get it?
5       A.    Yes.
6       Q.    Okay.
7       A.    With respect to quantity, yes.
8       Q.    And so it's your belief from your
9  assessment that there was information that was
10  untrue, and I'm -- and -- but I'm trying to
11  understand what -- what did somebody from Air
12  Tool tell you that there was false information
13  given to you?
14       MR. MUETHING:  Objection to form.
15       A.    Yeah, could you ask that question
16  again?
17       Q.    Sure.
18            Did you talk to Rick Sabath, Mike
19  Sevilla, or any of the other individuals who were
20  associated with Air Tool and did they tell you we
21  gave you false information prior to August 13,
22  2014?
23       A.    I don't recall anyone from Air Tool
24  Service Company telling me they gave me false
25  information.

Page 65

JOSEPH MOLINO

1
2       Q.    Okay.  Do you know if Air Tool changed
3  its -- the way it conducted its business from the
4  time that it signed a letter of intent with you
5  until August 13, 2014?
6       A.    I do recall that they had a -- they
7  were having a difficult time producing product in
8  the several months before the closing.
9       Q.    Is that in your due diligence binders
10  somewhere?
11       A.    I don't recall.
12       Q.    And was that a change in their doing
13  business?
14       A.    I suppose it depends on your
15  perspective.
16       Q.    Were they selling different products
17  to different people?
18       A.    Not to my recollection.
19       Q.    Did they -- were they outsourcing
20  their manufacturing to somebody else to produce
21  the parts for their customers?
22       A.    I don't remember.
23       Q.    Was Air Tool the subject of an annual
24  audit by its accountants?
25       A.    I believe that it was.

Page 66

JOSEPH MOLINO

1         JOSEPH MOLINO
2      Q.    Is there anything that you found in
3  the audited financial statements of Air Tool for
4  the periods up through the closing date of this
5  transaction that's untrue?
6      A.    Not that I recall.
7      Q.    Would have an audit looked at Air
8  Tool's method of doing inventory and accounting
9  and so forth of the materials it had on hand?
10     A.    I'm sorry, is that a question?
11     Q.    It is.
12     A.    Can you say it again?
13     Q.    Would an audit of Air Tools business
14  have included a review of Air Tool's inventory
15  handling and counting?
16     A.    I'm sorry.  You broke up -- you broke
17  up a little bit.  I apologize.  One more time?
18     Q.    Sure.
19         In the course of an audit, would Air
20  Tool's inventory handling and counting have been
21  subject to the review of the audit firm?
22         MR. MUETHING:  Objection, form,
23     foundation.
24     A.    I believe that it would.
25     Q.    And did you see anything in the

Page 67

JOSEPH MOLINO

1         JOSEPH MOLINO
2  audited financial statements that you received
3  prior to the closing of this transaction that told
4  you there was something amiss with Air Tool's
5  inventory handling and counting?
6         MR. MUETHING:  Objection, form.
7      A.    Not that I remember.
8      Q.    I'm going to ask you to go back to
9  Plaintiffs' Exhibit Number 16, if you would.
10     A.    Is that the asset purchase agreement?
11     Q.    Yes.  That's what I was just going to
12  say, it's the asset purchase agreement.
13     A.    Okay.  Got it.
14     Q.    Okay.  Let's look at Section 2.3.2.1,
15  the inventory section.
16     A.    Okay.
17     Q.    When Hy-Tech came into the business
18  after the transaction, would that have been
19  August 14, 2014?
20     A.    Yes.
21     Q.    Okay. Did -- did Air Tool have an
22  inventory system in place before Hy-Tech purchased
23  Air Tool?
24     A.    To my recollection, yes.
25     Q.    Okay.  And when Hy-Tech stepped in and

Page 68

JOSEPH MOLINO

1         JOSEPH MOLINO
2  took over the business, was the inventory count of
3  Air Tool's inventory done in a manner consistent
4  with Air Tool's audited financial statements.
5      A.    I'm sorry, could you ask that question
6  again?
7      Q.    Certainly.
8         When Hy-Tech took over the assets of
9  Air Tool and did an inventory count, was the
10  Hy-Tech inventory count of Air Tool's inventory
11  done in a manner consistent with Air Tool's
12  audited financial statements?
13         MR. MUETHING:  Objection.
14     A.    Yeah, I don't know. I can only
15  speculate as to how inventory was taken when we
16  didn't own the company.
17         I do know that good accountants
18  typically use very similar procedures in taking
19  inventory, so all I can suggest is that the way
20  that we took inventory is fairly common among
21  accountants, in my experience in accounting and
22  finance for 30 years.
23     Q.    So you can't tell the Court
24  definitively that Hy-Tech's inventory was done in
25  a manner consistent with Air Tool's audited

Page 69

JOSEPH MOLINO

1         JOSEPH MOLINO
2  financial statements, can you?
3      A.    I can only say that if the inventory
4  was taken properly and audited by an outside
5  accounting firm that, what we did would have been
6  most likely quite similar.
7      Q.    Right.  But in terms of my question --
8  I appreciate what you're saying, sir, but in terms
9  of my question, your answer is no, you don't know
10  if Hy-Tech's inventory count of Air Tool's
11  inventory was done in a manner consistent with Air
12  Tool's audited financial statements. Is that
13  correct?
14     A.    No, I wouldn't know.
15     Q.    Thank you.
16         Do you know if the Air Tool production
17  processes continued to run after July 1, 2014
18  until Hy-Tech took the business over?
19     A.    Yes, they were -- they were in
20  operation.
21     Q.    And do you know if the product that
22  was produced during that -- they use the phrase
23  "GAAP period."  I'm referring to the July 1, 2014
24  until the end of business August 13, 2014, do you
25  know if that was -- those products were

Page 70

JOSEPH MOLINO

1
2 incorporated into Air Tool's inventory?
3     A.    I wouldn't know the answer to that.
4     Q.    Do you know how parts were being
5 processed, new finished goods were being produced,
6 or new work-in-progress was being produced in
7 inventory at Air Tool during that July 1 through
8 August 13 close of business 2014 period?
9     A.    No, I won't --
10          MR. MUETHING:  Objection.
11     A.    Yeah, I wouldn't know that either.
12     Q.    After August 14, 2014, when Hy-Tech
13 took over the Air Tool assets, until January 30,
14 2014, we heard that the MacTurn -- the Okuma
15 MacTurn piece of equipment was at the facility in
16 Mentor, Ohio, that Air Tool formerly operated.
17          Did you know that?
18     A.    Could you repeat those dates again,
19 please?
20     Q.    Yeah, sure.
21          So my understanding is this
22 transaction closed on August 14, 2014.
23          We're in agreement on that?
24     A.    Yeah.
25     Q.    We were told yesterday that the

Page 71

JOSEPH MOLINO

1
2 MacTurn -- the Okuma MacTurn at the Mentor
3 facility was taken by a rigging company on
4 January 18, 2015.
5          Did you know that -- January 30, 2015.
6     A.    That sounds about right.
7     Q.    Okay.  Was the Okuma MacTurn operating
8 during that period, August 14 through January 30?
9     A.    I don't remember.
10     Q.    It would have been under the control
11 of Hy-Tech during that period of time, wouldn't
12 it?
13     A.    Yes.
14     Q.    Okay.  Let's look at Exhibit 16,
15 Section 2.3.2.1.
16     A.    Okay.
17     Q.    There's a defined term, "Inventory
18 Count."
19          Do you see that?
20     A.    Yes.
21     Q. And it indicates that the inventory
22 count was to be taken by Mike Sevilla, Nicholas
23 Russell, and Michael Turick.
24          Do you see that?
25     A.    Yes.

Page 72

JOSEPH MOLINO

1
2     Q.    Do you know if those individuals did
3 the physical count, which is defined here as
4 "Inventory Count"?
5     A.    I was not on location that day. My
6 recollection is those three people were there.
7 They -- they stayed on with the company after the
8 closing. I do know that our team was also there
9 working on the inventory.
10     Q.    Did that take place within 20 days of
11 August 14, 2014?
12     A.    My recollection is it took place 21
13 days after that date.
14     Q.    Okay. And then was there rollback of
15 the inventory count that took place within 20 days
16 of August 14, 2014?
17     A.    It took place after that.
18     Q.    And was there some kind of an
19 inventory acknowledgement that was sent within 20
20 days of the closing date by Hy-Tech to Air Tool?
21     A.    My recollection is it was sent after
22 that.
23     Q.    It was sent on August -- or -- I'm
24 sorry -- October 16, 2014.  Isn't that correct?
25     A.    I don't have the document in front of

Page 73

JOSEPH MOLINO

1
2 me that you're referring to, but -- so I'm not
3 sure I can answer that question.
4     Q.    Okay.  Well, we'll get to the
5 document.
6          But I do have a document that's dated
7 October 16, 2014 to Rick Sabath from you, and it
8 purports to be the inventory acknowledgement
9 pursuant to Section 2.3.2.1 of the asset purchase
10 agreement.  Okay?
11          So you don't have -- you'll see it,
12 but you don't have a disagreement that October 16,
13 2014 was when you actually sent an inventory
14 acknowledgment form.  Is that right?
15     A.    I'd have to look at the document to
16 confirm that, but that sounds about right.
17     Q.    And that was considerably more than 20
18 days after August 14, 2014.  Is that right?
19     A.    Yep.
20     Q.    Did Hy-Tech know what Air Tool's
21 inventory practices were prior to the closing of
22 this transaction?
23     A.    I don't know the answer to that
24 question.
25     Q.    Do you know if Air Tool had a

Page 74

JOSEPH MOLINO

1
2  computerized system by which it took care of this
3  inventory requirement?
4      A.    Yes, my recollection is it had a
5  computerized system, yes.
6      Q.    Did Hy-Tech use that system for any
7  purpose?
8      A.    When?
9      Q.    After the transaction closed?
10     A.    Yeah, I'm fairly certain we would have
11 continued to use whatever system was there for
12 some period of time.
13     Q.    Were you -- was that personal
14 knowledge you have or you're assuming that to be
15 the case?
16     A.    It's my recollection of my knowledge.
17     Q.    Okay. Who would have been the person
18 directly responsible for operating the Mentor
19 facility of Air Tool after the transaction closed?
20     A.    I don't remember the team that was
21 left in place. My recollection, it would have
22 been the team that was there when we bought the
23 company.
24     Q.    Was that Mr. Ober?
25     A.    Mr. Ober would have been the president

Page 75

JOSEPH MOLINO

1
2  of the parent company, but I -- I don't remember
3  if he was running day-to-day operations at Atsco
4  immediately after the closing.
5      Q.    Do you know if he ever came to Atsco
6  and made announcements to the staff?
7      A.    I'd say that's likely.
8      Q.    Do you know if he told the staff
9  immediately after the closing of the transaction
10 that the facility was going to be closed?
11     A.    I don't remember if he said that.
12     Q.    Do you know if he told personnel at
13 Air Tool that the inventory system that Air Tool
14 had been using would no longer be utilized after
15 the close of the transaction?
16     A.    No, I don't remember that.
17     Q.    In the Exhibit 16, 2.3.2.1, the
18 inventory count was to be done -- if you'll find
19 this phrase with me, it's in this first
20 sentence -- in accordance with the past practices
21 of seller as of the date of such inventory count.
22     Do you see that?
23     A.    Yes.
24     Q.    Okay. Did Hy-Tech know what the
25 inventory past practices of Air Tool were after

Page 76

JOSEPH MOLINO

1
2  the transaction closed?
3      A.    Again, as I said earlier, there's only
4  so many ways to take an inventory.
5      So if it was an -- it was an audited
6  statement. These statements were audited by a
7  public accounting firm.  The practices that would
8  have taken place would have been quite similar to
9  the standard practices any team of accountants
10 would perform on inventory.
11     Q.    So I appreciate your answer, but I
12 need a specific response to my question, which is
13 do -- did Hy-Tech know what the past practices of
14 Air Tool were with regard to inventory?
15     A.    I can't say for certain.
16     Q. So is your answer, no, Hy-Tech did not
17 know what the past practices were of Air Tool with
18 regard to inventory?
19     A.    Other than what we would have learned
20 in due diligence, no.
21     Q. Quite candidly, sir, the judge is
22 going to want a very direct answer from you.
23     Did Hy-Tech know what the past
24 practices were of Air Tool with regard to
25 inventory?

Page 77

JOSEPH MOLINO

1
2      MR. MUETHING:  Objection.
3      A.    I don't know -- I don't know the
4  answer to that question.
5      Q.    That's a fair response, and I
6  appreciate that.
7      If you go to the next section in
8  Exhibit 16, which is 2.3.2.2, regarding the
9  closing statement, and this is towards the lower
10 middle of that paragraph, and see if you can find
11 it and follow with me and see if I read this
12 correctly:
13     "The closing statement shall be
14 prepared in accordance with GAAP applied
15 consistently with seller's past practices,
16 including giving effect to reasonable allowances
17 for bad debt, inventory shrinkage, and
18 obsolescence, and reasonable reserves for customer
19 returns, allowances, and rebates."
20     Do you see that line?
21     A.    Yes.
22     Q.    And did I read it correctly?
23     A.    Yes.
24     Q.    Okay.  And to the degree that you
25 recall the closing statement that you sent in

JOSEPH MOLINO

1     JOSEPH MOLINO
2  October, did it take into account seller's past
3  practices?
4        A.    Could you say that -- I'm sorry --
5  could you ask that question again?
6        Q.    Right.
7              To the degree you recall sending a --
8  a closing networking capital statement to --
9              (Discussion off the record.)
10       Q.    Let me start again, and we'll strike
11 that question.
12             To the degree you recall sending a
13 closing statement to Air Tool, did that closing
14 statement take into account and what were
15 consistently with seller's past practices?
16       A.    I don't know.
17       Q.    Thank you.
18             And do you know if your closing
19 statement included giving effect to reasonable
20 allowances for bad debt?
21       A.    Yes, to my recollection, it did.
22       Q.    And was that allowance of bad debt
23 consistent with seller's past practices in that
24 regard?
25       A.    To the best of my knowledge, yes.

JOSEPH MOLINO

1     JOSEPH MOLINO
2        Q.    Okay. Same question: When you sent
3  that closing statement, did you take into account
4  seller's past practices insofar as you were
5  describing inventory shrinkage and obsolescence?
6        A.    I don't know the answer to that.
7        Q.    I believe in your due diligence
8  binders, there are references that you make both
9  in typed and in handwritten form that say Air Tool
10 doesn't have an obsolescence policy for inventory.
11             Do you recall that?
12       A.    It sounds like something I would --
13 would say.  It sounds correct.  That's -- what you
14 said sounds reasonable.
15       Q.    And so would you have known -- you
16 really didn't have a written policy, so how did
17 you take into account seller's obsolescence policy
18 into your closing statement?
19       A.    We relied on their representations.
20       Q.    Which representations?
21       A.    In the asset purchase agreement.
22       Q.    Okay.  Was there representations about
23 their obsolescence policy in the asset purchase
24 agreement?
25       A.    There were representations about the

JOSEPH MOLINO

1     JOSEPH MOLINO
2  obsolescence and the fact that there wasn't any.
3        Q.    How did you apply seller's
4  obsolescence policy to your closing statement?
5        A.    As I said, I don't know.
6        Q.    You said you don't know.
7              Is that still true?
8        A.    Seller's obsolescence policy, we sent
9  the -- in the due diligence, we indicated that
10 they didn't have an obsolescence policy, so how
11 can I apply it?
12       Q.    Well, they didn't have a written one.
13             Do you know if they had an
14 obsolescence policy that never found its way into
15 a writing?
16       A.    I don't know.  I don't recall that.
17             MR. MUETHING: Hey, Tim, when you get
18       to a spot that makes some sense, can we take
19       like a five-minute break, please?
20             MR. COLLINS: Yes, sir.  Now's good.
21             MR. MUETHING:  Now's good?
22             MR. COLLINS:  Yes.
23             MR. MUETHING:  I don't want to
24       interrupt.  Thank you.
25             MR. COLLINS:  No, we just finished

JOSEPH MOLINO

1     JOSEPH MOLINO
2        that section.
3              MR. MUETHING:  Okay.  Perfect.  Thank
4        you.
5              Let's take a five-minute break.
6              Off the record, please.
7              VIDEOGRAPHER:  We're going off the
8        record at 1:11 p.m.
9              (Recess.)
10             VIDEOGRAPHER:  This marks the start of
11       Media No. 3. We're back on the record at
12       1:19 p.m.
13 BY MR. COLLINS:
14       Q.    Thank you, Mr. Molino.
15             Let me ask a couple of questions here.
16             You -- Hy-Tech is a -- well, I guess
17 P&F is a publicly traded company.  Isn't that
18 correct?
19       A.    Yes.
20       Q.    What exchange are you traded on?
21       A.    NASDAQ.
22       Q.    And going into the acquisition that
23 you made of the Air Tool assets, did P&F borrow
24 from any financing sources in order to do the
25 transaction?

Page 82

JOSEPH MOLINO

2   A.    I would -- yes, I'm certain that we
3   borrowed the money from our -- our bank.
4   Q.    Okay.  And it has been described
5   yesterday as being an asset-based loan.
6        Does that seem to be a correct
7   description of the transaction as far as you
8   recall?
9   A.    Well, if I could just clarify, the
10  transaction was an asset-based structure.  Our
11  arrangement with our bank is an asset-based
12  facility.  Those are two separate things.
13  Q.    Okay.  I was quoting the language that
14  some of your company witnesses used over the last
15  couple of days, so I appreciate that
16  clarification.
17       In the context of an asset-based
18  facility, isn't it true that the secured lender
19  comes in and performs an audit as to the assets
20  that are going to serve as the basis for the loan
21  that you're taking out?
22  A.    Not usually at the time of the
23  closing. It's possible, and to be honest, I don't
24  remember if that took place.
25       What was more likely would have taken

Page 83

JOSEPH MOLINO

1   place is some months after the closing, they would
2   have done an audit of assets.
4   Q.    So a bank would lend money in an
5   asset-based loan situation and they wouldn't
6   verify what the assets were before they lent out
7   that money?  Is that what you're suggesting?
8        MR. MUETHING:  Objection.
9   A.    It is possible that -- and I don't
10  remember exactly, but it's possible that we had
11  sufficient collateral available to us without the
12  assets of the target company sufficient to make
13  the acquisition.
14  Q.    Okay. And so when an asset-based
15  lender does an audit, that's a field audit.
16  Someone actually shows up in the premises where
17  the assets are that serve as the collateral for
18  their loan.  Is that correct?
19       MR. MUETHING:  Objection, form,
20  foundation.
21  Q.    Is that correct, sir?
22  A.    Yes.
23  Q.    Okay.  And an asset-based loan field
24  audit, the auditors are checking inventory.
25  They're looking at accounts receivable.  They're

Page 84

JOSEPH MOLINO

2   going down the list of anything valuable that's
3   serving as the basis of their collateral, yes?
4   A.    It's based on the collateral that
5   we've agreed that's used in the -- our facility.
6   For example, it was just in accounts receivable
7   and inventory, it wouldn't have included
8   equipment.
9   Q.    Okay.  But they would have been taking
10  a hard look at that inventory to see what it was,
11  its quality, those kinds of things in their audit.
12  Is that correct?
13  A.    At some point in time, yes.
14  Q.    Okay.  And in addition to the lender's
15  asset-based loan on it, would there also have been
16  an audit performed by your auditor, CohnReznick,
17  of the assets that you were acquiring?
18  A.    Not typically.  The transaction would
19  have been too small for that.
20  Q.    So are you suggesting that there was
21  no such audit or that you just don't recall one?
22  A.    I don't recall an audit, and finally,
23  I'm fairly confident there was no audit
24  specifically of the target company.
25  Q.    Now, to get to the net working capital

Page 85

JOSEPH MOLINO

2   adjustment that you described in the examination
3   that Mr. Muething had with you, you made a
4   deduction -- let me find exactly where -- for an
5   obsolescence reserve of $126,152.60.
6        Do you recall that?
7        That would be Plaintiff's Exhibit 27,
8   if you need to go back to it.
9   A.    Yep, that's what I see here, yep.
10  Q.    And so that obsolescence reserve, was
11  that a policy -- an outspoken policy of Hy-Tech?
12  A.    Hy-Tech required that, per GAAP, that
13  any inventory that is not valued -- that is not
14  worth what its value is on the books must be
15  reserved against. That's generally accepted
16  accounting principles.
17  Q.    You said that that's a Hy-Tech policy,
18  not an Air Tool policy, that triggered this
19  reduction based upon an obsolescence reserve,
20  correct?
21  A.    To be clear, it's a GAAP policy.  Any
22  company who's purporting to produce financial
23  statements under GAAP would have to have that
24  policy.
25  Q.    Well, but you don't know if it was a

                    JOSEPH MOLINO

1   policy of Air Tool.  You do know it was a policy
2   of Hy-Tech, correct?
3       A.    That's correct.
4       Q.    Okay.  Again, if we look at the
5   Section 3.13 of the asset purchase agreement --
6   that would be Plaintiff's Exhibit 16.  I'll give
7   you a moment to get there.
8       A.    Okay.
9       Q.    "Inventory is supposed to consist of a
10  quality and quantity useable in the ordinary
11  course of the business of seller."
12          Do you see that language?
13      A.    Yes.
14      Q.    So that would be a -- whether
15  something is in quantity or quality usable will be
16  defined by the ordinary course of the business of
17  the seller under this contract.  Isn't that right?
18      A.    Well, it would be defined by generally
19  accepted accounting principles.
20      Q.    Well, the asset purchase agreement
21  uses this specific language that I just had you
22  read, doesn't it?
23      A.    Yeah, that's what's in the agreement,
24  yes.

                    JOSEPH MOLINO

1       Q.    And doesn't this agreement define the
2   transaction between Air Tool and Hy-Tech?
3       A.    Yes.
4       Q.    And so inventory is required here to
5   consist of a quality and quantity usable in the
6   ordinary course of the business of the seller.
7   Isn't that true?
8       A.    Yes.
9       Q.    And then drop down to the end of that
10  paragraph: "The quantities of each item of
11  inventory are not excessive but are reasonable in
12  the present circumstances of the Business."
13          Do you see that language?
14      A.    Yes.
15      Q.    Isn't the capital B, Business, isn't
16  that Air Tool?
17      A.    I'm sorry.  Say that again?
18      Q.    Do you see the word "Business" is
19  capitalized?
20      A.    Yes.
21      Q.    That's a defined term, isn't it?
22      A.    Typically, capitalization would be a
23  defined term, yes.
24      Q.    Okay.  And the business in this -- in

                    JOSEPH MOLINO

1   this agreement is the business as it was operated
2   by Air Tool.  Isn't that right?
3       A.    Yes.
4       Q.    And it makes all the sense in the
5   world, if signing an agreement before the sale of
6   assets, of course, it's the business of Air Tool,
7   correct?
8           MR. MUETHING:  Objection, form.
9       A.    Yes.
10      Q.    Did you take into account the ordinary
11  course of Air Tool's business or the present
12  circumstances of Air Tool's business in
13  determining what inventory should be noted as
14  obsolescent reserve?
15      A.    I'm not sure I'm understanding the
16  question.  Maybe you could rephrase it.
17      Q.    I'd be glad to.
18          You made an obsolescence reserve of
19  126-plus thousand dollars against the Air Tool
20  inventory, correct?
21      A.    Yes.
22      Q.    In doing that, taking into account
23  what -- what was the inventory from the
24  perspective of the ordinary course of Air Tool's

                    JOSEPH MOLINO

1   business for the present circumstances of Air
2   Tool's business?
3           MR. MUETHING:  Objection, form.
4       A.    I'm not exactly sure what you're
5   asking, but, again, I'm not -- your question seems
6   a bit confusing to me.
7       Q.    All right.  Let me try it again.
8           You acknowledge you took an
9   obsolescent reserve of more than $126,000 against
10  Air Tool's inventory, correct?
11      A.    Correct.
12      Q.    Did you do that because that was
13  something that was done in the ordinary course of
14  business of Air Tool?
15      A.    In the ordinary course of business,
16  you would write -- you would have a reserve for
17  inventory that is not sellable, so --
18      Q.    And I appreciate your answer, but it
19  doesn't answer my question.
20          In taking that obsolescent reserve,
21  did you do so taking into account the ordinary
22  course of business of Air Tool?
23          MR. MUETHING:  Objection.
24      Q.    I'm sorry, your answer was?

JOSEPH MOLINO

2    A.    Yes.
3    Q.    And how did you do that?
4          Well, how did you know what the
5    ordinary course of business of Air Tool was?
6          MR. MUETHING:  Objection, compound.
7    A.    In the ordinary course of business, if
8    you're applying generally accepted accounting
9    principles, you are required to place a reserve on
10   non-sellable inventory. There is no wiggle room
11   there. Otherwise, they would not have had a clean
12   opinion for their audit.
13   Q.    Sir, I appreciate your answer, but I'm
14   trying to see how Air Tool fits in, not general
15   accounting principles or any other factors.
16         Since the contract calls for you to
17   take into account the ordinary course of Air
18   Tool's business, did you in taking an obsolescent
19   reserve take into account the ordinary course of
20   Air Tool's business, specifically?
21   A.    Yes, yes.
22   Q.    How? How?
23         MR. MUETHING:  Objection.
24   A.    I'm not sure how to answer "how."
25   Q.    Well, if you did it, you've got to

JOSEPH MOLINO

2    explain to me where you got the information --
3    A.    Okay.  Well --
4    Q.    -- so we would know it wasn't taken
5    into account.
6    A.    Okay.  They produce product for sale,
7    presumably because they thought they could sell
8    something. That's the ordinary course of
9    business. And we discovered after the closing
10   that it was not sellable.
11         I'm not sure what else to say.
12   Q.    What information did you have about
13   the ordinary course of Air Tool prior to
14   August 14, 2014 when your folks took over the
15   Mentor facility?
16   A.    We had lots of information.  I'm not
17   sure what you're asking.
18   Q.    And how did you -- well, I'm asking
19   about inventory, and I'm asking what did you know
20   about Air Tool's inventory and how did you apply
21   that in your obsolescence reserve?
22   A.    We knew the types of inventory that
23   Air Tool Service Company had, so we knew the
24   quantity based on what was presented to us.
25         Of course, that was not confirmed

JOSEPH MOLINO

2    until later when we took the inventory.
3    Q.    And do you know if the quality and
4    quantity that Air Tool had on hand was sufficient
5    for -- for selling in the ordinary course of
6    business of Air Tool?
7          MR. MUETHING:  Objection.
8    A.    We relied on their representations to
9    that effect.
10   Q.    So you didn't know other than pieces
11   of paper that you saw?
12   A.    And their representations to that
13   effect.
14   Q.    Okay. And then in terms of the
15   present circumstances of Air Tool -- let's just
16   pick the date of the signature on the contract --
17   on August 13, 2014, did you know what the present
18   circumstances were of the business of Air Tool?
19   A.    Could you rephrase?  I'm not sure what
20   you mean by the "present circumstances."
21   Q.    Well, I can't because that's the
22   contract language of a contract that you, I
23   believe, personally signed, so I have a hard time
24   avoiding the words that you committed to.
25         MR. MUETHING:  Objection,

JOSEPH MOLINO

2    argumentative.  Object to the form.  It's
3    not even a question.
4          MR. COLLINS:  I'm not sure that's an
5    objection, but thank you, Brian.
6    Q.    Do you -- did Hy-Tech know the present
7    circumstances of Air Tool -- it's a very simple
8    question -- on August 13, 2014?
9    A.    Present circumstances?
10   Q.    Based on Section 3.13, the contract
11   that you signed, the last line: "Present
12   circumstances of the" -- initial cap B --
13   "Business"?
14         MR. MUETHING:  That's good.  Now let
15         him answer.
16         MR. COLLINS:  Thank you, Brian.
17   A.    To the best of my knowledge, the
18   answer would be "yes."
19   Q.    Okay. Well, what did you know about
20   inventory and the present circumstances of the Air
21   Tool business?
22   A.    I knew what was represented to us and
23   what was on the sheets of paper.
24   Q.    Is that all there is to the present
25   circumstances for the business?

JOSEPH MOLINO

1
2      A.    With respect to inventory, that's all
3  there is.
4      Q.    Whether it could be sold, whether
5  there were customers looking for it, whether
6  customers were returning it, does that have
7  anything to do with the present circumstances?
8      A.    Those were -- it was represented to us
9  that it could all be sold.
10     Q.    And do you know if they were selling
11 it or not?
12     A.    They were selling inventory every day.
13     Q.    Do you know if they were having
14 returns from their customers because the products
15 were defective?
16     A.    I do know that they had some warranty
17 over time, yes.
18     Q.    Was it a -- how big was the warranty
19 claims?
20     A.    I don't remember. But I do remember
21 discussing that with Rick. There were definitely
22 warranty claims.
23     Q.    Was it a material amount of money to
24 this transactions?
25     A.    To my knowledge, the warranty claims

JOSEPH MOLINO

1
2  were not material.
3      Q.    So what they were making and putting
4  out to their customers wasn't coming back as
5  defective product, was it?
6      A.    Well, yes, it was. We're discussing
7  how much of it there was.
8      Q.    An infinitesimal -- "infinitesimal
9  nonmaterial amount might have been coming back" is
10 what you said to us?
11     A.    I didn't use the word "infinitesimal."
12     Q.    How about nonmaterial, a nonmaterial
13 amount might have been coming back?
14     A.    To the point of the closing, that was
15 the information we were given, yes.
16     Q.    And after the closing, which is -- was
17 there more than a vast material amount coming
18 back?
19     A.    Yes -- let me -- coming back? No.
20     Q.    And, in fact, TorcUP, the customer
21 that Mr. Ober couldn't get, Air Tool accepts they
22 weren't having a problem with returned, defective
23 product from Air Tool going to TorcUP, were they?
24          MR. MUETHING:  Objection, form.
25     A.    I don't know.

JOSEPH MOLINO

1
2      Q.    Did that have anything to do with the
3  present circumstances of the business, whether or
4  not a significant customer of Air Tool was
5  returning products because it was defective?
6      A.    That would have something to do with
7  the present circumstances of the business.
8      Q.    And you don't know about that
9  situation you just told us, correct?
10     A.    I don't know about what?
11     Q.    You don't know about whether there
12 were returns coming back from TorcUP?
13     A.    Again, we didn't -- we only would --
14 we only knew what was told to us and given to us
15 in the form of documentation.
16     Q.    Okay. Let's talk about -- let me find
17 it -- Section 3.17.
18     A.    3.17, okay.
19     Q.    Tell me when you got it.
20     A.    Ownership -- yeah, okay, I got it.
21     Q.    So the caption at 3.17 is "Ownership
22 and Condition of Assets." The second sentence
23 reads:  "The assets constitute all assets
24 necessary to permit seller to conduct the business
25 as now conducted."

JOSEPH MOLINO

1
2          Did I read that correctly?
3      A.    Yeah.
4      Q.    Okay. Do you know if the -- if the
5  Okuma MacTurn was functioning prior to August 14,
6  2014 at Air Tool?
7      A.    I -- I believe that it was.
8      Q.    Okay. And do you know if it was
9  functioning from August 14, 2014 through
10 January 30, 2015?
11     A.    I remember there was -- there were
12 issues with the functioning of that machine
13 intermittently. I don't remember the specific
14 dates, but there were definitely issues with the
15 functioning of that machine.
16     Q.    And that's not an unusual thing with a
17 complicated CMC machine, is it?
18          MR. MUETHING:  Objection.
19     A.    Actually, it's quite unusual.
20     Q.    Okay. And if it's a -- if it's
21 unusual, there's no one at Hy-Tech who was capable
22 of diagnosing what might be wrong with a
23 complicated piece of equipment like that, is
24 there?
25     A.    Could you -- can you rephrase?  I'm

Page 98

JOSEPH MOLINO

1   
2  not sure what you mean by "diagnosing."
3      Q.  Determining exactly what is wrong with
4  a piece of equipment, like the Okuma MacTurn,
5  there was no one at Hy-Tech who was capable of
6  determining why a piece of equipment like that is
7  not functioning.  Is that correct?
8      A.  No.  You would typically bring in the
9  Okuma consultants to make that determination.
10      Q.  And that, indeed, is what Hy-Tech did.
11  You had one, if not two outside companies that
12  were experts on Okuma equipment, correct?
13      A.  Yes, that's my recollection.
14      Q.  Yeah, Mr. Curry told us that there was
15  one, and he had a vague recollection of perhaps
16  another, but you agree with him that that's the
17  procedure, you bring in an outside expert?
18      MR. MUETHING:  Objection to form --
19  hold on, Joe.
20      Objection to form.  And objection to
21  agree to the testimony he doesn't know
22  about.  He can't do that.
23      MR. COLLINS:  Thank you, Brian.
24      MR. MUETHING:  You may answer, Joe.
25      THE WITNESS:  Could you repeat the

Page 99

JOSEPH MOLINO

1   
2  question, please?
3      MR. COLLINS:  Could the court reporter
4  read it back, please?
5      (Record read.)
6      A.  I would agree that that is standard,
7  yes.
8      Q.  And so, so far in this case, we've had
9  three witnesses.  That would be you, Mr. Curry,
10  and Mr. Aloi.
11      Do you know that?
12      A.  I was aware of that.
13      Q.  And Mr. Aloi is a person with a
14  financial services background, a CPA, correct?
15      A.  Correct.
16      Q.  And that's the same with you, you're a
17  person with a financial services CPA background,
18  correct?
19      A.  That is my education, yes.
20      Q.  Yes. And you've had certainly
21  management experience that you described earlier
22  in your testimony, but I guess what I want to make
23  a distinction is, you're not an engineer?
24      A.  I am not, no, sir.
25      Q.  And so Mr. Curry is the only engineer

Page 100

JOSEPH MOLINO

1   
2  who's been offered as a -- in this case thus far.
3      Are you aware of that?
4      A.  Yes.
5      Q.  Okay.  So when we look at
6  Section 3.17(a), the second sentence, "The assets
7  constitute all assets necessary to permit seller
8  to conduct the business that is now conducted," do
9  you know how Air Tool was using the Okuma MacTurn
10  up until August 13, 2014?
11      A.  I was informed that it was a critical
12  component of manufacturing their product.
13      Q.  Who would have told you that?
14      A.  Rick Sabath.
15      Q.  And is it -- is that a representation
16  and warranty somewhere in this asset purchase
17  agreement?
18      A.  The fact that the MacTurn was critical
19  to their operation, is that what you're asking?
20      Q.  Yes, yes.
21      A.  Well, all the equipment -- so MacTurn
22  is not specifically referenced in the asset
23  purchase agreement, other than it's part of the
24  schedule attached to the agreement.
25      Q.  If you look at Section 2.4.1(j) of

Page 101

JOSEPH MOLINO

1   
2  that asset purchase agreement -- tell me when you
3  have it.
4      A.  Okay.
5      Q.  That section reads:
6      "Any and all liability or obligation
7  arising out of that certain litigation style
8  Gosiger, Inc., d/b/a Gosiger Machine Tools versus
9  Air Tool Service Companies, d/b/a Atsco, Inc.,
10  pending in the Court of Common Pleas, Lake County,
11  Ohio," and then it cites to a case number.
12      Do you know what that reference was
13  to?
14      A.  I -- I remember it having -- I don't
15  specifically remember.
16      Q.  Does the fact that this was a repair
17  company that had not done adequate repairs to this
18  particular Okuma, does that -- MacTurn, does that
19  refresh your recollection at all?
20      A.  Yes, if that's what this is referring
21  to, I do remember a conversation or conversations
22  around a -- an outside service company doing
23  inadequate work regarding the repair of some piece
24  of equipment.
25      Q.  And that was part and parcel of how

Page 102

JOSEPH MOLINO

1
2  Air Tool was conducting its business through
3  August 13, 2014, wasn't it?
4           MR. MUETHING:  Objection.
5      A.   I'm not sure what -- what you're -- is
6  that a question?
7      Q.   It is a question.
8      A.   What is the question?  What is the
9  question?
10     Q.   The fact that a piece of equipment was
11 being subjected to $60,000 worth of repairs is
12 part of how Air Tool was conducting its business
13 on August -- through August 13, 2014, isn't it?
14     A.   Yes.
15     Q.   In your view, as a financial and
16 business professional, are you in a position to
17 tell the Court what factors caused the Okuma
18 MacTurn not to work?
19     A.   Correct, correct.
20     Q.   Okay. We've uploaded all those
21 exhibits earlier that were part of your closing
22 binder.
23           Could you look at Plaintiffs'
24 Exhibit 18.
25     A.   Okay.  I have it up.

Page 103

JOSEPH MOLINO

1
2      Q.   All right. And tell the Court what at
3  least the first number of pages are of Plaintiffs'
4  Exhibit 18.
5           It looks like a report to your company
6  by CohnReznick for purposes of preparing to do
7  this transaction with Air Tool.  Is that right?
8      A.   That's what it looks like, yeah.
9      Q.   Okay. And then if I can direct your
10 attention to the page that's got the Bates number
11 of HY0603.
12     A.   0603, okay, yeah.
13           MR. MUETHING:  Tim, I'm sorry, I was
14 asking a question, but I was on mute.
15           You said 0603?
16           MR. COLLINS:  Yes.
17           MR. MUETHING:  Thank you, sir.
18     Q.   Let me know when you get there.
19     A.   Yeah, I'm just getting it right-side
20 up.
21     Q.   Yeah, sorry.
22     A.   Sorry, wrong one.
23           Okay.
24     Q.   So the handwriting on there is yours.
25 Am I correct?

Page 104

JOSEPH MOLINO

1
2      A.   Yes, that looks like my handwriting.
3      Q.   And so at the bottom, tell me if I'm
4  reading this correctly, it's a reference: "There
5  is no inventory obsolescence policy or reserve.
6  Will be established at closing."  Is that correct?
7      A.   Yes.
8      Q.   And was that in reference to a reserve
9  that Hy-Tech was going to establish or was it a
10 reserve that Air Tool was going to establish?
11     A.   It would be Hy-Tech's policy.
12     Q.   Okay.  And then if we go to
13 page HY0605.
14     A.   Okay.
15     Q.   And I believe this confirms in
16 typewritten form what you just said.  The last
17 paragraph reads, I think:
18           "At closing, we will establish an
19 inventory reserve based on the standard Hy-Tech
20 approach.  For fair value accounting purposes, it
21 will be treated as a trade reduction of the
22 opening inventory value."
23           Did I read that correctly?
24     A.   Yes.
25     Q.   And would that have been something

Page 105

JOSEPH MOLINO

1
2  that you would have included in -- on this
3  particular page?
4      A.   I'm sorry.  I didn't hear your last
5  part you said.  Say that again, please?
6      Q.   Yes.  I'm sorry.
7           Would this have been something that
8  you included on this particular page?
9      A.   Me, meaning those were my notes or
10 my -- my -- I'm not sure what you're saying, me.
11     Q.   Yes, I'm asking if these are -- these
12 are your ideas and this is your set of notes?
13     A.   This is -- well, again, this document
14 is -- you said 604 or 605?
15     Q.   605.
16     A.   Well, there's two 605s.  Okay. Hold
17 on a second. Sorry. I was looking at the wrong
18 document.
19     Q.   The one I'm looking at has Molino 7 --
20     A.   Oh, yes.  Here it is, yes, yes.  I'm
21 sorry, I was looking at -- that is me. I would
22 have written this, yes.
23     Q.   Okay.  So those are your words: "At
24 closing, we will establish an inventory reserve
25 based on the standard Hy-Tech approach."

JOSEPH MOLINO

1
2          Those are your words, correct?
3     A.   Yes.
4     Q.   And that's what you did when you made
5  an inventory obsolescence charge against Air
6  Tool's inventory, correct?
7     A.   No, that's not what this is referring
8  to.  Sorry.
9     Q.   What is this referring to?
10    A.   What this refers to is our internal
11 algorithms that we used to calculate inventory
12 reserves.  It would have nothing to do with -- it
13 would have nothing to do with between the buyer
14 and seller in a transaction.
15    Q.   So this was -- well, the previous page
16 we looked at, HY063, you said that a reserve will
17 be established at closing.
18    A.   Yep, I did.
19    Q.   So 0605 is a different reserve in
20 addition to the one --
21    A.   No, they're referring to the same
22 thing.
23         We are -- we perform certain -- P&F is
24 a very conservative company when it comes to
25 inventory reserves.  Having nothing to do as

JOSEPH MOLINO

1
2  between -- the agreement between a target and P&F
3  in any acquisition, regardless of our findings in
4  due diligence or thereafter, we have a very
5  specific approach to applying inventory reserves
6  that generally have nothing to do with the asset
7  purchase agreement or as any -- any issue
8  regarding the buyer and the seller.
9         That's what this is referring to.
10    Q.   So -- but you did make an obsolescence
11 reserve against Air Tool's inventory that you
12 acquired in this transaction?
13    A.   Yes. But if you'll notice, on 604,
14 the second sentence says:  "If this is supplied,
15 we can apply our obsolescence formula."
16         That's not what we -- that
17 obsolescence formula has nothing to do with the --
18 the inventory acknowledgement statement. They're
19 separate issues, apples and oranges.
20    Q.   If we go to 0813, and that's in
21 exhibit -- no -- I'm sorry -- that's in
22 Exhibit 19.  I apologize.
23         Exhibit 19, HY0813.
24    A.   I'm sorry, what's the number again?
25    Q.   Yes, HY0813.

JOSEPH MOLINO

1
2     A.   Oh, 813, okay.
3         Okay. I think I'm there. All right.
4  The first couple of sentences read -- and tell me
5  if I'm reading it correctly:
6         "During the prior 12 months, seller
7  was involved with two suits, Gosiger Machine Tools
8  sued Atsco for unreimbursed machine repairs
9  totaling" 70,000 -- or "70K. The one is in the
10 process of being settled for 7,500. At the
11 closing, the seller will retain this liability."
12         Did I read that correctly?
13    A.   Yes.
14    Q.   Does that refresh your recollection
15 that repairs -- you were aware that repairs had
16 been done on the Okuma MacTurn by Gosiger
17 Machinery prior to the closing of the transaction?
18    A.   I can't say that I specifically
19 remember them being made to the Okuma, but I do
20 remember the lawsuit.
21    Q.   If you look further at page HY0879.
22    A.   Okay.
23    Q.   To the left of the first box is, I
24 think, the words "outsource."  Is that correct?
25    A.   Yeah, that's what it looks like.

JOSEPH MOLINO

1
2     Q.   And that's with reference to the Okuma
3  type LT200 piece of equipment.
4         Do you see that?
5     A.   Yes.
6     Q.   Was that piece of equipment part of
7  the transaction with Air Tool?
8     A.   I don't know. I'd have to -- you'd
9  have to give me -- you'd have to give me a minute
10 on this document to see if it would be.
11         If this is a -- if this is a -- I
12 apologize. If this is a schedule to the
13 agreement, the answer --
14    Q.   Well, I can help you with another
15 document, sir, if that will refresh your
16 recollection, and that's HY0887.
17    A.   887?
18    Q.   Do you have that?
19    A.   Just give me one minute.
20    Q.   Sure.
21    A.   Okay.  The preliminary terms document?
22    Q.   Yes.  Paragraph No. 10 reads:  "Assets
23 to be purchased will exclude the Okuma LT200." Is
24 that correct?
25    A.   Yes, that's what it says.

Page 110

JOSEPH MOLINO

2  Q.  So what do the words "outsource" mean
3  next to the Okuma type LT200 when you wrote them?
4  A.  I believe Rick Sabath represented to
5  me that the company didn't really need it, that
6  you could get by by outsourcing those needs
7  elsewhere. He assured me that we'd be fine
8  without the second Okuma.
9  Q.  And so that would mean in the ordinary
10 course of business of Air Tool, prior to
11 August 14, 2014, that's how they conducted
12 business, they didn't necessarily need an Okuma
13 MacTurn?
14 A.  That was his representation.
15 Q.  And you went through a closing subject
16 to that representation, didn't you?
17 A.  Absolutely.
18 MR. COLLINS:  Let me just have a
19 moment.
20 (Pause.)
21 MR. COLLINS:  If you'd be kind enough
22 to find Exhibit 22.
23 (Plaintiffs' Exhibit 22, document, was
24 marked for identification at this time.)
25 A.  Oh, did you just send that?

Page 111

JOSEPH MOLINO

2  Q.  No.
3  A.  Oh, I apologize.  Do you mean on this
4  same document?
5  Q.  No, no. Plaintiffs' Exhibit 22 is
6  another one of the -- we sent you earlier in this
7  deposition.
8  A.  Actually, I thought it was 17 to 21.
9  So 22 is a new one, so...
10 Q.  Yes, it's a new one for our
11 conversation.
12 A.  Okay.  So let me see if -- I've got to
13 upload it.
14 Q.  Okay.
15 A.  Hold on.
16 Okay.  I've got it.
17 Q.  Can you tell us what Exhibit 22 is?
18 A.  Give me a second.
19 It looks like the document is required
20 per the agreement where we acknowledge any issues
21 we've got with respect to the inventory.
22 Q.  Okay.  And in numbered paragraph 1,
23 that talks about Michigan Pneumatic, the ATA
24 grinder inventory totaling $93,313, which would
25 require substantial modification to be salable.

Page 112

JOSEPH MOLINO

2  Do you see that line?
3  A.  Yes, yes.
4  Q.  Did you know that your lawyers have
5  dismissed any claims related to Michigan Pneumatic
6  in this case?
7  MR. MUETHING:  Objection.
8  A.  I didn't hear what you -- you got a
9  little muffled. I'm sorry. I didn't hear the
10 question.
11 MR. MUETHING:  Objection.
12 Tim, this is beyond the scope of
13 anything we asked him on direct, and he's
14 not a lawyer, nor is he to be asked those
15 things that occurred between --
16 conversations between counsel and the
17 clients, and I'll instruct him not to answer
18 for that reason.
19 Q.  Sir, you know that your counsel has
20 dismissed any claims against Air Tool related to
21 Michigan Pneumatic and the ATA grinder inventory.
22 You know that, right?
23 MR. MUETHING:  Same instruction.
24 You don't need to answer that, Joe.
25 Q.  You know that pursuant to paragraph 2,

Page 113

JOSEPH MOLINO

2  it says here that there was no market for two
3  tools -- Michigan Pneumatic Tools, and there's a
4  couple of SKUs and prices.
5  You know that that claim has been
6  dismissed by your lawyer in this case, don't you?
7  MR. MUETHING:  Same objection.
8  You don't need to answer that, Joe.
9  Q.  Paragraph 3 talks about TorcUP part
10 that is unusable and non-conforming.
11 You know that the -- there's no TorcUP
12 claim -- the TorcUP claim that was in this case
13 has been dismissed by your lawyer, right?
14 MR. MUETHING:  Same objection.
15 You don't need to answer that, Joe.
16 Q.  Paragraph 4 --
17 MR. COLLINS:  I mean, you can
18 stipulate to these things, Brian, and then I
19 won't ask that these claims have been
20 dismissed.
21 MR. MUETHING:  We'll stipulate that
22 the record of the case is reflected as
23 presently between the parties.
24 MR. COLLINS: Well, I'd like to --
25 MR. MUETHING:  Asking the witness to

Page 114

JOSEPH MOLINO

1
2    interpret prior Court decisions and prior
3    Court filings is not what he's here for, and
4    it's outside the scope of our direct
5    examination.
6            And I'll instruct him not to answer.
7            If you want to stipulate that you
8    would ask him all the same questions, then
9    we'd give him all the same instructions.
10           MR. COLLINS: Well, I would just ask
11   you to stipulate that there are no claims to
12   these paragraphs 1, 2, 3, 4 in this case.
13           MR. MUETHING: You can argue that with
14   the Court. We -- I respect your position
15   with respect to that line.
16           MR. COLLINS: Okay.
17   BY MR. COLLINS:
18       Q.   And so because your lawyer doesn't
19   want to stipulate to it, I'm going to ask you:  If
20   there's a reference to cost of labor to rework
21   certain set of parts that are described in
22   paragraph 4, do you know that that claim has been
23   dismissed in this case?
24           MR. MUETHING:  Objection.
25           Same instruction, and you don't need

Page 115

JOSEPH MOLINO

1
2    to answer that.
3        Q.   The next paragraph reads:
4    "Additionally there has been an accounts
5    receivable writeoff of Columbus Castings in the
6    amount of $27,082.53."
7            Was that amount paid?
8            THE WITNESS:  Do I answer that one?
9            MR. MUETHING:  Yes.
10       A.   I believe it -- we were informed after
11   this letter, it was paid.
12       Q.   Okay. Great.
13           Was there ever an amendment to the
14   October 16, 2014 inventory acknowledgement letter
15   sent to Air Tool?
16       A.   I don't remember.
17       Q.   Do you think you've got a contractual
18   duty to provide a letter like that?
19       A.   Are you asking --
20           MR. MUETHING:  Objection.
21           He's not a lawyer and is not -- the
22   question is vague and has no foundation.
23       Q.   We went over the language in the asset
24   purchase agreement where an acknowledgement letter
25   was required to be sent to Air Tool by Hy-Tech.

Page 116

JOSEPH MOLINO

1
2            Do you recall that?
3        A.   Yes.
4        Q.   And your description in your
5    October 16 letter is that you were sending this as
6    an inventory acknowledgment letter, correct?
7        A.   Yes.
8        Q.   Was there ever another letter sent
9    after October 16, 2014 constituting an amendment
10   to the inventory acknowledgement letter?
11       A.   There was lack of communication as
12   between us understand Rick Sabath. I don't
13   remember if another letter was sent.
14       Q.   So the contract has a specific
15   requirement, and you don't know if you fulfilled
16   that requirement.  Is that true?
17       A.   I do not recall.
18           MR. COLLINS: If you can give me a
19   five-minute recess here, I would pretty much
20   appreciate it.
21           MR. MUETHING:  No problem.
22           MR. COLLINS:  Thank you.
23           VIDEOGRAPHER:  We're going off the
24   record at 2:08 p.m.
25           (Recess.)

Page 117

JOSEPH MOLINO

1
2            VIDEOGRAPHER:  This marks the start of
3    Media No. 4. We are back on the record at
4    2:21 p.m.
5    BY MR. COLLINS:
6        Q.   Thank you.
7            Mr. Molino, I just have a couple more
8    to follow up with you on.
9            Do you know what the last monthly
10   financial statement was that Hy-Tech received from
11   Air Tool prior to closing the transaction?
12       A.   I don't remember, but that's typically
13   referenced in the asset purchase agreement.
14       Q.   So whatever it says in Plaintiffs'
15   Exhibit 16, that would be the last required
16   financial statement provided to Air Tool, correct?
17       A.   That's correct.
18       Q.   Right. And so between the last
19   financial statement prepared until August 13,
20   2014, was there a -- a regular closing of the
21   books, as it were, before the transaction closed?
22       A.   I -- I don't remember.  Obviously, we
23   were not responsible for those financials. I
24   don't remember.
25       Q.   And the calculation that you did in

Page 118

JOSEPH MOLINO

1
2  your -- your October 16, 2014 letter assumed that
3  the inventory counts that you folks did were
4  accurate.  Is that correct?
5      A.   Yes.
6           MR. COLLINS: Very good. I believe
7      that is -- those are all the questions that
8      I have for you at this time.
9           MR. MUETHING:  Thanks -- excuse me --
10     thanks, Tim.
11          Joe, the Civil Rules provide you with
12     two options:  One would be to read and sign
13     your deposition confirming that there were
14     no errors in the transcription,
15     notwithstanding everybody's efforts to be
16     accurate.
17          THE WITNESS:  Okay.
18          MR. MUETHING:  And your second option
19     is to waive that option and just be done
20     with it.
21          I can't make that decision for you,
22     but I always encourage everyone to take
23     advantage of the opportunity to read their
24     deposition.
25          So, for the record, what would you

Page 119

JOSEPH MOLINO

1
2  like to do?
3           THE WITNESS:  Can I ask a question?
4           Does the recording of this constitute
5      my -- my deposition?
6           MR. MUETHING:  That's a good question,
7      Joe.
8           What I'm referring to is the
9      typewritten transcript that the court
10     reporter is making right now and that they
11     may or may not have misspelled something or
12     misheard you, and this gives you an
13     opportunity to read it and make sure that
14     the written words accurately reflect what
15     you think you said, and so --
16          THE WITNESS:  Then I would like to do
17     that.
18          (Continued on next page for jurat.)
19
20
21
22
23
24
25

Page 120

1
2           MR. MUETHING:  Okay.  That would be
3      fine.  We will get you a copy of it then.
4           MR. COLLINS:  Okay.  If we can go off
5      the record, Brian, and have a quick
6      conversation, that would be great.
7           VIDEOGRAPHER:  This concludes the
8      deposition.  We are going off the record at
9      2:24 p.m.
10          (Whereupon the proceedings were
11     concluded at 2:24 p.m.)
12               oOo
13          I, JOSEPH MOLINO, the witness herein,
14     do hereby certify that the foregoing
15     testimony of the pages of this deposition to
16     be a true and correct transcript, subject to
17     the corrections, if any, shown on the
18     attached page.
19     _____
20                    JOSEPH MOLINO
21     Subscribed and sworn to before me this
22     _____day of_____,_____.
23
24     _____
25     (Notary Public)

Page 121

1                    CERTIFICATE
2       I, AMY A. RIVERA, a Certified Shorthand
3  Reporter, Registered Professional Reporter,
4  Certified LiveNote Reporter, and Notary Public of
5  the State of New York, do hereby certify that prior
6  to the commencement of the examination JOSEPH
7  MOLINO, was duly sworn by me to testify the truth,
8  the whole truth and nothing but the truth.
9       I DO FURTHER CERTIFY that the foregoing is
10 a true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place and on the date hereinbefore set forth.
13      I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of
15 any of the parties to this action, and that I am
16 neither a relative nor employee of such attorney or
17 counsel, and that I am not financially interested in
18 the action.
19 _____
20                    AMY A. RIVERA
21      Notary Public of the State of New York
22      My commission expires December 6, 2021
23      License No. XI00939
24 Dated: November 18, 2020
25

Page 122

```
 1
 2                    INDEX
 3   WITNESS                          PAGE
 4   JOSEPH MOLINO
 5   By Mr. Muething                    6
 6   By Mr. Collins                    43
 7
 8          PREVIOUSLY MARKED EXHIBITS
 9   NUMBER           DESCRIPTION     PAGE
10   Plaintiffs' Exhibit 16 Asset purchase    22
11                    agreement
12   Plaintiffs' Exhibit 17 Due diligence binder   45
13   Plaintiffs' Exhibit 18 Due diligence binder   45
14   Plaintiffs' Exhibit 19  Due diligence binder  45
15   Plaintiffs' Exhibit 20 Due diligence binder   45
16   Plaintiffs' Exhibit 21 Due diligence binder   45
17   Plaintiffs' Exhibit 22 Document              110
18   Plaintiffs' Exhibit 27 Spreadsheet           41
19   Plaintiffs' Exhibit 32 Spreadsheet           38
20
21
22
23
24
25
```

Page 123

```
 1                    ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg. No. Now Reads    Should Read Reason
 6   ____ _____       _____   _____
 7   ____ _____       _____   _____
 8   ____ _____       _____   _____
 9   ____ _____       _____   _____
10   ____ _____       _____   _____
11   ____ _____       _____   _____
12   ____ _____       _____   _____
13   ____ _____       _____   _____
14   ____ _____       _____   _____
15   ____ _____       _____   _____
16   ____ _____       _____   _____
17   ____ _____       _____   _____
18   ____ _____       _____   _____
19   ____ _____       _____   _____
20
21                    _____
                       Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS_____DAY OF_____, 2020.
24   _____
25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

**$**

**$126,000** 89:10

**$126,152.60** 85:5

**$27,082.53** 115:6

**$60,000** 102:11

**$700,000** 51:16

**$93,313** 111:24

**0**

**0603** 103:12,15

**0605** 106:19

**0813** 107:20

**1**

**1** 5:2 39:10,11 42:22
52:6 69:17,23 70:7
111:22 114:12

**10** 39:9 42:16 109:22

**11** 39:9

**11.7** 31:14,19,23

**11:04** 5:10

**11:24** 21:20

**11:30** 21:23

**11:59** 42:23

**12** 108:6

**126-plus** 88:20

**12:11** 43:3

**12:15** 47:13

**12:26** 47:16

**13** 62:6,12 63:7 64:21
65:5 69:24 70:8
92:17 93:8 100:10
102:3,13 117:19

**14** 23:20 67:19 70:12,
22 71:8 72:11,16
73:18 91:14 97:5,9
110:11

**15** 10:2 24:9,16

**16** 22:7 43:16 67:9
71:14 72:24 73:7,12
75:17 77:8 86:7
115:14 116:5,9
117:15 118:2

**17** 44:25 45:2,22
46:11 47:19,24
48:14,22 49:18,20,
22,23 111:8

**18** 45:5 47:19 48:8,13
71:4 102:24 103:4

**19** 45:8 47:19 48:8
107:22,23

**19,637** 42:10

**1:11** 81:8

**1:19** 81:12

**1A** 49:24

**2**

**2** 43:2 112:25 114:12

**2.3** 35:4

**2.3.2.1** 67:14 71:15
73:9 75:17

**2.3.2.2** 35:7 77:8

**2.3.2.3** 35:8

**2.3.3** 35:7

**2.4.1(j)** 100:25

**20** 8:8 45:11 72:10,
15,19 73:17

**2014** 56:25 57:9 62:6,
12 63:7 64:22 65:5
67:19 69:17,23,24
70:8,12,14,22 72:11,
16,24 73:7,13,18
91:14 92:17 93:8
97:6,9 100:10 102:3,
13 110:11 115:14
116:9 117:20 118:2

**2015** 71:4,5 97:10

**2020** 5:9

**21** 44:25 45:14,22,23
46:12 47:19,24 48:8
72:12 111:8

**22** 110:22,23 111:5,9,

**17**

**2247** 42:5

**23** 8:8

**265** 56:5

**27** 41:15 85:7

**2:08** 116:24

**2:21** 117:4

**2:24** 120:9,11

**3**

**3** 23:19,23 27:2 32:6
81:11 113:9 114:12

**3.1** 27:3

**3.13** 86:6 93:10

**3.17** 27:12,23 30:9,15
96:17,18,21

**3.17(a)** 100:6

**3.17(c)** 27:17

**3.38** 27:3

**30** 4:20 12:11 68:22
70:13 71:5,8 97:10

**32** 38:16

**38** 27:9

**4**

**4** 113:16 114:12,22
117:3

**6**

**6** 5:9 42:11

**60** 12:11

**604** 105:14 107:13

**605** 105:14,15

**605s** 105:16

**7**

**7** 105:19

**7,500** 108:10

**7/1/14** 50:14

**70,000** 108:9

**70K** 108:9

**8**

**8** 39:11

**813** 108:2

**887** 109:17

**9**

**9** 39:11

**90** 12:11

**A**

**a.m.** 5:10 21:20,23
42:23

**absolutely** 20:10
29:7 61:23 110:17

**Acampora** 59:23

**accepted** 39:13
85:15 86:20 90:8

**accepts** 95:21

**access** 61:10,13

**accommodate** 7:7

**accomplish** 42:18

**accordance** 75:20
77:14

**account** 78:2,14
79:3,17 88:11,23
89:22 90:17,19 91:5

**accountants** 60:9
65:24 68:17,21 76:9

**accounting** 7:18 8:2
9:3,7 39:13 59:16
66:8 68:21 69:5 76:7
85:16 86:20 90:8,15
104:20

**accounts** 17:21
19:23 32:22 83:25
84:6 115:4

**accurate** 39:14
118:4,16

**accurately** 25:9
51:22 119:14

**acknowledge** 89:9
111:20

**acknowledgement**
72:19 73:8 107:18
115:14,24 116:10

**acknowledgment**
73:14 116:6

**acquired** 107:12

**acquiring** 29:4,7
33:15 56:20 84:17

**acquisition** 10:2
30:6 35:18 36:17
42:11 51:12 81:22
83:13 107:3

**acquisitions** 9:21

**activities** 9:21 10:2
37:4 44:15

**activity** 36:19,23

**actual** 34:11,13
40:18 41:2

**adding** 30:2

**addition** 9:5 33:24
84:14 106:20

**Additionally** 4:12
115:4

**address** 19:16 20:2,
14 46:6

**adequate** 101:17

**adjustment** 19:11
32:10,25 33:25
34:20,22 35:11,13
36:8 39:18,21 40:15
41:10 42:10 85:2

**adjustments** 39:4,
12

**admissible** 4:18

**admission** 22:24
41:23

**admit** 22:22

**advantage** 33:3

118:23

**affect** 14:21

**afternoon** 43:13

**agree** 98:16,21 99:6

**agreed** 11:2 84:5

**agreed-upon** 11:14 12:10

**agreement** 11:3 15:21 16:9,16,19 20:11 22:6,8,16 23:8 24:10 25:4 26:25 35:13 43:22,25 44:4, 6 48:16,17,21 67:10, 12 70:23 73:10 79:21,24 86:6,21,24 87:2 88:2,6 100:17, 23,24 101:2 107:2,7 109:13 111:20 115:24 117:13

**agreements** 23:11

**ahead** 41:11 62:14

**air** 5:4 29:20 43:20,21 44:21 48:10 56:20 58:15 60:25 61:4 62:5,11 63:7,10,12, 17 64:11,20,23 65:2, 23 66:3,7,13,14,19 67:4,21,23 68:3,4,9, 10,11,25 69:10,11,16 70:2,7,13,16 72:20 73:20,25 74:19 75:13,25 76:14,17,24 78:13 79:9 81:23 85:18 86:2 87:3,17 88:3,7,12,13,20,25 89:2,11,15,23 90:5, 14,17,20 91:13,20,23 92:4,6,15,18 93:7,20 95:21,23 96:4 97:6 100:9 101:9 102:2,12 103:7 104:10 106:5 107:11 109:7 110:10 112:20 115:15,25 117:11,16

**algorithms** 106:11

**allegations** 63:9

**allowance** 78:22

**allowances** 77:16, 19 78:20

**allowed** 11:11 12:14, 16 55:9

**Aloi** 57:15,20 59:3 99:10,13

**amendment** 115:13 116:9

**amiss** 67:4

**amount** 12:9 34:15 39:22 61:13 94:23 95:9,13,17 115:6,7

**Amy** 4:13 5:14

**and/or** 8:6,23

**announcements** 75:6

**annual** 65:23

**anymore** 43:5

**apologize** 8:14 48:25 66:17 107:22 109:12 111:3

**apparent** 15:3

**apparently** 61:24

**appeal** 11:25

**appealed** 29:16

**appearances** 5:17

**appears** 22:15 49:24

**apples** 107:19

**applied** 77:14

**apply** 80:3,11 91:20 107:15

**applying** 90:8 107:5

**approach** 104:20 105:25 107:5

**approximately** 8:8

**area** 29:24 30:6

**argue** 114:13

**argumentative** 93:2

**arising** 101:7

**arrangement** 82:11

**Article** 23:23 27:2

**ascertain** 54:10

**aspects** 11:6

**assess** 11:5,13

**assessment** 64:9

**asset** 15:20 16:9,18 22:6,7 43:22,24 44:6 48:16,17,20 67:10,12 73:9 79:21,23 86:6, 21 100:16,22 101:2 107:6 115:23 117:13

**asset-based** 82:5, 10,11,17 83:5,14,23 84:15

**assets** 16:21 17:3, 14,15 18:19 19:20 43:21 54:7 58:15 68:8 70:13 81:23 82:19 83:3,6,12,17 84:17 88:7 96:22,23 100:6,7 109:22

**assistance** 59:7

**association** 4:5 5:12,15

**assume** 50:16

**assumed** 17:4 118:2

**assuming** 74:14

**assumption** 14:13, 16 15:2,3

**assure** 15:9

**assured** 110:7

**ATA** 111:23 112:21

**Atsco** 5:4,20 22:20 23:10 29:23 31:2 34:23 51:12,23 53:12 54:2,6,25 55:2,4 56:13 75:3,5 101:9 108:8

**Atsco's** 54:10

**attached** 48:19 100:24 120:18

**attachment** 48:15

**attempt** 11:13

**attempted** 22:4

**attendance** 5:25

**attending** 6:4

**attention** 35:2 103:10

**audit** 11:17 65:24 66:7,13,19,21 82:19 83:3,15,24 84:11,16, 21,22,23 90:12

**audited** 66:3 67:2 68:4,12,25 69:4,12 76:5,6

**auditor** 84:16

**auditors** 83:24

**August** 62:6,12 63:7 64:21 65:5 67:19 69:24 70:8,12,22 71:8 72:11,16,23 73:18 91:14 92:17 93:8 97:5,9 100:10 102:3,13 110:11 117:19

**average** 34:8

**avoiding** 92:24

**aware** 13:6 99:12 100:3 108:15

---

**B**

**BA** 7:18

**back** 15:13 20:13 21:22 26:21 28:21 38:14 40:21 41:2 43:2 46:20 47:15 49:19 52:24 56:25 67:8 81:11 85:8 95:4, 9,13,18,19 96:12 99:4 117:3

**background** 7:16 99:14,17

**bad** 77:17 78:20,22

**balance** 26:9 36:9 39:2,5,12 42:6,8,12

**bank** 82:3,11 83:4

**banks** 9:3

**based** 7:4 27:25 31:8 34:8 47:22 53:4 60:5 84:4 85:19 91:24 93:10 104:19 105:25

**basis** 82:20 84:3

**Bates** 48:3 50:7 53:7 103:10

**bearing** 32:4

**began** 23:3

**begin** 36:12

**beginning** 23:5

**begins** 24:16 35:17 36:9

**behalf** 61:3

**belabor** 37:25

**belaboring** 38:9

**belief** 64:8

**benefit** 33:16 34:2

**Betty** 57:17,19 59:3

**big** 94:18

**binder** 45:3,6,9,12,15 102:22

**binders** 45:20 47:25 48:5,6,9 49:25 51:2,3 56:24 57:3 59:12 65:9 79:8

**bit** 26:12 66:17 89:7

**Bob** 56:14 57:12,18 59:2

**books** 85:14 117:21

**borrow** 81:23

**borrowed** 82:3

**bottom** 23:20 39:20, 21 104:3

**bought** 54:11 74:22

**box** 108:23

**breached** 62:9

**breaches** 62:22

**break** 7:6 54:22 80:19 81:5

**Brian** 5:19 6:20 13:8 22:23 52:18 55:10 93:5,16 98:23 113:18 120:5

**briefly** 36:4 40:7

**bring** 14:5,11 98:8,17

**broader** 10:4

**broke** 66:16

**broken** 48:5

**broker** 60:7

**brought** 19:24

**built** 34:23

**bumping** 13:12

**business** 12:24
16:20 17:6,21 18:16,
18 28:3,5,10 29:4,19
31:5,7,9 32:19 33:23
34:4 36:15,19 37:4
58:13 65:3,13 66:13
67:17 68:2 69:18,24
70:8 86:12,17 87:7,
13,16,19,25 88:2,7,
12,13 89:2,3,15,16,
23 90:5,7,18,20 91:9
92:6,18 93:13,21,25
96:3,7,24 100:8
102:2,12,16 110:10,
12

**businesses** 32:13

**buy** 12:22

**buyer** 10:10,24 11:5
12:9 15:8 17:6 18:2
19:8,10,25 20:12
23:9 24:5 25:17
27:10 28:10 33:4,15
34:6,17,18 39:24
40:19 43:20 106:13
107:8

**buying** 12:20 15:10
16:19

**C**

**calculate** 106:11

**calculated** 39:23
42:9

**calculates** 42:5

**calculating** 41:10

**calculation** 36:7
39:17 40:15 117:25

**call** 6:24 10:25 32:21

**check** 34:17,18

**checking** 83:24

**chief** 8:5,6,9 9:6,13

**choose** 19:14

**circumstances**
87:13 88:13 89:2
92:15,18,20 93:7,9,
12,20,25 94:7 96:3,7

**cites** 101:11

**Civil** 4:21 118:11

**claim** 113:5,12
114:22

**claims** 94:19,22,25
112:5,20 113:19
114:11

**clarification** 82:16

**clarify** 82:9

**clean** 90:11

**clear** 12:25 38:5 62:7
85:21

**Cleveland** 5:23

**click** 21:9

**clients** 112:17

**close** 70:8 75:15

**closed** 50:22 70:22
74:9,19 75:10 76:2
117:21

**closely** 31:11

**closing** 29:10 30:23
31:4,9,12 33:2,6,8,10
34:4,10,16 36:10
37:16 39:2,15 40:11,
17,23 41:2,3,5,6
48:18 58:11 62:2
65:8 66:4 67:3 72:8,
20 73:21 75:4,9 77:9,
13,25 78:8,13,18
79:3,18 80:4 82:23
83:2 91:9 95:14,16
102:21 104:6,18
105:24 106:17
108:11,17 110:15
117:11,20

**CMC** 97:17

**Cohnreznick** 59:16,

**called** 8:2 15:22 16:9
34:7 40:21

**calls** 90:16

**candidly** 76:21

**cap** 93:12

**capable** 97:21 98:5

**capacity** 25:24

**capital** 17:20 32:9,
15,22,25 33:22,25
34:3,7,9,10,11,13,16,
20,22 35:10,12 36:8
39:17,21 40:14 41:10
78:8 84:25 87:16

**capitalization** 87:23

**capitalized** 87:20

**caption** 96:21

**care** 74:2

**case** 4:22 16:18
18:25 19:18 39:23
40:22 41:4 59:18
74:15 99:8 100:2
101:11 112:6 113:6,
12,22 114:12,23

**cases** 14:11

**cash** 17:2 33:17

**Castings** 115:5

**caused** 102:17

**cell** 42:5

**certificate** 7:19

**certify** 120:14

**CFO** 8:8,10,23 9:2,11
25:24 57:12,15,16

**chairman** 9:16

**change** 19:15 38:14
65:12

**changed** 33:22 65:2

**charge** 9:2,14 57:2
106:5

**chat** 20:17,20,21
21:10 35:17 40:2
44:24

19 60:10 84:16 103:6

**collateral** 83:11,17
84:3,4

**collectible** 17:22

**collecting** 19:23
33:16

**Collins** 4:24 5:22 6:5
13:8,18 15:11,18
20:9 22:23 25:16
26:2,19 27:24 28:14,
19 29:2 31:24 32:11
35:14 38:19 42:20
43:7,9,11 45:17 47:4,
10,17 49:9,16 52:12,
18,23 55:17 80:20,
22,25 81:13 93:4,16
98:23 99:3 103:16
110:18,21 113:17,24
114:10,16,17 116:18,
22 117:5 118:6 120:4

**Columbus** 115:5

**column** 42:4,11

**columns** 39:9,10

**combined** 49:2

**comfort** 18:23 26:6
30:4

**comments** 26:22

**Commission** 9:9

**committed** 92:24

**common** 68:20
101:10

**communication**
116:11

**companies** 8:7
29:22 98:11 101:9

**company** 5:5 8:16
9:6,17 10:6,11 11:6,
10 12:21 13:6 16:5
25:25 29:12 32:20
41:2 62:21 64:24
68:16 71:3 72:7
74:23 75:2 81:17
82:14 83:12 84:24
85:22 91:23 101:17,
22 103:5 106:24
110:5

**company's** 13:25

**compared** 34:11

**compiled** 50:25

**complete** 39:14

**completely** 19:21

**completeness** 25:5,
23

**complicated** 97:17,
23

**component** 25:19
100:12

**compound** 62:14
90:6

**compressed** 29:20

**computer** 46:25

**computerized** 74:2,
5

**concept** 10:18 23:14
25:12 30:2 32:24
34:6

**concluded** 120:11

**concludes** 120:7

**condition** 30:17
96:22

**conduct** 28:5 96:24
100:8

**conducted** 28:6
36:20 65:3 96:25
100:8 110:11

**conducting** 102:2,
12

**confident** 84:23

**confirm** 23:21 73:16

**confirmed** 91:25

**confirming** 118:13

**confirms** 104:15

**conformance** 39:13

**confusing** 89:7

**connection** 22:17,
19 24:7 25:14 27:8

**consecutive** 48:4

**conservative**
106:24

considerably 73:17

considered 9:6 52:4

consist 86:10 87:6

consistent 68:3,11, 25 69:11 78:23

consistently 19:5 53:25 54:25 55:4 56:12 77:15 78:15

constitute 96:23 100:7 119:4

constituting 116:9

consultants 98:9

consummating 25:4

contained 23:18 25:9

context 82:17

Continental 8:19

continue 11:3 28:9 29:9

continued 69:17 74:11 119:18

contract 86:18 90:16 92:16,22 93:10 116:14

contractual 115:17

control 71:10

controller 57:12

conversation 54:16 101:21 111:11 120:6

conversations 101:21 112:16

COO 8:23 25:24

cooperating 61:21

cooperation 60:24

copy 35:18 120:3

corner 37:21 38:4 50:6

Corp 5:4

corporate 30:10 38:7 41:19

corporation 38:6 52:15

correct 23:23 30:17 43:21,25 44:16,21 47:20 50:22 51:4 54:7 56:21 61:22 62:2 63:3,4 69:13 72:24 79:13 81:18 82:6 83:18,21 84:12 85:20 86:3,4 88:8,21 89:11,12 96:9 98:7, 12 99:14,15,18 102:19 103:25 104:6 106:2,6 108:24 109:24 116:6 117:16, 17 118:4 120:16

corrections 120:17

correctly 25:7 56:17 77:12,22 97:2 104:4, 23 108:5,12

correctness 25:5,22

cost 114:20

counsel 5:16 6:7 112:16,19

counselors 4:3

count 40:20 68:2,9, 10 69:10 71:18,22 72:3,4,15 75:18,21

counted 41:9

counting 66:15,20 67:5

counts 118:3

County 101:10

couple 12:3 16:6 49:2 60:22 81:15 82:15 108:4 113:4 117:7

court 4:12 5:6,14 6:11 7:15 9:24 10:20 16:10 17:10 22:13 27:22 28:20 31:22 32:9 36:5 47:24 52:23 68:23 99:3 101:10 102:17 103:2 114:2,3,14 119:9

courtroom 4:19

COVID-19 4:7

CPA 7:19 99:14,17

create 44:18

created 37:15 44:19 48:10 50:2

critical 25:18 29:8 31:3 100:11,18

current 8:10 30:8 53:12 54:2 56:13

Curry 58:21 59:3 98:14 99:9,25

customer 77:18 95:20 96:4

customers 11:8 54:10,14 65:21 94:5, 6,14 95:4

___

**D**

d/b/a 101:8,9

damage 63:24

date 33:2,5 39:15 40:11 41:2,3,7 50:14, 18 66:4 72:13,20 75:21 92:16

dated 73:6

dates 70:18 97:14

day 7:3 15:6 33:8,11 50:18 72:5 94:12 120:22

day-to-day 9:14,18 75:3

days 12:11,12 72:10, 13,15,20 73:18 82:15

deadlines 61:9

deal 15:16 19:17 22:24

deals 18:10

debt 77:17 78:20,22

decide 58:7

deciding 58:7

decision 25:19 53:5 118:21

decisions 19:13 114:2

deduction 85:4

deemed 25:3

defective 94:15 95:5,22 96:5

defendants 5:24

define 87:2

defined 71:17 72:3 86:17,19 87:22,24

defines 43:19,23 44:3

definitive 16:16 22:16

definitively 68:24

degree 14:8 77:24 78:7,12

delivering 25:4

depends 65:14

deposition 4:11 5:3, 8 111:7 118:13,24 119:5 120:8,15

describe 8:13 17:10 23:3 27:22 32:9 36:4 38:22 40:7

describing 79:5

description 7:23 51:15 64:2 82:7 116:4

detail 17:10

detailed 36:7

details 40:9

determination 98:9

determine 19:10

determining 88:14 98:3,6

detour 38:21

diagnosing 97:22 98:2

difference 34:19 42:6,9

differently 37:6

difficult 11:19,24 12:15 30:22 31:7

54:14 65:7

diligence 10:11,19 11:4,12,16 12:5,12 14:2,22 15:8,15 18:21 26:4 32:3 44:7, 10,15 45:2,5,8,11,14, 21 46:13 47:25 48:6, 9 49:20,22,25 51:3 54:9 56:23 57:3,5,9, 21 58:2,12,20 60:4, 11,25 61:8,18 63:16 65:9 76:20 79:7 80:9 107:4

Dinsmore 5:23

direct 76:22 103:9 112:13 114:4

directly 9:15 58:9 74:18

disadvantage 33:4

disagreement 73:12

disclosed 28:10

disclosure 19:13

discovered 32:2 91:9

discovery 44:24

discussed 19:25

discussing 23:13 94:21 95:6

discussion 23:6 36:13 78:9

dismissed 112:5,20 113:6,13,20 114:23

display 20:24

distancing 4:9

distinction 99:23

District 5:6,7

Division 5:7

document 10:25 16:8,10,25 19:9 20:13,18,24 22:3,11 23:4,6,18 26:15,21 31:13 35:3,16 36:2, 13 37:8,11,13,21 38:11,23 39:16,25 40:4,8 41:25 43:19, 23 44:16 48:19,20

49:7 72:25 73:5,6,15
105:13,18 109:10,15,
21 110:23 111:4,19

**documentation**
10:12 38:6 59:25
96:15

**documents** 9:8,10
11:7 15:25 18:13
37:17,19 44:2,11
48:8

**Dolan** 5:23

**dollars** 88:20

**download** 45:18

**downloaded** 47:18

**dozen** 10:8

**drop** 87:10

**dropping** 6:3

**due** 4:7 10:11,18
11:4,12,16 12:5
13:25 14:22 15:8,15
18:21 26:4 32:2,3
33:17 44:7,10,14
45:2,5,8,11,14,21
46:13 47:25 48:6,9
49:20,22,25 51:3
54:9 56:23 57:3,5,8,
21,25 58:12,20 60:3,
10,25 61:7 63:16
65:9 76:20 79:7 80:9
107:4

**duly** 6:13

**duties** 8:25

**duty** 115:18

---

**E**

---

**earlier** 16:13,14
17:22 18:20 33:21
38:25 40:13 76:3
99:21 102:21 111:6

**Eastern** 5:7

**echos** 28:15

**education** 7:16
99:19

**effect** 77:16 78:19
92:9,13

**efforts** 118:15

**employees** 11:9
12:23 13:5

**employment** 7:23

**encompass** 48:2

**encountered** 61:17

**encourage** 118:22

**end** 15:5 18:17 19:4
42:21 69:24 87:10

**engaging** 37:4

**engineer** 99:23,25

**engineering** 14:8

**entail** 8:25

**entering** 44:5

**entire** 51:17

**entries** 39:6

**environmental**
59:11,12

**equipment** 13:25
14:22,25 16:3 17:23
19:3 26:8 28:3 29:4,5
30:16,21,23 31:4
52:5 70:15 84:8
97:23 98:4,6,12
100:21 101:24
102:10 109:3,6

**Ernst** 8:2,3

**errors** 118:14

**escrow** 17:2

**establish** 11:2
104:9,10,18 105:24

**established** 104:6
106:17

**et al** 5:4,5

**event** 41:8

**eventual** 51:17 52:14

**everybody's** 118:15

**evidentiary** 38:2

**exact** 40:12

**examination** 6:15
43:10 85:2 114:5

**excessive** 87:12

**exchange** 9:9 81:20

**exclude** 109:23

**exclusively** 24:3

**excuse** 34:17 42:7
118:9

**executing** 25:3

**execution** 9:18

**executive** 51:11,14

**executives** 9:15

**exhibit** 22:7 31:13
38:16 41:15 43:16
44:25 45:2,5,8,11,14,
22 46:15 47:19,23,24
48:8 67:9 71:14
75:17 77:8 85:7 86:7
102:24 103:4 107:21,
22,23 110:22,23
111:5,17 117:15

**exhibits** 22:24 45:22
46:11 102:21

**exist** 29:6

**expect** 51:19

**expecting** 18:17

**expense** 33:12

**experience** 7:4 13:2
15:14 16:11 25:13
28:2 32:7 68:21
99:21

**expert** 14:6,7 59:13
98:17

**experts** 14:12 57:14
59:9 98:12

**explain** 91:2

**expressed** 51:22

**extra** 34:15

**eye** 13:22

---

**F**

---

**face** 49:23

**facilitate** 30:21

**facility** 11:11,20

51:18 52:7 59:13
61:10 70:15 71:3
74:19 75:10 82:12,18
84:5 91:15

**fact** 18:21 19:18 33:5
37:18 53:9,23 80:2
95:20 100:18 101:16
102:10

**factor** 53:5

**factors** 52:4 90:15
102:17

**fair** 77:5 104:20

**fairly** 10:5 18:18
68:20 74:10 84:23

**false** 62:5,12 64:12,
21,24

**familiar** 14:10 30:4,7

**feature** 22:4

**Federal** 4:20

**feedback** 13:10,20
28:17

**feel** 7:5,8 55:18

**field** 83:15,23

**fighting** 28:17

**figure** 28:17 32:21

**filed** 9:8 47:24 62:8,
20

**filings** 114:3

**final** 16:17 22:16 23:8
26:24 39:5,11,20
41:3,9

**finally** 84:22

**finance** 7:20 68:22

**financial** 8:6 11:8
59:20 66:3 67:2 68:4,
12 69:2,12 85:22
99:14,17 102:15
117:10,16,19

**financials** 117:23

**financing** 81:24

**find** 21:8 53:15 75:18
77:10 85:4 96:16
110:22

**findings** 107:3

**fine** 110:7 120:3

**finished** 27:21 70:5
80:25

**firm** 8:2 59:17,22,24
60:10,17 66:21 69:5
76:7

**fits** 90:14

**five-minute** 80:19
81:5 116:19

**flavor** 9:25

**fluctuate** 32:24

**folder** 21:15

**folks** 91:14 118:3

**follow** 43:14 77:11
117:8

**follow-up** 12:3

**foregoing** 120:14

**form** 62:14 64:14
66:22 67:6 73:14
79:9 83:19 88:9 89:4
93:2 95:24 96:15
98:18,20 104:16

**formal** 48:20

**format** 47:2

**formula** 107:15,17

**forward** 19:14,24
25:19 41:6

**found** 15:15 66:2
80:14

**foundation** 66:23
83:20 115:22

**frame** 61:7

**free** 7:5,8 55:18

**front** 31:14 60:7
72:25

**fulfilled** 116:15

**full** 12:24 18:16 31:10
37:19 53:21,22

**fully** 17:22

**function** 9:4,12
17:11 20:17,20 21:10

32:15 35:13,17 44:24

**functioning** 32:20
97:5,9,12,15 98:7

**functions** 8:24 11:7

---

**G**

**GAAP** 69:23 77:14
85:12,21,23

**gave** 55:24 64:21,24

**general** 6:7 31:25
90:14

**generally** 8:25 13:3
35:10 39:13 54:14
85:15 86:19 90:8
107:6

**generated** 37:3
51:17

**generic** 26:11

**give** 7:22 9:24 18:23
26:5 31:20 35:20
40:5 49:3 86:7 109:9,
19 111:18 114:9
116:18

**giving** 49:13 77:16
78:19

**glad** 88:18

**global** 46:11

**good** 4:2 5:18 6:17
14:14,17 15:4 16:3
17:23 28:6 29:8 30:6,
17,20 43:12 56:15
68:17 80:20,21 93:14
118:6 119:6

**Goodman** 6:7

**goods** 70:5

**Gosiger** 101:8 108:7,
16

**great** 115:12 120:6

**greater** 34:14

**grinder** 111:24
112:21

**grounds** 52:12 59:13

**grown** 10:6

---

**guess** 21:5,16 35:8
81:16 99:22

---

**H**

**half** 33:9

**hand** 66:9 92:4

**handling** 66:15,20
67:5

**handwriting** 50:10
103:24 104:2

**handwritten** 79:9

**Hang** 48:23

**happen** 7:4

**happening** 13:19

**hard** 61:8 84:10
92:23

**he'll** 6:2

**heading** 24:21

**headings** 27:3

**hear** 7:3,11,13 18:7
28:14 63:15 105:4
112:8,9

**heard** 57:19 70:14

**held** 5:8

**helped** 59:25

**helping** 57:20 60:3

**Hey** 80:17

**high** 18:17

**historically** 28:6

**history** 7:23 10:15

**hold** 36:11 98:19
105:16 111:15

**Holdings** 5:4,20

**honest** 82:23

**Horowitz** 57:22 58:9,
14

**hours** 12:19

**huge** 33:9

**Hy-tech** 5:21 8:16,18
22:20 23:9 29:18

---

36:20,22,24 37:3
41:20 43:20 44:7
46:12 48:10 50:2
51:18 52:10 53:9,23
55:2,5 56:10,15,20
58:6,8,19 61:2 67:17,
22,25 68:8,10 69:18
70:12 71:11 72:20
73:20 74:6 75:24
76:13,16,23 81:16
85:11,12,17 86:3
87:3 93:6 97:21 98:5,
10 104:9,19 105:25
115:25 117:10

**Hy-tech's** 36:14
45:21 68:24 69:10
104:11

**HY0176** 48:3 50:7

**HY0177** 53:7,18

**HY0265** 56:4

**HY0603** 103:11

**HY0605** 104:13

**HY063** 106:16

**HY0813** 107:23,25

**HY0879** 108:21

**HY0887** 109:16

**HY2034** 48:4

---

**I**

**ideas** 105:12

**identification** 22:9
38:17 41:16 45:3,6,9,
12,16 110:24

**identified** 23:25
41:13

**identify** 22:13

**imagine** 54:15

**immediately** 75:4,9

**impaired** 19:20

**important** 18:5
28:11,24

**impossible** 31:6
40:12

---

**in-house** 58:18

**inadequate** 101:23

**inartful** 38:9

**incentive** 34:2

**incentivize** 34:5

**included** 49:25
57:12 66:14 78:19
84:7 105:2,8

**including** 20:16
54:11 77:16

**incorporated** 70:2

**individuals** 64:19
72:2

**industries** 6:7 8:14,
15,20 37:22 38:3
41:20

**industry** 29:21

**infinitesimal** 95:8,
11

**information** 51:2
59:9 60:7 61:5 62:4
63:2,23 64:9,12,21,
25 91:2,12,16 95:15

**informed** 100:11
115:10

**inherently** 33:19

**initial** 11:14 93:12

**inquisitive** 10:5
29:13

**instruct** 55:14
112:17 114:6

**instruction** 112:23
114:25

**instructions** 114:9

**insurance** 59:8,9
60:2,7

**intent** 11:2 16:15
19:22 65:4

**intention** 51:23

**interesting** 57:6

**intermittently** 97:13

**internal** 14:9 106:10

---

**international** 7:25

**interposed** 55:16

**interpret** 114:2

**interrupt** 80:24

**inventory** 17:18
19:21 26:8 32:14,16,
23 40:12,18,22,25
41:3,5,9 42:7 63:24,
25 66:8,14,20 67:5,
15,22 68:2,3,9,10,15,
19,20,24 69:3,10,11
70:2,7 71:17,21 72:4,
9,15,19 73:8,13,21
74:3 75:13,18,21,25
76:4,10,14,18,25
77:17 79:5,10 83:24
84:7,10 85:13 86:10
87:5,12 88:14,21,24
89:11,18 90:10
91:19,20,22 92:2
93:20 94:2,12 104:5,
19,22 105:24 106:5,
6,11,25 107:5,11,18
111:21,24 112:21
115:14 116:6,10
118:3

**investment** 32:19

**involved** 10:9,12
16:2 18:11 57:20,23,
25 58:3,10,12,19,22
59:4,17,23 60:10,17
108:7

**involvement** 60:13

**issue** 19:4,22 107:7

**issues** 7:2,8 18:18,
19 20:3 59:11 97:12,
14 107:19 111:20

**item** 48:22 49:20
87:11

**items** 32:18 64:3

---

**J**

**January** 70:13 71:4,
5,8 97:10

**job** 8:25 55:12

**Joe** 6:23 7:2,10,15
9:24 12:4 15:13 16:7

---

18:10 20:4,17 21:10
22:3 23:25 24:16
25:13 26:10 27:2
28:12,25 31:13 32:7
37:20 38:21 39:25
41:19 43:5 49:5 55:7,
11 62:15 98:19,24
112:24 113:8,15
118:11 119:7

**jointly** 24:24

**Joseph** 4:1 5:1,3 6:1
7:1 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:13,
20

**judge** 76:21

**July** 69:17,23 70:7

**juncture** 6:2 61:20

**jurat** 119:18

**K**

**Keating** 5:19

**Kevin** 4:4 5:11

**kind** 26:11 41:7 72:18
110:21

**kinds** 84:11

**Klekamp** 5:20

**knew** 29:22 62:5,11
63:7,10,13 91:22,23
93:22 96:14

**knowledge** 15:5
29:21 58:16 74:14,16
78:25 93:17 94:25

**L**

**labeled** 5:2 48:3,5
51:3 56:4

**labor** 114:20

**lack** 60:24 116:11

**Lake** 101:10

**language** 20:15
24:16 25:21 26:24
82:13 86:13,22 87:14
92:22 115:23

**law** 59:22,24 60:17

**lawsuit** 62:8,20
108:20

**lawyer** 47:23 51:3
112:14 113:6,13
114:18 115:21

**lawyers** 10:13 56:4
60:16 112:4

**laying** 38:2

**lays** 16:25

**lead** 9:20

**learned** 76:19

**leaving** 34:3 37:10

**left** 74:21 108:23

**left-hand** 36:8 37:21
38:4 39:2

**legal** 4:4 5:11 18:5
24:13

**lend** 83:4

**lender** 82:18 83:15

**lender's** 84:14

**lent** 83:6

**letter** 10:25 16:15
65:4 115:11,14,18,24
116:5,6,8,10,13
118:2

**level** 26:4 32:15
33:22

**liabilities** 17:4

**liability** 18:19 101:6
108:11

**life** 19:5

**light** 11:15

**limitations** 15:7,15

**limited** 11:18 12:6,13
18:19,22 59:20 61:10

**limits** 12:9

**linear** 21:15

**list** 17:15 47:23 84:2

**listed** 47:25

**litigation** 37:10
101:7

**loan** 82:5,20 83:5,18,
23 84:15

**location** 21:14 72:5

**long** 46:16,24

**longer** 75:14

**looked** 34:24 44:12
56:23 66:7 106:16

**lot** 10:14,15 19:7

**lots** 91:16

**lower** 19:15 50:6
77:9

**Loyola** 7:18

**LT200** 109:3,23
110:3

**M**

**M.B.A.** 7:20 8:4

**machine** 5:21 8:16,
18 29:18 41:20
97:12,15,17 101:8
108:7,8

**machinery** 13:25
14:7 108:17

**machines** 12:23,24
14:10,14

**Macturn** 70:14,15
71:2,7 97:5 98:4
100:9,18,21 101:18
102:18 108:16
110:13

**made** 14:24 19:13
26:22 27:8,9 32:5
39:4,8 63:16 75:6
81:23 85:3 88:19
106:4 108:19

**maintain** 32:14

**maintained** 17:24
28:8 37:11,14,15

**make** 14:16 24:25
29:17 38:5 49:13
58:7 62:17 79:8
83:12 98:9 99:22
107:10 118:21
119:13

**makes** 80:18 88:5

**making** 14:20 15:2,4
23:25 95:3 119:10

**management** 99:21

**manager** 60:13

**manner** 17:25 68:3,
11,25 69:11

**manufacturing**
12:20 51:18 65:20
100:12

**marked** 22:5,8 38:17
41:16 45:3,6,9,12,15
110:24

**market** 29:23 113:2

**marketing** 11:8

**marks** 4:25 42:21,25
81:10 117:2

**Marth** 4:4 5:11

**Maryland** 7:19

**material** 25:3,13
94:23 95:2,17

**materials** 54:12
63:17 66:9

**math** 59:2

**matter** 5:3 6:21 8:17
11:19

**meaning** 105:9

**means** 25:17 26:3
31:25

**mechanism** 15:12

**media** 5:2 42:22 43:2
81:11 117:3

**medium-size** 8:7

**meet** 58:10

**meeting** 10:9,23

**meetings** 19:16

**mentioned** 6:6 8:22
10:18 16:8 17:9 20:5
29:12,13 30:14 40:13

**Mentor** 70:16 71:2
74:18 91:15

**merger** 9:25

**mergers** 9:20

**method** 66:8

**Michael** 6:3 71:23

**Michigan** 111:23
112:5,21 113:3

**microphone** 13:9,13

**middle** 56:8 77:10

**Mike** 64:18 71:22

**million** 52:6

**mind** 13:16 49:4,13

**minds** 10:23

**minus** 32:23

**minute** 35:20 45:24
46:20 49:13 56:6
109:9,19

**minutes** 42:16

**misheard** 119:12

**misspelled** 119:11

**modification** 111:25

**Molino** 4:1 5:1,3 6:1,
9,17 7:1 8:1,22 9:1
10:1 11:1 12:1 13:1,

24 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1,3 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1,16
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1,
12 44:1 45:1 46:1
47:1,18 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1,
14 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1,19 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1,7 118:1
119:1 120:13,20

**moment** 5:25 21:18
31:18,20 35:12 38:14
40:8 42:2 45:18 49:6,
17 86:8 110:19

**money** 39:22 82:3
83:4,7 94:23

**monitor** 5:10

**monthly** 117:9

**months** 33:21 51:20
65:8 83:2 108:6

**morning** 4:2 5:18
6:17 43:12

**mouth** 7:10

**move** 19:14 25:19
38:11 55:25

**moved** 52:7

**movement** 51:17

**moving** 7:10

**Muething** 4:23 5:18,
19 6:5,16,20 13:14,

21,23 18:7,9 21:17,
24 22:2,21 23:2
28:16,22 38:20
41:12,18,22 42:15
43:4 46:19 47:6,11
49:5,9 51:6 52:11,13
55:6,11 62:13 63:5,
11 64:14 66:22 67:6
68:13 70:10 77:2
80:17,21,23 81:3
83:8,19 85:3 88:9
89:4,24 90:6,23 92:7,
25 93:14 95:24 97:18
98:18,24 102:4
103:13,17 112:7,11,
23 113:7,14,21,25
114:13,24 115:9,20
116:21 118:9,18
119:6 120:2

**muffled** 112:9

**multiple** 32:8

**mute** 103:14
—

**N**

**named** 57:17

**NASDAQ** 81:21

**necessarily** 110:12

**needed** 61:25

**negotiate** 34:7

**negotiated** 20:13
26:13

**negotiation** 26:16

**negotiations** 20:2,6,
8 52:5

**nervous** 13:5

**net** 84:25

**networking** 32:22
78:8

**niche** 29:23

**Nicholas** 71:22

**non-conforming**
113:10

**non-saleability**
63:23

**non-sellable** 90:10

**nonmaterial** 95:9,12

**normal** 12:18

**Northern** 5:6

**notary** 120:25

**note** 38:19

**noted** 88:14

**notes** 42:17 105:9,12

**notice** 107:13

**notwithstanding**
118:15

**November** 5:9

**Now's** 80:20,21

**number** 8:7 16:23
17:13 27:7 38:15
39:6,21 49:24 50:7
53:15 56:10 64:4
67:9 101:11 103:3,10
107:24

**numbered** 53:7
111:22

**numbers** 48:3

**O**

**Ober** 54:17,21 56:14
57:12,18 59:2 74:24,
25 95:21

**Object** 93:2

**objection** 15:11,18
20:9 25:16 26:2,19
27:24 29:2 31:24
32:11 35:14 38:19
51:6 52:11 55:6,16
62:13 63:5,11 64:14
66:22 67:6 68:13
70:10 77:2 83:8,19
88:9 89:4,24 90:6,23
92:7,25 93:5 95:24
97:18 98:18,20 102:4
112:7,11 113:7,14
114:24 115:20

**objections** 22:25
41:24 55:13

**obligation** 101:6

**obsolescence**
77:18 79:5,10,17,23
80:2,4,8,10,14 85:5,
10,19 88:19 91:21
104:5 106:5 107:10,
15,17

**obsolescent** 88:15
89:10,21 90:18

**obsolete** 17:19

**obvious** 13:7

**occasions** 58:11

**occurred** 112:15

**October** 72:24 73:7,
12 78:2 115:14
116:5,9 118:2

**offered** 100:2

**offering** 30:8

**office** 5:23

**officer** 8:6,9 9:7,13

**Ohio** 5:7 70:16
101:11

**Okuma** 70:14 71:2,7
97:5 98:4,9,12 100:9
101:18 102:17
108:16,19 109:2,23
110:3,8,12

**one-time** 10:3

**open** 20:23 21:11
35:22,25

**opening** 42:12 46:14
104:22

**operate** 28:9

**operated** 70:16 88:2

**operating** 8:6,9 9:13
71:7 74:18

**operation** 11:25
12:17,24 14:20 17:25
29:6,7 30:5 51:18
69:20 100:19

**operations** 9:14
11:8 16:5 75:3

**opinion** 90:12

**opportunity** 11:5,11
118:23 119:13

**opposite** 41:4,7

**option** 118:18,19

**options** 118:12

**oranges** 107:19

**order** 14:14,17 16:3
17:23 28:7 29:8
81:24

**ordinary** 86:11,17
87:7 88:11,25 89:14,
16,22 90:5,7,17,19
91:8,13 92:5 110:11

**outlined** 30:20

**outsource** 108:24
110:2

**outsourcing** 65:19
110:6

**outspoken** 85:11

**owed** 32:17

**owned** 8:18,20

**Ownership** 96:20,21

**P**

**P&f** 6:7 8:14,15,20
9:14 10:3 36:14,20,
21,24 37:3,21 38:3
39:8 41:19 81:17,23
106:23 107:2

**P&f's** 39:8

**p.m.** 43:3 47:13,16
81:8,12 116:24 117:4
120:9,11

**pages** 48:4 103:3
120:15

**paid** 115:7,11

**paper** 92:11 93:23

**papers** 45:20

**paragraph** 51:16
52:3 56:9 77:10
87:11 104:17 109:22
111:22 112:25 113:9,
16 114:22 115:3

**paragraphs** 114:12

**parcel** 101:25

parent 75:2

part 12:21 13:25 14:15 33:16 36:17 37:16,18 38:6 39:8 40:13,14 44:3 48:20 64:4 100:23 101:25 102:12,21 105:5 109:6 113:9

parties 4:16 11:2 16:17 17:19 22:16 23:12 113:23

partner 60:13,22

parts 14:24 15:4 19:6 29:5,9,10 32:18 65:21 70:4 114:21

passed 60:6

past 6:23 75:20,25 76:13,17,23 77:15 78:2,15,23 79:4

Patrick 58:21 59:3

Pause 110:20

pay 34:15 39:23

payables 32:17,23

paying 18:15

PDFS 47:3,4

pending 4:22 55:17 101:10

Pennsylvania 7:21

people 14:9 54:18 65:17 72:6

Perfect 81:3

perform 16:4 44:12 59:20 61:7 76:10 106:23

performed 84:16

performs 82:19

period 11:4,22 12:10 34:9 51:19 69:23 70:8 71:8,11 74:12

periods 66:4

permission 21:13

permit 96:24 100:7

person 74:17 99:13,

17

personal 74:13

personally 92:23

personnel 58:19 75:12

perspective 65:15 88:25

phone 13:8

phones 13:11

phrase 69:22 75:19

physical 40:18 72:3

pick 9:22 92:16

piece 19:3 70:15 97:23 98:4,6 101:23 102:10 109:3,6

pieces 92:10

Pittsburgh 51:19

place 14:12,18 33:6, 11,20,21 40:20 54:16 57:24 58:4 67:22 72:10,12,15,17 74:21 76:8 82:24 83:2 90:9

plaintiff 8:17

Plaintiff's 43:16 85:7 86:7

plaintiffs 5:20 6:20 22:21 41:22

plaintiffs' 22:7 38:16 41:15 45:2,5,8,11,14, 22 47:19 67:9 102:23 103:3 110:23 111:5 117:14

Pleas 101:10

plenty 19:3

pneumatic 29:19 111:23 112:5,21 113:3

point 9:23 37:25 38:9 40:16 84:13 95:14

policy 79:10,16,17, 23 80:4,8,10,14 85:11,17,18,21,24 86:2 104:5,11

portfolio 30:3

position 102:16 114:14

potential 13:4 18:2 29:16 51:12 58:15

potentially 30:7

powered 29:20

practicalities 11:19

practice 4:8

practices 73:21 75:20,25 76:7,9,13, 17,24 77:15 78:3,15, 23 79:4

pre 61:18

preliminary 109:21

premises 83:16

prepared 77:14 117:19

preparing 103:6

presales 61:18

presence 29:25

present 40:19 87:13 88:12 89:2 92:15,17, 20 93:6,9,11,20,24 94:7 96:3,7

presented 39:3 42:6, 8 91:24

presently 113:23

president 9:17 56:15 74:25

pretty 24:6 116:19

previous 106:15

previously 22:5,8 38:12,17 41:13,16 45:15

price 11:14 16:25 18:16 19:11,15 31:8

prices 113:4

principles 39:14 85:16 86:20 90:9,15

prior 29:21 31:9 44:5 56:19 57:23 58:4 64:21 67:3 73:21

91:13 97:5 108:6,17 110:10 114:2 117:11

pristine 18:18

problem 95:22 116:21

problems 13:11 19:5

procedure 4:21 98:17

procedures 44:13 59:20 68:18

proceed 6:12 61:25

proceedings 120:10

process 11:12 14:4, 16 15:8,16 52:9,15 53:2 108:10

processed 70:5

processes 69:17

produce 29:5,9 65:20 85:22 91:6

produced 20:11 30:25 54:11 69:22 70:5,6

produces 9:10

producing 19:6 29:19 33:12 41:3 65:7

product 30:8 33:10, 12,13,14 65:7 69:21 91:6 95:5,23 100:12

production 30:24 69:16

products 65:16 69:25 94:14 96:5

professional 102:16

professionals 60:3 61:2

properly 17:23 28:7 69:4

provide 17:20 31:22 53:10,24 56:11 115:18 118:11

provided 33:4 34:13 36:10 44:23 117:16

public 9:6 39:9 76:7 120:25

publicly 81:17

purchase 15:20,21 16:9,19,21,22,25 19:11,15 22:6,8,19 30:16 31:8 37:17 43:22,24 44:6 48:16, 17,21 54:6 58:7,8 67:10,12 73:9 79:21, 23 86:6,21 100:16,23 101:2 107:7 115:24 117:13

purchased 17:3,14 28:4 30:24 31:5 67:22 109:23

purchaser 25:2,3 28:24 34:14

purchasing 25:24 26:7

purport 26:8

purporting 85:22

purports 73:8

purpose 74:7

purposes 41:9 44:21 48:10 103:6 104:20

pursuant 73:9 112:25

put 44:24

putting 95:3

PX-16 22:5,22 25:10 31:13 34:24

PX-27 41:14,23

PX-32 38:13

### Q

quality 15:9 16:4 28:9 84:11 86:11,16 87:6 92:3

quantities 87:11

quantity 16:4 17:24 28:5 64:7 86:11,16 87:6 91:24 92:4

question 25:21

28:20,23 30:12 37:6,
7 46:11 49:10 52:14,
22,24 55:18,22,25
57:7 62:17 64:15
66:10 68:5 69:7,9
73:3,24 76:12 77:4
78:5,11 79:2 88:17
89:6,20 93:3,8 99:2
102:6,7,8,9 103:14
112:10 115:22 119:3,
6

**questions** 12:3
24:19 27:17 38:10
43:5 44:15 81:15
114:8 118:7

**quick** 120:5

**quiet** 11:23

**quoting** 82:13

**R**

**reach** 21:5

**read** 24:18 25:7
28:20 50:15,16,19
52:24,25 56:9,17
77:11,22 86:23 97:2
99:4,5 104:23 108:4,
12 118:12,23 119:13

**reading** 50:25 104:4
108:5

**reads** 96:23 101:5
104:17 109:22 115:3

**ready** 27:19

**reason** 49:21 50:17,
20 112:18

**reasonable** 11:14
77:16,18 78:19 79:14
87:12

**reasons** 11:23 13:7

**rebates** 77:19

**recall** 26:18,20 59:10
61:8 64:23 65:6,11
66:6 77:25 78:7,12
79:11 80:16 82:8
84:21,22 85:6 116:2,
17

**receivable** 17:21
32:23 33:15 83:25

84:6 115:5

**receivables** 26:7
32:16

**received** 67:2 117:10

**recess** 21:21 42:24
47:14 81:9 116:19,25

**recipe** 30:6

**recognized** 54:22

**recognizing** 47:2

**recollection** 24:12
26:14,17 56:22 60:5,
12,14 61:6 65:18
67:24 72:6,12,21
74:4,16,21 78:21
98:13,15 101:19
108:14 109:16

**record** 4:10 5:17
6:19 21:17,20,23
23:14 24:18 36:19,
21,23 37:2 38:3
41:12,19 42:16,22
43:2 46:21 47:8,13,
16 48:2 52:25 55:14
78:9 81:6,8,11 99:5
113:22 116:24 117:3
118:25 120:5,8

**recording** 4:17
119:4

**records** 38:7 40:25

**reduces** 41:8

**reduction** 85:19
104:21

**reference** 101:12
104:4,8 109:2 114:20

**referenced** 48:19
50:14 100:22 117:13

**references** 79:8

**referring** 53:16
69:23 73:2 101:20
106:7,9,21 107:9
119:8

**refers** 106:10

**reflect** 45:20 46:12
119:14

**reflected** 38:22
113:22

**refresh** 101:19
108:14 109:15

**regard** 42:3 51:23
76:14,18,24 78:24

**regular** 36:15 117:20

**regularly** 36:14

**relate** 8:15 30:9
39:11 41:25

**related** 37:19 56:2
112:5,20

**relating** 40:25

**relationship** 56:15

**relationships** 9:3

**reliant** 29:4

**relied** 25:5,22 79:19
92:8

**reluctant** 54:15

**rely** 14:9 18:20,22

**relying** 25:17 26:5

**remember** 54:13,24
60:19 61:9 65:22
67:7 71:9 74:20 75:2,
11,16 82:24 83:10
94:20 97:11,13
101:14,15,21 108:19,
20 115:16 116:13
117:12,22,24

**reminds** 6:1

**remote** 4:17 5:2

**remotely** 4:11,15

**repair** 19:7 101:16,23

**repairs** 101:17
102:11 108:8,15

**repeat** 28:19 52:21
55:21 70:18 98:25

**repeated** 63:17

**rephrase** 62:16
88:17 92:19 97:25

**replacement** 11:16

**report** 9:15,16 29:17
103:5

**reporter** 4:12 5:14
6:11 28:20 52:23

99:3 119:10

**Reporting** 4:6 5:13

**reports** 9:4,10

**represent** 5:24 6:20

**representation**
17:16 27:18,23
28:11,24 30:9,15
100:15 110:14,16

**representations**
15:22 16:2 17:5,9
18:12,22 20:7 23:15,
17,25 24:4,5,22,25
25:6,18 26:5,10,15
27:7,10 32:5 62:22
79:19,20,22,25 92:8,
12

**represented** 93:22
94:8 110:4

**representing** 10:10
28:2

**reps** 18:4 20:16 62:9

**requested** 35:3

**requests** 61:5 63:17

**require** 19:7 44:12
111:25

**required** 32:14,18
52:7 57:14 85:12
87:5 90:9 111:19
115:25 117:15

**requirement** 32:20
74:3 116:15,16

**requirements** 39:8

**requires** 19:10

**reserve** 22:25 85:5,
10,19 88:15,19
89:10,17,21 90:9,19
91:21 104:5,8,10,19
105:24 106:16,19
107:11

**reserved** 85:15

**reserves** 41:24
77:18 106:12,25
107:5

**respect** 17:6,8,14
27:6 39:17 61:13
64:7 94:2 111:21

114:14,15

**response** 55:17
76:12 77:5

**responsible** 10:11
74:18 117:23

**rest** 39:10

**result** 33:17

**retain** 108:11

**returned** 95:22

**returning** 94:6 96:5

**returns** 77:19 94:14
96:12

**reverse** 40:24

**review** 11:13 20:24
27:18 31:18 42:17
66:14,21

**reviewed** 60:8

**reviewing** 11:6

**rework** 114:20

**Richard** 6:6

**Rick** 6:2 24:11,14
61:9 64:18 73:7
94:21 100:14 110:4
116:12

**rigging** 71:3

**right-hand** 39:5 50:6

**right-side** 103:19

**Rivera** 4:13 5:15

**role** 29:13

**roll** 40:21 41:6

**rollback** 72:14

**room** 4:9,14 90:10

**Rule** 4:20

**rules** 4:20,21 118:11

**run** 14:11 16:5 17:24
31:7,8,9,11 32:18
34:3 69:17

**running** 12:17,23
75:3

**Russell** 71:23

**S**

**Sabath** 6:2 24:12,14
58:10,14 61:9 64:18
73:7 100:14 110:4
116:12

**salable** 17:18 111:25

**sale** 33:9,18,20 58:15
88:6 91:6

**saleable** 19:22

**satisfaction** 53:11,
25 56:12

**save** 21:4,14

**saved** 45:25

**savings** 51:16

**schedule** 42:12
49:21 100:24 109:12

**scheduled** 19:9,24

**schedules** 48:18

**schemed** 25:13

**School** 7:21

**scope** 9:25 11:18
12:6,13 112:12 114:4

**secret** 13:4

**section** 15:22,24
23:19,24 31:14,19,23
32:6 35:4 53:15
67:14,15 71:15 73:9
77:7 81:2 86:6 93:10
96:17 100:6,25 101:5

**secured** 82:18

**Securities** 9:9

**seek** 22:21 41:22

**sell** 29:9 91:7

**sellable** 89:18 91:10

**seller** 10:10,24 11:22
12:8 13:3 17:5 19:7,
25 23:9 24:4,9,12,14,
22,24 27:7 28:2 32:6
33:4,8,11,15 34:2,6,
15,18 39:3,7,23
40:19 43:21 54:15
75:21 86:12,18 87:7
96:24 100:7 106:14

**seller's** 77:15 78:2,
15,23 79:4,17 80:3,8

**sellers** 61:15

**selling** 33:13 65:16
92:5 94:10,12

**send** 110:25

**sending** 78:7,12
116:5

**sense** 80:18 88:5

**sentence** 52:3
53:21,22 56:8 75:20
96:22 100:6 107:14

**sentences** 108:4

**separate** 82:12
107:19

**series** 44:15

**serve** 82:20 83:17

**service** 5:5 64:24
91:23 101:9,22

**services** 99:14,17

**serving** 84:3

**set** 44:11 105:12
114:21

**setting** 29:14

**settled** 108:10

**Seventeen** 48:12,15

**severally** 24:25

**severity** 4:7

**Sevilla** 6:3 64:19
71:22

**shareholder** 24:9,
11,23,24

**sheet** 26:9 36:9 39:3,
5,12 42:6,8,12

**sheets** 93:23

**shipping** 33:13

**short** 34:3 61:7

**shown** 22:9 32:3
38:17 41:16 45:16
120:17

**shows** 83:16

**shrinkage** 77:17
79:5

**side** 20:12 26:23 36:9
39:2,5

**sides** 26:23 40:19

**sign** 9:7 118:12

**signature** 92:16

**signed** 16:15 65:4
92:23 93:11

**significant** 96:4

**signing** 88:6

**Silverman** 59:23
60:17

**similar** 68:18 69:6
76:8

**simple** 93:7

**sir** 52:20 53:2 69:8
76:21 80:20 83:21
90:13 99:24 103:17
109:15 112:19

**situation** 14:21
15:17 29:3 83:5 96:9

**situations** 61:16

**SKUS** 113:4

**Smail** 57:17,19 59:3

**small** 8:7 24:6 42:10
84:19

**social** 4:8

**sold** 13:6 30:25 33:9
52:8 94:4,9

**sort** 10:25 11:18
29:15 46:11

**sorts** 12:21 30:25

**sounds** 71:6 73:16
79:12,13,14

**sources** 81:24

**speak** 12:14 54:14

**speaking** 11:9

**specialist** 5:12

**specific** 16:2 20:15
76:12 86:22 97:13

**shows** 83:16

**specifically** 27:12,
16 30:24 31:5 55:14
84:24 90:20 100:22
101:15 108:18

**speculate** 68:15

**spoke** 54:17

**spoken** 6:22

**spot** 80:18

**spreadsheet** 35:17
38:16 41:15 42:2

**staff** 9:9 60:12,23
75:6,8

**standard** 76:9 99:6
104:19 105:25

**start** 4:25 42:25
78:10 81:10 117:2

**started** 46:23

**state** 5:17

**state's** 4:21

**stated** 19:9

**statement** 59:21
76:6 77:9,13,25 78:8,
13,14,19 79:3,18
80:4 107:18 117:10,
16,19

**statements** 66:3
67:2 68:4,12 69:2,12
76:6 85:23

**states** 5:6 24:23

**stayed** 72:7

**stepped** 67:25

**steps** 15:16

**stipulate** 4:16
113:18,21 114:7,11,
19

**stock** 15:21 16:22

**stored** 37:11,13,14

**strategy** 9:18,19
29:14,15 30:10,19,21

**strike** 78:10

**structure** 16:21,24
24:13 82:10

**structuring** 16:20

**style** 101:7

**subject** 20:8 26:16
65:23 66:21 110:15
120:16

**subjected** 102:11

**Subscribed** 120:21

**subsidiary** 8:19,20
9:15

**substantial** 111:25

**success** 31:3

**successful** 30:23

**sued** 108:8

**sufficient** 17:20,24
28:5,8,9 83:11,12
92:4

**sufficiently** 28:8

**suggest** 49:6 68:19

**suggesting** 62:25
83:7 84:20

**suits** 108:7

**summary** 51:11,14

**supplied** 63:21
107:14

**supplier** 53:12 54:2,
23 55:2,5 56:13

**supplying** 63:8

**suppose** 61:12
65:14

**supposed** 86:10

**surprised** 63:14

**swear** 4:14 6:11

**swearing** 4:18

**sworn** 6:14 120:21

**system** 44:9,18,19,
20 45:21 46:12 67:22
74:2,5,6,11 75:13

**T**

**Tab** 49:23

**tabs** 49:25

**takes** 40:20

**taking** 57:24 58:4 68:18 82:21 84:9 88:23 89:21,22 90:18

**talk** 40:8 43:17 49:19 64:18 96:16

**talked** 26:10

**talking** 43:15

**talks** 111:23 113:9

**target** 11:6,10 12:15 13:24 34:8,12,14 83:12 84:24 107:2

**team** 57:4,9 72:8 74:20,22 76:9

**technical** 7:2

**telling** 13:14,21 64:24

**term** 24:8 71:17 87:22,24

**terms** 44:4 58:20 69:7,8 92:14 109:21

**testified** 6:14 62:21

**testify** 52:16

**testimony** 35:11 57:19 98:21 99:22 120:15

**thing** 10:3 19:19 49:15 97:16 106:22

**things** 12:22 16:7 26:6 30:5 43:15 49:2 62:9 82:12 84:11 112:15 113:18

**thinking** 30:19 32:7 50:25 53:2

**thinks** 15:9

**thought** 49:14 52:9, 14 62:9 91:7 111:8

**thousand** 88:20

**Thrasher** 5:22

**Tim** 5:22 13:15 41:24 47:9 80:17 103:13 112:12 118:10

**time** 5:9,16 6:10 8:24 12:9,18 22:9 32:24 34:9 38:18 41:17 43:6 45:4,7,10,13,16 46:4,7,16 49:18 51:25 57:16 61:7 62:18 65:4,7 66:17 71:11 74:12 82:22 84:13 92:23 94:17 110:24 118:8

**timeline** 61:14

**times** 11:21 19:3 20:14 26:22

**title** 8:10

**today** 4:5,13 5:8,12, 14 6:24 43:15 62:21

**told** 15:4 17:25 67:3 70:25 75:8,12 96:9, 14 98:14 100:13

**tool** 5:5 8:19 29:19 43:20 44:21 56:20 58:15 60:25 61:4 62:5,11 63:7,10,13, 17 64:12,20,23 65:2, 23 66:3 67:21,23 68:9 69:16 70:7,13, 16 72:20 73:25 74:19 75:13,25 76:14,17,24 78:13 79:9 81:23 85:18 86:2 87:3,17 88:3,7,20 89:15,23 90:5,14 91:13,23 92:4,6,15,18 93:7,21 95:21,23 96:4 97:6 100:9 101:9 102:2,12 103:7 104:10 109:7 110:10 112:20 115:15,25 117:11,16

**Tool's** 43:21 66:8,14, 20 67:4 68:3,4,10,11, 25 69:10,12 70:2 73:20 88:12,13,25 89:3,11 90:18,20 91:20 106:6 107:11

**Tool/hy-tech** 48:11

**tools** 14:20 29:10,20 30:3,25 53:10,24 56:11 66:13 101:8 108:7 113:3

**top** 24:9,16 38:4 50:10 53:7,17

**Torcup** 53:10,24 54:11,18,23 55:5 56:11,14,16 95:20,23 96:12 113:9,11,12

**totaling** 108:9 111:24

**trade** 104:21

**traded** 81:17,20

**transaction** 11:23 13:4 16:20 17:7 22:18 24:8 25:14,20 27:8 28:12,13 29:17 33:14 34:23 37:17,19 40:24 43:20,24 44:3, 21 46:13 48:11 50:3, 22 51:24 52:10 53:3 54:6 56:19 57:10,24 58:4,20 59:14,19 60:4,18 61:14,25 66:5 67:3,18 70:22 73:22 74:9,19 75:9, 15 76:2 81:25 82:7, 10 84:18 87:3 103:7 106:14 107:12 108:17 109:7 117:11, 21

**transactions** 10:9, 15 32:8 94:24

**transcript** 119:9 120:16

**transcription** 118:14

**transition** 51:19

**treated** 104:21

**trick** 36:25

**triggered** 85:18

**trouble** 46:14

**true** 51:24 62:23 63:3 80:7 82:18 87:8 116:16 120:16

**TSG** 4:5 5:13,15

**Turick** 71:23

**turn** 9:16 27:13 31:14 43:7 56:3

**turning** 50:5

**type** 109:3 110:3

**typed** 79:9

**types** 27:9 91:22

**typewritten** 104:16 119:9

**typical** 33:14 44:11

**typically** 9:20 10:24 11:10,17 12:8,14,19 13:2 14:3,10 15:20, 24 16:15 17:15 19:2, 7,16 20:11 26:12,22 36:16 59:8 60:22 68:18 84:18 87:23 98:8 117:12


**U**

**ultimately** 8:9

**uncooperative** 61:12,16

**uncooperativeness** 61:4

**understand** 30:11 49:14 55:7 62:17 64:11 116:12

**understandable** 13:5

**understanding** 16:17 27:23,25 31:23 37:7 53:13 54:5 56:21 70:21 88:16

**understandings** 23:12

**undertake** 44:16

**unfair** 33:19

**United** 5:5

**University** 7:19,21

**unpack** 16:6

**unreimbursed** 108:8

**untrue** 63:8 64:10 66:5

**unusable** 113:10

**unusual** 97:16,19,21

**unwind** 40:24

**upload** 22:4 46:9 111:13

**uploaded** 20:18 35:16 39:25 46:8 102:20

**upper** 37:20

**usable** 86:16 87:6

**useable** 86:11

**utilized** 75:14


**V**

**vague** 98:15 115:22

**validity** 4:17

**valuable** 84:2

**valuation** 13:24 14:15 18:17

**valued** 52:5 85:13

**vast** 95:17

**vendor** 56:14

**vendors** 32:17

**verify** 83:6

**versus** 5:4 101:8

**video** 4:17 5:2,9,12

**view** 102:15

**views** 62:21

**virtue** 33:5

**virus** 4:8

**visit** 11:11


**W**

**wait** 47:6 48:25 56:6

**waive** 118:19

**walked** 61:22

**wanted** 63:15

**warranties** 15:23 17:5,9 18:4,12,23 20:7,16 23:15,18 24:2,4,5,22 25:2,6,18 26:11,15 32:5 62:9, 22

**warranty** 94:16,18, 22,25 100:16

**ways** 10:6 16:23 19:17 76:4

**weekend** 12:20

**weeks** 40:17,23 50:21,24

**Wharton** 7:21

**Whinney** 8:3

**wholly** 8:18,19

**wiggle** 90:10

**withheld** 63:20,22,25

**witnesses** 82:14 99:9

**woman** 57:17

**word** 87:19 95:11

**words** 20:5 22:5 54:3 56:25 92:24 105:23 106:2 108:24 110:2 119:14

**work** 11:3 14:4 16:16 46:18 57:23 58:3,5 101:23 102:18

**work-in-progress** 70:6

**worked** 7:25 10:8

**working** 14:14,17 16:3 17:20,23 28:7 29:8 30:17,20 32:9, 15,25 33:22,25 34:3, 7,8,10,11,13,16,20, 22 35:10,12 36:8 39:17,20 40:14 41:10 72:9 84:25

**workup** 42:12

**world** 88:6

**worth** 33:10 85:14 102:11

**write** 34:17,18 89:17

**writeoff** 115:5

**writing** 56:24 80:15

**written** 79:16 80:12 105:22 119:14

**wrong** 97:22 98:3 103:22 105:17

**wrote** 51:11 53:8 57:3 110:3

---
### Y
---

**year** 34:10

**year's** 33:10

**years** 8:3,8 10:2 53:10,24 56:11 68:22

**yesterday** 57:19 70:25 82:5

**Young** 8:2

---
### Z
---

**Zoom** 20:17 22:4