UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ATSCO HOLDINGS CORP., *et al.* | ) | CASE NO. 1:15-CV-1586 |
| | ) | |
| *Plaintiffs*, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | |
| AIR TOOL SERVICE COMPANY, *et al.* | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

Plaintiffs hereby oppose Defendants' Motion for Judgment on Partial Findings pursuant to Civil Rule 52(c) (Doc. 126 – the "Motion") and respectfully state:

**I.      INTRODUCTION**

Plaintiffs wrote Defendants a check for over $7.6 million dollars to purchase substantially all of the assets of an operating company. Defendants, in turn, made Plaintiffs a series of promises that took the form of contractual representations and warranties. (*See* Asset Purchase Agreement, PX-16.) Of particular note is that section 3.17 where Defendants promised that the assets Plaintiffs were purchasing were in good working condition and sufficient to operate the business in the future as Defendants had in the past.

Plaintiffs' evidence submitted through three trial witnesses was compelling. The witnesses described equipment—and particularly a vital machine, the Macturn—that failed to function, required substantial maintenance in an effort to work, and ultimately required replacement. In other

words, the assets were *not* "sufficient in nature, quantity, and quality" to operate the business as in the past. In such a circumstance, Defendants have breached the asset purchase agreement.

Defendants have moved for judgment pursuant to Rule 52(c). While their motion is nearly thirty pages, there is not much "there" there. Indeed Defendants advance principally two arguments. One, they claim that various contractual provisions bar the claims. But this is a threshold argument that is either exactly or in the spirit of what the Sixth Circuit has said was not sufficiently preserved. Two, Defendants claims that Plaintiffs needed expert testimony to support claims related to non-functional machines and related matters. But the important consideration for testing whether Plaintiffs provided evidence going to the breach of certain representations—Plaintiffs do not need to establish *why* a machine malfunctioned, but instead merely prove that the machine *did* malfunction. Plaintiffs easily cleared this bar.

As shown below, Plaintiffs' evidence was sufficient to overcome dismissal.

## II. GOVERNING STANDARD

Defendants have moved to dismiss pursuant to Rule 52(c). The rule allows the Court to enter judgment when a party has been fully heard "or the court may decline to render any judgment until the close of all the evidence." The granting of a Rule 52 motion "is discretionary, and a court has full discretion to defer the entry of judgment until after hearing all of the evidence." *See In re Iron Workers Local 25 Pension Fund*, 811 F. Supp. 2d 1295, 1298 n.2 (E.D. Mich. 2011)

## III. PLAINTIFFS WITNESSES[1]

Plaintiffs called Joe Molino to testify. Mr. Molino serves as the Chief Financial Officer and Chief Operating Officer of P&F Industries, Inc., the ultimate parent company of Plaintiffs. (Molino 7:22-8:21.) Mr. Molino explained the importance but also the limitations of due diligence

---

[1] Plaintiffs, of course, rely on the full extent of these witnesses testimony. This section is intended to serve as a summary of important aspects of the testimony.

in connection with a purchase transaction. Mr. Molino testified that because a potential seller typically wants to maintain the confidentiality of a possible transaction that typically due diligence is limited, often performed outside typical business hours, and when the business is not active. (*Id*. at 10:20-15:6.) To address these limitations, Mr. Molino explained that representations and warranties in a purchase agreement, going to many topics but including quality of inventory and equipment, can provide a potential purchaser the comfort to pay full price for assets even with a more limited opportunity for diligence. (*Id*. at 15:7-20:2.)

Mr. Molino, as relevant to the transaction at issue in this litigation, confirmed that important representations and warranties were contained in the purchase agreement between the parties. (*Id*. at 20:3-29:10.) Mr. Molino indicated the representations with respect to the quality of the equipment were particularly important given the reliance on equipment in the ATSCO business. (*Id*. at 29:3-10.) Without the properly functioning equipment, it is "very difficult to run the business in the way that it was run, and the purchase price was based on how the business was run prior to the closing." (*Id*. at 31:3-9.)

Plaintiffs called Jim Aloi to testify. Mr. Aloi, until his recent retirement, worked for Plaintiffs and their affiliates and, as relevant here, served as the vice president of finance at Hy-Tech. Mr. Aloi described substantial familiarity with most of the business functions of the companies, including operations, given that the business units reported financial results to him on a daily and longer-term basis. (Aloi 9:6-11:7.) Mr. Aloi described that a principal goal of the ATSCO transaction was to gain access to existing ATSCO customers and add to the Hy-Tech business. (*Id*. at 13:9-14:9.) Mr. Aloi described the post-closing challenges encountered by Plaintiffs: "I recall that [it was] very difficult to get quality product off of one specific machine,

an Okuma Macturn…that was a very difficult situation for us, to get quality parts off of that particular machine" (*Id*. at 15:15-23.)

Mr. Aloi described a "vicious cycle" where Plaintiffs would find the machine unable to produce parts to planned drawings, a machine out of tolerance, and a machine generally offline. (*Id*. at 16:15-17:25.) Mr. Aloi identified a company record that showed the Macturn machine frequently offline, *including* an entire four-month period where it would not function. (*Id*. at 18:12-25:10; PX-30.)

With respect to resulting expenses, Mr. Aloi identified an exhibit containing expenses resulting from the Macturn's non-operation, including frequent repair bills. (Aloi 26:5-30:17; PX-14.) And Mr. Aloi testified to and identified an exhibit showing that Plaintiffs eventually were forced to purchase a replacement Macturn machine for $330,000 in connection with the deficiencies he had previously identified. (Aloi 35:4-41:4.; PX-15.)

Plaintiffs also elicited testimony from Patrick Curry. Mr. Curry was an operations manager at Hy-Tech (before recently moving to a different function). Mr. Curry described his role: "[I was] responsible for all the manufacturing responsibilities, day-to-day manufacture of parts that went through the manufacturing plant. I was responsible for quality control. I was responsible for the shipping and receiving for Hy-Tech and also over product development, engineering and product development." (Curry 9:16-22.)

Mr. Curry described the Macturn machine and what it could have done, properly functioning, for Hy-Tech. "MacTurn is a machine that's actually a manufactured by a company named Okuma, and it is what you refer to as a multifunctional CNC machine. And what I mean by that is that it will do lathe turning, and it will also do milling. So it's like taking a CNC milling machine and a CNC lathe machine and combining them into one machine…So the productivity of

the machine should be much better, so you're actually being able to eliminate process steps by being able to do multiple steps in one machine." (*Id*. at 18:7-20.)

Rather than receiving the hoped-for machine described above, Mr. Curry testified that the machine was beset with issues. (*Id*. at 21:21-23:16.) Indeed Mr. Curry said it was between six and eight months without consistent production off the machine. (*Id*. at 22:20-22.)

IV. ARGUMENT

Defendants raise a number of arguments that seek to shut down this litigation at this interim stage.

First Defendants assert various notice and related deficiencies related to Plaintiffs' compliance with pre-suit dispute resolution procedures. (Motion at 8-11.) If this sounds like déjà vu for the Court, that's because it is. This was precisely the argument Defendants advanced near the eve trial in 2017 (*see* Doc. 59); indeed Plaintiff's recent Motion and Doc. 59 (the 2017 brief) look and read remarkably similar. (*Compare*, e.g. Doc. 126 at 8-12 *with* Doc. 59 at 3-8.) And while the Court sided with Defendants on that issue, the Sixth Circuit has held that by failing to sufficiently raise the issue in their answer, a motion to dismiss, or a motion for summary judgment, that Defendants have "fail[ed] to raise the issue 'at a pragmatically sufficient time.'" Sixth Circuit Opinion, Doc. 107 at 4-6, citing *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993).

The same can be said of Plaintiff's latest iteration of the argument. The argument has been specifically foreclosed by the Sixth Circuit. And even if there is some new iteration, the *rationale* and *spirit* of the Sixth Circuit's decision applies with equal weight. Essentially nothing that Defendants have argued depends on any of the evidence submitted by Plaintiffs in their case. Rather, Defendants argue that there were threshold issues—known for years, almost certainly by the beginning of the case, and certainly no later than the close of discovery—that bar Plaintiffs'

claims. The Sixth Circuit clearly held that even if Defendants were right on the substance (and they are not) that these contractual provisions cannot serve as a bar at this point to Plaintiffs' claims.

Moreover, the Sixth Circuit similarly foreclosed these arguments because the evidence previously submitted makes clear that Defendants refused to meaningfully participate in pre-suit dispute resolution procedures. (*Id*. at 5.) Under the Sixth Circuit's opinion and order, Defendants may not seek to use these procedures now as a shield. *Id*.

With respect to Plaintiffs' contention that the fixed assets were not usable and thus the representation was false, Defendants claim that there is no evidence with regard to the suitability of these assets as of the date of the sale. If Defendants are contending that they are relieved of their obligations under the representations because the equipment was defective right away, that is obviously fallacious.

And the argument that Plaintiffs' claim is somehow weakened because the evidence only shows deficiencies after five months is no better. Section 11.1 of the Agreement provides that the representations and warranties would survive for 12 months. Of course, the parties could have negotiated any survivability period, from none at all (Defendants warrant the condition of assets as turned over) to an unlimited period (Defendants essentially warrant the machines never go bad). That they chose 12 months—while expressly providing other survivability periods for other provisions—represents a negotiated resolution on that point. Plaintiffs are thus entirely within their contractual rights to complain of breaches occurring within 12 months.

The same is true of Defendants' related argument or insinuation that Plaintiffs' custody and control of the Macturn until operational issues—or because they moved it from one place to another—should compel judgment for Defendants. Defendants seek to impose conditions in the

agreement that are not there. Of course, with a survivability period of 12 months, the parties contemplated that the equipment would be in Plaintiffs' possession. That this is so is hardly an evidentiary gap or something that compels a defense judgment. So too with Defendants' contention that the warranty was effectively voided when the equipment was transported; the agreement *could have* but does *not* contain a requirement that limits the warranty to the equipment staying where it was located. No such provision exists and the Court should reject Defendants' attempt to inject language into the agreement.

Defendants argue that Plaintiffs needed an expert to establish issues related to the Macturn or other related matters. To consider this issue, the Court should recall the point of representations and warranties, as provided here by Mr. Molino. Even allowing for reasonable due diligence, Plaintiffs are unable to run the equipment over an extended period of time or learn all that could possibly be learned about the condition of equipment. And when paying full value for a company, a purchaser (here: Plaintiffs) seek the protection of knowing that, at least for a negotiated term, they know that they will enjoy the benefit of the equipment and assets as enjoyed by the seller.

In this regard then, a representation and warranty functions as a guarantee: the assets will work as intended, or "you as the purchaser will have what you need to run this business," for the extent of the survivability period. Plaintiffs then do not have to prove the deeper issue of *why* an equipment did not work—though the invoices for maintenance show why the machine did not work, as a factual matter, in any event—but only the far more basic question: *did* the machine work as represented in the agreement.

Consider by analogy a warranty issue more familiar to all, that of the car warranty. As is broadly understood, the purchase of a new automobile typically comes with a contractual warranty from the seller that a car will work for a specified amount of time. If the car stops running on I-71,

it is hardly the consumer's obligation to understand or prove *why* the car failed to work. And for good reason: the manufacturer is the one with the expertise and prior knowledge of the product, and accepted the risk of non-performance. So too here. Defendants delivered Plaintiffs a performance warranty. The machine did not work as represented. That fact—the one in the prior sentence—is what Plaintiffs need to (and did) prove.

The same argument defeats Defendants' claim that Plaintiffs failed to prove there was a violation of the representation that the equipment was maintained prior to closing as consistent with industry standards. While there may be nuance with respect to maintenance standards, the Court does not need expert testimony for something as basic as "does the machine work?" One does not need to be a weatherman to know which way the wind blows. In any event, whether the equipment was maintained to industry standards is not a point of emphasis—said different: that representation is not a core one focused on by Plaintiffs here—in this matter.

Defendants' cited authority does not compel an opposite conclusion. Defendants cite *Guild Associates, Inc. v. Bio-Energy (Washington), LLC*, 309 F.R.D. 436 (S.D. Ohio 2015) but that is a case about consolidation that has no holding even remotely relevant to this case. Plaintiffs cite cases for the unremarkable proposition that experts are needed to prove damages in certain instances but fail to grapple with *any* of the evidence actually submitted by Plaintiffs. For example, Plaintiffs cited to invoices representing repairs made necessary by Defendants' breach of representation. This is *factual*, non-expert proof of damage. Same too with Plaintiffs' submission of the invoices and other matters related to the Macturn replacement. On the working capital claim, Mr. Molino provided the factual foundation and analysis related to that. (Molino 32:7-42:14; PX 17, 27, 32.) There is easily sufficient factual evidence going to damages.

Finally, Defendants claim that their counterclaim precludes the judgment Plaintiffs seek. For starters, even if Defendants are right that they are irrevocably entitled to the escrow—if they were right, one would think they would have attempted to secure the escrow in the last two years—that does not mean that Plaintiffs have not also established their entitlement to a payment from Defendants. It would only make collection different and harder. But, more to the point, the counterclaim judgment was on the state of permitted claims and evidence. Plaintiffs could not at that time do anything to defend against the counterclaim because, said with respect, the Court had wrongly (per the Sixth Circuit) prevented Plaintiff from the introduction of evidence on the lion's share of their claims. The reversal of that judgment means that Plaintiffs necessarily now *can* and *have* defended against the counterclaim. To side with Defendants on this issue is to give them the spoils of a victory that was facilitated only through an evidentiary and legal error.

### V. CONCLUSION

For these reasons, the Court should overrule Defendants' Motion.

Respectfully submitted,

*/s/ Brian P. Muething*
Brian P. Muething (0076315)
KEATING MUETHING & KLEKAMP, PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-3814
Fax: (513) 579-6457
bmuething@kmklaw.com

*Attorney for Plaintiffs, ATSCO Holdings Corp. and HY-TECH Machine, Inc.*

**CERTIFICATE OF SERVICE**

    I certify that on the 1st of April, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which send notification of such filing to all counsel of record.

                                          */s/ Brian P. Muething*
                                          Brian P. Muething

10719924.1