UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ATSCO HOLDINGS CORP. ET AL.,** | ) | CASE NO.1:15CV1586 |
| | ) | |
| Plaintiffs, | ) | SENIOR JUDGE |
| | ) | CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| **AIR TOOL SERVICE CO. ET AL.,** | ) | **OPINION AND ORDER** |
| | ) | |
| Defendants. | ) | |

## CHRISTOPHER A. BOYKO, SR. J:

The parties to the above action have requested, and the Court has agreed to determine the claims in this case in a most unusual manner. The parties have requested that the Court determine the claims in this case entirely on a paper record and video depositions and without any evidence or testimony in open court unless the Court determines such testimony is necessary. The parties have submitted deposition transcripts, video tapes of the depositions and have submitted exhibits for the Court's consideration. Once those documents and depositions were entered into the record, Plaintiffs are deemed to have rested their case. Then Defendants were permitted to file any motion they deemed fit for the Court's consideration. Should the Court deny the Motion, then Defendants will present their evidence and the Court will make the final determination. At this stage of the proceedings, Plaintiffs have rested and Defendants have moved under Fed. R. Civ. P. 52(c) for judgment. For the following reasons, the Court denies Defendants' Motion.

By way of background, according to Plaintiffs' Amended Complaint, Plaintiffs ATSCO

Holdings Corp. and Hy-Tech Machine, Inc. are Delaware corporations with principal places of business in Pennsylvania.  Defendant Air Tool Service Co. is an Ohio corporation and Defendant Rick Sabath, Air Tool Service Co.'s sole shareholder, is a North Carolina resident. The case is here on the Court's diversity jurisdiction.

The claims in this case arise out of an Asset Purchase Agreement executed on August 13, 2014, wherein Plaintiffs purchased nearly all the assets of Defendant Air Tool for $7,658,540.  The purchase price was to be adjusted pursuant to a closing statement and working capital adjustment.   Pursuant to the Agreement, $387,500 has been placed in escrow in connection with the capital adjustments and to deal with any disputes.

According to Plaintiffs' Trial Brief, Defendants made several representations and warranties including:   1) the financial statements were true and accurate; 2) there were no debts or liabilities outside those reflected in the balance sheet or financial statements; 3) Defendants were the owners of all the Intellectual Property used in its business operations; 4) Defendants inventories were finished and saleable; and 5) Defendants owned the assets listed in the agreement and these assets were well maintained and in good working condition.   After closing, Plaintiffs learned that these representations and warranties were untrue.

Plaintiffs allege that certain grinders and grinder part inventories intended for a customer, ATA, were non-saleable.  These were valued at $93,313.  Two tools manufactured for Michigan Pneumatic were non-saleable.   These were valued in the agreement at $13,000.  Parts manufactured for a company, TorcUp, were defective.  These were valued at $8,000.  Other parts and assemblies valued in the agreement at $90,000, were unusable or unrepairable.

Equipment sold to Plaintiffs also were in poor condition, causing loss to Plaintiffs.

These include a computerized numerical controlled manufacturing machine, the Okuma MacTurn, that stopped functioning shortly after closing, costing Plaintiffs $32,714.36 to repair and will require an additional $45,000 in parts and $30,000 in labor charges to make the machine operational. Due to the MacTurn's unreliability, Plaintiffs have lost $100,000 in productivity. Without a sufficient replacement, Plaintiffs cannot continue the manufacturing business, costing them an additional $130,000. Defendants further kept payments rightfully belonging to Plaintiffs in the amount of $2,715.42.

Despite Defendants' representations, third parties have disputed the ownership of certain intellectual property sold by Defendants to Plaintiffs. There were also $20,000 in liabilities owed to third parties that Defendants did not disclose in the balance sheet.

Plaintiffs further alleges $1,109.50 was paid to Defendant from a third party vendor when that payment should have gone to Plaintiffs. The APA gives Plaintiffs a working capital adjustment pursuant to a contractual formula. Under that formula, Plaintiffs allege they are entitled to $100,928.

In addition, certain plans and drawings were found to be inaccurate or incomplete resulting in damages of $127,250.

As a result, Plaintiffs asserted Breach of Contract and Unjust Enrichment claims against Defendants.

Defendants Counterclaimed for the escrowed amount of $387,500, contending they made no false representations. According to Defendants, Plaintiffs had ample opportunity prior to closing to inspect all inventory, equipment, balance sheets and accounts but failed to do so. Defendants further allege Plaintiffs failed to take adequate steps to protect the assets and

inventory post-closing. Defendants allege they complied with all contractual requirements, yet Plaintiffs have breached the agreement by failing to release the escrowed funds.

Specifically, Defendants dispute Plaintiffs' failure under the terms of the contract to timely complete an inventory and submit to Defendants an Inventory Acknowledgment, precluding recovery on any working capital adjustment.

Defendants further contend Plaintiffs stipulated to judgment on Defendants' Counterclaim on the MacTurn Inefficiency and Work Performed elsewhere claims and MacTurn Maintenance. Also, Plaintiffs' need, but do not have, expert witness testimony on their MacTurn claims.

Defendants allege their contract with Plaintiffs contains a $75,000 indemnification limit such that Defendants are not liable for losses below the $75,000 threshold.

Lastly, Defendants allege they will prove at trial that Plaintiffs waived any contract claims.

**Procedural History**

On July 20, 2017, the Court held a Final Pre-Trial in the above-captioned case. At the Final Pre-Trial, Defendants argued Plaintiffs failed to provide timely notice of claims under the express terms of the APA. Plaintiffs acknowledged that the notice was not submitted within the time frame agreed to by the parties in the APA. According to Defendants, this failure to timely submit a notice of a claim was a condition precedent to filing an action in court and precludes Plaintiffs from asserting such claims in the above-captioned case. Plaintiffs requested an opportunity to brief the issue. On July 21, 2017, the Court issued an order continuing the bench trial set for July 31, 2017, and instead, ordered the parties to brief the notice issue. After the

briefing, on December 17, 2017 the Court issued its Opinion and Order granting Defendants' Motion to Preclude any of Plaintiffs' claims that were not listed in writing prior to a cut off date set in the contract for notifying Defendants of any claimed insufficiencies in the equipment. Plaintiffs, on the original day of trial, dismissed their remaining contract claims, consented to judgment on Defendants' Counterclaim and reserved for appeal those claims dismissed by the Court in its December 2017 Opinion and Order.  On appeal the Sixth Circuit reversed in part this Court, holding that because the Defendants failed to raise their claim notice defense in their Answer or in a motion for summary judgment, Plaintiffs were prejudiced in their ability to respond as discovery had already been closed and the Court did not give notice it was conducting a summary judgment review on the Motion.  Because Defendants failed to show material prejudice and failed to specifically assert lack of claim notice as an affirmative defense, that defense has been waived.

The case was returned to the Court and a new trial date was set.  Plaintiffs proposed and Defendants agreed, with approval of the Court, the following mechanism to present their cases to the Court without live testimony due in part to the Covid pandemic and concerns over older principals having to provide live testimony:

> On or before October 23, 2020, the parties shall take trial testimony of Plaintiffs' trial witnesses by video and stenographic means. Plaintiffs shall bear the cost of these proceedings for video and stenographic recording.
>
> Plaintiffs shall all arrange the location, presence of witnesses and all video and stenographic services and give notice of the schedule of witnesses to testify at least seven (7) calendar days before the date of the testimony so as to allow Defendants and counsel to make arrangements to attend, in person or via commercially available electronic  means such as Zoom, Skype or a similar system , supply exhibits and other necessary preparations.

Each party shall be responsible to provide those exhibits that party wishes to utilize to the court reporter, marked as appropriate, in advance of the scheduled testimony.

Objections during trial testimony will be brief, not speaking objections. In the event a questioning party is unclear as to the basis of any objection, inquiry may be made as to the basis for the objection, and a short response provided, so as to allow a questioning party to seek to cure any defect in the question, as the questioning party deems appropriate.

At the conclusion of the recording of Plaintiffs' scheduled witnesses, Plaintiffs shall cause the video recordings and the transcripts to be filed with this Court for review, and to be made the record of the testimony in this case.

Thereafter, the parties will confer as to the exhibits identified in the Plaintiffs' Trial Brief to ascertain which will be admitted without objection, and which will require a hearing with Court as to admissibility.

Following admission of Plaintiffs' exhibits, whether by stipulation, or ruling, Plaintiff will be deemed to have rested its case in chief.

The parties hereby stipulate to the authenticity of the exhibits listed by both parties in their respective Trial Briefs, obviating the need of testimony from the custodian of records, but preserving all other objections.

At the conclusion of Plaintiffs' case in chief, and upon receipt of the transcripts from Plaintiffs' witnesses by the Court and the parties, Defendants shall have three (3) weeks to file any motion they wish to file, including but not limited to pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

Plaintiffs shall have thirty (30) days to file any brief in opposition to motion(s) filed by Defendants. Any reply by Defendants shall be filed fourteen (14) days after the filing of Plaintiffs' Brief in Opposition.

Should the Court wish to have arguments from counsel on any subjects raised in the filings of the Parties, same will be set at the convenience of the Court and counsel.

In the event the Court concludes that evidence from the Defendant is required to decide some or all of the issues in this matter, the Court will advise the parties as to those issues for which it requests additional evidence, and a hearing will be set for Defendant s to present its evidence.

The Court and the parties will, after Defendants have rested, establish a method and timing for providing final arguments in a briefing schedule on any remaining issues. For purposes of all trial testimony, the parties shall exchange all trial exhibits seven (7)

calendar days before the commencement of Plaintiffs' witnesses' testimony.

**<u>Defendants' Motion</u>**

Defendants contend they are entitled to judgment on Plaintiffs' remaining claims. Regarding Plaintiffs' contract claims Defendants argue:

1) Plaintiffs' breach of contract on the working capital adjustment agreement found in Section 2.3 of the Asset Purchase Agreement is meritless because Plaintiffs have failed to demonstrate by competent evidence that they complied with the prerequisites required under the APA to arrive at a working capital adjustment. Plaintiffs have failed to demonstrate that Defendants misrepresented the nature or quality of the Inventory in question. Plaintiffs have failed to demonstrate they supplied an Inventory Roll-Back account within twenty days of closing per the express terms of the contract. Plaintiffs were required under the APA to provide an Inventory Acknowledgment within twenty days of closing. They did not. Plaintiffs were further required under the APA to utilize the method used to prepare the Audited Financial Statements. They did not. Also, Plaintiffs were required per the APA to comply "with the Seller's past practices, including giving effect to reasonable allowances for bad debt, Inventory shrinkage and obsolescence, and reasonable reserves for customer returns, allowances and Rebates." (APA 2.3.2.2). Finally, Plaintiffs representatives did not know what Defendants' practices were so they clearly did not utilize them. Instead, they imposed their own practices which were not authorized under the terms of the APA. Therefore, Plaintiffs failed to comply with the required terms of the APA and Plaintiffs' claim for a working capital adjustment must fail.

Defendants further argue Plaintiffs cannot demonstrate they are entitled to damages

arising from the alleged problems with the MacTurn machine. Upon purchase, Plaintiffs had no in-house staff member who could diagnose or service it. Instead, Plaintiffs relied on an outside service professional. Plaintiffs failed to obtain expert testimony to prove the MacTurn was not in compliance with the representations and warranties made in the APA at Section 3.17. Plaintiffs possessed the MacTurn for five months before it began to operate erratically. The APA required that the MacTurn operate as warrantied at the time of possession. There is no evidence that it did not operate as warrantied at that time.

The APA further warrantied that Defendants maintain the MacTurn according to industry standards, yet Plaintiffs offer no evidence that Defendants' maintenance fell below the standard. Plaintiffs have offered no evidence of the industry standards nor have they offered evidence that the MacTurn was maintained below that standard. Finally, the APA warrantied that the MacTurn will be suitable for use in business as currently conducted, yet Plaintiffs offer no testimony on what the MacTurn's use was and have admitted they possess no knowledge of how Defendants conducted business at the time of the sale. Thus, their claim on the MacTurn fails.

**Waiver**

According to Defendants, under the express terms of the APA Section 11.5(c), the parties agreed that their sole remedies were as follows:

> The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims (other than Claims arising from fraud, criminal activity or willful misconduct on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article XI.

> In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, Claims and causes of Action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article XI.

Because Plaintiffs never sought indemnification, they have waived any breach of contract claims.

**Plaintiffs' Opposition**

Plaintiffs allege they paid $7.600,000.00 to purchase substantially all the assets of Defendants' business via the APA. At Section 3.17 of the APA, Defendants represented and warrantied that those assets were in good working order and were sufficient to operate the business as Defendants had in the past. Based on the testimony of three witnesses, Plaintiffs can show Defendants' representations and warranties were not accurate.

The first witness, Joe Molino, Chief Operating Officer and Chief Financial Officer of Plaintiffs' parent company, P & F Industries, Inc., testified that Plaintiffs relied heavily on the representations and warranties in the APA when purchasing the business in order to operate the business as it was operated before the purchase.

The second witness, Jim Aloi, Vice-President of Finance for Plaintiff Hy-Tech, testified that the purchase of ATSCO was to get access to their customers. However, once operations started with ATSCO-purchased equipment, it was difficult to get quality product from the equipment, in particular the MacTurn. That machine was regularly unable to produce product and was out of service for nearly four months. Aloi described the expenses incurred to fix the

MacTurn and further testified that Plaintiffs ultimately had to purchase a new MacTurn for $330,000 as the purchased machine was unreliable.

Plaintiffs' third witness is Patrick Curry, Hy-Techs Operations Manager. In that position, Curry was responsible for the day-to-day operation of Hy-Techs business including: quality control, daily manufacturing, shipping and receiving and product development. Curry testified that the MacTurn was purchased because it reduced certain steps in the manufacturing process because it was both a lathe and milling machine. Yet, due to its problems, it failed to consistently produce product for six to eight months.

Plaintiffs oppose Defendants' argument that Plaintiffs failed to comply with the prerequisite obligations under the APA arguing this exact issue was rejected by the Sixth Circuit on appeal, which held that Defendants' failure to raise these defenses in their Answer, Motion to Dismiss or Summary Judgment resulted in waiver of these procedural challenges.

Even if they could still raise this issue, the evidence presented shows Defendants failed to engage in any pre-suit resolution as required by the APA, thus further militating against Defendants' argument.

Defendants' argument that Plaintiffs cannot show the equipment was defective or did not conform to the representations and warranties made in the APA because they had it for five months is a non-starter because the APA says the warranties remain for twelve months after the closing date.

Per the APA, Plaintiffs assert they do not need to prove why the MacTurn did not work; they merely need to prove that it did not work as represented in the APA. This they have done with the depositions of Curry and Aloi.

**LAW AND ANALYSIS**

Defendants move for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) which reads:

> (c) Judgment on Partial Findings. If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

"In entering judgment under Rule 52(c), the court must set forth specific findings of fact that are reviewed for clear error." *In re Mod. Plastics Corp.*, 732 F. App'x 379, 385 (6th Cir. 2018) *Sharp v. United States,* 401 F.3d 440, 442 (6th Cir. 2005).

The parties agree that the only remaining claims are Plaintiffs' claims for Breach of Contract at Counts 6, 7, 8 and 9 of their Amended Complaint. These claims include the Working Capital Adjustment, MacTurn Work issues and work performed elsewhere, MacTurn Maintenance Costs and MacTurn replacement costs.

**MacTurn Performance Issues**

According to Plaintiffs, Defendants breached the Asset Purchase Agreement regarding the warranties and representations of the MacTurn CNC machine. In deciding this issue the Court begins with the warranties and representations made in the Asset Purchase Agreement. Article III, Section 3.17 reads in pertinent part:

> The Fixed Assets(I) are in good operating condition and repair, subject to normal wear and tear, (ii) have been reasonably maintained consistent with standards generally followed in the industry, (iii) are suitable for their present uses, and (iv) are sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after the Closing as currently conducted.

Plaintiffs assert that the MacTurn machine performed erratically when initially put into service at Plaintiffs' Cranberry, Pennsylvania location.  Ultimately, Plaintiffs had to buy a new machine due to the lack of dependable performance by the MacTurn purchased from Defendants.  Plaintiffs do not have an expert to opine on the source or cause of the mechanical issues with the MacTurn.   Instead, Plaintiffs rely on the testimony of Jim Aloi, former vice-president of finance for Plaintiffs who testified  "I recall that [it was] very difficult to get quality product off of one specific machine, an Okuma Macturn…that was a very difficult situation for us, to get quality parts off of that particular machine" (Aloi depo. 15:15-23.).  Aloi testified that the MacTurn did not work for a four month period, was regularly offline and when it did work it did not produce parts that complied with planned drawings.  Aloi produced repair bills and expenses associated with the failure of the MacTurn to perform as warrantied and ultimately resulted in Plaintiffs having to purchase a replacement for the MacTurn costing $330,000.00.

Plaintiffs further offer the testimony of Patrick Curry, an engineer and operations manager for Plaintiffs, responsible for the day-to-day manufacturing operation, quality control, shipping and receiving.  According to Curry, because the MacTurn was a multi-function CNC machine capable of doing lather and milling work it was prized for its efficiency in that it eliminated several steps in the manufacturing process.  However, the MacTurn purchased from Defendants had issues including a six to eight month period where it failed to provide consistent production.

Defendants argue that the MacTurn problems did not surface until nearly five months after the close of sale.  Defendants further assert that Plaintiffs have failed to produce any expert testimony as to the cause of the MacTurn problems and cannot say if the MacTurn problems

were the result of damage in the transport of the machine from Mentor Ohio to Plaintffs' facility in Cranberry, Pennsylvania.

Plaintiffs counter that they do not need to show why the MacTurn failed to perform, only that it failed to perform up to the warranties and representations in the Asset Purchase Agreement. Moreover, it is inconsequential that the MacTurn problems first surfaced five months after the close of sale because the Asset Purchase Agreement expressly states "The representations and warranties contained in this Agreement shall survive the Closing for a period of twelve (12) months..."

According to Curry, the MacTurn began experiencing performance issues "within a few days to a week" of relocating the machine to Pennsylvania. (Curry depo. Pg. 22). He further testified "from the time we had the machine, over the next six to eight months, we never really had true production where the machine ran three or four or five months without any problems." *Id* at 22-23. Curry lists a number of problems with the MacTurn including the controller not working, having to rebuild the main spindle and internal components failing. (*Id* at 22). Curry then discussed a list of parts purchased to fix the problems with the MacTurn.

The Court agrees with Plaintiffs that they do not need an expert to testify on the cause of the problems of the MacTurn. Fed. Rule of Evid. 701 reads, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." "The function of lay opinion testimony is to 'describ[e] something that the jurors could not otherwise experience for themselves by drawing

13

upon the witness's sensory and experiential observations that were made as a first-hand witness to a particular event.'" *United States v. Kilpatrick,* 798 F.3d 365, 379 (6th Cir. 2015)(quoting *United States v. Jayyousi,* 657 F.3d 1085, 1120 (11th Cir.2011) (Barkett, J., concurring in part and dissenting in part)); see also *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir.2005) (describing lay opinion testimony as an acceptable shorthand for the rendition of facts the witness personally perceived).

Here, both Curry and Aloi testified to what they personally observed and experienced with the MacTurn's performance. Both testified it did not produce product with the quality or quantity sufficient to perform the work required. This evidence is sufficient to show the MacTurn did not perform as represented and warrantied in the APA that it was in "good operating condition," was "suitable for their present uses" and was "sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after the Closing as currently conducted." Because the APA further states these representations and warranties remain in force until one year after the closing, Defendants' argument that the MacTurn issues began after five months is not dispositive of the issue.

Therefore, the Court finds Plaintiffs' have offered competent evidence that the MacTurn did not perform as represented, however, Defendants have not yet presented their case to the Court. Consequently, the Court declines to issue a judgment in Defendants' favor on the MacTurn claims until it hears all the evidence in the case.

**Working Capital Adjustment**

Plaintiffs bought Defendants business for the purchase price of $7,658,540 dollars along with the assumption of Assumed Payables. Pursuant to Section 2.3 of the Asset Purchase

14

Agreement the purchase price may be adjusted based on differences between the Closing Net Working Capital Amount and the Base Net Working Capital Amount.  According to Defendants, Plaintiffs have failed to demonstrate they are entitled to any working capital adjustment because Defendants did not inaccurately portray the inventory sold to Plaintiffs.  Furthermore, Plaintiffs failed to comply with the strict terms of the Asset Purchase Agreement by providing an Inventory Roll-Bank count and Inventory Acknowledgment within twenty days of the close of the APA.  Plaintiffs also agreed to produce the Inventory Roll-Back utilizing a method consistent with that used in performing the Audited Financial Statements.  Defendants allege the Audited Financial Statements at issue were those of Defendants, not Plaintiffs.  However, Plaintiffs not only failed to utilize such a method but in fact failed to even inquire what method was used.  Therefore, they cannot now prevail on such a flawed and contra-contractual argument for a working capital adjustment.

      Under Section 2.3, within twenty days of closing, Plaintiffs were to conduct a physical inventory in accordance with Defendants' past practices and the reasonable procedures of Plaintiffs.  These are not defined in the Agreement.  Plaintiffs were then required to give Defendants notice of the inventory and allow a representative of Defendants to attend.  Again, within twenty days of closing a roll-back of the inventory count was to be performed by Plaintiffs in the same manner as used by Defendants to perform an audit of its financial statements.  Inventory Roll-back is not defined in the Agreement.

      Upon completion, Plaintiffs were to deliver the Inventory Roll-Back statement to Defendants and such statement was to be final unless formally disputed and arbitrated.  No arbitration was held.

Defendants would then prepare a Closing Statement based on the Inventory Roll-Back along with the books and records of Defendants at the time of the closing. Defendants would provide Plaintiffs with a calculation of the difference between the sum of the net book value of accounts plus the net book value of the inventory based on the roll-back. It would then subtract the assumed payables plus customer deposits. This would then equal the Closing Net Working Capital Amount. The parties were then to compare the Closing Net Working Capital Amount to the Base Net Working Capital Amount which the Asset Purchase Agreement listed as $858,689. If the Closing Net amount were greater than the Net Amount, Plaintiffs would pay the difference. If less, Defendants would pay the difference.

According to Plaintiffs, they are entitled to $100,928 for the Working Capital Adjustment. Plaintiffs Trial Brief asserts that witnesses Joe Molino, Patrick Crotty,[1] Jim Aloi, and Robert Ober will testify on this issue and that Exhibits PX-1-5, PX-13, and PX22-25 support their claim. However, Plaintiffs never filed any testimony with the Court as required by their own stipulation. Instead, they simply provided the Court two thumb drives of testimony. But their failure to comply with their own stipulation means anything not filed with the Court is not part of the record. The only filings with the Court include the deposition testimony of Joe Molino and Jim Aloi on this issue and that is all that will be considered by the Court.

According to Defendants, Plaintiffs have failed to demonstrate they are entitled to any working capital adjustment because Defendants did not inaccurately portray the inventory sold to Plaintiffs. Furthermore, Plaintiffs failed to comply with the strict terms of the Asset Purchase

---

[1] The Court believes this to have been a typographical error by Plaintiffs and that the witness identified as Patrick Crotty is actually Patrick Curry whose trial deposition has been docketed and will be considered by the Court.

Agreement by providing an Inventory Roll-Bank count and Inventory Acknowledgment within twenty days of the close of the agreement. Plaintiffs also agreed to produce the Inventory Roll-Back utilizing a method consistent with that used in performing the Audited Financial Statements. Defendants allege the Audited Financial Statements at issue were those of Defendants, not Plaintiffs. However, Plaintiffs not only failed to utilize such a method but in fact, failed to even inquire what method was used. Therefore, they cannot now prevail on such a flawed and contra-contractual argument for a working capital adjustment.

The Inventory Acknowledgment provided by Plaintiffs was submitted on October 14, 2014, more than thirty days after the time established by the APA. Defendants raised the issue of failure to timely provide an Inventory Acknowledgment notice previously in this suit but the Sixth Circuit found they had waived the defense by failing to assert it as an affirmative defense. However, Defendants assert now that Plaintiffs failure to follow any of the procedures in establishing a working capital adjustment entitles Defendants to judgment on the claim.

Plaintiffs contend that Defendants failed to participate in the pre-suit resolution procedure set forth in the Asset Purchase Agreement at Section 2.3.3 specifically intended to resolve any disputes arising from the Inventory Roll-Back and the Closing Statement. The Sixth Circuit agreed that Defendants failure to abide by the dispute resolution procedure in the APA demonstrated Defendants were not materially prejudiced by Plaintiffs failure to timely submit an Inventory Acknowledgment. Section 2.3 set forth a specific agreed upon method for resolving disputes and the Sixth Circuit noted that Defendants refused to arbitrate these disputes as they were contractually obligated to do. Now, Defendants claim that Plaintiffs failure to comply with the time requirements and failure to apply Defendants' accounting methodologies warrants

judgment in their favor. The Court disagrees. The APA does not foreclose a working capital adjustment based on a failure to timely submit an Inventory Roll-Back and Closing Statement, nor is it foreclosed for failure to apply Defendants' methodologies. Instead, the parties had agreed to, but failed to abide by their own dispute resolution procedure to address issues such as these. Because the Court finds Defendants failed to abide by its own agreed upon dispute resolution they cannot show material prejudice for Plaintiffs failure to timely file the Inventory Roll-Back and Closing Statement. Moreover, Defendants argument that Plaintiffs failed to apply the correct methodology for determining a working capital adjustment is an evidentiary issue on the correct amount of the working capital adjustment and not a defense to the entitlement of the same. Therefore, the Court must consider the evidence regarding entitlement to and calculation of the working capital adjustment. Since Defendants have yet to put on their case or present their evidence and in light of the testimony of Plaintiffs' principals and exhibits offered therein, the Court finds it needs to consider all the evidence in order to render judgment on the working capital adjustment claim. Therefore, the Court holds that Defendants are not entitled to judgment on Plaintiffs' claims for a working capital adjustment.

Finally, insofar as Defendants allege Plaintiffs waived their rights under the APA at Section 11.5 to bring suit on any claims brought for breach of the APA, the Sixth Circuit held Defendants waived any such challenge by failing to assert it as an affirmative defense. Moreover, Defendants failure to arbitrate the disputes results in the parties leaving the determination to the Court.

Because the Court requires additional evidence on the remaining claims, the Court denies Defendants' Motion under Rule 52(c).

IT IS SO ORDERED.

/s/Christopher A. Boyko
CHRISTOPHER A. BOYKO
Senior United States District Judge