**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| **ATSCO HOLDINGS CORP. ET AL.,** | ) | **CASE NO.1:15CV1586** |
| | ) | |
| **Plaintiffs,** | ) | **SENIOR JUDGE** |
| | ) | **CHRISTOPHER A. BOYKO** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **AIR TOOL SERVICE CO. ET AL.,** | ) | **OPINION AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

**CHRISTOPHER A. BOYKO, SR. J:**


On August 22, 2022, the Court conducted an atypical bench trial in the above captioned case, focused on Defendants' evidence.  Following the bench trial and the production of the trial transcripts, the parties submitted their final Findings of Fact and Conclusions of Law on October 31, 2022.  Having considered the evidence, arguments and submissions, the Court finds in favor of Defendants.

According to Plaintiffs' Amended Complaint, Plaintiffs ATSCO Holdings Corp. and Hy-Tech Machine, Inc. are Delaware corporations with principal places of business in Pennsylvania.  Defendant Air Tool Service Co. is an Ohio corporation and Defendant Rick Sabath, Air Tool Service Co.'s sole shareholder, is a North Carolina resident.   The case is here on the Court's diversity jurisdiction.

1

The claims in this case arise out of an Asset Purchase Agreement ("APA") executed on August 13, 2014, wherein Plaintiffs purchased nearly all the assets of Defendant Air Tool for $7,658,540.  The purchase price was to be adjusted pursuant to an inventory rollback and closing statement.[1]  Pursuant to the APA, $387,500 was placed in escrow in connection with certain capital adjustments and to deal with any disputes.

According to Plaintiffs' Trial Brief, Defendants made several representations and warranties, including:   1) the financial statements were true and accurate; 2) there were no debts or liabilities outside those reflected in the balance sheet or financial statements; 3) Defendants were the owners of all the Intellectual Property used in its business operations; 4) Defendants' inventories were finished and saleable; and 5) Defendants owned the assets listed in the agreement and these assets were well maintained and in good working condition.   After closing, Plaintiffs learned that these representations and warranties were untrue.

As a result, Plaintiffs asserted Breach of Contract and Unjust Enrichment claims against Defendants.

Defendants Counterclaimed for Breach of Contract and sought the escrowed amount of $387,500, contending they made no false representations.  According to Defendants, Plaintiffs had ample opportunity prior to closing to inspect all inventory, equipment, balance sheets and accounts, but failed to do so.  Defendants further allege Plaintiffs failed to take adequate steps to protect the assets and inventory post-closing.   Defendants allege they complied with all contractual requirements, yet Plaintiffs breached the agreement by failing to release the escrowed funds.

---

[1]  Also referred to as a working capital adjustment.

Specifically, Defendants assert Plaintiffs failed under the terms of the contract to timely complete an inventory and submit to Defendants an inventory acknowledgment; thus precluding recovery on any working capital purchase price adjustment.

Defendants further contend Plaintiffs stipulated to judgment on Defendants' Counterclaim that would encompass Plaintiffs' remaining claims.  Also, Defendants argue that Plaintiffs need, but do not have, expert witness testimony on cause of the service issues on a MacTurn machine and therefore, cannot prevail on their warranty claims concerning the same.

Defendants allege their contract with Plaintiffs contains a $75,000 indemnification limit such that Defendants are not liable for losses below the $75,000 threshold.

Lastly, Defendants allege Plaintiffs waived any contract claims.

**Procedural History**

On July 20, 2017, the Court held a Final Pre-Trial in the above-captioned case.  At the Final Pre-Trial, Defendants argued Plaintiffs failed to provide timely notice of claims under the express terms of the APA.  Plaintiffs acknowledged that the notice was not submitted within the time frame agreed to by the parties in the APA.  According to Defendants, this failure to timely submit a notice of a claim was a condition precedent to filing an action in court and precludes Plaintiffs from asserting such claims in the above-captioned case.   Plaintiffs requested an opportunity to brief the issue.  On July 21, 2017, the Court issued an order continuing the bench trial set for July 31, 2017, and instead, ordered the parties to brief the notice issue.  After the briefing, on December 17, 2017 the Court issued its Opinion and Order granting Defendants' Motion to Preclude any of Plaintiffs' claims that were not listed in writing prior to a cut off date set in the APA for notifying Defendants of any claimed insufficiencies in the equipment.

Plaintiffs, on the original day of trial, dismissed their remaining contract claims, consented to judgment on Defendants' Counterclaim and reserved for appeal those claims dismissed by the Court in its December 2017 Opinion and Order. On appeal the Sixth Circuit reversed in part this Court, holding that because the Defendants failed to raise their claim notice defense in their Answer or in a motion for summary judgment, Plaintiffs were prejudiced in their ability to respond as discovery had already been closed and the Court did not give notice it was conducting a summary judgment review on the Motion. Because Defendants failed to show material prejudice and failed to specifically assert lack of claim notice as an affirmative defense, that defense has been waived.

The case was returned to the Court and a new trial date was set. Plaintiffs proposed and Defendants agreed, with approval of the Court, the following mechanism to present Plaintiffs' case to the Court without live testimony due in part to the Covid pandemic and concerns over older principals having to provide live testimony:

> On or before October 23, 2020, the parties shall take trial testimony of Plaintiffs' trial witnesses by video and stenographic means. Plaintiffs shall bear the cost of these proceedings for video and stenographic recording.

> Plaintiffs shall all arrange the location, presence of witnesses and all video and stenographic services and give notice of the schedule of witnesses to testify at least seven (7) calendar days before the date of the testimony so as to allow Defendants and counsel to make arrangements to attend, in person or via commercially available electronic means such as Zoom, Skype or a similar system , supply exhibits and other necessary preparations.

> Each party shall be responsible to provide those exhibits that party wishes to utilize to the court reporter, marked as appropriate, in advance of the scheduled testimony.

> Objections during trial testimony will be brief, not speaking objections. In the event a questioning party is unclear as to the basis of any objection, inquiry may be made as to the basis for the objection, and a short response provided, so as to allow a questioning

party to seek to cure any defect in the question, as the questioning party deems appropriate.

At the conclusion of the recording of Plaintiffs' scheduled witnesses, Plaintiffs shall cause the video recordings and the transcripts to be filed with this Court for review, and to be made the record of the testimony in this case.

Thereafter, the parties will confer as to the exhibits identified in the Plaintiffs' Trial Brief to ascertain which will be admitted without objection, and which will require a hearing with Court as to admissibility.

Following admission of Plaintiffs' exhibits, whether by stipulation, or ruling, Plaintiff will be deemed to have rested its case in chief.

The parties hereby stipulate to the authenticity of the exhibits listed by both parties in their respective Trial Briefs, obviating the need of testimony from the custodian of records, but preserving all other objections.

At the conclusion of Plaintiffs' case in chief, and upon receipt of the transcripts from Plaintiffs' witnesses by the Court and the parties, Defendants shall have three (3) weeks to file any motion they wish to file, including but not limited to pursuant to Rule 52(c) of the Federal Rules of Civil Procedure.

Plaintiffs shall have thirty (30) days to file any brief in opposition to motion(s) filed by Defendants. Any reply by Defendants shall be filed fourteen (14) days after the filing of Plaintiffs' Brief in Opposition.

Should the Court wish to have arguments from counsel on any subjects raised in the filings of the Parties, same will be set at the convenience of the Court and counsel.

In the event the Court concludes that evidence from the Defendant is required to decide some or all of the issues in this matter, the Court will advise the parties as to those issues for which it requests additional evidence, and a hearing will be set for Defendant s to present its evidence.

The Court and the parties will, after Defendants have rested, establish a method and timing for providing final arguments in a briefing schedule on any remaining issues. For purposes of all trial testimony, the parties shall exchange all trial exhibits seven (7) calendar days before the commencement of Plaintiffs' witnesses' testimony.

## Remaining Claims

In its April 15, 2022 Opinion and Order, the Court found there remains two claims arising

5

from the APA that require adjudication by the Court:

1)      Breach of Contract for failure to provide a working capital adjustment under Section 2.3 of APA.

2)      Breach of Contract for failure of the Okuma MacTurn CNC machine to comply with the warranties and representations made in the APA.

As subparts of this issue there are damage claims arising out of:

Work that had to be performed elsewhere due to the Okuma MacTurn issues;

Okuma MacTurn maintenance costs; and

Okuma LT200 replacement costs.

In the Court's April 15, 2022 ruling on Defendants' Rule 52(c) Motion for Judgment, the Court held that Plaintiffs had presented evidence to support their claim that the MacTurn CNC Machine did not comply with the warranties and representations made by Defendants in violation of the Asset Purchase Agreement Art III Section 3.17, which reads:

> The Fixed Assets(i) are in good operating condition and repair, subject to normal wear and tear, (ii) have been reasonably maintained consistent with standards generally followed in the industry, (iii) are suitable for their present uses, and (iv) are sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after the Closing as currently conducted.

Plaintiffs presented evidence in the form of testimony from James Aloi, vice-president of finance for Plaintiffs, and Patrick Curry, engineer and operations manager for Plaintiffs, who both testified that the MacTurn did not produce parts of sufficient quality, was regularly down for repairs and failed to provide consistent production.  The Court found this testimony was sufficient to show the MacTurn was not "in good operating condition and repair," not "suitable for their present uses" and not "sufficient in nature, quality and quantity to permit Purchaser to

6

conduct the Business from and after the Closing as currently conducted."

Regarding the Working Capital Adjustment claim, the Court found the parties agreed to the sale in the amount of $7,658,540. Pursuant to Section 2.3 of the APA, the purchase price itself may be adjusted based on the differences between the Closing Net Working Capital Amount and the Base Net Working Capital Amount. According to Defendants, Plaintiffs have failed to demonstrate they are entitled to any purchase price adjustment because Defendants did not inaccurately portray the inventory sold to Plaintiffs. Furthermore, Plaintiffs failed to comply with the strict terms of the APA by providing an inventory roll-bank count and inventory acknowledgment within twenty days of the close of the APA. Plaintiffs also agreed to produce the inventory roll-back utilizing a method consistent with that used in performing the audited financial statements. Defendants allege the audited financial statements at issue were those of Defendants, not Plaintiffs. However, Plaintiffs not only failed to utilize such a method, but in fact failed to even inquire what method was used. Therefore, they cannot now prevail on such a flawed and contra-contractual calculation for a working capital adjustment.

Under Section 2.3 of the APA, within twenty days of closing, Plaintiffs were to conduct a physical inventory in accordance with Defendants' past practices and the reasonable procedures of Plaintiffs. These are not defined in the Agreement. Plaintiffs were then required to give Defendants notice of the inventory and allow a representative of Defendants to attend. Again, within twenty days of closing a roll-back of the inventory count was to be performed by Plaintiffs in the same manner as used by Defendants in preparing their financial statements.

Upon completion, Plaintiffs were to deliver the inventory roll-back statement to Defendants and such inventory was to be final, conclusive and binding absent manifest error.

Upon receipt of the inventory acknowledgment letter from Plaintiffs, Defendants were to prepare a Closing Statement based on the inventory roll back and the books and records of Defendants. This Closing Statement was to be prepared by Defendants in accordance with Generally Accepted Accounting Principles (GAAP) and Defendants' past practices, including an allowance for bad debt, obsolescence, inventory shrinkage and reasonable reserves for returns allowances and rebates.  This Closing Statement was to be provided by Defendants to Plaintiffs no later than fifty days after closing.  Any disputes were subject to a mediation and arbitration procedure.  The disputes were never submitted to mediation or arbitration.

Defendants were to provide a calculation of the difference between the sum of the net book value of the Accounts as defined in the APA and the net book value of the Inventory based on the roll back inventory and the sum of the assumed payables and customer deposits.  This difference was to be Closing Net Working Capital Amount.  The parties were then to compare the Closing Net Working Capital Amount to the Base Net Working Capital Amount which the APA listed as $858,689.  If the Closing Net amount were greater than the Base Net Amount, Plaintiffs would pay the difference.  If less, Defendants would pay the difference.

According to Plaintiffs, they are entitled to $100,928 for the purchase price adjustment. Plaintiffs' Trial Brief asserts that witnesses Joe Molino, Patrick Crotty,[2] James Aloi and Robert Ober would testify on this issue and that Exhibits PX-1-5, PX-13, and PX22-25 support their claim.  However, Plaintiffs never filed any testimony with the Court as required by their own trial procedure stipulation adopted by the Court.  Instead, they simply provided the Court via mail two

---

[2]   The Court believes this to have been a typographical error by Plaintiffs and that the witness identified as Patrick Crotty is actually Patrick Curry whose trial deposition has been docketed and will be considered by the Court.

thumb drives of testimony.  Accordingly, their failure to comply with their own stipulation means anything not filed with the Court is not part of the record.  The only filings with the Court include the deposition  testimony of Joseph Molino, James Aloi and Patrick Curry, all of which were filed by Defendants and thus, Plaintiffs are limited to the testimony of these three witnesses for the Court's consideration.

More importantly, Plaintiffs rely on several documents that it never moved the Court to admit into evidence.  Again, under the parties' own Stipulation and Order Regarding Trial, Trial Testimony and Related Procedures (ECF # 121), at some point in time after Plaintiffs' filing the trial recordings and transcripts with the Court and made the record testimony of the case, "the parties will confer as to the exhibits identified in the Plaintiffs' Trial Brief to ascertain which will be admitted without objection, and which will require a hearing with Court as to admissibility. ***Following admission of Plaintiffs' exhibits, whether by stipulation, or ruling*** Plaintiff will be deemed to have rested its case in chief." (Emphasis added).  At no point after Plaintiffs' trial witnesses' transcripts were filed did Plaintiffs move the Court to admit Plaintiffs' exhibits nor was there any stipulation made to the Court to admit the exhibits.   Furthermore, PX-32, Plaintiffs' sole exhibit directed to its purported working capital price adjustment damages, was never listed as a Trial Exhibit. (See ECF #116, pgs. 9-10).   The Court's standing Trial Order reads, "Exhibits not listed in the trial brief shall not be introduced at trial, absent a showing of good cause."  (Trial Order pg 3).  That same Trial Order also requires a party to obtain a ruling from the Court on the admissibility of an exhibit.  (*Id* at pg. 5).

At no time prior to Defendants' presentation of its evidence did Plaintiffs move the Court to admit their evidence.  Plaintiffs could have done so up to and including Defendants'

evidentiary presentation.   At the conclusion of Defendants' trial presentation, Defendants expressly moved to admit without objection, Plaintiffs exhibits labeled PX-16,17, 18,19, and 21, which included the due diligence binders presented to the Court, PX 22 and Plaintiffs' Responses to Defendants' Interrogatories and Requests for Production.  Plaintiffs could have moved even at that late hour to admit its exhibits into evidence but failed to do so.

In their trial depositions, Plaintiffs' counsel stated that he moved to admit Plaintiffs' exhibit when presenting the exhibit to the witness.  (See for example Curry transcript. pg 25, Aloi transcript. pg 27).   Defendants counsel objected and then expressly stated that the parties would "preserve the conversation for later on your motion to admit." (Aloi transcript pg 27).  A review of the docket demonstrates that no stipulation or motion was ever made to the Court following the filing of the trial depositions.  Thus, under the parties' own agreed upon methodology, these exhibits are not evidence before the Court and will not be considered in the Court's ruling.

**Purchase Price Adjustment**

According to the  Amended Complaint, Plaintiffs are entitled to a working capital adjustment pursuant to Sections 2.3.2.3, 3.6 and 3.13 of the APA because certain grinder parts and grinders that were associated with one of Defendant's customers and valued at $93,313 on the balance sheet and financial statements of Defendants were non-saleable and without value.

Plaintiffs also claim two tools manufactured for Defendant's customer Michigan Pneumatic valued in the financial statements and balance sheet of Defendants at $13,000 were non-saleable and without value.

Also, Plaintiffs argue another $8,000 in parts for TorcUp were defective due to a contaminant coating the threads and unusable.

The Amended Complaint further alleges another $90,000 in parts and assemblies were unusable and without value due to poor quality, incorrect machining, burrs and contamination, while another $6,000 in additional machining was required to make other inventory usable.

During the pendency of the case, Plaintiffs dismissed their claims on the Michigan Pneumatic parts and tools along with the claims on the parts and tools intended for TorcUp. Also, Plaintiffs dismissed their claims for labor costs associated with making parts usable as described in paragraph 4 of the Inventory Acknowledgment.   In fact, Plaintiffs abandoned all claims described in the inventory acknowledgment letter.  (See ECF # 104, pg 5).   Plaintiffs' witness Joseph Molino, Chief Financial Officer of Plaintiffs,  agreed that $27,082.53 in an accounts receivable write-off were ultimately paid and are no longer part of the claims against Defendants. (Molino dep. Pg. 115).

When the Court prepared to try the case in 2020, the parties submitted Trial Briefs that created some confusion as to what claims were presently pending and were being pursued by Plaintiffs.  The Court requested clarification and Defendants responded that the only remaining claims were those concerning the MacTurn and the purchase price adjustment.  Plaintiffs agreed.  (ECF 135 pg. 4). At trial Plaintiffs now seek $100,928 in working capital adjustments. However, the evidence presented at trial by Plaintiffs appears unrelated to the claimed amounts in either the Amended Complaint or the inventory acknowledgment letter, which under the terms of the APA was to be final and binding absent manifest error.  Again, those claims contained in

11

the inventory acknowledgment letter were expressly abandoned by Plaintiffs on the eve of trial in 2020.

**Plaintiffs' Evidence at Trial**

Plaintiffs offer the testimony of Joseph Molino, Plaintiffs' CFO who testified that Plaintiffs conducted their inventory roll back in accordance with GAAP and that the actual inventory was performed by Michael Sivula, Nicholas Russell and Michael Turick.  Despite the APA's requirement that Plaintiffs use Defendants' past practices in determining the inventory roll back, Molino testified Plaintiffs did not apply them, nor did they even know what Defendants' past practices were.  These included Defendants' obsolescence policy.   Because none of Plaintiffs' witnesses  testified to an amount, the only evidence of a damages calculation arising from the purchase price capital adjustment is found in exhibits Plaintiffs never moved to admit into the record.  Therefore, the Court is left to speculate as to that figure which the Court cannot do any more than a jury could.   Moreover, the amount sought in PX 32 contains an inventory adjustment which the Court finds was so fundamentally flawed that it cannot be relied upon.  Consequently, because Plaintiffs have failed to offer any evidence of the amount of the damages incurred for a purchase price adjustment, the Court finds in favor of Defendants on this claim.

Plaintiffs' witnesses Patrick Curry and James Aloi offered no testimony relevant to the Purchase Price Adjustment.

**Defendants' testimony and evidence at trial**

According to the Asset Purchase Agreement at Section 2.3, a working capital adjustment was to be made after a Closing Statement was prepared by Defendant.  (See Molino dep. Pg. 35).

12

The Closing Statement was to be based on the roll-back inventory and the Books and Records of Defendant. Plaintiffs' CFO Molino has described a working capital adjustment as a companies' accounts receivable and inventory minus accounts payable. The purpose of a working capital adjustment is to adjust for changes in a sale of a business from the time of the closing of the sale agreement and actual transfer of assets that would present a more accurate picture of the value of the company as customer orders are presumably still coming in during and after the sale as well as product is going out and raw materials are being purchased. (See Molino transcript pg 32-33). "So the concept is the buyer and seller negotiate a -- what's called a "working capital target," and usually, based on the average working capital over some period of time, let's call it a year, and at the closing, the working capital – the actual working capital is compared to what the target was." ( Id at 34).

An inventory roll back is a snapshot in time of the value of a company's inventory. The inventory is based on a physical survey of the inventory, counting each item, and then comparing that count to the record of receipts, shipments, transfers, returns, losses and spoilage. The value of each item was to be determined by using Defendants' past accounting practices.

So the formula for calculating the working capital adjustment would be:

Net book value of accounts + net book value of inventory based on roll back inventory - assumed payables + customer deposits= Closing Statement.(or Closing Net Working Capital Amount.)

At trial, Defendants offered the testimony of Michael Sivula, Chief Financial Officer for Defendants, who testified that Plaintiffs' employees were removing inventory, primarily parts, loading it into trucks and transporting it to Plaintiffs' Pennsylvania facility. Sivula further

testified that these parts were never entered into the inventory recording system nor were they ever accounted for in the final inventory. (Trial transcript pg. 35-36).

Defendants' representatives testified that not only were Plaintiffs' employees taking inventory out by hand and transporting it to Plaintiffs' Pennsylvania facility without recording it in the accounting tracking system, but they did not account for inventory that was outsourced to third parties for additional machining.  (Trial transcript pg. 40).

Defendants testified that a part's value changes in relation to where it is in the machining process.  Some parts require more than one step in the process and that part's value changes as it becomes closer to the finished product, yet Plaintiffs did not track or record the inventory's location in the machining process therefore, its inventory was not in accordance with Defendants' past practices and did not accurately reflect the value of the inventory. (Trial transcript pg. 43).

Sivula testified he conducted a review of Plaintiffs' roll-back inventory and found many discrepancies in the physical count and found material differences in the same.  Also, Sivula testified that Plaintiffs failed to apply Defendants' obsolescence policy with regard to outdated inventory but instead applied their own obsolescence policy.  (Trial trascript pg. 70).   Moreover, instead of providing a roll-back inventory within 20 days of the sale as required under the APA, Plaintiffs provided their roll-back inventory 62 days after the closing date of the APA.  Plaintiffs used their own inventory system and did not use Defendants' SYSPRO inventory system but instead entered all inventory by hand into Plaintiffs inventory system.

When Sivula was asked to account for the discrepancies between the inventory at closing and the roll back inventory he testified it was due to a failure to conduct a mid-August inventory to capture work in process, failure to capture inventory physically removed by Plaintiffs'

14

employees after closing without recording it, failure to capture outsourced inventory and failure to use Defendants' inventory procedures and practices when Plaintiffs conducted the roll back inventory.  (Trial transcript pg 73).

Rick Sabath testified the roll back inventory was off by $200,000.  Given these discrepancies Defendants testified it was impossible for Plaintiffs to have engaged in an accurate roll back inventory.

Plaintiffs testified that eighty-four parts and inventory were unsaleable and had to be scrapped.  These parts totaled $74,487.69.  However, the support for this claim was never filed with the Court nor presented to any witness and is therefore excluded.  Moreover, this figure was not part of its claimed purchase price working capital adjustment testimony and is not a component thereof.  Therefore, Court finds against Plaintiffs and for Defendants on this claim.[3]

The Court further finds for Defendants on Plaintiffs' working capital adjustment claim as Plaintiffs failed to move into evidence PX-32 and PX-27, which provide the only evidence of a damages calculation.  Moreover, Plaintiffs have presented a moving target as to the inventory rollback ultimately abandoning any claims related to the inventory acknowledgment letter. Finally, the evidence offered for trial on the working capital adjustment bears no relation to the inventory issues raised in Plaintiffs' Amended Complaint.

Therefore, the Court finds for Defendants and against Plaintiffs on the working capital adjustment claim.

_____

[3]  Moreover, any claims expressly relating to inventory were abandoned by Plaintiffs. (See ECF # 104 at pg.5).

**Okuma MacTurn**

According the Amended Complaint, an Okuma MacTurn CNC machine was part of the APA purchase but the machine was not properly maintained and did not perform as warranted. As a result, Plaintiffs incurred over $32,714.36 in parts and labor to repair the machine and incurred another $100,000 in operating losses and productivity.

As evidence Plaintiffs presented the testimony of James Aloi, Vice-President of Finance for Plaintiffs, who testified it was hard to get quality parts from the MacTurn machine. (Aloi transcript pg.. 15). Aloi also testified the machine was inoperable for a four month period. (Id. at pg.19). Patrick Curry, Operations Manager for Plaintiffs, testified that the MacTurn only worked for a few days after it was transported from Ohio to Pennsylvania, but shortly thereafter it began experiencing problems. (Curry transcript pg. 21). Relying on Aloi and Curry's testimony and PX-14, a spreadsheet with supporting invoices showing the repairs needed and expended on the MacTurn, Plaintiffs seek a total amount of $151,428,74. (See also Aloi transcript pgs. 26-30, Curry transcript pgs. 24-32).

Rick Sabath, Defendants' owner, testified that he informed Plaintiffs that the MacTurn had frequent service issues prior to the Closing date. (Trial Transcript pg. 113). This was due in part to the fact that there were no Okuma certified service techs near Defendants' business so Defendants had "an issue getting service." (*Id.* At 109). Due to the problems with the Okuma, Defendants purchased two separate machines to do the work of the Okuma and stopped using it in their business. (*Id* at 110).

Having reviewed the testimony and evidence, the Court finds for Defendants on Plaintiffs' breach of contract for Defendants' warranties on the condition of the MacTurn.

16

Plaintiffs' damages calculations and invoices on the MacTurn were never admitted into evidence. Moreover, the evidence presented does not provide a method absent those excluded exhibits for the Court to derive a damages figure. However, even if the Court were to consider PX- 14, it lists $29,599.69 in transportation and storage expenses unrelated to repair costs. Thus, total repair damages would be $96,669.28. Consequently, because no such evidence was before the Court, the Court finds for Defendants on Plaintiffs' MacTurn repair issues claim.

**Okuma LT200 Replacement**

According to Plaintiffs, a second Okuma, an LT200 machine, was part of the APA sale but Defendants sold the machine prior to Closing. (Amended Complaint pg 5, para. 23). Plaintiffs purchased a replacement for $370,757.65. (PX-15, Aloi pg. 36, Curry pg 39-47.) This figure is derived from PX-15, which includes invoices and a spreadsheet showing the cost of the machine which was purchased nearly a year and a half after the close in March of 2016. Schedule 3.17(b) of the APA lists two Okuma Machines that were part of the APA. (See PX-21, 130-5, HY1925). Plaintiffs' due diligence appraisal of the machine valued the Okuma LT200 at $300,000.

Plaintiffs never moved to admit into evidence PX-15. However, Aloi testified the cost of the replacement machine was $330,000.00 (Aloi transcript pg. 38).

More problematically for Plaintiffs, Molino testified the LT200 was not part of the APA. (See Molino depo. Pg. 110).

Q. So what do the words "outsource" mean next to the Okuma type LT200 when you wrote them?

A. I believe Rick Sabath represented to me that the company didn't really need it, that

you could get by by outsourcing those needs elsewhere. He assured me that we'd be fine

without the second Okuma.

Q. And so that would mean in the ordinary course of business of Air Tool, prior to

August 14, 2014, that's how they conducted business, they didn't necessarily need an Okuma

MacTurn?

A. That was his representation.

Q. And you went through a closing subject to that representation, didn't you?

A. Absolutely.

Regardless of whether the LT200 was part of the APA sale or was mistakenly included in

the Fixed Asset list, both sides acknowledge it was not to be part of the sale.   Even though

Plaintiffs' Amended Complaint alleges the LT200 was necessary to conduct the business as

currently conducted,  the Court finds the undisputed evidence demonstrates that Defendants sold

the LT200 months before the close of the APA and informed Plaintiffs of the same. (See also

PX-19, pg. HY 887 stating that the LT 200 was to be excluded from the APA).   Section 2.1.1 of

the APA defines "Included Assets" as "includes the right, title and interest of Seller in and to the

following assets, properties and rights as of the Closing Date."  Because the undisputed evidence

demonstrates Defendants had no right, title or interest in the LT200 as of the closing date, the

LT200 would not be an "Included Asset."   Furthermore,  it could not have been a breach of the

express language of the APA warranty that the equipment was sufficient to perform the work as

"currently conducted" at the time of closing as it was sold months prior to the closing.  Also,

Plaintiffs waited for more than a year and a half to purchase the new replacement Okuma,  which

the Court finds as conclusive evidence that it was not necessary for the conduct of the business.

18

Lastly, Plaintiffs offered no evidence why they would be entitled to the value of a new machine to replace the well-used LT200. Therefore, Plaintiffs knew the LT 200 was sold months prior to closing, knew the LT200 was not an Included Asset" and was not being used in Defendants' business as "currently conducted" at the time of the closing.

Therefore, the Court finds for Defendants and against Plaintiffs on the replacement costs for a second Okuma.

**<u>Findings of Fact</u>**

Having reviewed the testimony and exhibits admitted into evidence the Court makes the following factual findings:

1. Plaintiff ATSCO Holdings Corp. ("ATSCO") is a Delaware corporation with its principal place of business in Pennsylvania. (Amended Complaint, at ¶ 1).

2. Plaintiff Hy-Tech Machine, Inc. ("Hy-Tech") is a Delaware corporation with its principal place of business in New York. (Amended Complaint, at ¶ 2).

3. Defendant Air Tool Service Company, n/k/a X5432, Inc. ("Air Tool") is an Ohio Corporation. (Answer and Counterclaim, at ¶ 1; Hearing Tran. pgs. 9-10, 87, 94).

4. Defendant Rick J. Sabath ("Sabath") is the sole shareholder of Air Tool. (Answer and Counterclaim, at ¶ 2; Hearing Tran. p. 87).

5. Plaintiffs approached Defendants to purchase Air Tool's machining business. (Hearing Transcript pg 102).

6. Prior to the purchase Plaintiffs engaged in due diligence wherein they engaged in a comprehensive assessment of Defendant Air Tool's business, including a valuation of the

equipment, inventory, accounts receivable and other assets from April 2014-August 2014. (Plaintiffs' Exhibits 16-22, Hearing Transcript pgs. 102-105).

7.  On August 13, 2014, Plaintiffs and Defendants executed an Asset Purchase Agreement ("APA").  (Plaintiffs' Exhibit 16).

8.  The APA established the sale price of Air Tool at  $7,658,540.00.  (Plaintiffs' Exhibit 16 at Section 2.3 pg. 10).

9.  The APA further established that $7,241.040.00 was due at the time of the closing while an additional $387,500.00 to be held in escrow.  (Plaintiffs' Exhibit 16 Section 2.3.4 pg. 12).

10.  The APA established a purchase price adjustment based on the difference between the Base Net Working Capital Amount of $858,689 and the Closing New Working Capital Amount. The Closing Net Capital Amount was to be determined by the difference between the sum of the net book value of accounts and the net book value of  the inventory based on the roll back inventory and the sum of the assumed payables and customer deposits.  (Plaintiffs Exhibit 16, Section 1.2 page 5, Section 2.3.2.1, 2.3.2.2 and 2.3.2.3 pg. 11).

11.  A physical inventory count was to be conducted twenty days after the closing date of August 13, 2014, in accordance with Defendants' past practices and reasonable procedures of Plaintiffs.   (Plaintiffs' Exhibit 16, Section 2.3.21 pg. 11).

12.  A roll back inventory was to be performed by Plaintiffs' employees back to the effective time, which was 4:59 pm of the closing date of August 13, 2014 and a statement of the roll back -i.e.-an inventory acknowledgment letter should have been sent by Plaintiffs to

20

Defendants not later than twenty days after closing.  (Plaintiffs Exhibit 11, Section 2.3.2.1 pg. 11).

13.  The inventory count was taken after an indeterminate amount of inventory had been removed by Plaintiffs' employees and never included in the inventory count or roll back inventory.  (Hearing transcript pg. 22-23, 36, 141-143).

14.  Work in process was not accounted for in the inventory because there was no record of where the inventory was in the manufacturing process to account for it. (Hearing Transcript pg. 71).

15.  The inventory count and roll back inventory did not include inventory located at third party locations. (Hearing transcript pgs. 44-46.)

16.  Defendants' former employee and Plaintiffs consultant Michael Sivula, charged with conducting the inventory count, reviewed Plaintiffs' roll back inventory and found many discrepancies.  (Trial transcript pg. 44).

17.  The inventory count and roll back were not conducted in accordance with Defendants' past practices and were not consistent with Air Tool's audited statements.  (Hearing Transcript pg. 34-46).

18.  Plaintiffs did not know of, nor did they apply, Defendants' obsolescence policy to the inventory count or roll back.  (Molino transcript pgs. 79-80, 85-86, 88, 104-107).

19.  The inventory acknowledgment letter was not provided to Defendants within twenty days as required by the APA and none of Plaintiffs' purchase price adjustments based on inventory are derived from the amounts provided in the inventory acknowledgment letter. (Plaintiffs Exhibit 22.).

20.  Plaintiffs' inventory roll back was off by at least $200,000.  (Hearing transcript pg. 143).

21.  Plaintiffs' working capital adjustment amount calculations were only presented in two documents never admitted  into evidence.  Also, their primary working capital calculation was never listed in their Trial exhibits.  (ECF # 116, pgs 9-10).

22.  Because of Plaintiffs' failure to comply with the requirements of the APA in conducting an inventory count and inventory rollback and failure to move into evidence their primary working capital adjustment evidence, Plaintiffs have not presented competent, reliable damages evidence upon which to base its purchase price adjustment claim.

23.  As part of the APA Plaintiffs purchased an Okuma MacTurn from Defendants. (APA Fixed Asset Schedule PX-21, pg HY 1925).

24.  The APA contained the following relevant warranties:

The Fixed Assets are (i) in good operating condition and repair, subject to normal wear and tear, (ii) have been reasonably maintained consistent with the standards generally followed in the industry, (iii) are suitable for their present uses, and (iv) are sufficient in nature, quality and quantity to permit Purchaser to conduct the Business from and after Closing as currently conducted.  (PX-16, pg 22).

25.  The MacTurn machine was purchased by Defendants in 2006 when the machine was two years old.  (Hearing transcripts pgs. 89-9, Plaintiffs Ex. 17, pg HY0983).

26. During its time with Defendants, the MacTurn did not operate at full capacity and experienced many service issues.  Hearing Transcript pgs 106-113, 130-132, 109-111).

27.  The MacTurn service issues were communicated by Defendants to Plaintiffs during the due diligence period.  (Hearing Trans pg. 113).

28.  Air Tool purchased two Haas machines in 2012 to make up for the production loss from the MacTurn service issues.  (Hearing transcript. Pgs. 106-113, 130-132).

29.  Defendants used the MacTurn and Haas machines together from 2012-2014 to fulfill customer orders.  (Hearing Transcript pgs. 110, 130-133).

30.  The Okuma LT200 was sold four months prior to closing and therefore could not have been part of the business as "currently conducted" at the time of closing.  (Hearing Transcript pg.59-60, 76-78.)

31.  Plaintiffs were informed of the pending sale on April 25, 2014 (Plaintiffs' Exhibit 19, pg. HY829).

32.  Molino testified he knew the LT200 had been sold prior to closing.  (Molino transcript. Pg. 110).

33.  Plaintiffs sole damages calculation evidence for MacTurn service expenses is found at PX 14.

34.  Even if it were considered by the Court, Plaintiffs' Exhibit 14 lists $29,599.69 in MacTurn related expenses that are not compensable as they relate solely to the costs incurred for moving the MacTurn machine to Pennsylvania and storing the same and are unrelated to repairs incurred.

35.  PX-14 was never admitted into evidence nor stipulated to by the parties as evidence.[4]

---

[4]  The Court carefully considered whether barring certain exhibits of Plaintiffs' for failure to move them into evidence or obtain a stipulation would be "too harsh" and whether prejudice to the Defendants should also be considered.

36.  Plaintiffs sole damages calculation evidence for Okuma LT200 replacement costs is found in PX-15.  Even if considered by the Court, PX-15 shows a replacement cost of $370,757.65.  However, Plaintiffs due diligence appraisal on the Okuma LT200 was $300,000. (PX-17, pg HY292).

37.  PX-15 was never admitted into evidence nor stipulated to by the parties.

38.  Plaintiffs were not conducting business after the sale as currently conducted by Defendants at the time of sale but planned to discard $1,000,000 dollars worth of equipment purchased from Defendants and to increase manufacturing capacity by thirty percent from the remaining equipment.  (Hearing transcript pgs 48-49, 51, 54-55, 115-117, HY 266).

**Conclusions of Law**

---

First, moving to admit exhibits into evidence is "Trial Procedure 101" and has been a bedrock requirement for any proponent seeking to first have the Court review for conformance with the Rules of Evidence and, if passing muster, have the trier of fact give whatever credence the evidence deserves.

Second, the parties' own "Stipulation and Agreed Order" and the Court's Trial Order hammer this requirement home and bar any argument to the contrary.

Third, the Court was never given the opportunity to rule on the admissibility of Plaintiffs' exhibits to determine issues such as relevance, reliability and speculative damages.

Defendants objected to Plaintiffs' exhibits during trial deposition, yet Plaintiffs failed to bring the same before the Court for a ruling as required and explained above.

Defendants have no burden nor obligation to do Plaintiffs' job of placing the exhibits before the Court for a ruling.  Defendants did move into evidence at trial some of Plaintiffs' exhibits, following the agreed upon procedure and the Court's Trial Order, which the Court has properly considered.

Turning to whether Defendants would be prejudiced by allowing Plaintiffs' exhibits into evidence, there is a substantial monetary amount Defendants would pay if the Court considered the barred exhibits credible.

Defendants should not be financially punished for Plaintiffs' breach of their own agreement, failure to adhere to the Court's Trial Order and failure to adhere to one of the most basic principles of trial; presenting objected-to evidence to the Court for an admissibility ruling, prior to any consideration by the Court as trier of fact in this case.

1.   The remaining claims in this case are breach of the APA arising from a working capital adjustment to the purchase price and representations and warranties for the Okuma MacTurn and Okuma LT200.

2.   When the Court's subject matter jurisdiction is based on the diversity of parties the Court applies the substantive law of the state in which it sits.  28 U.S.C. § 1332.  Phelps v. McClellan, 30 F.3d 658, 661 (6th Cir. 1994).

3.   The APA contains a choice of law provision requiring the Court to apply Ohio law when interpreting and construing the APA.  (PX 16 pg. 51).

4.   To establish a breach of contract claim under Ohio law a plaintiff must show:1) the existence of a contract; 2) performance by the nonbreaching party: 3) failure to perform contractual obligations by the party alleged to be in breach; and 4)  damages arising from the breach.  *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.,* 570 F. Supp. 3d 552, 560 (N.D. Ohio 2021); *Telxon Corp. v. Smart Media of Delaware, Inc.,* Case Nos. 22098, 22099, 2005 WL 2292800, at *20 (Ohio App. 9th Dist. 2005).

5.   Damages in a breach-of-contract case are intended to compensate the non-breaching party for the losses suffered as a result of a breach. Thus, money damages awarded for breach of contract are designed to put the non-breaching party in the same position it would have been in if the contract had not been violated.  *Quest Workforce Sols., LLC v. Job1USA, Inc.,* 2018-Ohio-3304, ¶ 15, 119 N.E.3d 817, 822

6.   As a general rule, although a plaintiff in a civil case must prove its damages with certainty, it is permitted to reasonably estimate the amount of the damages. *Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443,

25

2017 WL 1407306, ¶ 30.   Plaintiff must prove that it suffered damages, but is not necessarily required to prove the amount of the damages with absolute precision. *Secy. of Veterans Affairs v. Shaffer,* 5th Dist. Richland No. 14 CA 61, 2015-Ohio-2237, 2015 WL 3562575, ¶ 53 ("It is uncertainty as to the existence of damages rather than uncertainty as to their amount which precludes recovery.").  This is particularly true in cases where the plaintiff is unable to precisely calculate its damages because of the defendant's actions.  In such cases, the plaintiff's proof of damages is sufficient if it provides a reasonable basis for estimating the damages. *Quest Workforce Sols., LLC v. Job1USA, Inc.,* 2018-Ohio-3304, ¶ 16, 119 N.E.3d 817, 822–23.

7.  Failure to move for admission of trial exhibits bars their consideration.  Stipulation and Agreed Order (ECF # 121 ¶s 7-8), Trial Order ECF # 112).

8.  Plaintiffs failed to prove their breach of contract claim for a working capital adjustment because their inventory roll back was not reliable, did not account for inventory removed by Plaintiffs, work in process, work being performed by third party vendors and was not performed in accordance with the past practices of Defendants.

9.  Plaintiffs working capital adjustment evidence on damages was never properly placed into evidence and therefore, Plaintiffs have not provided evidence from which the Court could derive a damage amount.

10.  "To establish a claim for breach of express warranty under Ohio law, plaintiff must prove: (1) the item in question was subject to a warranty; (2) the item did not conform to the warranty; (3) the seller was given a reasonable opportunity to cure any defects; and (4) the seller failed to cure the defects within a reasonable period of time or after a reasonable number of attempts." *Risner v. Regal Marine Indus., Inc.*, 8 F. Supp. 3d 959, 988 (S.D. Ohio 2014).

11.  Defendants did not breach the APA warranty by not including the Okuma LT200 in the sale of the Fixed Assets because it was not necessary to "permit Plaintiffs to conduct the Business from and after Closing as currently conducted."  Defendants, with full knowledge of Plaintiffs, sold the LT200 months prior to the closing and were not conducting the business at the time of closing using the LT200.

12.  Although Plaintiffs have produced evidence that Defendants breached the warranties in the APA that the Okuma MacTurn included in the APA sale was not " (i) in good operating condition and repair, subject to normal wear and tear, (ii) have been reasonably maintained consistent with the standards generally followed in the industry, (iii) are suitable for their present uses," they failed to properly move for the admission of the exhibits they rely upon to demonstrate the damage amount incurred for such a breach and therefore, failed to satisfy their obligation to establish a breach.

13.  Defendants proved by a preponderance of the evidence that the roll back inventory was replete with errors and could not be used to calculate a Closing Net Capital Working Amount.

14.  Plaintiffs failed to establish damage amounts by a preponderance of the evidence.

15.  Plaintiffs failed to prove by a preponderance of the evidence that the MacTurn machine was not reasonably maintained.

16.  Therefore, the Court grants judgment for Defendants on Plaintiffs' remaining claims. Having previously determined Defendants are entitled to the escrowed amount of $387, 500 the Court orders payment of the same along with interest in accordance with the Escrow Agreement.

IT IS SO ORDERED.

                              /s/Christopher A. Boyko
                              CHRISTOPHER A. BOYKO
                              Senior United States District Judge

28